# EXHIBIT 1

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OKLAHOMA


PETSMART, INC.,                        )
                                       )
                    Plaintiff,)
                                       )Case Number
vs.                                    )17:CV-0361-CVE
                                       )
DANCOR CONSTRUCTION, INC., and         )
DANIEL J. POLICICCHIO, SR.,            )
                                       )
                    Defendants.)
_____



30(b)(6)VIDEO DEPOSITION OF JAMES ALLEY

TAKEN ON BEHALF OF THE PLAINTIFF

ON JULY 16, 2018

IN OKLAHOMA CITY, OKLAHOMA




REPORTED BY:  BRENDA SCHMITZ, CSR, RPR
              CITY REPORTERS, INC.
          117 Park Avenue, Fourth Floor
          Oklahoma City, Oklahoma 73102
                 (405)235-3376

Page 2

1   APPEARANCES:
2
3   FOR THE PLAINTIFF:
4       MR. ROBERT IVY
        Cotter Ranch Tower, 18th Floor
5       100 North Broadway
        Oklahoma City, Oklahoma  73102
6       Telephone:  405-232-0803
7
8   FOR THE DEFENDANT:
9       MR. GREGG J. LYTLE
        McDaniel Acord, PLLC
10      9343 East 95th Court
        Tulsa, Oklahoma  74133
11      Telephone:  (918) 382-9200
        Email:  Glytle@ok-counsel.com
12
13
14  VIDEO TECHNICIAN:  Mr. Robert Rusch, Johnson Video
15
16
17
18
19
20
21
22
23
24
25

Page 4

1   Number 20  Answer to Amended Complaint ....179
2   Number 21  January 4, '17 email ...........185
3   Number 22  January 4, '17 email ...........190
4   Number 23  January 9, '17 email ...........193
5   Number 24  January 11, '17 email ..........195
6   Number 25  February 2, '17 email ..........196
7   Number 26  February 2, '17 email ..........199
8   Number 27  February 2, '17 email ..........200
9   Number 28  February 3, '17 email ..........201
10  Number 29  February 14, '17 email .........202
11  Number 30  February 20, '17 email ........203
12  Number 31  March 20, '17 email ...........204
13  Number 32  March 15, '17 email ...........205
14  Number 33  March 20, '17 email ...........207
15  Number 34  March 22, '17 email ...........208
16  Number 35  March 22, '17 email ...........209
17  Number 36  March 22, '17 email ...........212
18  Number 37  March 30, '17 email ...........214
19  Number 38  April 3, '17 email ............214
20  Number 39  April 3, '17 email ............215
21  Number 40  April 17, 2018 email ..........217
22
23
24
25

Page 3

2   INDEX
3
4   DIRECT EXAMINATION BY MR. IVY ............. 6
5
6   Plaintiff's Exhibits
7       Number 1  30(b)(6) Notice .................23
8       Number 2  Dancor Responses ................29
9       Number 3  Supplemental Responses ..........29
10      Number 4  Second Supplemental Responses.....30
11      Number 5  Qualification Review .............36
12      Number 6  Qualification Review .............38
13      Number 7  Courthouse News Service ..........40
14      Number 8  Construction Contract ............52
15      Number 9  Payment Application No. 1 ........60
16      Number 10  Payment Application No. 2 .......71
17      Number 11  Payment Application No. 3 .......83
18      Number 12  Copy of check to Demolition......86
19      Number 13  Copy of check to Demolition......86
20      Number 14  Vendor Summary ..................96
21      Number 15  PetSmart payments ...............96
22      Number 16  Payment Application No. 4 ......104
23      Number 17  Copy of check to Allegiance ....109
24      Number 18  Payment Application No. 5 ......127
25      Number 19  Sworn Statement ................147

Page 5

1   STIPULATIONS
2       It is hereby stipulated and agreed by and
3   between the parties hereto, through their respective
4   attorneys, that the video deposition of JAMES ALLEY
5   may be taken on behalf of the Plaintiff on JULY 16,
6   2018 in the City of Oklahoma City, Oklahoma by
7   Brenda Schmitz, Certified Shorthand Reporter within
8   and for the State of Oklahoma, taken by notice
9   pursuant to the Federal Rules of Civil Procedure.
10      It is further stipulated and agreed by and
11  between the parties hereto, through their respective
12  attorneys, that all objections, except as to the
13  form of the question and the responsiveness of the
14  answer, are reserved until the time of trial, at
15  which time they may be made with the same force and
16  effect as if made at the time of the taking of this
17  deposition.
18
19
20
21
22
23
24
25

2  (Pages 2 to 5)

Page 6

1    VIDEO TECHNICIAN: We're now on the record
2  for the video deposition of James Alley, today is
3  Monday, July 16th, 2018, the time is now 9:56 a.m.
4  At this time will counsel please identify themselves
5  for the record.
6    MR. IVY: Robert Ivy from the Law Office
7  of Robert H. Alexander, Jr. on behalf of the
8  plaintiff, PetSmart.
9    MR. LYTLE: Gregg Lytle for the
10  defendants.
11    VIDEO TECHNICIAN: Would the court
12  reporter please swear the witness?
13    And thereupon the following witness was produced
14  by the Plaintiff:
15          JAMES ALLEY,
16  the witness hereinbefore named, being first duly
17  cautioned and sworn to testify the truth, the whole
18  truth, and nothing but the truth, testified on his
19  oath as follows:
20          DIRECT EXAMINATION
21  BY MR. IVY:
22    Q.  Would you please state your name for the
23  Court and the Jury?
24    A.  James Alley.
25    Q.  Mr. Alley, you are an employee of the

Page 7

1  Dancor -- of Dancor Construction, Inc.; is that
2  true?
3    A.  Yes.
4    Q.  We had -- we have -- we deposed you once
5  before, correct?
6    A.  Correct.
7    Q.  I went down to Florida and took your
8  deposition when you were presented by Dancor, I'm
9  going to shorten Dancor Construction, Inc. to just
10  Dancor, okay?
11    A.  That's fine.
12    Q.  When Dancor had designated you as Dancor's
13  30(b)(6) witness, and at that time you had told me
14  that you only were -- you were only able to testify
15  on behalf of Dancor regarding one of the 21 topics
16  that -- that were identified in PetSmart's 30(b)(6)
17  Notice. True?
18    MR. LYTLE: Object to the form. You can
19  answer.
20    THE WITNESS: I believe we testified to
21  more than one.
22    Q.  That -- that wasn't my question, so listen
23  to my question, please. We've done this before, but
24  just so that we do it again, let me be clear about
25  the deposition process.

Page 8

1    I'm going to ask you a series of questions and
2  you have to give me your answers out loud, we have
3  to try not to talk over each other, okay? Listen
4  carefully to my question, because they're -- they
5  are going to be very specific. If you have -- if
6  you're not sure about my question, you can ask me,
7  but otherwise, if you answer the question, it's
8  going to be assumed, because we're creating a record
9  here, that you understood the question. Do you
10  understand that?
11    A.  I understand that.
12    Q.  Okay. The question that I asked you was,
13  at the time that -- the first time I took your
14  deposition in Florida, you testified that you were
15  only able to testify on behalf of Dancor regarding
16  one of the 21 topics?
17    MR. LYTLE: Object to the form. You can
18  answer.
19    THE WITNESS: Can you explain further?
20    Q.  Sure. You testified that there were
21  several topics that you were able to testify from
22  your personal knowledge, but as Dancor as a whole,
23  you were only able to testify about one topic, true?
24    A.  That is true, correct.
25    Q.  Okay. Now, you understand that you're

Page 9

1  here pursuant to a court order from the Federal
2  Court ordering Dancor Construction, Inc. to present
3  a witness that's able to testify fully about all
4  matters within Dancor Construction, Inc.'s
5  knowledge? Do you understand that to be the case?
6    A.  Yes.
7    Q.  And are you prepared today to give that
8  testimony in that depth?
9    A.  Yes.
10    Q.  All right. Obviously you have done some
11  work since the last time we talked in Florida to
12  prepare yourself with that information. What have
13  you done to prepare for this deposition today?
14    A.  I have reviewed the documents that are
15  referenced here as exhibits, and presented the
16  documents that we have in our folders on the desk
17  and around me.
18    Q.  I'm sorry, the second part of that, you
19  said really quickly. You reviewed the documents
20  that?
21    A.  That were here, that were presented to you
22  previously.
23    Q.  The documents that -- that counsel
24  produced to me that are Bates labeled Dancor 1
25  through something like 5700, something like that?

3  (Pages 6 to 9)

Page 10

1     A.  Correct.
2     Q.  Okay.  You reviewed those.  And what else
3   did you review?
4     A.  I reviewed the statements here, the
5   payment applications and requests for the project,
6   for payments of subcontractors and payments from
7   PetSmart.
8     Q.  Anything else that you reviewed?
9     A.  There's quite a few documents, so do I
10   need to get in depth through the 1 through 5700
11   pages that were reviewed or --
12     Q.  No, sir.  That you -- you've identified
13   the 1 through 5700, that's good enough for that, I'm
14   just wondering, and then you also identified the
15   payment applications?
16     A.  Uh-huh.
17     Q.  I'm just wondering if in addition to those
18   5700 pages and the payment applications, if there
19   was anything else that you included?
20     A.  That was the bulk of it, that included
21   everything.
22     Q.  Okay.  Did you have any conversations with
23   the CEO of Dancor, Daniel J. Policicchio, Sr.?
24     A.  I spoke with our legal counsel pertaining
25   to this and what I needed to know for this

Page 11

1   deposition.
2     Q.  Okay.  My question was, did you speak with
3   Daniel J. Policicchio, Sr. about this deposition?
4     A.  That I had to come, so, yes.
5     Q.  Okay.  You spoke to him and he said you
6   had to come?
7     A.  I needed to be here to represent Dancor
8   Construction, Incorporated.
9     Q.  Okay.  And other than that, did you have
10   any substantive talk with -- discussion with
11   Mr. Policicchio about the substance of the
12   deposition?
13     A.  It was the remaining of the items that I
14   would be here and I would need to review the
15   documents, and so the answer would be, I guess, yes,
16   short answer to your question.
17     Q.  Okay.  So yes, and what Mr. Policicchio
18   told you was, and again, I may be mispronouncing it,
19   so help me out, how do I pronounce it?
20     A.  It's Policicchio.
21     Q.  Policicchio.  So Mr. Policicchio told you
22   that -- you talked to Mr. Policicchio, how long did
23   the conversation last, in preparation for this
24   deposition?
25     A.  I could not tell you exactly.  It was a

Page 12

1   short phone call, saying that I needed to be here.
2     Q.  Okay.
3     A.  So probably 15 minutes that we were on the
4   phone call.
5     Q.  Okay.  So in preparation for this
6   deposition, you spent about 15 minutes talking with
7   Daniel J. Policicchio, Jr. about the substance of
8   this deposition, true?
9         MR. LYTLE:  Object to the form.
10         THE WITNESS:  No, that's not true.  The
11   name is incorrect, Daniel Policicchio, Sr.
12     Q.  Ahh.  So let's -- let's do that question
13   again.
14     A.  I just want to make it accurate.
15     Q.  Is it true that -- that you spoke with
16   Daniel J. Policicchio, Sr. for roughly 15 minutes
17   about the substance of this deposition in
18   preparation for the deposition?
19     A.  Yes.
20     Q.  Okay.  And in that 15 minutes, he told you
21   that you had to come and represent Dancor, right?
22     A.  Yes, I would be representing Dancor.
23     Q.  Okay.  And what else did he tell you?
24     A.  To speak with legal counsel and they would
25   discuss with you what you need to know for the case

Page 13

1   and go over the certain topics that you would be
2   needing to be presented.
3     Q.  Okay.  So he -- he basically -- in terms
4   of what you were going to testify to and -- and how
5   you were going to testify, he -- he directed you to
6   speak with legal counsel?
7     A.  Uh-huh.
8     Q.  Yes?
9     A.  Yes.
10     Q.  He didn't give you any direction himself
11   about any of the substantive topics in the
12   Deposition Notice?
13     A.  No, just review the documents.
14     Q.  Okay.  So, would it be fair to say that --
15   well, we know from the previous deposition that your
16   knowledge of the -- on behalf of Dancor Construction
17   as a whole, was limited to that one topic of the
18   punch list.  True?
19     A.  True.
20     Q.  And now you're here to testify about all
21   21 topics, true?
22     A.  True.
23     Q.  So, and we know that -- that Daniel J.
24   Policicchio, Sr. did not give you any substantive
25   information about the topics of the Deposition

4  (Pages 10 to 13)

Page 14

1    Notice when you talked to him, true?
2          MR. LYTLE:  Object to the form.
3          THE WITNESS:  True.
4          Q.   So the -- we can conclude then that the
5    entirety of your knowledge that you've gained since
6    the last deposition has come from your review of the
7    documents that -- that you identified, true?
8          MR. LYTLE:  Object to the form.
9          THE WITNESS:  Yes.
10          Q.   If there is other information in documents
11    that were not contained in the documents that you
12    reviewed, you wouldn't have knowledge of that, would
13    you?
14          A.   No, if I did not review them, I would not
15    have knowledge.
16          Q.   Okay.  What, if anything, did you do to
17    confirm on behalf of the Dancor corporation that the
18    documents that you reviewed were the entirety of the
19    documents that you needed to review?
20          A.   The documents that were provided to you
21    were the documents that are relevant to this case.
22    So those would be the ones that I would review if it
23    was relevant to the case.
24          Q.   Okay.  My question was a little bit
25    different, so let me ask the question again.  What

Page 15

1    did Dancor Construction do to ensure that the
2    documents that were produced to PetSmart were the
3    entirety of the documents that were responsive and
4    that would -- that would fully inform your testimony
5    as Dancor here today?
6          MR. LYTLE:  Object to the form.
7          THE WITNESS:  Dancor provided the
8    documents that we have pertaining to the case in
9    general to the entire project.  You have your
10    e-mails, we have all of our daily reports, photos,
11    files, subcontractor information, their contracts,
12    everything pertaining to the entire project.  So
13    everything that is involved with this project was
14    provided, so that would be what was reviewed and
15    what I needed to review that pertained to the
16    project in general.
17          Q.   Okay.  So, as -- and just so that we're --
18    let me be clear right upfront, we've been through
19    this before, once before, but just so we're clear on
20    this record, I want to be very clear that today
21    you're not testifying as James Alley, you understand
22    that, right?
23          A.   Yes.
24          Q.   You're testifying as the Dancor
25    corporation, true?

Page 16

1          A.   Yes.
2          Q.   And you understand that the Dancor
3    corporation has a duty to fully inform itself and
4    test its corporate memory, learn from whatever
5    sources that are available, everything that it needs
6    to know in order to answer the -- talk about the
7    topics that are in the 30(b)(6) Deposition Notice;
8    do you understand that?
9          MR. LYTLE:  Object to the form.
10          THE WITNESS:  Yes.
11          Q.   Okay.  Other than Mr. Policicchio, did you
12    talk to anybody else, and other than Mr. Policicchio
13    and your counsel, did you talk to anybody else to
14    prepare for this deposition?
15          A.   No.
16          Q.   All right.  So, we can conclude then that
17    the entirety of what Dancor corporation has done to
18    prepare for the deposition today is to review the
19    documents that were produced, the 1 through roughly
20    5700, and the payment applications for the project
21    and the 15-minute phone call that you've described
22    with Mr. Policicchio, true?
23          A.   True.
24          MR. LYTLE:  Object to the form -- well --
25          Q.   What did Dancor do to identify the roughly

Page 17

1    5700 documents that were produced?
2          A.   Can you be more specific?
3          Q.   No.
4          A.   What did we do?
5          Q.   I want to know what the process was, what
6    was the process by which Dancor identified the 5700
7    documents, roughly, that were produced?
8          A.   Well, the documents that are on the daily
9    correspondence is the main thing from the start to
10    the finish of the project, so if they are from day
11    one on the job site, there would be daily reports,
12    daily logs, e-mails, photos, and as the project
13    proceeded forward, every file that was saved in our
14    system and our files and folders were all produced,
15    you know, per request, that would be relevant to the
16    case.
17          If you wanted to know anything that was there
18    as a business file, it was pretty much here is the
19    file, this is everything that we have on the
20    project.
21          Q.   Okay.  When we spoke last time, you had
22    access only to or you had -- I don't know if you had
23    access to or if you only looked at your own files,
24    but for purposes of this deposition, did Dancor look
25    at all of its files?

5  (Pages 14 to 17)

Page 18

1    A.  Yes, we pulled all the e-mails and
2  reviewed them.
3    Q.  And did -- and you personally, when you,
4  as Dancor, when you -- were you the one who
5  identified those files?
6    A.  Those files were produced by Dancor as a
7  whole, and they were provided to me to review to be
8  here to provide testimony on them.
9    Q.  Okay.  So my -- I understand that the 5700
10  documents were provided to you by Dancor for review,
11  to you, James Alley.  What I want to know is, what
12  employee of Dancor actually identified those files
13  and gave them to you?
14    A.  That would probably be between myself,
15  which I did pull the business file and all those
16  documents and provided them, and any of the previous
17  correspondence I did not have would have been
18  submitted by Daniel Policicchio.
19    Q.  Okay.  You said "probably" in that.  I
20  need to know what happened.
21    A.  Well, Daniel Policicchio is the only other
22  person that has the access to these files, so Daniel
23  Policicchio would have pulled the e-mails and
24  documents that I did not produce.  So it would have
25  been between Daniel Policicchio and myself to

Page 19

1  produce the documents.
2    Q.  Okay.  Which documents did Daniel
3  Policicchio produce and which documents did James
4  Alley produce?
5    A.  James Alley produced the business file,
6  which would include project documents, pictures,
7  subcontractor files, all the subcontractor files,
8  the daily reports that would be in there, personal
9  e-mail communications that I had, all of those were
10  provided.  The e-mails that were provided by others
11  were the ones I did not have, which would have been
12  pulled by Daniel Policicchio.
13    Q.  I see.  So let me see if I understand this
14  correctly.  In terms of the business file, and I
15  hear you distinguishing between e-mail
16  communications and the business file.
17    A.  Uh-huh.
18    Q.  Is that a reasonable separation?  Those
19  are two different things?
20    A.  It would be.
21    Q.  Okay.  You had access, you, James Alley --
22  let me put it this way.  James Alley had access to
23  all of the -- all of Dancor's business records; is
24  that true?
25    A.  Yes.

Page 20

1    Q.  Okay.  But James Alley didn't have access
2  to all of the e-mail communications?
3    A.  No.
4    Q.  James Alley only had access to James
5  Alley's own e-mail communication; is that true?
6    A.  Yes.
7    Q.  Okay.  And the remainder of the email
8  communication was provided to James Alley by Dan
9  Policicchio?
10    A.  Yes.
11    Q.  And I don't want to say his whole name all
12  the time.  Can we just go by Dan?
13    A.  You can go by Dan, you can call him Dan.
14  If we -- or Daniel Policicchio, Sr. can be known as
15  Dan.
16    Q.  Okay.  Thank you.  All right.  Now, the
17  first time we talked down in Florida, you told me
18  that -- James Alley told me that -- or Dancor told
19  me that James Alley had no involvement in the
20  financial aspects of Dancor.  Do you recall that?
21    A.  I do.
22    Q.  All right.  Is it still true today that --
23  that James Alley has no involvement in financial
24  matters for Dancor?
25    A.  As of today, I am representing Dancor

Page 21

1  Construction, Incorporated, so I do have the
2  financials knowledge to be able to answer certain --
3    MR. LYTLE:  Listen, listen to his
4  question, he asked you something else.
5    Q.  Sure, so I'm going to ask that question
6  differently because you made -- made a good
7  distinction.  Before -- well, the day before
8  Mr. Policicchio called you and said you have to come
9  and represent the Dancor corporation, on that day,
10  did James Alley have any knowledge or responsibility
11  for financial matters for Dancor corporation?
12    A.  No.
13    Q.  Your -- the knowledge of financial matters
14  that you have for Dancor today is specifically for
15  purposes of this deposition; is that true?
16    A.  That is true.
17    Q.  And it's based on your review of the
18  documents that you've already told us you reviewed?
19    A.  True.
20    Q.  Ordinarily, who is the person at Dancor
21  that's responsible for financial matters?
22    A.  That would be Daniel Policicchio.
23    Q.  Did you -- did James Alley ask
24  Mr. Policicchio if he had given you all of the
25  financial documents that you would need for this

Page 22

1  deposition?
2      A.  I did not specifically ask, no.
3      Q.  And James Alley wouldn't know whether he
4  had gotten complete financial records, because James
5  Alley -- or from Mr. -- let me strike that and ask
6  this again.
7          James Alley wouldn't know whether he had gotten
8  complete financial records from Mr. Policicchio,
9  because James Alley didn't know anything about the
10 financial records before he talked to
11 Mr. Policicchio, correct?
12     A.  Correct.
13     Q.  So James Alley was taking it on faith that
14 Mr. Policicchio was giving him full records of the
15 financials, true?
16         MR. LYTLE:  Object to the form.
17         THE WITNESS:  Yes.
18     Q.  Did Dancor do anything to ensure that it
19 had produced all of the relevant financial records
20 that were in any way related to the project at
21 issue?
22     A.  Yes, all records were provided for the
23 financials.
24     Q.  So it's Dancor's position that Dancor has,
25 in the documents that it's produced, in those 5700

Page 23

1  some pages, has produced all of the financial
2  records that exist that are relevant to the Tulsa
3  store or PetSmart store project; is that true?
4      A.  That's true.
5      Q.  Okay.
6          (Plaintiff's Exhibit No. 1 marked.)
7      Q.  I'm showing you -- this is the same
8  30(b)(6) Notice that we went over once before, and I
9  just want you to confirm that that's the same
10 notice?
11     A.  This is the same notice that we went over
12 before, correct.
13     Q.  Okay.  The documents that the Dancor
14 corporation produced, did they all come from
15 computer files?
16     A.  Yes.
17     Q.  And the documents that Dancor produced
18 were -- they had general names associated with each
19 group of pdf files that were sent, and you've
20 described some things like e-mails or project
21 records, that sort of thing.  Are the way that the
22 pdfs are marked as they were produced the same as --
23 the same way that the files are labeled in the
24 computer?
25     A.  Yes.

Page 24

1      Q.  So now, I'm not just talking -- I'm not
2  talking about the deposition now, I'm talking about
3  the Dancor's Response to Requests for Production,
4  okay?  Did you -- did Dancor review the PetSmart's
5  Requests for Production of Documents?
6      A.  Yes.
7          MR. LYTLE:  I'm going to object to the
8  form.  This is outside the scope of the notice and
9  the person that signed -- signed the verification on
10 the interrogatories is a different person than
11 Mr. Alley, but --
12         MR. IVY:  I just asked about request for
13 production, I didn't ask about --
14         MR. LYTLE:  Okay.
15         MR. IVY:  -- about interrogatories.
16 BY MR. IVY:
17     Q.  In any event, did -- did Dancor review
18 the -- PetSmart's Requests for Production before
19 producing the documents?
20     A.  Yes.
21     Q.  Did -- did James Alley review the Requests
22 for Production before Dancor produced the documents
23 that it produced?
24     A.  No.
25     Q.  Did Daniel -- did Dan Policicchio review

Page 25

1  PetSmart's document request before the documents
2  were produced?
3      A.  I cannot answer that.
4      Q.  Well, the Dancor corporation is charged
5  with knowledge, particularly of the CEO.
6          MR. LYTLE:  Counsel, can you point out
7  which -- which item relates to the discovery
8  questions that he's supposed to be prepared for
9  today?
10         MR. IVY:  I tell you what, if you want to
11 get that specific on the notice, that's fine.
12 Dancor has played endless games with production, and
13 I'm trying to find out what's going on with the
14 production.
15         I just want to know whether everything has been
16 produced and whether there's anything else.  I have
17 Dancor sitting here now, I didn't have the
18 opportunity to know that Dancor was going to be
19 playing games with production and producing at the
20 very last second and producing, serially, past the
21 date that the Court ordered, so I would ask the
22 Court disregard whatever objection is leveled in
23 this regard and allow me to inquire about Dancor's
24 Responses to Request for Production.
25         MR. LYTLE:  And I would move to strike

7 (Pages 22 to 25)

Page 26

1    that entire soliloquy.  You can ask your question.
2          MR. IVY:  Sure.  You've made your record.
3    BY MR. IVY:
4          Q.   So Dancor corporation does not know
5    whether Dan Policicchio reviewed PetSmart's Requests
6    for Productions -- Production of Documents, true?
7          MR. LYTLE:  Object to the form.
8          THE WITNESS:  As of right now, everything
9    has been produced.  There is no files yet.  So did
10   Dan Policicchio himself read that as -- I would say,
11   yes, that he did, because these files have been
12   produced.
13         Q.   That's not my question.  My question was,
14   does the Dancor corporation know whether Dan
15   Policicchio sat and read PetSmart's Requests for
16   Production of Documents?
17         MR. LYTLE:  Object to the form.
18         THE WITNESS:  Yes, then.
19         Q.   Yes?
20         A.   Because they were -- they were produced.
21         Q.   Did -- what did the Dancor corporation do
22   to confirm its conclusion that Dan Policicchio had
23   read the PetSmart's Requests for Production of
24   Documents?
25         MR. LYTLE:  Continuing objection to this

Page 27

1    line of questioning.  It's outside the scope of the
2    notice.  You can answer, if you can.
3          THE WITNESS:  By producing the documents,
4    if you request for documents and they get produced,
5    then obviously it was produced by the two parties
6    that were available to do that, would be James Alley
7    and Daniel Policicchio, Sr.
8          Q.   Okay.  So your conclusion that the Dancor
9    corporation's conclusion that Dan Policicchio read
10   PetSmart's Requests for Production of Documents is
11   based on logic, rather than actual knowledge; is
12   that true?
13         MR. LYTLE:  Object to the form.
14         THE WITNESS:  Yes.
15         Q.   Okay.  Did Dancor corporation hold back
16   any documents that Dancor didn't want PetSmart to
17   see?
18         A.   No.
19         Q.   And how does the Dancor corporation know
20   that?
21         A.   There are only so many documents and they
22   were all stored, and locations, the financial
23   records have been provided, and all other case
24   documents, or not case, but file documents that were
25   put into the case, as in every folder, was provided.

Page 28

1          Q.   Now, as you sit here as Dancor
2    corporation, are you confident to testify under oath
3    on behalf of the Dancor corporation that all of the
4    financial matters that were requested by PetSmart,
5    all of the financial-related documents, that those
6    were produced by Mr. Policicchio?
7          MR. LYTLE:  Object to the form.
8          THE WITNESS:  Yes.
9          Q.   There was a section of the documents that
10   were produced that were identified as subcontractor
11   files, true?
12         A.   True.
13         Q.   And there was another section that was
14   identified as e-mails; is that true?
15         A.   True.
16         Q.   And so communications with subcontractors
17   might be contained in either one of those files; is
18   that true?
19         A.   More on the e-mails, communication would
20   be all via e-mail.
21         Q.   Okay.
22         A.   Subcontractor section is for subcontracts
23   and documents related to the actual subcontractor,
24   communications via e-mail.
25         MR. IVY:  Would you please mark that as

Page 29

1    Exhibit 2?
2          (Plaintiff's Exhibit No. 2 marked.)
3          Q.   I'm showing you what we've marked as
4    Deposition Exhibit 2, this is Dancor's initial
5    Responses to PetSmart's First Interrogatories and
6    Request for Production.  Do you see that?
7          A.   I do see it.
8          Q.   Okay.  And do you see at the back that Dan
9    Policicchio has signed the verification swearing
10   that the -- the responses are true and accurate?
11         A.   Yes, I see that.
12         Q.   Okay.  Did -- did James Alley review this
13   document?
14         A.   Yes.  Thank you.
15         MR. IVY:  Can you mark this as Exhibit 3,
16   please?
17         (Plaintiff's Exhibit No. 3 marked.)
18         Q.   I'm showing you what we've marked as
19   Exhibit Number 3.  And these, I believe, are -- I
20   think I handed you my only copy.  I think these are
21   the supplemental responses, Dancor's supplemental
22   responses, and there were two supplements.  I
23   believe this is the first supplement.
24         MR. IVY:  Am I right about that, Gregg?
25         MR. LYTLE:  Yes.

8  (Pages 26 to 29)

Page 30

1    Q.  Did Dancor review the First Supplement to
2  Dancor's Responses to PetSmart's Interrogatories and
3  Request for Production?
4    A.  That would be in here, so, yes.
5    Q.  And did James Alley review Exhibit 3?
6    A.  These were reviewed, yes.
7      MR. IVY:  Let me mark this as Exhibit 4,
8  please.
9      (Plaintiff's Exhibit No. 4 marked.)
10   Q.  Exhibit 4 has -- it appears to have the
11  same name as the original responses, but I believe
12  that Exhibit 4 is actually the Second Supplemental
13  responses.
14     MR. IVY:  Is that right, Gregg?
15     MR. LYTLE:  That is correct, and this
16  draft was sent to you for a discussion that did not
17  take place on Saturday when I did not get a call,
18  but, yes.
19     MR. IVY:  Yeah, move to strike the -- the
20  comment.  The e-mail string will speak for itself on
21  that and the context behind it.
22  BY MR. IVY:
23   Q.  Did -- so I'm going to refer to -- that's
24  4, right?
25   A.  Exhibit 4.

Page 31

1    Q.  I'm going to refer to what we've marked as
2  Exhibit 4 as the -- as Dancor's second supplemental
3  responses, okay?
4    A.  Okay.
5    Q.  And did Dancor review its second
6  supplemental responses to PetSmart's Interrogatories
7  and Requests for Production?
8    A.  Yes.
9    Q.  And did James Alley review those, Exhibit
10  4, also?
11   A.  Yes.
12   Q.  Thank you.
13   A.  Thank you.
14   Q.  I apologize, we may have covered this in
15  the previous deposition, but I want to be sure
16  that -- that I have this.  The Dancor corporation,
17  would it be fair to call it a closely held
18  corporation?
19   A.  Can you explain a little further, closely
20  held?  How do you mean?
21   Q.  Did -- the -- Dan Policicchio is the -- is
22  the president and CEO of Dancor; isn't that true?
23   A.  That is true.
24   Q.  Is -- does he own all the shares of
25  Dancor?

Page 32

1    A.  I do not have that information right in
2  front of me.
3    Q.  Okay.  Do you know if there are other
4  officers of Dancor corporation, other than Dan
5  Policicchio?
6    A.  Dan would be the main officer as
7  president, CEO.
8    Q.  Okay.  Currently, how many employees of
9  the Dancor corporation are there?
10   A.  I don't have that figure in front of me.
11   Q.  Okay.  Do -- as -- as an employee, as
12  James Alley, do you know how many employees there
13  are?
14   A.  Companies fluctuate with employees, it's
15  construction.  You could be 1 to 5 or 50 to 100 the
16  next day.
17   Q.  All right.  And as of today, you don't --
18  the Dancor corporation can't identify how many
19  employees it has right now?
20     MR. LYTLE:  Object to the form.
21     THE WITNESS:  I do not have an accurate
22  statement.
23   Q.  At the time that the PetSmart project
24  started, how many employees did the Dancor
25  corporation have?

Page 33

1    A.  I do not have that information directly in
2  front of me to answer.
3    Q.  Okay.  When was the last shareholder's --
4  shareholder's meeting for Dancor corporation?
5      MR. LYTLE:  Object to the form.
6      THE WITNESS:  I could not tell you an
7  exact date.
8    Q.  Who keeps the corporate books for Dancor
9  corporation?
10     MR. LYTLE:  Object to the form.
11     THE WITNESS:  As far as financial
12  information?  Cooperate books, that would be -- I'm
13  sorry, can you explain the cooperate books a little
14  bit further?
15   Q.  Let's start with financial.  Who keeps
16  the -- who does the bookkeeping for the corporation?
17   A.  Dancor does have an accounting firm that
18  does our accounting.
19   Q.  I'm sorry, I didn't --
20   A.  For financials.
21   Q.  I didn't understand that answer.  Did you
22  say Dancor does that?
23     MR. LYTLE:  No, he said Dancor has.  But
24  you can repeat it.
25     THE WITNESS:  Dancor has an accounting

9  (Pages 30 to 33)

Page 34

1  firm that does -- an outside firm that does our
2  financials.
3      Q.  And what's the name of that firm?
4      A.  I do not have that name directly in front
5  of me, I know it's in these records, I'd have to
6  pull it up.
7      Q.  There were some tax records that were
8  produced, is the -- is the accounting firm that did
9  the tax records the same accounting firm that does
10  the financials for the Dancor corporation?
11      A.  Yes.
12      Q.  When the accountant does financials, it's
13  based on -- the accountant doesn't just make that up
14  out of thin air, it's based on information that's
15  provided by the Dancor corporation, true?
16      A.  True.
17      Q.  Did the Dancor corporation produce the
18  financial records that were requested in a Request
19  for Production that it would have had to provide to
20  its accountant in order to -- for the accountant to
21  do its bookkeeping?
22          MR. LYTLE:  Object to the form.
23          THE WITNESS:  All -- yes.
24      Q.  Would the Dancor corporation please
25  identify which documents were produced that would --

Page 35

1  that are the underlying financial records that the
2  accountant would have used to do his bookkeeping?
3          MR. LYTLE:  I'm going to object to the
4  form, it's, again, outside the scope of this Notice.
5          THE WITNESS:  Based upon your question,
6  the financial information has been produced, so it
7  would be the pay applications, our taxes and the
8  payments to the subcontractors, that would be the
9  financial-related information to the PetSmart case.
10  Itch.  You all are looking at me weird, I had
11  an itch in my foot.
12      Q.  Does the Dancor corporation know what a
13  balance sheet is?
14          MR. LYTLE:  Object to the form.
15          THE WITNESS:  Yes.
16      Q.  Did the Dancor corporation produce balance
17  sheets as requested in the Request for Production?
18      A.  I believe so, yes.  It would be a part of
19  the tax balance sheet, it would be on our taxes that
20  were there, I remember reviewing that sheet.
21      Q.  Is the Dancor corporation's testimony that
22  the -- that what -- that the balance sheet that's
23  contained in the -- in their tax returns is the only
24  balance sheet that's created for the Dancor
25  corporation?

Page 36

1          MR. LYTLE:  Object to the form.
2          THE WITNESS:  That would be the balance
3  sheet that was produced for this particular case,
4  that's there.  That would be all of the information
5  that is there.  So, yes.
6      Q.  Okay.
7          (Plaintiff's Exhibit No. 5 marked.)
8      Q.  And just for a quick catch-up.  The Notice
9  was 1, the discovery requests were 2, the
10  supplemental were 3, and the second supplemental
11  were 4, and this is 5.  Do you have Exhibit 5 in
12  front of you?
13          MR. LYTLE:  Robert, just for the record,
14  is there a better copy of this?  It's just it's hard
15  to read, but just a -- I don't know if it's just my
16  copy or --
17          MR. IVY:  Can I see your copy?
18          MR. LYTLE:  Yeah.  It's okay, I've seen
19  it.  Just to make sure -- sorry, the one that will
20  be in the court file is -- is better, I just want to
21  make sure we've got a readable copy when we go to do
22  that.
23          MR. IVY:  Mine's a little better, too, if
24  you want to share.
25          MR. LYTLE:  No, I'm fine, thank you.

Page 37

1          MR. IVY:  Just the vagaries of a printer.
2  BY MR. IVY:
3      Q.  Do you recognize Exhibit 5?
4      A.  Yes, it's a qualification review and AA
5  305 document.
6      Q.  That's a -- that document is something
7  that's part of a -- it's a form, right?
8      A.  Yeah, it's a standard construction
9  qualification review.
10      Q.  And the purpose for the qualification
11  review, the reason why Dancor would have sent this
12  to PetSmart is that Dancor wanted to get business
13  from PetSmart, true?
14      A.  That would be true.
15      Q.  And PetSmart wanted to make sure that
16  Dancor was qualified to do that business, right?
17      A.  Correct.
18      Q.  And you see at the end of the exhibit on
19  page four, and I should say, this is the -- this is
20  the form part.  There is -- and I have a version of
21  it that has -- there were a lot of attachments, and
22  if you'd prefer to look at the one that has all the
23  attachments, I can show it to you.
24      A.  I wouldn't mind seeing it all as well.
25      Q.  Sure.  This is a brief portion of it.

10  (Pages 34 to 37)

Page 38

1   Six, right?
2       A.  That I believe from our previous
3   deposition is the rest of the stuff that I produced.
4   The rest of the stuff, the documents were.  Nope,
5   there's more.
6       (Plaintiff's Exhibit No. 6 marked.)
7       Q.  Just let me know when you've had a chance
8   to review it.
9       A.  I've reviewed Exhibit 6.
10      Q.  Okay.  Take a look at, if you would, page
11  four of the form, of the -- what does AIA stand for?
12      A.  The AIA?
13      Q.  Uh-huh.
14      A.  It's the Association of -- American
15  Institute of Architects, sorry.
16      Q.  If I would have looked a little further, I
17  would have seen that, too, I'm sorry.
18      A.  You made me think about it.
19      Q.  American Institute of Architects, all
20  right.  On page four of the American Institute --
21  American Institute of Architects form, do you see at
22  the bottom where Section 6, there's a signature
23  area?
24      A.  Yes.
25      Q.  And Exhibit -- this one is Exhibit 6 that

Page 39

1   we're looking at.  Exhibit 6, is -- is that signed
2   by the president and CEO of the Dancor corporation,
3   Dan Policicchio?
4       A.  Yes.
5       Q.  And do you see below that where it says
6   "Dan" -- "M. Daniel J. Policicchio, Sr., being duly
7   sworn, deposes and says that the information
8   provided herein is true and sufficiently complete so
9   as not to be misleading."  Do you see that?
10      A.  I do see that, yes.
11      Q.  All right.  And then it's notarized to
12  show that Mr. Policicchio had actually signed,
13  correct?
14      A.  Correct.
15      Q.  All right.  I'd like you to take a look at
16  Section 3.2 on page two of the form.  And
17  specifically at --
18      MR. LYTLE:  Do you mind -- he said page
19  two.
20      THE WITNESS:  Oh, sorry.  Page two of the
21  form of the AIA document, not the qualification,
22  sorry.
23      MR. LYTLE:  Just wanted to make sure this
24  is on the same page, 3.2.
25      THE WITNESS:  Do you need to see this as

Page 40

1   well?
2       MR. LYTLE:  No, I'm good.
3       Q.  And Section 3.2.2, do you see that?
4       A.  Yes, Claims and Suits, 3.2.2.
5       Q.  Right.  And it says, "Are there any
6   judgments, claims, arbitration proceedings or suits
7   pending or outstanding against your organization or
8   its officers?"  And Dancor corporation answered no.
9   True?
10      A.  That is the answer there on the page,
11  true.
12      Q.  Okay.  Was that answer true and
13  sufficiently complete so as not to be misleading?
14      A.  That's true.
15      (Plaintiff's Exhibit No. 7 marked.)
16      Q.  Let me know when you've had a chance to
17  look at Exhibit 7.
18      A.  All right.  Reviewed 7.
19      Q.  The -- the prequalification review form
20  that the CEO of Dancor or Dan Policicchio signed
21  stating that there were no lawsuits as mentioned in
22  that form is dated December 11th, 2013; is that
23  true?
24      A.  True.
25      Q.  I'd like you to turn to the last page.

Page 41

1   This is -- this is produced by Dancor, so this is
2   Dancor 5569.
3       A.  Okay.
4       Q.  How many lawsuits do you see against the
5   Dancor corporation listed there before December
6   11th, 2013?
7       A.  Looks like mechanics' liens.  There are
8   liens showing that someone is seeking money for a
9   job, looks like construction --
10      MR. LYTLE:  Just answer his question.
11      THE WITNESS:  How many?  Do you want me to
12  count them?
13      MR. LYTLE:  He asked you from December,
14  I'm sorry, what was the date, Robert?
15      Q.  Before December 11th, 2013.
16      A.  2013.  I'm sorry, I heard 2015.  Appears
17  to be eight.
18      Q.  In fact, there was a lawsuit filed on
19  December 2nd, 2013, Jacobs U.S. versus Dancor, filed
20  in Minnesota; is that true?
21      A.  According to the document in front of me,
22  yes.
23      Q.  And there was a lawsuit filed against
24  Dancor by LFS Glass and Glazing in New Orleans, also
25  on December 2nd, 2013, true?

11  (Pages 38 to 41)

Page 42

1    A.   True.
2    Q.   And there was a lawsuit filed against
3  Dancor by Southland Block, A Headwaters Construction
4  and Materials Company on August 30th, 2013, true?
5    A.   True.
6    Q.   And there was a lawsuit filed on June
7  28th, 2013 against Dancor by Bruce Concrete
8  Construction, Inc., in Madison, Illinois, true?
9    A.   True.
10   Q.   And there was a lawsuit filed against the
11 Dancor corporation in Minnesota on November 26th,
12 2012, Stockness Construction, Inc. versus Dancor,
13 true?
14   A.   True.
15   Q.   And there was a lawsuit filed against
16 Dancor Construction, Inc. in Minnesota on November
17 26th, 2012, that's also Stockness, maybe it's the
18 same one, but it -- yeah, I think that might be the
19 same one.  There was a lawsuit filed in Minnesota
20 against Dancor on April 11th, 2012, ITCO Allied
21 Engineering Company versus Dancor, true?
22   A.   True.
23   Q.   There was a lawsuit filed against Dancor
24 on December 9th, 2010 against Dancor in Kane County,
25 Illinois, Solutions Construction versus Dancor

Page 43

1  Construction; do you see that?
2    A.   True.
3    Q.   And then there's one from 2007, Chicago
4  Regional Lake County filed in, looks like, Lake
5  County, yeah, Lake County, Illinois.  Tauheed Bari
6  versus Dancor -- Dancor; do you see that?
7    A.   Yes.
8    Q.   Do you know who Al Johnson is?
9    A.   No.
10   Q.   Would you agree, would the Dancor
11 Corporation agree that the response to number 3.2.2,
12 "Are there any judgments, claims, arbitration
13 proceedings or suits pending or outstanding against
14 your organization or its officers," that Dancor's
15 answer of no on the prequalification form was not
16 correct?
17      MR. LYTLE:  Object to the form.
18      THE WITNESS:  Are these closed or pending
19 or outstanding?  That's kind of a little misleading
20 there.  If they're pending, are they open, that's
21 what pending means to me.  If they're outstanding,
22 it means they have either been closed or been
23 satisfied.
24   Q.   My question to the Dancor corporation is,
25 is the Dancor corporation's position that its answer

Page 44

1  to 3.2.2 on page two of the AIA form was correct
2  when made?
3    A.   That's because there's nothing outstanding
4  or pending, so, yes.  No would be my answer to that
5  one, if it's pending or outstanding, it's not open,
6  are there anything outstanding, no, everything from
7  those dates from here, looks to be closed.
8    Q.   What on -- what on document -- what on
9  Dancor 5569 tells you that these matters have been
10 closed?
11      MR. LYTLE:  Object to the form.  To the
12 extent you know that information from anyone other
13 than me, you can answer.
14      THE WITNESS:  Okay.  I --
15      MR. IVY:  I'm going to object to any
16 coaching of the witness.  You can object to form
17 and -- and that's what you can object to.
18      MR. LYTLE:  I -- I can object to privilege
19 if you're asking between -- a communication between
20 my client and mine, I can object to that, so --
21      MR. IVY:  I didn't ask any attorney-client
22 question at all.  He said -- the witness' answer was
23 that he explained that these were closed somehow,
24 I'm asking what on this document tells the Dancor
25 corporation that these matters were closed.

Page 45

1      THE WITNESS:  What's keeping them that
2  says they're open, my question.  Sorry.
3      MR. LYTLE:  You don't ask questions, you
4  give answers.  I'm going to make my objection,
5  Robert, if you want to go to the judge while I'm
6  instructing my witness not to give information about
7  conversations he and I've had, information I've
8  provided to him, that's fine.  So aside from
9  anything I've told you, you can answer the question.
10      THE WITNESS:  Do they show on this page,
11 document 5569, yes, they show on that page.
12 BY MR. IVY:
13   Q.   Is it Dancor corporation's position that
14 the lawsuits that are identified on Dancor 5569 that
15 we've talked about, could properly have been not
16 identified in answer to that question and still have
17 been sufficiently complete so as not to be
18 misleading?
19      MR. LYTLE:  Object to the form.
20      THE WITNESS:  I believe so, yes.
21   Q.   Mr. Alley, I'd like you to take a look
22 at -- I'd like you to get past the form on
23 Exhibit -- is that 7?
24   A.   Six.  Or 7, the full one?  The full one as
25 far as qualification packet with all documents?

12  (Pages 42 to 45)

Page 46

1    Q.   Yes.
2    A.   That is 6.  Seven is the Courthouse News
3  Service starting 5565.
4    Q.   Okay.  Take a look at Exhibit Number 6,
5  and if you get -- there's a -- there's the AIA form,
6  then there's a PetSmart Confidentiality Agreement,
7  do you see that?
8    A.   Yes.
9    Q.   And then just behind that, there is Dancor
10  Construction, Inc. Income and Expenses for the Year
11  Ended December 31st, 2012.  Do you see that?
12    A.   I do.
13    Q.   And this was provided to PetSmart as part
14  of the prequalification review, true?
15    A.   True.
16    Q.   And just behind that, there is a document
17  that's Dancor Construction, Inc. Balance Sheet,
18  December 31st, 2012.  Do you see that?
19    A.   Yes.
20    Q.   Behind that is a document that's Dancor
21  Statement of Cash Flows, Year Ended December 31st,
22  2011.  Do you see that?
23    A.   Yes.
24    Q.   Behind that is a Dancor Construction, Inc.
25  Balance Sheet, December 31st, 2011; do you see that?

Page 47

1    A.   Yes.
2    Q.   Behind that is Dancor Construction, Inc.'s
3  Statement of Cash Flows Year Ended December 31,
4  2010.  Do you see that?
5    A.   Yes.
6    Q.   Behind that is Dancor Construction, Inc.
7  Balance Sheet December 31st, 2010.  Do you see that?
8    A.   Yes.
9    Q.   Those documents that we've all -- that
10  we've just gone through, those were all provided to
11  Dancor as part of the Dancor's prequalification
12  review?
13    MR. LYTLE:  Object to the form, I think
14  you meant to say PetSmart, but --
15    MR. IVY:  To PetSmart, what did I say?
16    MR. LYTLE:  You said to Dancor.
17    Q.   Oh. Dancor provided all these financial
18  records that we have identified, I'm calling them
19  financial records, is that okay, as a summary?
20    A.   That works, because they are financial
21  records.
22    Q.   To Dancor -- to PetSmart as part of the
23  prequalification review, true?
24    A.   True.
25    Q.   Now, I did not see any similar documents

Page 48

1  in the documents that Dancor produced in the 1
2  through 5700.  Is that true?
3    A.   That is true.
4    Q.   All right.  At some point, did Dancor stop
5  keeping income and expense reports, balance sheets,
6  statement of cash flows, at some point did Dancor
7  stop keeping those records?
8    MR. LYTLE:  Object to the form.
9    THE WITNESS:  This is what was produced
10  for the qualification document, and the related
11  financial records have been produced for the other
12  items, so we still keep them, yes, we still keep
13  records.
14    Q.   Okay.  So these records, Dancor has income
15  and expenses, balance sheet and statement of cash
16  flows from -- these were 2011 and 2012, they go all
17  the way through 2017 or 2018; is that true?
18    MR. LYTLE:  Object to the form.
19    THE WITNESS:  They would go up until what
20  we have available.  I don't know if it goes to 2018
21  or not as of right now.
22    Q.   Okay.  But they would at least go through
23  2017, because we're past that year, correct?
24    MR. LYTLE:  Object to the form.
25    THE WITNESS:  We produced everything to

Page 49

1  the last statement you got was 2016, and I believe
2  2017 has been finalized.
3    Q.   Is it your -- is it your testimony that
4  Dancor, in those 5700 pages, has produced income and
5  expenses, balance sheets and statements of cash flow
6  through 2016?
7    MR. LYTLE:  Object to the form.
8    THE WITNESS:  I know 2016 specifically has
9  a balance sheet that was provided in our tax
10  documents.
11    Q.   Okay.  I saw there was tax documents and I
12  saw there was something in there.  My question is,
13  did Dancor provide your income and expenses, balance
14  sheet and statement of cash flows up until 2017?
15    MR. LYTLE:  Object to the form.
16    Q.   In the documents?
17    A.   I did not see that record, so, no.
18    Q.   There are additional financial records
19  that form the basis for all of these inputs on the
20  income and expenses, balance sheet and statement of
21  cash flows; isn't that true?
22    A.   Can you repeat?  Sorry.
23    Q.   Well, the numbers that are -- well, let's
24  take for example the income and expenses, numbers
25  that are listed in the income and expenses.

13 (Pages 46 to 49)

Page 50

1      MR. LYTLE: What year? I want to make
2  sure the witness knows what you're talking about.
3      Q. We're looking for the Dancor Construction,
4  Inc. Income and Expenses for the Year Ended December
5  31st, 2012. Do you see that?
6      A. I do see that.
7      Q. Those numbers don't come out of thin air,
8  do they?
9      A. No.
10      Q. They come from financial records, true?
11      A. True.
12      Q. All right. So those financial records are
13  kept at Dancor, true?
14      A. Our accounting has it, so, not true, if
15  I'm not mistaken, if we have an outside accounting
16  firm, they would have this information.
17      Q. Well, Dancor provides the accounting firm
18  with that information, true?
19      A. True.
20      Q. The accounting firm can't make this stuff
21  up, right, it's got to be based on Dancor, true?
22      A. True.
23      Q. Okay. And Dancor has, looking at the
24  balance sheet dated December 31st, 2012, Dancor,
25  these numbers also come from underlying financial

Page 51

1  records, true?
2      MR. LYTLE: I think it's the next page.
3      THE WITNESS: Next page. True.
4      Q. True? Dancor has not produced any of
5  those underlying financial records in this case,
6  true?
7      MR. LYTLE: Object to the form.
8      THE WITNESS: True.
9      Q. And that's the same for the -- for the
10  income and expenses that we talked about, Dancor has
11  not produced any underlying financials for income
12  and expenses in this case, true?
13      A. True.
14      Q. And the balance sheet on December 31st,
15  2011, that -- the information on that is also based
16  on underlying financials, true?
17      A. True.
18      Q. Dancor has not produced any underlying
19  financials related to its balance sheets, as they
20  would be through -- current through today's date,
21  true?
22      MR. LYTLE: Object to the form.
23      THE WITNESS: Okay. True.
24      MR. IVY: Are we on 8 now? Would you go
25  ahead and mark that as 8.

Page 52

1      (Plaintiff's Exhibit No. 8 marked.)
2      THE WITNESS: Thank you.
3      Q. This is -- have you -- you don't have to
4  read the whole thing, I just want you to identify,
5  Exhibit 8 is the contract between Dancor and
6  PetSmart for the Tulsa store, true?
7      A. True.
8      Q. All right. And we're going to -- we're
9  going to refer to this document on and off from time
10  to time, I don't intend -- we're not going to go --
11  just by way of organization, we're not going to go
12  through the whole thing right now, I've got -- I've
13  got another topic, but we'll go to it as its
14  relevant to the topics we're going to discuss, okay?
15      A. Okay.
16      Q. I'd like you to take a look at section
17  five -- first of all, Dancor is a -- is a
18  contractor, right?
19      A. Correct.
20      Q. Dancor works with construction contracts,
21  right?
22      A. Correct.
23      Q. Dancor understands the importance of a
24  contract, right?
25      A. Correct.

Page 53

1      Q. Dancor understands that it needs to follow
2  the requirements of a contract, true?
3      A. Correct.
4      Q. Dancor -- is Dancor licensed to do
5  contracting work in Oklahoma?
6      A. There is no license required for the State
7  of Oklahoma as far as a general contractor's
8  license, you do have to be registered in the state.
9      Q. Okay. And is Dancor registered in
10  Oklahoma?
11      A. For tax purposes, yes.
12      Q. Is Dancor charged with knowledge of the
13  contracting, the laws that are relevant to
14  contractors in a jurisdiction that Dancor works in?
15      A. You go into a jurisdiction, so, yes, you
16  are bound by the laws there, in the state that you
17  were working in, so we would be aware of those.
18      Q. And so Dancor, when it decided to do the
19  PetSmart job in Tulsa, was aware of the Oklahoma
20  laws governing contractors, true?
21      A. True.
22      Q. Take a look at section five, Progress
23  Payments, if you would. And what I'd like to do is
24  I just want to get a summary of how this works, we
25  can get into it in more detail, but for anybody who

14 (Pages 50 to 53)

Page 54

1   is not a person who regularly deals with
2   construction contracts, there is -- there was a
3   progress -- there was a process in this contract of
4   what's called progress payments, true?
5       A.  True.
6       Q.  And the system of progress payments is
7   pretty standard in the construction industry; is
8   that true?
9       A.  True.
10      Q.  In fact, the forms that are eventually
11  used to -- to document the progress payments are
12  that American Institute of Architecture form, it's
13  on a form, right?
14      A.  AIA 702, if I'm not mistaken.
15      Q.  Okay.  That's -- that's a form that
16  contractors all over the country use?
17      A.  True.
18      Q.  And basically speaking, what happens is
19  that rather than paying the entire amount of a
20  contract all at once, a client will pay a contractor
21  progress payments over a period of time based on the
22  amount of work that's done, right?
23      A.  Yes.
24      Q.  And -- and then, so in this case, the --
25  the Tulsa PetSmart job was being -- there were five

Page 55

1   payment applications that were made in the -- in the
2   Tulsa PetSmart store job, true?
3       A.  True.
4       Q.  And when I say five payment applications
5   were made, I mean, Dancor made five payment
6   applications to PetSmart, true?
7       A.  True.
8       Q.  And those payment applications are --
9   those progress payments are done every 30 days,
10  true?
11      A.  Yes, true.
12      Q.  So we're talking about roughly a five
13  month span?
14      A.  True.
15      Q.  And during that five month span, say in
16  the -- in the first period, Dancor, in the
17  progress -- in the payment application, would
18  identify the amount that it had paid so far and the
19  amount that it thought it was going to have to pay
20  in the future, and then the client, PetSmart, would
21  pay whatever has been paid so far?
22      A.  True.
23      Q.  Plus something to -- so -- strike that.
24      So the -- the -- and in terms of what's paid so
25  far, what gets paid is amounts to subcontractors and

Page 56

1   amounts to Dancor, true?
2       A.  True.
3       Q.  So have we sort of generally described the
4   way the payment application process works?
5       A.  True.
6       Q.  All right.  And that payment application
7   process, in addition to being routine in the
8   construction industry, that's documented in the
9   contract between Dancor and PetSmart at section
10  five, Progress Payments, true?
11      A.  True.
12      Q.  As Dancor presented each of the five
13  payment applications to PetSmart, PetSmart would
14  have to rely on what Dancor said about what was paid
15  by Dancor, true?
16      A.  True.
17      Q.  And PetSmart would be reasonable in
18  relying on what Dancor identified as having paid to
19  subcontractors, true?
20      A.  True.
21      Q.  Dancor knew it was required to put
22  truthful information into the payment applications,
23  true?
24      A.  True.
25      Q.  Is it Dancor's position, as you sit here

Page 57

1   today, that Dancor put only truthful information to
2   all of the payment applications on the PetSmart
3   project?
4       A.  True.
5       Q.  Okay.
6       MR. IVY:  Does anybody need to take a
7   break, go to the bathroom or anything else?
8       THE WITNESS:  I'm good if everyone else is
9   good.
10      MR. IVY:  I don't even know what time it
11  is.  Where's my file of payment applications?  Looks
12  like we're going to have to take a break anyway, I
13  don't have my file of payment applications.  Let's
14  take a break just a minute.
15      VIDEO TECHNICIAN:  We're off the record,
16  the time is 11:04 a.m.
17      (Recess taken.)
18      VIDEO TECHNICIAN:  We are back on the
19  record, the time is now 11:12 a.m.
20  BY MR. IVY:
21      Q.  All right.  Dancor has previously
22  testified that the payment applications that we've
23  just talked about, and the additional financial
24  records that Dancor identified in its Responses to
25  PetSmart's Requests for Production are the entirety

15  (Pages 54 to 57)

Page 58

1  of Dancor's financial records as requested; is that
2  true?
3      A.  True.
4      Q.  The -- I have here a collection of the
5  financial records that are not the payment
6  applications, so I have the payment applications and
7  they're real big, so I'm not going to -- and at this
8  point they're not Bates stamped yet.  But you know
9  what I'm talking about when I talk about payment
10 application 1 through 5, right?
11     A.  They're in front of me, yes.
12     Q.  Okay.  And then there was a series of
13 documents that was identified as the remaining
14 financials in Dancor's responses, and I pulled all
15 of those individually identified documents and
16 they're all checks; is that correct?
17     A.  Correct.
18     Q.  So when I have the pile of checks that was
19 identified in the -- by Dancor in its responses and
20 the -- I think that was a -- supplemental responses,
21 and I have the -- the payment applications, I have
22 what Dancor is representing as all of the responsive
23 financial documents, true?
24         MR. LYTLE:  If I may, there was one --
25         MR. IVY:  You're right, go ahead.

Page 59

1          MR. LYTLE:  -- supplement to -- that was
2  included in an e-mail attachment that had the
3  summary of the amounts paid to the various
4  subcontractors and vendors on the project.
5          MR. IVY:  That's right, and I apologize,
6  let me rephrase the question so we have everything
7  in one spot.
8          MR. LYTLE:  Perfect.
9  BY MR. IVY:
10     Q.  So payment application 1 through 5, the
11 checks that were identified in Dancor's Responses to
12 PetSmart's Requests for Production, and the vendor
13 summary, is that -- am I describing that properly?
14 It's -- it's identified as Job Cost by Job and
15 Vendor Summary.
16     A.  Yes, vendor summary, we'll go with that.
17     Q.  Okay.  When we have those three things,
18 those are -- those are all the things that Dancor
19 has produced that is responsive to PetSmart's
20 requests regarding Dancor's financials, true?
21     A.  True.
22     Q.  Okay.  All right.  Let's talk about --
23 let's mark application number one as Exhibit -- I
24 believe we're on 9.
25         MR. IVY:  You guys appear to have your own

Page 60

1  copies.
2          MR. LYTLE:  No, here's -- I'll let you
3  work off these and I don't need a copy.
4          (Plaintiff's Exhibit No. 9 marked.)
5      Q.  Are you looking at Exhibit 9 now?
6      A.  I am.
7      Q.  Is that a copy of Dancor's payment
8  application number one to PetSmart?
9      A.  This appears to be payment application
10 number one.
11     Q.  Okay.  And in this payment application,
12 just to go through it generally, we don't have to
13 get into a great deal of detail, there's a cover
14 sheet that identifies the total amount that's being
15 requested in payment application one, it looks like
16 the total amount being requested for payment is
17 129,000 and change, true?
18     A.  True.
19     Q.  And then there is -- behind that, there's
20 another AIA form, and that is a form, right?
21     A.  AIA form.
22     Q.  That's application --
23     A.  G703?
24     Q.  Yeah, G702.
25     A.  G702 and G703.

Page 61

1      Q.  Correct.  Those are two different forms,
2  702 and 703?
3      A.  Correct.
4      Q.  Where does Dancor get those forms?
5      A.  From the AIA website, basically.
6      Q.  Okay.
7      A.  It's a generalized website, you pay for
8  the forms and do all your billing.
9      Q.  And -- and are these payment applications,
10 these are prepared by -- these were prepared by Dan
11 Policicchio?
12     A.  That is true.
13     Q.  Did -- did Dan Policicchio have any help
14 from anyone else at Dancor preparing these payment
15 applications?
16     A.  That would only be between maybe the
17 construction coordinator, if they were there,
18 project manager, making sure the invoices were
19 provided to the general contractor, Dancor, for the
20 month's billing that they are required to do.  We
21 have to get the invoice to bill against the
22 documents, the percentage of work, basically.
23     Q.  Got it.  In terms of the actual -- this --
24 I'm going to ask you a slightly different question
25 that's -- this is -- might seem silly, but it --

16  (Pages 58 to 61)

Page 62

1  it's just simpler, okay, so I don't want you to
2  think on that deep level.
3       In terms of actually just preparing the form,
4  does Dan -- did Dan Policicchio sit in front of a
5  computer and fill in the information that he got
6  from whoever?
7       A.  Yes.
8       Q.  Did Dan Policicchio have a -- an assistant
9  that prepared any of these forms for him?
10      A.  The G702 or G703?
11      Q.  Correct.
12      A.  No.
13      Q.  Okay.  So Dan Policicchio was the only one
14  who was creating the forms that wind up being
15  payment applications one through five in this case,
16  true?
17      A.  Yes, true.
18      Q.  Okay.  The document that you've identified
19  as G702 within payment application one, which is
20  Exhibit 9, that is a -- that's sort of a summary of
21  the whole job, and then how it breaks down.  Would
22  that be sort of a fair summary of this document?
23      A.  Yes.
24      Q.  So in other words, the entire contract is
25  1.269 and change, million, and then it identifies

Page 63

1  down below what's due right now?
2       A.  True.
3       Q.  And then to the right of that, there is
4  a -- a sworn signature area.  Do you see that?
5       A.  Yes.
6       Q.  And it says that "The undersigned
7  contractor certifies that to the best of the
8  contractor's knowledge, information and belief, the
9  work covered by this application for payment has
10  been completed in accordance with contract
11  documents, that all amounts have been paid by the
12  contractor for work for which previous certificates
13  for payment were issued and payments received from
14  the owner and the current payment shown herein is
15  now due."  Do you see that?
16      A.  Yes.
17      Q.  And that's signed -- that signature there
18  is Dan Policicchio's signature on behalf of Dancor?
19      A.  True.
20      Q.  All right.  Now, obviously on -- with
21  payment application one, there is no prior -- where
22  it says that "all amounts have been paid by the
23  contractor for work for which previous certificates
24  for payment were issued," there were no previous
25  certificates for payment, because this is the first

Page 64

1  one, right?
2       A.  True.
3       Q.  Okay.  And then the document behind that,
4  which is G703, AIA G703, that just -- that
5  identifies all the different types of work that
6  needs to be done, and the rough amount of money that
7  it will cost to do it; is that true?
8       A.  That is true.
9       Q.  Okay.  And then behind that document is
10  what's labeled as a sworn statement.  Do you see
11  that?
12      A.  True.  Yes.
13      Q.  Is the -- is the sworn statement also part
14  of an AIA form?
15      A.  This does not appear to be an AIA document
16  as far as it could be, I couldn't -- I can't testify
17  that that is an AIA form or not, it is a sworn
18  statement.  This could be from the AIA website, I
19  would have to to look at that website, don't have
20  those -- the website in front of me or access to it
21  right now.  Usually AIAs do have a AIA stamp on
22  them, but as far as a sworn statement is concerned,
23  I do not know.  It might be a supplemental sworn
24  statement.
25      Q.  This is a -- this is a document, the

Page 65

1  sworn -- this sworn statement, though, that's also
2  typical in the construction field, true?
3       A.  True.
4       Q.  This -- and these are prepared by Dancor
5  on almost any job that it does, true?
6       A.  True.
7       Q.  And -- and Dancor sometimes acts -- does
8  Dancor ever work as a subcontractor?
9       A.  We sometimes self perform, but not really
10  because they're a subcontractor, we can't
11  subcontract ourself.
12      Q.  Okay.  So I notice that there -- in the
13  5700 pages of documents that there was at least one
14  that was a sworn statement of one of Dancor's
15  subcontractors to Dancor, sort of like this
16  document.
17      A.  Yes.
18      Q.  And that was also done, that appeared to
19  be exactly the same as the sworn statement that
20  we're looking at in Exhibit 9; is that -- is that
21  accurate?
22      A.  Exactly the same?  I do not know if it was
23  the exact same document.
24      Q.  Let's just say --
25      A.  It was another sworn statement, yes.

17  (Pages 62 to 65)

Page 66

1    Sworn statements are part of it, and the billing.
2        Q.  Okay.  So, is the -- is this sworn
3    statement, since it's not marked as an AIA form, is
4    this a Dancor form?
5        A.  Not a Dancor form, and this might be an
6    AIA form, it just might not be labeled at the top.
7    It could be part of their sworn statement, it's a
8    program that fills all of this information in, so it
9    actually literally transposes all the info, so when
10   you put it in for like the G703, that might actually
11   be the G703 sworn statement, but as far as the
12   subcontractor's section of it, as a continuation of
13   the G703, because the other pages don't have that,
14   it would be a AIA.
15       But this is sworn statement, and it would go
16   along -- yeah, that's a sworn statement, sworn
17   statement is basically where you're looking to have
18   all of your suppliers and vendors that go along with
19   the payment application.
20       Q.  Okay.  So on the sworn statement it lists
21   all of Dancor's subcontractors, at least up to the
22   point of that payment application, true?
23       A.  True.
24       Q.  So Dancor may later on take on another
25   subcontractor and they may get added on, I don't

Page 67

1    know if that's true or not, did that -- I'm just
2    trying to follow how it happens, is that -- is that
3    true?
4        A.  That would be true, it's an example here
5    as the two TBD's, which would be To Be Determined as
6    a subcontractor made by -- made on that condition or
7    Dancor may wish to self-perform that on their own.
8        Q.  I see.  Okay.  On the sworn statement in
9    Exhibit 9, so we have established that it -- it
10   lists the -- well, at the top, it -- it identifies
11   Dan Policicchio, the CEO, of Dancor as being the
12   person who is the affiant, the person preparing this
13   sworn statement, true?
14       A.  True.
15       MR. LYTLE:  Object to the form.
16       Q.  And --
17       MR. LYTLE:  You said CEO, it says
18   president, so that's -- if you're wondering why.
19       MR. IVY:  No, I'm not wondering why.  I'm
20   not referring specifically to the document.  He --
21   it's been testified to that he is the CEO, so I --
22       Q.  He's the CEO and president, true, Dan --
23   Dan Policicchio is president and CEO?
24       A.  True.
25       Q.  Okay.  So, the -- the sworn statement we

Page 68

1    said identifies the subcontractors, it says what
2    kind of work they're doing, it says what the total
3    amount of their contract is with Dancor, right?
4        A.  True.
5        Q.  And these are columns in the sworn
6    statement, true?
7        A.  Correct.
8        Q.  And then retention is -- retention is,
9    there's some part of the total contract that -- that
10   Dancor doesn't pay the subcontractor until the
11   subcontractor's finished all their work; is that
12   right?
13       A.  The retention is the amount held back by
14   the owner as well.  The owner holds the retention,
15   the client, I should say --
16       Q.  Okay.
17       A.  -- on each pay application of the amount.
18       Q.  Okay.  So the -- if -- and we'll do this
19   when we go back to the contract, but just generally
20   speaking, in the contract there's a provision that
21   says that 10 percent of the amount that's billed is
22   held back by PetSmart as what's called retainage,
23   right?
24       A.  True.
25       Q.  And the purpose for retention, generally

Page 69

1    speaking, in construction is -- is so that you're
2    not paying everything -- there's something held back
3    to make sure that everything gets done at the end;
4    is that true?
5        MR. LYTLE:  Object to the form.
6        THE WITNESS:  True.
7        Q.  And the contract, I believe -- well, we'll
8    go to the contract later, so we don't need to go
9    into that.  And so the -- the sworn statement breaks
10   down that overall 10 percent that the -- the client
11   is holding in retainer under the contract into the
12   individual subcontracts, it divides it out.  Is that
13   what you're saying?
14       A.  True.
15       Q.  Okay.  Then there's a column that says
16   "Net of Previous Payments."  Do you see that?
17       A.  Yes.
18       Q.  And on the Net of Previous Payments
19   column, that is where Dancor identifies payments
20   that it has actually already made to its
21   subcontractors; is that true?
22       A.  True.
23       Q.  If Dancor has not yet made a payment to a
24   subcontractor, then nothing should -- zero should
25   appear in net of previous payments, true?

18  (Pages 66 to 69)

Page 70

1      A.  True.
2      Q.  If Dancor has paid, let's say, $10,000 to
3   a subcontractor, but is expecting pretty soon to pay
4   another 10,000, 10,000 would be the amount that
5   would go into Net of Previous Payments, true?
6      A.  True.
7      Q.  Okay.  All right.  And then there's a
8   column, "Net Amount This Payment."  Now, this
9   payment is different from previous payments, right?
10     A.  Yes.
11     Q.  This payment is a payment that Dancor is
12  going to make, but hasn't yet made, true?
13     A.  True.
14     Q.  Okay.  And Dancor is going to make the
15  payment under Net Amount This Payment after they get
16  payment from PetSmart?
17     A.  True.
18     Q.  Based on the payment application.  So net
19  of previous is what Dancor has already paid, and Net
20  Amount this Payment is what Dancor is going to pay
21  as soon as PetSmart pays Dancor for the payment
22  application at issue.  True?
23     A.  True.
24     Q.  All right.  And then the balance to become
25  due, that's just the amount that's -- the total

Page 71

1   amount less what's been paid so far, right?
2      A.  True.  And it may include retention
3   numbers as well.
4      Q.  May include retention?
5      A.  Yeah, I think it does.  It does say it
6   there at the top.
7      Q.  Okay.  I won't get that specific.
8      A.  I was just trying to put it out there,
9   that's the number, but there's retention in the
10  column, so I want to be sure.
11     Q.  Yeah.  I'm just trying to get the general
12  idea of how it works.
13     A.  Correct.
14     Q.  As we talked about, since this is the
15  first payment application, Net of Previous Payments,
16  it all says zero down all of these comments because
17  no previous payments have been made on the payment
18  application?
19     A.  True.
20     Q.  All right.  Let's mark payment application
21  number two as 10.
22        (Plaintiff's Exhibit No. 10 marked.)
23        THE WITNESS:  Thank you.
24     Q.  Okay.  And Exhibit 10, payment application
25  number two, has the same AIA document 702 as payment

Page 72

1   application one did, you know, the same form, where
2   it identifies the total amount of the contract, and
3   what's going to be paid and that sort of thing, and
4   it also has the -- the sworn -- the sworn testimony
5   of Dan Policicchio, the president and CEO of Dancor,
6   true?
7      A.  True.
8      Q.  And on this AIA document 702, it again
9   says that, "The contractor certifies that to the
10  best of the contractor's knowledge, information and
11  belief, the work covered by this application for
12  payment has been completed in accordance with the
13  contract documents, that all amounts have been paid
14  by the contractor for work for which previous
15  certificates for payment were issued and payments
16  received from the owner and the current payment
17  shown here and is now due."  That's what
18  Mr. Policicchio signed, true?
19     A.  True.
20     Q.  And in that -- in that sworn statement
21  that he makes there, that Mr. Policicchio makes
22  there, when it refers to that all amounts have been
23  paid by the contractor for work for which previous
24  certificates for payment were issued, that's
25  referring to what we were talking about in the sworn

Page 73

1   statement where -- the column where it said previous
2   payments, right?
3      A.  True.
4      Q.  So in this sworn testimony here on
5   document 702, Dan Policicchio, the president and
6   CEO, is swearing under oath that the -- that the
7   amounts identified in the sworn statement that's
8   going to come up later as amounts previously paid
9   were actually paid, true?
10     A.  True.
11     Q.  And let's turn to the sworn statement in
12  Exhibit 10, payment application number two.  Are you
13  taking a look at that?
14     A.  I am on sworn statement payment
15  application two, page one of two.
16     Q.  Again, it lists the -- the subcontractors,
17  and we've already gone through what all the columns
18  mean.  If you go to the column labeled Net of
19  Previous Payments, please.
20     A.  Okay.
21     Q.  Do you see where it indicates Demolition
22  Wrecking Company and there's -- and under net of
23  previous payments, it says, 76,500?
24     A.  I see that.
25     Q.  Okay.  Now, going through -- I'll

Page 74

1  represent to you that going through Dancor's --
2  what -- what Dancor identified as its financial
3  records, I was able to find a check at -- from
4  Dancor to Demolition Wrecking in that amount at
5  Dancor 2271. Are you familiar with that check?
6      A.  It's one of the checks that were in all of
7  the records that we said. So it's there, it's been
8  reviewed, it's all the checks that you have as well.
9      Q.  Yeah. It's -- it's Dancor 02271 and the
10 amount of the checks is 7,000 -- $76,500, exactly as
11 it's identified in the net of previous payments on
12 this sworn statement. That check is written on --
13 let me see, I have other copies of these somewhere.
14 That check is written on Hancock Bank. Is Hancock
15 Bank the bank that Dancor used as part of its
16 business to make payments to subcontractors?
17     A.  Yes.
18     Q.  Did Dancor use any other banks to make
19 payments to subcontractors? And I'll tell you that
20 I -- just because this isn't like a memory test, I
21 did see other checks that were written on Bank of
22 America. Did Dancor also have an account with Bank
23 of America, did Dancor make payments to
24 subcontractors from account Bank of America and
25 Hancock Bank?

Page 75

1      A.  Yes.
2      Q.  Why were there two different bank
3  accounts?
4      A.  Can a business not have more than one bank
5  account? It's a question, sorry.
6      MR. LYTLE:  Answer his question.
7      THE WITNESS:  Why did they have two
8  different bank accounts, because we had to two
9  different bank accounts.
10     Q.  Was there any business reason to have two
11 different bank accounts?
12     A.  I guess to have multiple bank accounts,
13 there's not always a Bank of America next to the
14 office. Bank of America is great, but come to the
15 south where I'm at in -- or you were at my office in
16 Florida, it's a 45-minute drive to a Bank of
17 America.
18     Q.  Got it. I'm not trying to insinuate
19 anything.
20     A.  No, I'm just giving you -- it's a simple
21 question, sorry, I'm trying to answer questions.
22     Q.  Yeah, I'm just trying to figure out --
23 just trying to know what's going on.
24     Other than Hancock Bank and Bank of America,
25 were there any other banks that Dancor would

Page 76

1  regularly use to pay subcontractors?
2      A.  Not to my knowledge offhand right now. I
3  believe that was the bulk of them for this job.
4      Q.  Were there -- did -- did Dancor open an
5  account specifically for this job?
6      A.  Not to my knowledge.
7      Q.  So help me with this. Oh, never mind.
8  We'll -- we'll get to that later, let's stick with
9  the payment applications for a while. If we go down
10 in payment application number two, which is Exhibit
11 10, the next indication of a net previous payment is
12 to DaVco Mechanical Contractors in the amount of
13 $21,331, do you see that?
14     A.  I do.
15     Q.  I'll represent to you that I found a check
16 at Dancor, 3813, to DaVco that was in the exact
17 amount of $21,330. So, there's records of both of
18 these previous payments for payment application
19 number two.
20     The last -- oh, there's also -- the Last
21 Previous Payment identified on payment application
22 number two is to Dancor Construction Company in the
23 amount of $31,413.45. I found no record in any of
24 the 5700 plus records that Dancor produced of a
25 check or a ledger entry or any other indication of

Page 77

1  receipt of $31,413.45, and I guess that would be
2  from Dancor to Dancor? Is that how that would be
3  done? How does Dancor -- so Dancor gets its money
4  from PetSmart from the first payment application,
5  now we're in the second payment application and
6  PetSmart is indicate -- and Dancor is indicating in
7  payment application number two that it's already
8  paid itself $34,413.45; is that right?
9      A.  That's what it shows in the payment
10 application.
11     Q.  Okay. How does Dancor pay itself?
12     A.  It would go into a general operating fund.
13     Q.  When you say it would go into a generate
14 operating fund, what is it?
15     A.  The payment of $31,413 -- $31,413.45 would
16 go into the general operating fund for the Dancor
17 Construction business to pay for any expenses that
18 come up.
19     Q.  Okay. Now, that would come in -- did
20 PetSmart pay in a check?
21     A.  PetSmart, I believe, paid in direct
22 deposit, so it would be deposited into that account.
23     Q.  All right. And when PetSmart made a
24 direct deposit, there would be some sort of bank
25 record that would identify that direct deposit,

Page 78

1  wouldn't there?
2      A.  It would have direct deposit to the ACH
3  setup that we set up for PetSmart to deposit into,
4  so it would have a bank account number and routing
5  number.
6      Q.  And Dancor would receive a record
7  confirming that direct deposit, true?
8      A.  True.
9      Q.  That record has not been produced in this
10  case.  Is there a reason why that record has not
11  been produced in this case?
12          MR. LYTLE:  Object to the form.
13          THE WITNESS:  Not a reason.
14      Q.  Okay.  Where would the record of
15  PetSmart's direct deposit of $31,413.45 be located
16  in Dancor's record?
17          MR. LYTLE:  Object to the form, misstates
18  his testimony.  I think you need to clarify.
19          THE WITNESS:  Clarify where it's going
20  into, how it's specifically -- I guess I'm confused,
21  you're asking a specific location of where the check
22  goes into and where the record is, is that --
23      Q.  Well, let me see if I can -- let's --
24  let's see if we can work through.  Okay?  I -- I
25  think the question was pretty clear, but we'll see

Page 79

1  if we can work through it, okay?  You told me that
2  PetSmart made a direct deposit, that's how they did
3  it, of $31,413.45 into Dancor's general operating
4  account?
5      A.  There we go.
6      Q.  True?
7      A.  I think that's where my confusion is.
8      Q.  Okay.
9      A.  That specific amount, no.  The net payment
10  that we received for payment application of one or
11  two that we're on, 248,000 --
12          MR. LYTLE:  You're on still payment for
13  one.
14          THE WITNESS:  We're still on payment for
15  one, yes.  This is payment application two, not
16  payment application one.  Dancor would have received
17  a check in the amount of -- a deposit in the amount
18  of $129,243.45.  That would be the amount that would
19  go into the Dancor account number that we provided
20  to PetSmart.
21      Q.  Okay.  I found no record of any deposit of
22  $129,243.45 in the 5700 plus documents, there's no
23  record of direct deposit, there's no bank record or
24  anything like that.  Are you aware of a -- Dancor
25  would have received a record concerning --

Page 80

1  confirming the direct deposit of that 129,000 and
2  change, wouldn't they?
3      A.  Possibly, yes, it would have to show that
4  we came in.
5      Q.  Excuse me, what was that?
6      A.  Yes.
7      Q.  Okay.  And which bank did Dancor deposit
8  or did Dancor have PetSmart deposit the 129,000 and
9  change into?
10      A.  I do not have that information in front of
11  me.
12      Q.  So Dancor is unable to testify today about
13  where it asked PetSmart to make the direct deposit
14  of $129,243.45; is that true?
15          MR. LYTLE:  Object to the form.
16          THE WITNESS:  That is true.
17      Q.  And since there's an objection, I'll just
18  make sure that this is very clear.  Dancor cannot
19  testify today where PetSmart made the direct deposit
20  to Dancor of 129 -- when I say where, to what bank
21  Dancor made -- PetSmart made the direct deposit of
22  $129,243.45, true?
23      A.  True.
24      Q.  I -- this got a little confused, just so
25  we're clear.  Dancor would have received a

Page 81

1  confirmation from the bank that that deposit of
2  129,000 and change had been made, true?
3      A.  Somehow, yes, true.
4      Q.  That document does not exist in the
5  produced records, I will represent to you.  Is -- do
6  you believe that there is such a record in the
7  produced records, does Dancor believe that there is
8  such a record in the produced documents?
9      A.  In the produced documents?
10      Q.  Yes.
11      A.  I do not believe so.
12      Q.  Okay.  When Dancor would receive
13  confirmation from its bank that Dancor had -- that
14  PetSmart had deposited the $129,243.45, where would
15  Dancor keep that record?
16      A.  I do not have that knowledge at the
17  moment.
18      Q.  Okay.  The general -- the general
19  operating fund that you're talking about that Dancor
20  has, that general operating fund is for the PetSmart
21  project and other projects all at the same time?
22      A.  True.
23      Q.  So all of the money that Dancor would
24  receive from various construction projects, would
25  that go into one single bank account?

21  (Pages 78 to 81)

Page 82

1   A.  Not necessarily one single one, depending
2   on the amount of banks that we had, it could go into
3   multiple.
4       Q.  Was there a way that Dancor would
5   determine how it would divide up where it would put
6   the income that it brought in from jobs like from
7   PetSmart?
8       A.  Sometimes the closeness and the proximity
9   of the check that came over.
10      Q.  So would -- and would that -- would the
11  person at Dancor who would make that decision be Dan
12  Policicchio?
13      A.  That would be, yes.
14      Q.  Okay.  So is there -- so there may be more
15  than one general operating -- well, do you believe
16  that -- is it Dancor's testimony that during the
17  time of the PetSmart job, Dancor had more than one
18  general operating fund?
19      A.  I do not know.
20      Q.  Okay.  And then I should point out that at
21  the bottom of -- this is sort of obvious, but at the
22  bottom of this sworn statement is a -- is a notary
23  provision that states that, "It is understood that
24  the total amount paid to date, plus the amount
25  requested in this application shall not exceed," and

Page 83

1   it's a blank percent, "of the cost of work completed
2   to date.  I have also furnished lien waivers for all
3   subcontractors, materials and labor under my
4   contract."  And then that's signed by Dan
5   Policicchio, president, and notarized, true?
6       A.  True.
7       Q.  Okay.  Let's move on to payment
8   application number three.  Oh, you know what?  Let's
9   not move on to payment application number three.  Sorry.  I
10  forgot to go through the payments.
11      A.  We did go through the payments.
12      Q.  We did go through payments.  I just
13  confused myself.  Let's go on to three, which would
14  be Exhibit 11, I believe.
15          MR. IVY:  Need a copy, Gregg?
16          MR. LYTLE:  I have it, thanks.
17          (Plaintiff's Exhibit No. 11 marked.)
18      Q.  This is payment application number three
19  from Dancor to PetSmart, correct?
20      A.  Correct.
21      Q.  And this invoice date is December 9th,
22  2016, true?
23      A.  True.
24      Q.  The amount requested in this payment
25  application is 423,004.11, true?

Page 84

1       A.  True.
2       Q.  And this isn't an aggregate amount, this
3   isn't -- the 423,004.11 isn't that amount --
4   whatever's in the previous payment application isn't
5   part of that amount, is it?  This is -- this is
6   Dancor saying send me a check for 423?
7       A.  That is the billed amount for this
8   application or payment due.
9       Q.  Okay.  And so that's -- that's the amount
10  that Dancor is saying, PetSmart, please send me a
11  check for $423,004.11?
12      A.  True.
13      Q.  Okay.  And again, the payment application
14  number three has the AIA document 702, which, again,
15  identifies the total amount and the payments so far,
16  and it contains that same sworn statement from -- is
17  that Dan Policicchio there who signed that?
18      A.  True.
19      Q.  So Dan Policicchio signs that saying that
20  he certifies, to the best of his knowledge and
21  information, I should say contract, that's Dancor,
22  and believe the work covered by this application for
23  payment has been completed in accordance with the
24  contract documents, that all amounts have been paid
25  by the contractor for work for which previous

Page 85

1   certificates for payment were issued and payments
2   received from the owner and the current payment
3   shown herein is now due, and Dan Policicchio signed
4   that to indicate that that was true; is that
5   correct?
6       A.  True.
7       Q.  Okay.  If you would turn to the sworn
8   statement in payment application number three,
9   please.
10      A.  Okay.
11      Q.  All right.  The first -- the first
12  subcontractor payment that's indicated on the sworn
13  statement is Demolition Wrecking, and it says that
14  what Dan -- it says, "Net of previous payments,
15  $145,831.50."  Do you see that?
16      A.  I do.
17      Q.  And that means that Dancor is -- is
18  representing under oath to PetSmart that it has paid
19  Demolition Wrecking $145,831.50 already?
20      A.  True.
21      Q.  Looking through the financial records that
22  Dancor identified in its responses to PetSmart's
23  requests for production, I was able to find two
24  checks to Demolition Wrecking Company at Dancor 2271
25  and Dancor 2209, and those checks totaled

22  (Pages 82 to 85)

Page 86

1  $111,165.75. I'll just ask first, are you familiar
2  with that?
3      A.  That as far as the checks that were in
4  there, I saw payments that went to that, to specific
5  amounts, I could pull them back up and reference
6  those checks, if you'd like me to.
7      Q.  I'd be happy to hand them to you.
8      A.  Okay.  It would be a little bit faster, I
9  think.
10     Q.  Yeah.  I guess let's mark these as
11 individual exhibits.
12     (Plaintiff's Exhibits No. 12 and 13 marked.)
13         THE WITNESS:  Thank you.
14     Q.  And if you don't mind, since they got out
15 of my hand, you have Exhibits 12 and 13 there,
16 right?
17     A.  Correct.
18     Q.  And Exhibit Number 12, which -- which
19 Bates number is that one?
20     A.  2209, Exhibit 12, and Exhibit 13 is 2271.
21     Q.  Okay.  Do you see those two checks there?
22     A.  I do see them.
23     Q.  Are they written on the same bank?
24     A.  They are both from Hancock Bank.
25     Q.  Okay.  And where is Hancock Bank located?

Page 87

1      A.  Its corporate headquarters?  In the south.
2      Q.  I'm just wondering if -- if there's a
3  particular branch, did Dancor use a particular
4  branch?
5      A.  Probably the one close to my office, which
6  would be Santa Rosa Beach, Florida, they have them
7  from Texas throughout the entire south.  I think
8  that was the closest.
9      Q.  And if -- if Dan Policicchio -- did you
10 ever use the bank on behalf of Dancor, Hancock Bank
11 near you?
12     A.  I've deposited checks there.
13     Q.  So James Alley has deposited checks at the
14 bank in -- at the Hancock Bank at Santa Rosa,
15 Florida?
16     A.  True.
17     Q.  All right.  The two checks that you're
18 looking at, if you add them up, I think you'll find
19 that they come up to $111,165.75.  You can check
20 that if you want to.
21     A.  I'll go by your math at the moment, but it
22 appears to be accurate.
23     Q.  Okay.  I found no other checks in the
24 documents produced by Dancor that contained any
25 other check to Demolition Wrecking.  Is it Dancor's

Page 88

1  position that there is some other check somewhere
2  that -- and I missed it?
3      A.  No.
4      Q.  Okay.  Is there a record somewhere that
5  Dancor has of the remaining amount between 111,000
6  and change and the 134,000 and change that Dancor
7  says it paid Demolition Wrecking?
8      A.  I do not believe so, no.
9      Q.  Is it Dancor's position that Dancor
10 actually paid, as it swore that it did, Demolition
11 Wrecking $145,831.50?
12         MR. LYTLE:  Object to the form.
13         THE WITNESS:  No.
14     Q.  Okay.  What is -- what is Dancor's
15 position as to that payment?
16     A.  That's that payment, and based upon the
17 checks, Exhibit 12 and 13, showed that we paid them
18 more than 111,000 and some change.
19     Q.  So the amount that Dancor swore to
20 PetSmart that it paid to Demolition Wrecking in
21 payment application number three is incorrect?
22     A.  Correct.  True.
23     Q.  And the amount that Dancor swore to
24 PetSmart that it paid to Demolition Wrecking is more
25 than what Dancor actually paid to Demolition

Page 89

1  Wrecking, true?
2          MR. LYTLE:  Object to the form.
3          THE WITNESS:  True.
4      Q.  The next subcontractor with an identified
5  payment is Bennett Steel.  Do you see that?
6      A.  Yes.
7      Q.  I found two documents with checks, they're
8  Dancor 2336 and Dancor 2338, and they are two checks
9  that add up to exactly $55,800, as indicated on the
10 sworn statement, so that payment is accounted for.
11     A.  Okay.
12     Q.  The next one is for R.L.S. Construction.
13 Do you see that?
14     A.  I do.
15     Q.  And it, in payment application three,
16 identifies a payment already made of $21,780 to
17 R.L.S.  I found a check in the financial records
18 produced by Dancor at Dancor 2922 that -- that
19 confirms that payment.  And it's Dancor's position
20 that it did, in fact, pay R.L.S. Construction
21 $21,780, true?
22     A.  True.
23     Q.  Okay.  The next subcontractor identified
24 as Girtman & Associates.  Do you see that?
25     A.  Yes.

23  (Pages 86 to 89)

Page 90

1      Q.  And it says that Dancor had already paid
2  Girtman & Associates $10,075.70, do you see that?
3      A.  Yes.
4      Q.  I found no record in Dancor's -- in the
5  financial records that Dancor produced of any
6  payment of $10,075.70.  Is there such a record?
7      A.  Yes.
8      Q.  Where is the record?
9      A.  It's in the vendor summary.  Dancor did
10  pay over $100,000 using credit cards.  A lot of
11  these vendors have to be paid immediately, such as,
12  I believe, Novar, Girtman, a couple of other ones,
13  Cart Corral for the cart bumpers, there's -- there's
14  a lot of vendors that it's faster and easier to pay
15  with a credit card than it is to pay with check and
16  having to get it out because they need it right that
17  second.
18      Q.  Okay.  I found no record in the financial
19  records that Dancor produced to PetSmart of any
20  credit card payment.  Did Dancor produce any records
21  of credit card payments in the financial records
22  that it produced?
23      A.  Just the summary sheet.
24      Q.  Okay.  I'm asking you about --
25      A.  Not a balance sheet, no.

Page 91

1      Q.  I'm sorry?
2      A.  Not a balance sheet of showing exactly the
3  payments that went out to each vendor on credit card
4  number XYZ.  It was listed in the total charges on
5  the summary sheet only.
6      Q.  Dancor would have received a record that
7  it paid a subcontractor with a credit card, wouldn't
8  it?
9      A.  It would have been a -- a charge, whether the
10  name is known when it comes across, because a lot of
11  vendors have completely different names, so it may
12  not have been flagged, but there could possibly be a
13  record of that on a credit card statement.
14      Q.  Do you know what credit card was used to
15  pay --
16      A.  No.
17      Q.  -- Girtman & Associates?
18      A.  No.
19      Q.  What credit cards did Dancor have that it
20  used to pay subcontractors?
21      A.  I think it was Hancock Bank during the
22  year 2015, '16.
23      Q.  Did Dancor only have one card that it
24  would use to pay subcontractors?
25      A.  Yes, so it would have been under the

Page 92

1  umbrella of Hancock Bank's business card.  Not one
2  card number ending in 1111, there's probably a 1112,
3  maybe 1113, depending on the project manager or
4  superintendent, whomever may have had a card.
5      Q.  I see.  So -- so it would be like me and
6  my wife with our Visa, I have one, she has one, but
7  it goes to the same account?
8      A.  Correct.
9      Q.  All right.  Dancor produced no credit card
10  records to PetSmart in its -- in response to
11  PetSmart's request for production; is that true?
12      A.  That's true.
13      Q.  But it's your testimony that Dancor paid
14  $10,075.70 to Girtman & Associates using that
15  Hancock, probably, credit card, right?
16      A.  Yes, it's listed in the vendor summary.
17      Q.  Is there -- are there any other credit
18  cards that Dancor used to pay any subcontractor on
19  the PetSmart job?
20      A.  No, the Hancock Bank, those were the
21  credit cards that were used.
22      Q.  Okay.  And did Daniel Policicchio -- did
23  Dan Policicchio make all the credit card payments?
24      A.  Yes.  To be more specific on that one,
25  that's wasn't just like -- that's paying off the

Page 93

1  credit card, not actually physically making the
2  Girtman payment of 10,000, so, correct?
3      Q.  Who -- does Dancor know who made the
4  Girtman payment of 10,075, who at Dancor?
5      A.  No, it could have been one of the cards,
6  it would have to be -- I don't know if we actually
7  have that record of who exactly used that
8  authorization and what card number it was.
9      Q.  Does Dancor still have the credit card
10  account from Hancock Bank that you're describing?
11      A.  I do not have that knowledge.
12      Q.  Dancor does not know whether it still has
13  the bank account that it used on the PetSmart
14  project?
15      MR. LYTLE:  Object to the form.
16      THE WITNESS:  I do not know.
17      MR. IVY:  Just so I'm clear, what's --
18  what's the form problem there?
19      MR. LYTLE:  Well, you don't -- I don't
20  have to explain that.
21      MR. IVY:  No, you don't, but I'm asking,
22  because I'll correct it if there's a problem.
23      MR. LYTLE:  Okay.
24      MR. IVY:  But I'm asking Dancor
25  Corporation if it knows what it's credit card number

24  (Pages 90 to 93)

Page 94

1  is, I just can't imagine what the form problem would
2  be there.
3      MR. LYTLE: You're asking for a credit
4  card number, that's inappropriate, but -- I'm going
5  to make my objection, I made my record. You can ask
6  your questions.
7  BY MR. IVY:
8      Q. Sure. Does Dancor know -- does Dancor
9  know whether it still has the business credit card
10 account that you've described for us?
11     A. Not at this moment.
12     Q. Okay. The next indication of payment to a
13 subcontractor is Roll A Shade in the amount of
14 $2,528. I also found no record of that payment.
15 Was that also a credit card payment?
16     A. According to the vendor summary, yes.
17     Q. Okay. Just so that we've got it all in
18 one place, let's go ahead and mark the vendor
19 summary. Is the vendor summary a two-page document?
20     A. That is a two-page document.
21     Q. Okay. Let's go ahead and mark that.
22     A. Well, the vendor summary is a one-page
23 document, the second part of that is the payments
24 that were made by PetSmart in the pay applications.
25 It was scanned on one document, so if you want to

Page 95

1  consider it the same document, you're more than
2  welcome to, but if you look at it, too, this is the
3  QuickBooks vendor summary that was provided for
4  payments totaling $904,371.22. The second part of
5  that is the pay application numbers for a quick
6  total balance paid.
7      Q. I'm sorry, I missed the second part,
8  what's the second part?
9      A. The second part is your pay applications
10 and amount owed to Dancor in the total paid.
11     Q. Okay. I got it. I got it. This is
12 PetSmart payments to Dancor?
13     A. Yeah, it's kind of the whole balance
14 summary of including all change orders. Just kind
15 of a quick reference of payment dates and where they
16 were, but the job costs and job vendor summary is
17 the QuickBooks printout of what was sent, if I'm not
18 mistaken. With the payments that were made on this
19 account. That's what it is. Summary of payments
20 that were there.
21     Q. Okay.
22     A. But you can have both into one if you
23 want. They were sent over in the same document.
24     Q. Let's -- did we mark this already? I
25 don't even remember.

Page 96

1      A. Do you want one or two sheets, is where we
2  stopped at.
3      Q. Let's -- well, it says page one of one,
4  let's mark these as individual exhibits, so we're
5  on -- we're around 14 or 15. Let's mark the -- the
6  document that Dancor identified as the vendor
7  summary as 14. And as 15, we'll call that the
8  PetSmart payment summary.
9          (Plaintiff's Exhibit No. 14 and 15
10 marked.)
11     Q. All right. Looking at Exhibit --
12     MR. LYTLE: 14.
13     Q. -- 14, which is the vendor summary.
14 Dancor testified that the $10,075.70 amount paid to
15 Girtman & Associates was paid by credit card. Can
16 you tell me which of the entries on Exhibit 14
17 refers to the payment to Girtman & Associates?
18     A. The one labeled credit card payments, and
19 then providing the vendors afterwards. Would you
20 like me to read the entire statement?
21     Q. No, I -- I see it. And so there are
22 certain of these that are identified individually,
23 and then there -- there's one that says credit card
24 payments for various, and Girtman is included in
25 that?

Page 97

1      A. That is correct.
2      Q. All right. So if we added up the amounts
3  paid to Girtman, National Cart, Ellason, Roll A
4  Shade, Graybar, Novar, and says other miscellaneous
5  supplies, so I don't know what that is, we would get
6  to $129,140.07?
7      A. Sure.
8      Q. Okay. You mentioned that Exhibit 14 came
9  from QuickBooks; is that right?
10     A. Yes.
11     Q. Did Dancor use QuickBooks for its
12 accounting?
13     A. That was sent over by our accountant, he
14 printed the summary and it was sent over.
15     Q. And what information did the accountant
16 use to prepare the summary that's Exhibit 14?
17     A. Dancor does not have that information as
18 it was -- it would have been sent over from the
19 accountant. I do not know specifically what he
20 used.
21     Q. Well, the accountant didn't pick these
22 numbers out of thin air, they had to come from
23 Dancor, true?
24     A. They would have to come from Dancor, true.
25     Q. Okay. What records did Dancor provide to

25 (Pages 94 to 97)

Page 98

1  the accountant that allowed the accountant to create
2  the QuickBooks summary that is Exhibit Number 14?
3      A.  Exhibit 14 would be by payments that were
4  made, checks that either went out or credit card
5  invoices, from the looks of this and what we have
6  here.
7      Q.  Okay.  So, checks and credit card invoices
8  exist because they went to the accountant, true?
9      A.  True.
10     Q.  Dancor did not produce those to PetSmart,
11 though, true?
12     A.  True.
13         MR. LYTLE:  Object to the form.
14     Q.  So now, going back to our payment
15 application number three, Roll A Shade, I found no
16 record, that's -- is that a credit card payment?
17     A.  That is listed under the credit card
18 payments on Exhibit 14.
19     Q.  And Ellason is also listed under the
20 credit card payments, true?
21     A.  True.
22     Q.  I see the next one is Allegiance Electric
23 for $19,350.90, and I did locate a check at Dancor
24 3430 for that amount.  So, Dancor paid Allegiance
25 Electric with a check, true?

Page 99

1      A.  True.
2      Q.  And that check was from Hancock Bank,
3  right?
4      A.  I do not have the check in front of me,
5  but I can pull it from the records, that it appears
6  to be Hancock Bank, true.
7      Q.  Okay.  The next contractor listed is DaVco
8  Mechanical Contractors, do you see that?
9      A.  Yes.
10     Q.  And Dancor put in its sworn statement that
11 it swore to PetSmart that it had paid DaVco, that it
12 had already paid DaVco as of the third payment
13 application, $47,542.50, do you see that?
14     A.  I do.
15     Q.  And that's what that indicates in the
16 sworn statement of payment application number three
17 that Dancor had already -- it was representing to
18 PetSmart that it had already paid DaVco $47,542.50,
19 true?
20     A.  True.
21     Q.  I was able to find no record in the
22 financial records that Dancor produced of any
23 payment to DaVco, other than the $21,030 -- 330 that
24 we talked about in payment application two.  Is
25 Dancor aware of any other record of a payment to

Page 100

1  DaVco Mechanical Contractors that was more than the
2  $21,330 in payment application number two?
3      A.  No.
4      Q.  So, would it be correct to say that Dancor
5  did not pay DaVco Mechanical Contractors $47,542.50,
6  as indicated in the sworn statement of payment
7  application number three?
8      A.  True.
9      Q.  The next contract, subcontractor listed is
10 Brazeal Masonry, do you see that?
11     A.  Yes.
12     Q.  Brazeal Masonry, on the sworn statement in
13 payment application number three, I could find no
14 record in the financial records provided by Dancor
15 of a payment of $17,910 to Brazeal Masonry as Dancor
16 swore that it had made in payment application number
17 three.  Is it Dancor's position -- and am I right
18 about that, there is no document supporting that
19 payment, true?
20     A.  True.
21     Q.  So, it's true, is it not, that -- that
22 Dancor did not make a payment of $17,910 to Brazeal
23 Masonry as it swore to PetSmart that it had?
24     A.  True.
25     Q.  The next payment that's indicated is

Page 101

1  Dancor Construction in the amount of $53,519.67.  Do
2  you see that?
3      A.  Yes.
4      Q.  I imagine Dancor did make that payment to
5  itself, right?
6         MR. LYTLE:  Object to the form.
7         THE WITNESS:  As I stated, that check
8  wouldn't have been made that payment, it would have
9  gone to the general operating fund.
10     Q.  Right.  So for -- for -- as of the time of
11 payment application number three, Dancor had
12 received the amount that it had billed in payment
13 application number three, correct?
14     A.  Correct.
15     Q.  And so Dancor took that total amount, and
16 then the amount that it kept was $53,519.67, true?
17     A.  True.
18     Q.  The amount that Dancor is requesting
19 that -- that Dancor billed from PetSmart in payment
20 application number three was $423,004.11, true?
21     A.  True.
22     Q.  And how is that number generated?
23     A.  I -- I do not have that knowledge, other
24 than my thoughts of it being invoiced billing,
25 percentage of completion.

26 (Pages 98 to 101)

Page 102

1    Q.  Does Dancor not know how the amount it
2  billed PetSmart in payment application number three
3  was generated?
4    A.  Percentage of completion, it's a
5  percentage billing project.
6    Q.  Is -- is the amount that Dancor billed
7  PetSmart in payment application number three related
8  to the amounts that it claims to have paid already
9  to subcontractors?
10    A.  Can you repeat that again?
11    Q.  Is the amount that PetSmart -- or that
12  Dancor is billing PetSmart for in application -- in
13  payment application number three related to the
14  amounts that Dancor says that it paid -- that it's
15  already paid to subcontractors?
16    MR. LYTLE:  Object to the form.
17    THE WITNESS:  So you're asking the
18  relation between how we billed and how the
19  subcontractors bill?
20    Q.  Let me ask you a different question.  If
21  we were to add up, which I didn't do, if we were to
22  add up all of the net of previous payments on the
23  sworn statement in payment application number three,
24  would that add up to the amount that Dancor billed
25  PetSmart in payment application number three?

Page 103

1    MR. LYTLE:  I'm going to object to the
2  form.  We're -- completely two things.  The payments
3  reflecting in three should equal the payment made in
4  number two.  The application amount is the invoiced
5  amount from the contractors at that time, so that
6  the invoiced amount in payment application number
7  three should be paid in number four.  Does that make
8  sense?
9    MR. IVY:  I don't know, because I didn't
10  follow you.
11    MR. LYTLE:  Okay.  So in the payment, the
12  $423,000 that Dancor is asking for in payment
13  application number three, those payments would then
14  be reflected in number four, and those are the
15  invoiced amounts at that time, so you're always
16  working one back.
17    MR. IVY:  Okay.  Well, yeah, I just want
18  to get the -- I'll work through it, I just want to
19  work through it, and if the answer is no, then the
20  answer's no.
21  BY MR. IVY:
22    Q.  So I take it then that -- let me ask a
23  question so we have a question.  The -- actually
24  it's not worth it.  Let's move on to payment
25  application number four.

Page 104

1    (Plaintiff's Exhibit No. 16 marked.)
2    MR. IVY:  Do you have a copy, Gregg?
3    MR. LYTLE:  I do.
4    Q.  Do you have Exhibit 16 in front of you?
5    A.  Yes.
6    Q.  An that's payment application number four,
7  correct?
8    A.  Correct.
9    Q.  Again, the Exhibit 16, payment application
10  number four, up front has the AIA document G702, in
11  which Dan Policicchio certifies that to the best of
12  the contractor's knowledge, information and belief,
13  the work covered by this application for payment has
14  been completed in accordance with the contract
15  documents, that all amounts have been paid by the
16  contractor for work for which previous certificates
17  for payments were issued and payments received from
18  the owner, and that current payment shown herein is
19  now due, and that's signed by Dan Policicchio there,
20  correct?
21    A.  Correct.
22    Q.  Signed under oath, true?
23    A.  True.
24    Q.  Okay.  I'd like you to go to the sworn
25  statement in payment application number four?

Page 105

1    A.  On page one, I'm on page one.
2    Q.  Okay.  If you look on the net of previous
3  payments, this is where Dancor is -- is telling
4  PetSmart under oath what it has already paid to
5  contractors, true?
6    A.  True.
7    Q.  All right.  We've already talked about
8  that Demolition Wrecking, Dancor had not paid
9  $145,831 as represented to Demolition Wrecking,
10  Dancor had only paid 111,165.75, true?
11    A.  True.
12    Q.  Now, R.L.S. Construction, do you see that
13  one?  Bennett Steel, we've already talked about, is
14  supported by checks.  The next one is R.L.S.
15  Construction; do you see that?
16    A.  Yes.
17    Q.  And Dancor is representing to PetSmart
18  here that it has already paid R.L.S. Construction
19  $105,219.  Do you see that?
20    A.  Yes.
21    Q.  As we talked about previously, the only
22  record received from Dancor that Dancor produced to
23  PetSmart in its financials was a check for $21,780
24  to R.L.S. Construction.  Is that true?
25    A.  I'd have to, again, look at the check that

27 (Pages 102 to 105)

Page 106

1    was there, but I believe we already looked at that
2    one, so, yes, true.
3        Q.  All right.  Now, Dancor here is
4    representing under oath to PetSmart that it's paid
5    more than $80,000 more than it has to R.L.S.
6    Construction, true?
7        A.  True.
8        Q.  I'm going to skip over the two Girtman and
9    National we had established were -- you said were
10   part of that credit card payment.
11       A.  Correct.
12       Q.  And then for Alvarado, there's a payment
13   indicated of $695.23.  I found a check for that in
14   the documents that Dancor produced, it's at 2638.
15   So Dancor actually paid Alvarado Manufacturing by
16   check in the amount of $695.23, true?
17       A.  True.
18       Q.  Was Roll A Shade was one of the credit
19   card payments; is that true?
20       A.  True.
21       Q.  There's a Tulsa Glass & Mirror, do you see
22   that one?
23       A.  Yes.
24       Q.  That payment was also supported by a check
25   that Dancor produced to PetSmart, and it's what

Page 107

1    Dancor identified as the total financial records at
2    Dancor 4236 in the amount of $4,224.  Is that
3    accurate?
4        A.  Yes.
5        Q.  The next subcontractor listed here is APS
6    Fire; do you see that?
7        A.  Yes.
8        Q.  I found no record in the financial records
9    that Dancor produced to PetSmart of a payment of
10   $14,035.05 to APS Fire.  Am I correct that there is
11   no record of that payment?
12       A.  True.
13       Q.  Is it true that Dancor did not make the
14   payment to APS Fire that it swore to PetSmart that
15   it did in the amount of $14,035.05?
16       A.  Correct.
17       Q.  The next subcontractor listed as RainTech
18   Roofing.  Do you see that?
19       A.  Yes.
20       Q.  And that Dancor swore that it paid
21   RainTech Roofing $12,600, that it had already paid
22   RainTech $12,600.  Do you see that?
23       A.  Yes.
24       Q.  I found no record in Dancor's financial
25   records supporting that payment.  Am I correct there

Page 108

1    is no is such record?
2            MR. LYTLE:  Object to the form.
3        Q.  Am I correct that there's no record
4    Dancor, in the financial records that Dancor
5    produced to PetSmart, supporting a payment of
6    $12,600 to RainTech Roofing?
7        A.  Correct.
8        Q.  Is it true that Dancor did not, in fact,
9    make the payment to RainTech Roofing in the amount
10   of $12,600 that it swore to PetSmart that it had?
11       A.  Correct.
12       Q.  The next subcontractor listed is
13   Allegiance Electric, do you see that?
14       A.  Yes.
15       Q.  And in payment application number four,
16   Dancor swore to PetSmart that it had already paid
17   Allegiance Electric $87,645.60.  Do you see that?
18       A.  Yes.
19       Q.  I found one check in the financial records
20   that Dancor produced to PetSmart at Dancor 3430 in
21   the amount of $19,350.  Am I correct about that?
22       A.  I'd have to look at the check again.  Do
23   you want me to pull the records?  And I believe you
24   have that.
25       Q.  I have it.

Page 109

1        A.  If you can verify that for me, thank you.
2        Q.  Well, there's 90 cents on it, so I left
3    that out.  Let's go ahead and mark that, wherever we
4    are.
5            (Plaintiff's Exhibit No. 17 marked.)
6        Q.  I've handed you what's been marked as
7    Exhibit No. 17, which is a check from Dancor to
8    Allegiance Electric, is that on Hancock Bank?
9        A.  That is on Hancock Bank.
10       Q.  And what's the amount of that check?
11       A.  $19,350.90.
12       Q.  That check is not for $87,645.60, is it?
13       A.  No.
14       Q.  Am I correct that's the only record --
15   that that's Dancor -- the only record that Dancor
16   produced to PetSmart supporting a payment of any
17   kind to Allegiance Electric?
18           MR. LYTLE:  Object to the form.
19           THE WITNESS:  Correct.
20       Q.  Is it true that Dancor did not pay
21   $87,645.60 to Allegiance Electric, as Dancor had
22   swore to PetSmart that it had in payment application
23   four?
24           MR. LYTLE:  Object to the form.
25           THE WITNESS:  Correct.

28  (Pages 106 to 109)

Page 110

1    Q.  If you look at the next subcontractor,
2  it's DaVco Mechanical Contractors, do you see that?
3    A.  Yes.
4    Q.  And in payment application number four,
5  Dancor Construction swore to PetSmart that it had
6  already paid DaVco Mechanical Contractors $135,810.
7  Do you see that?
8    A.  Yes.
9    Q.  The only record in the financial records
10  that Dancor produced to PetSmart of a payment to
11  DaVco Mechanical Contractors was at Dancor 3813, and
12  it was the amount of $21,330.  Am I correct about
13  that?
14    A.  Correct.
15    Q.  And Dancor did not pay DaVco Mechanical
16  Contractors $135,810, as it swore it had in
17  payment -- to PetSmart in payment application number
18  four; is that true?
19    A.  True.
20    Q.  If you go to the second page of the sworn
21  statement, you can see that the next contractor
22  listed is Brazeal Masonry.  Do you see that?
23    A.  I do.
24    Q.  And Dancor swore to PetSmart that it had
25  already paid Brazeal Masonry $17,910  Do you see

Page 111

1  that?
2    A.  I do.
3    Q.  I found no record in the financial records
4  that Dancor produced to PetSmart supporting a
5  payment to Brazeal Masonry of $17,910 or of any
6  amount at all.  Am I right about that?
7    A.  Correct.
8    Q.  Would it be true then that Dancor did not
9  pay Brazeal Masonry $17,910, as it swore to PetSmart
10  that it had in payment application number four?
11    A.  True.
12    Q.  The next subcontractor listed is Impact
13  Specialties.  Is that one of the credit card
14  payments?
15    A.  It would be unless it was paid via check.
16  I do not see it listed on here.  Usually we do the
17  wall protection in a low dollar amount, that's
18  usually done with a credit card a lot of times.
19    Q.  I found no record in the documents that
20  Dancor produced to PetSmart of its financial records
21  supporting a payment of $2,439.47 to Impact
22  Specialties.  Am I right about that?
23    A.  Yes.  And that would be the other
24  miscellaneous items that would be in there, because
25  they would not ship the material unless it was paid

Page 112

1  for.
2    Q.  Okay.  So if we look at Exhibit Number 14,
3  which contains the credit card payments, well, it
4  contains a list of -- a vendor summary.  I don't see
5  Impact Specialties listed individually on Exhibit
6  14.  Am I right about that?
7    A.  That is correct.
8    Q.  And under credit card payments, it
9  identifies certain subcontractors, Girtman, National
10  Cart, Ellason, Roll A Shade, Graybar, Novar, it does
11  not identify Impact Specialties, does it?
12    A.  No.
13    Q.  So based on the documents that Dancor has
14  produced to PetSmart to date, there is no record
15  supporting a payment of $2,439.47 to Impact
16  Specialties, is there?
17    MR. LYTLE:  Object to the form.
18    THE WITNESS:  No, other than the other
19  miscellaneous being other items that could be in
20  there for different vendors as well.
21    Q.  So it's Dancor's testimony that -- that
22  under the category other miscellaneous supplies
23  needed to complete, that that applies in part to the
24  $2,439.47 to Impact Specialties?
25    A.  Yes.

Page 113

1    Q.  So Impact Specialties was treated
2  differently than other subcontractors in terms of
3  how Dancor kept its records with regard to payment
4  contract -- with regard to credit card payments,
5  true?
6    MR. LYTLE:  Object to the form.
7    THE WITNESS:  No, it was a material order
8  and it was purchased.  Because --
9    Q.  Well, I'll give you an example.  So if we
10  look in the same payment application, for example,
11  National Cart Company.  Do you see that?
12    A.  I do.
13    Q.  National Cart is identified on the list of
14  subcontractors paid by credit card in Exhibit Number
15  14, right?
16    A.  Correct.
17    Q.  And the amount of the National Cart
18  payment is $1,715.33, so it's actually a
19  substantially -- it's a smaller payment than the
20  payment that we're talking about to Impact
21  Specialties, true?
22    A.  True.
23    Q.  If we look at Roll A Shade, Roll A Shade,
24  you indicated, was also paid by credit card, Roll A
25  Shade is listed as one of the subcontractors paid by

29 (Pages 110 to 113)

Page 114

1   credit card in Exhibit Number 14, true?
2      A.   True.
3      Q.   And the amount paid to Roll A Shade was a
4   little over $2500, which is fairly similar to the
5   amount paid to Impact Specialties, true?
6      A.   True.
7      Q.   So what's -- is there a reason why Dancor
8   treated for -- its records purposes, why Dancor
9   treated Impact Specialties differently from the
10  other subcontracts -- subcontractors to whom it made
11  payments by credit card?
12     A.   No.
13     Q.   And so is it -- is it your testimony that
14  there may be other subcontractors that are not
15  listed in Exhibit Number 14 who are also paid by
16  credit card that would fall under the category of
17  miscellaneous supplies needed to complete?
18     A.   Not subcontractor, but a supplier or
19  vendor.
20     Q.   Okay.
21     A.   The subcontractor implies that you are a
22  subcontractor subcontracted to perform work, not
23  necessarily a material supplier is really not --
24  because all these -- they never performed any work,
25  they provided materials.

Page 115

1      Q.   Was Girtman a supplier?
2      A.   Girtman was --
3      Q.   Was --
4      A.   -- a supplier.
5      Q.   Was National Cart a supplier?
6      A.   A required supplier, correct.
7      Q.   Was Ellason a supplier?
8      A.   Yes.
9      Q.   Was Roll A Shade a supplier?
10     A.   Yes.
11     Q.   Was Graybar a supplier?
12     A.   Yes.
13     Q.   Was Novar a supplier?
14     A.   Yes.
15     Q.   And Impact Specialties was supplier?
16     A.   Yes.
17     Q.   So, Exhibit Number 14 lists all the
18  suppliers individually that received credit card
19  payments, and then says "other miscellaneous
20  supplies needed to complete," but doesn't list
21  Impact Specialties; do I have that right?
22     A.   You do have that correct.
23     Q.   Okay.  The next subcontractor listed is
24  Gerflor USA, do you see that?
25     A.   I do.

Page 116

1      Q.   And it indicates that in payment
2   application number four, Dancor swore to PetSmart
3   that it had already paid Gerflor $4,500.  Do you see
4   that?
5      A.   I do see Gerflor USA for the 4500.
6      Q.   Gerflor, is that how you pronounce it?
7      A.   It's G-E-R-F-L-O-R.  It's kind of blurred
8   on the papers.
9      Q.   I found a check on the records that Dancor
10  produced to PetSmart in -- of a payment to Gerflor
11  in the amount of $3,779.37 at Dancor 4213, and
12  that's the only payment record of a payment to
13  Gerflor that I found.  Am I correct about that?
14     A.   Yes, and I do see that on the vendor
15  summary as well.
16     Q.   Okay.  So, am I right that Dancor did not
17  pay $4,500 to Gerflor as it swore to PetSmart that
18  it did in payment application number four?
19     A.   Yes.
20     Q.   The next subcontractor listed is Tulsa
21  Tile Guys.  And Dancor swore to PetSmart that it had
22  paid Tulsa Tile Guys $4,224; do you see that?
23     A.   Yes.
24     Q.   I found no record of any payment at all
25  from Dancor to Tulsa Tile Guys in the financial

Page 117

1   records that Dancor produced to PetSmart.  Am I
2   right about that?
3      A.   Correct.
4      Q.   Was it true then that Dancor did not pay
5   $4,224 to Tulsa Tile Guys as it swore it had in
6   payment -- as it swore it had to PetSmart in payment
7   application number four?
8      A.   True.
9      Q.   The next -- I don't know if it's a
10  subcontractor or supplier, but Graybar, and the
11  amount that Dancor swore to PetSmart that it had
12  paid to Graybar was $73,615.96.  Do you see that?
13     A.   I do.
14     Q.   I found no records in -- in the records
15  that Dancor produced to PetSmart supporting a
16  payment to Graybar of $73,615.96, or any amount.  Am
17  I correct about that?
18     A.   Correct.
19     Q.   Would it be true then that Dancor had not
20  made a payment to Graybar in the amount of
21  $73,615.96 as Dancor swore it already had in payment
22  application number four?
23         MR. LYTLE:  Object to the form.
24         THE WITNESS:  No.  Credit card.
25     Q.   Okay.  Was Graybar paid that $73,615.96 by

30 (Pages 114 to 117)

Page 118

```
 1   credit card?
 2        A.  Yes.
 3        Q.  Is the credit card limit that Dancor had
 4   in an amount that would accommodate a $73,000
 5   charge?
 6        A.  Yes.
 7        Q.  What was the credit limit of Dancor's
 8   credit card?
 9        A.  I do not know if it had a limit.  Not all
10   business cards have limits.
11        Q.  Is it true that you don't know, Dancor
12   doesn't know one way or the other whether the card
13   that it used to pay Graybar had a limit?
14        MR. LYTLE: Object to the form.
15        THE WITNESS:  I do not have the
16   information in front of me that shows any limit on
17   the credit card, but it was able to make a $73,000
18   purchase for the lighting package for the project
19   and the required contractor or supplier, Graybar.
20        Q.  I was able to find no -- I found no --
21   there was no record of a credit card payment, other
22   than this -- this summary from an accountant in
23   Exhibit Number 14.  Am I right about that?
24        A.  Correct.
25        Q.  The -- the accountant who prepared Exhibit
```

Page 119

```
 1   Number 14, though, would have to have had some kind
 2   of a record supporting the credit card payment in
 3   order to include it in the amount in the summary
 4   that's Exhibit 14, true?
 5        A.  True.
 6        Q.  And that record would have come from
 7   Dancor to the accountant, true?
 8        A.  True.
 9        Q.  The next subcontractor listed is Novar.
10   Do you see that?
11        A.  I do.
12        Q.  Novar, I see, is listed as one of the
13   credit card payments, also.  Is it Dancor's
14   testimony that Dancor paid Novar $18,236.81 by
15   credit card?
16        A.  Yes.
17        Q.  Again, I found no record in Dancor's
18   financial records that it produced to PetSmart of
19   such a credit card payment, but it is listed in
20   Exhibit Number 14, the accountant's vendor summary,
21   true?
22        A.  True.
23        Q.  That the amount that the accountant has
24   accounted for would have been known to the
25   accountant by some record that Dancor provided to
```

Page 120

```
 1   the accountant of the credit card transaction, true?
 2        A.  True.
 3        Q.  But that record was not produced to
 4   PetSmart, true?
 5        A.  True.
 6        Q.  And then finally, Dancor Construction, it
 7   indicates a payment of $99,486.52, that has already
 8   been made.  Dancor, I take it, collected that money,
 9   true?
10        A.  True.
11        Q.  Part of the reason that these progress
12   payments are sworn to is because the client should
13   be entitled to know that the contractor is making
14   the payments that they're supposed to make, right?
15        A.  Correct.
16        Q.  A client would be -- would justifiably
17   withhold further payments if they were informed that
18   the contractor was not paying subcontractors as they
19   claimed to have been, true?
20        MR. LYTLE: Object to the form.
21        THE WITNESS:  Dancor had every intention
22   of paying our subcontractors as to our account and
23   if the progress --
24        MR. LYTLE:  Answer his question.
25        THE WITNESS:  Yes, true.
```

Page 121

```
 1        MR. IVY:  I'm confused, now, could I have
 2   what the record shows as what the question and
 3   answer being.
 4        (Record requested read by reporter)
 5   BY MR. IVY:
 6        Q.  So if I understand you correctly, Dancor
 7   had every intention of making the payments that it
 8   swore to PetSmart in payment application number four
 9   that Dancor claims to PetSmart that it had already
10   made; is that right?
11        A.  Correct.
12        Q.  Now, I'd like you to -- well, would you
13   agree with me that we've identified a -- well, let's
14   see.  We've identified one, two, three, four, five,
15   six, seven, eight -- we've identified -- I'm going
16   to say in the ballpark of eight subcontractors here
17   that Dancor -- and I'll give or take, you know, one
18   or two, because I'm just -- I'm summarizing, that
19   Dancor swore to have paid a certain amount, but had
20   not, in fact, paid that amount; am I right?
21        A.  Correct.
22        Q.  In a previous application, payment
23   application number three, we found one or two of
24   those, right?
25        A.  Correct.
```

31 (Pages 118 to 121)

Page 122

1      Q.   So there has been a significant increase
2  now in the number of subcontractors that Dancor is
3  not paying, as it swears to PetSmart that it already
4  has, right?
5      A.   Right.
6          MR. LYTLE:  Object to the form.
7      Q.   I'd like you to take a look at the bottom
8  of page two of the sworn statement in payment
9  application number four.  Do you see the very
10 bottom?
11     A.   I went past it.  The very bottom.  Where
12 it starts "It is understood"?
13     Q.   Correct.
14     A.   Okay.
15     Q.   Does it look like anything's missing
16 there?
17     A.   Percentage.
18     Q.   Well, let's -- let's compare it to payment
19 application number three.  Take a look at the sworn
20 statement of payment application number three, and
21 put them side by side.
22     A.   It appears to be missing the notary.
23     Q.   Yes.  The notary is missing.  So, at the
24 bottom of that sworn statement, Dan Policicchio is
25 no longer signing a notarization on a form that

Page 123

1  you've -- that Dancor has testified that he created.
2  Does Dancor have any knowledge of why Dan
3  Policicchio removed the notary provision from the
4  bottom of the sworn statement on payment application
5  number four?
6      A.   No.
7          MR. LYTLE:  Object to the form of the
8  question.
9          MR. IVY:  I think we need to change a
10 tape.
11         VIDEO TECHNICIAN:  We're off the record,
12 the time is now 12:40 p.m.
13         MR. IVY:  Keep those in front of you, he's
14 just got to change his tape.
15         MR. LYTLE:  Let's go ahead and take a
16 break while he's changing.
17         MR. IVY:  This is not a good time to
18 break.  I'll make a record that you -- I mean, you
19 can do whatever you want, but I'll made a record
20 that --
21         MR. LYTLE:  We've been going an hour and a
22 half, and I'm not allowed to go to the bathroom?
23         MR. IVY:  You're allowed to go to the
24 bathroom, but, you know, we're in a critical point
25 of testimony.  I don't want you coaching the

Page 124

1  witness.
2          MR. LYTLE:  Sure.  All right.  Let's go.
3  I appreciate your professionalism on that.
4          MR. IVY:  It's -- what would be
5  professional, is, hey, Bob, you got much longer on
6  this so we can take a break, and then I would say,
7  yeah, not much longer at all, we can probably break
8  in about five minutes.
9          VIDEO TECHNICIAN:  We're back on the
10 record, the time is 12:41 p.m.
11 BY MR. IVY:
12     Q.   You would agree, Dancor would agree that
13 the -- the signature and notary at the bottom of the
14 sworn statement on payment application number four
15 has disappeared compared to payment application
16 number three, true?
17     A.   True.
18     Q.   I think we've already testified --
19 Dancor's already testified that the form of sworn
20 statement that even Dancor has used with its own --
21 with its own subcontractors for payment -- for sworn
22 statements and payment applications contains such a
23 notary provision, true?
24     A.   True.
25     Q.   Does Dancor have knowledge of how it came

Page 125

1  to be that the notary provision was removed from
2  payment -- from the sworn statement in payment
3  application number four?
4      A.   No.
5          MR. LYTLE:  Object to the form.
6      Q.   Does Dancor have knowledge of why the
7  notary provision at the bottom of the sworn
8  statement of payment application number four was
9  removed?
10     A.   No.
11     Q.   Dancor would agree, would it not, that
12 some action would have been required to remove the
13 notary provision from the sworn statement and
14 payment application number four from the form, true?
15     A.   I'm sorry, can you repeat that?
16     Q.   Dancor would agree that some action would
17 be required to remove the sworn statement provision,
18 the notary provision at the bottom of the sworn
19 statement as it has been in payment application
20 number four, wouldn't it?
21     A.   Something happened, and the reason why
22 it's not there, something caused it to not be there.
23     Q.   Yeah.  Somebody would have to remove that,
24 wouldn't they?
25     A.   Something or a computer program, depending

32 (Pages 122 to 125)

Page 126

1    on how it was printed.
2        Q.   In all of Dancor's experience, has Dancor
3    experienced a circumstance where only the notary,
4    the signature and notary part of a sworn statement
5    has fallen off a document for some reason?
6        MR. LYTLE:  Object to the form.
7        THE WITNESS:  As it grows longer,
8    sometimes the Excel sheet is the only thing I can
9    think of it.  You're asking how it could happen, I'm
10   giving you a reason, but could it happen, yes, it
11   could happen, but do I know the reason, no.
12       Q.   Is it Dancor's position that the notary
13   provision, the signature and notary provision at the
14   bottom of the sworn statement that was prepared by
15   Dan Policicchio disappeared in payment application
16   number four because of a computer problem?
17       MR. LYTLE:  Object to the form.
18       THE WITNESS:  Do not know.
19       Q.   Would Dan Policicchio know how it was that
20   the signature and notary provision in the form that
21   he prepared disappeared --
22       MR. LYTLE:  Object to the form.
23       Q.   -- between payment application number
24   three and payment application number four?
25       A.   I do not have that information.

Page 127

1        Q.   Okay.
2        MR. IVY:  Okay.  This would be a good time
3    to take a break, go to the bathroom.
4        VIDEO TECHNICIAN:  We're off the record,
5    the time is 12:45 p.m.
6        (Recess taken.)
7        VIDEO TECHNICIAN:  We're back on the
8    record, the time is now 12:54 p.m.
9        (Plaintiff's Exhibit No. 18 marked.)
10   BY MR. IVY:
11       Q.   Okay.  You have in front of you what the
12   court reporter has marked as Exhibit Number 18,
13   payment application number five, true?
14       A.   True.
15       Q.   And that's the -- that's the fifth and
16   last payment application that Dancor made to
17   PetSmart, true?
18       A.   True.
19       Q.   And in this payment application, Dancor is
20   requesting $134,399.65, true?
21       A.   True.
22       Q.   This payment application also contains AIA
23   document G702 in which Mr. -- that's
24   Mr. Policicchio's signature, correct?
25       A.   Correct.

Page 128

1        Q.   And so Mr. Policicchio has certified that
2    to the best of the contractor's knowledge,
3    information and belief, the work covered by this
4    application for payment has been completed in
5    accordance with the contract documents, that all
6    amounts have been paid by the contractor for work
7    for which previous certificates for payments were
8    issued and payments received from the owner and the
9    current payment shown herein is now due, correct?
10       A.   Correct.
11       Q.   And that was sworn by Mr. Policicchio on,
12   it looks like, January 31st; am I right, of 2017?
13       A.   Yes.  That looked like June, yes, sorry, I
14   need to look at it closer to confirm that, the one
15   where the application -- but yes, January 31st,
16   2017.
17       Q.   And again, when -- when the AIA form
18   refers to amounts that have been paid by the
19   contractor for work for which previous certificates
20   for payment were issued, that's, again, referring to
21   the line in the sworn statement of net previous
22   payments; is that right?
23       A.   True.
24       Q.   Okay.  Let's take a look at the sworn
25   statement for payment application number five.

Page 129

1    The -- I think there's been no change in Demolition
2    Wrecking, we've already talked about that one, no
3    change in Bennett Steel.  For R.L.S. Construction,
4    do you see that one?
5        A.   Yes.
6        Q.   Okay.  Dancor Construction is swearing to
7    PetSmart in payment application number five that it
8    has already paid R.L.S. Construction $165,657.60.
9    Do you see that?
10       A.   Yes.
11       Q.   Am I right, there is no record supporting
12   any payment more than $21,780, is there?
13       MR. LYTLE:  Object to the form.
14       THE WITNESS:  Correct.
15       Q.   There is no record supporting total
16   payments from Dancor to R.L.S. Construction in the
17   amount of $165,657.60; am I right?
18       A.   Correct.
19       Q.   And, in fact, the only record that Dancor
20   produced to PetSmart in its financial documents was
21   of a check for 21,780, and there may have been
22   change; am I right about that?
23       A.   Correct.
24       Q.   So, Dancor did not pay R.L.S. Construction
25   $165,657.60, as it swore it had in payment

33 (Pages 126 to 129)

Page 130

1   application number five, correct?
2       A.   Correct.
3       Q.   The next subcontractor is Navarro
4   Painting, do you see that?
5       A.   Yes.
6       Q.   And Dancor swore to PetSmart in payment
7   application number five that it had already paid
8   Navarro Painting $17,280; do you see that?
9       A.   Yes.
10      Q.   I found no record in Dancor's financial
11  documents that it produced to PetSmart of a payment,
12  of any payment to Navarro Painting; am I correct
13  about that?
14      A.   Correct.
15      Q.   Would it be correct then that Dancor had
16  not made a payment -- had already made a payment to
17  Navarro Painting of $17,280, as Dancor swore it had
18  in payment application number five?
19      A.   Correct.
20      Q.   I understand that Girtman, National Cart,
21  Roll A Shade were all credit card, we've talked
22  about that already.
23      A.   Correct.
24      Q.   The next subcontractor or supplier listed
25  is Advanced Fixtures.  Do you see that?

Page 131

1       A.   I do.
2       Q.   And Dancor, in payment -- in payment
3   application number five, swore to PetSmart that it
4   had already paid Advanced Fixtures $54,011.44, do
5   you see that?
6       A.   I do.
7       Q.   Found no record of any payment from Dancor
8   to Advanced Fixtures in the financial records Dancor
9   produced to PetSmart.  Am I right about that?
10      A.   Correct.
11      Q.   Would it be true then that Dancor did not
12  pay Advanced Fixtures $54,011.44 as it swore to
13  PetSmart that it had in payment application number
14  five?
15      A.   Correct.
16      Q.   Ellason, I think we said was the credit
17  card.  Tulsa Glass & Mirror.  I found -- I found two
18  checks in the records that Dancor produced to
19  PetSmart for payments to Tulsa Glass & Mirror
20  totaling -- it was either exactly or very, very
21  close, $7,603.20, that was at Dancor 4223 and Dancor
22  4326, so I'll ask you no more questions about that.
23      APS Fire.  APS Fire, Dancor is representing in
24  payment application number five that now Dancor has
25  paid APS Fire $16,649.99; is that true?

Page 132

1       A.   Correct.
2       Q.   In payment application four, you have
3   already testified Dancor swore to PetSmart it had
4   paid APS Fire $14,035 that it had not paid, right?
5       A.   Correct.
6       Q.   So now Dancor is claiming that it paid APS
7   a little bit more that, in fact, it had not paid,
8   true?
9       A.   Correct.
10      Q.   I believe we've already talked about
11  RainTech Roofing, that's in the same amount, there
12  is no record, and Dancor did not pay RainTech
13  Roofing $12,600, as it claims that it has here in
14  payment application number five, correct?
15      A.   Correct.
16      Q.   All right.  The next -- I think this is a
17  supplier, Allegiance Electric, do you see that?
18      A.   Yes.
19      Q.   Is it a supplier?
20      A.   Allegiance is a supplier of -- no,
21  Allegiance Electric is the actual electrician.
22      Q.   Okay.  So that's a subcontractor?
23      A.   Yes, because --
24      Q.   All right.
25      A.   I'm sorry, Consolidated is their supplier,

Page 133

1   I'm looking at Exhibit 14, looking back to confirm.
2       Q.   That's okay.  It doesn't matter who they
3   are.  They're someone who did some work or supplied
4   some stuff for the PetSmart project, right?
5       A.   Right.
6       Q.   And in payment application number five,
7   Dancor swore to PetSmart that it had already paid
8   Allegiance Electric $108,235.99, correct?
9       A.   Correct.
10      Q.   I was able to find one payment to
11  Allegiance Electric in the documents that Dancor
12  produced to PetSmart in the amount of $19,350,
13  that's at Dancor 3430.  Am I right about that?
14      A.   Do you need to stop?
15      Q.   No, you can go ahead and answer.
16      A.   Can you repeat it again?  Sorry.
17      Q.   Sure.  We'll just back up, so it's
18  altogether, because I don't even remember where I
19  stopped.
20      A.   Something about Allegiance.
21      Q.   Yeah.  Allegiance Electric, Dancor swore
22  to PetSmart that it had already paid Allegiance
23  $108,235.99, correct?
24      A.   Correct.
25      Q.   I was able to find one record of one check

34  (Pages 130 to 133)

Page 134

1  in the documents that Dancor produced to PetSmart at
2  Dancor 3430 showing a payment to Allegiance Electric
3  of $19,350. Am I right about that?
4      A.  Correct.
5      Q.  So Dancor did not pay Allegiance Electric
6  $108,235.99, as it swore to PetSmart in payment
7  application number five, correct?
8      A.  Correct.
9      Q.  In fact, Dancor had paid somewhere in the
10 ballpark of $90,000 less to Allegiance Electric than
11 what they told -- what they swore to PetSmart that
12 they had paid to Allegiance Electric in payment
13 application number five, correct?
14     A.  Correct.
15     Q.  The next subcontractor listed is DaVco
16 Mechanical Contractors; do you see that?
17     A.  I do.
18     Q.  In payment application number five, Dancor
19 has now sworn to PetSmart that it has paid DaVco
20 Mechanical Contractors $151,335; is that correct?
21     A.  Correct.
22     Q.  I found just one payment to DaVco in the
23 amount of $21,330, we've talked about that already
24 at 3813. There is no other payment to DaVco; am I
25 right?

Page 135

1      A.  Correct.
2      Q.  So, compared to payment application number
3  four, Dancor is swearing to PetSmart that it's paid
4  DaVco even -- even a little bit more than it had
5  from the time of payment application number four,
6  goes from 135,000 and change to 151,000 and change,
7  right?
8      A.  Correct.
9      Q.  But in both circumstances, the only amount
10 that Dancor actually paid to DaVco at that point was
11 $21,330, correct?
12     A.  Correct.
13     Q.  This is -- we're now at the -- this is the
14 final payment application, so we're at the end of
15 the project now, right?
16     A.  Correct.
17     Q.  So, so far, Dancor has not followed
18 through on its intention, at least with regard to
19 this contractor, to pay them what they swore to
20 PetSmart they had already paid, right?
21     A.  Correct.
22     Q.  That would be true for all of the
23 subcontractors that we've identified, that Dancor
24 had not -- or the subcontractors that we've already
25 identified that Dancor did not pay the payments that

Page 136

1  they swore to PetSmart they had made. As to
2  application number five, Dancor had not followed
3  through on its intention to pay those
4  subcontractors, true?
5      A.  Correct.
6      Q.  The next subcontractor is Brazeal Masonry,
7  which I believe is unchanged from the previous
8  payment application, so we don't need to cover that
9  again, but in any event, though, Dancor is
10 representing in payment application five that it has
11 already paid Brazeal $17,910, I think that we
12 established that Dancor had not, in fact, paid
13 anything to Brazeal Masonry, true?
14     A.  Correct.
15     Q.  Impact Specialties is the credit card.
16 ELECHS, is that a -- is that a credit card payment,
17 also?
18     A.  No. They should be a short form contract,
19 if I'm not mistaken. They do have a contract with
20 us.
21     Q.  Okay.
22     A.  And that should be in the documents that
23 you have, which from the looks of it, it's the
24 payment less retention.
25     Q.  I have -- I found no record of a

Page 137

1  payment -- well, let's do it this way. Dancor swore
2  in payment application number five that it had
3  already paid ELECHS, Inc., $1,392.30, true?
4      A.  True.
5      Q.  I was able to find no record of a payment
6  to ELECHS in the financial documents that Dancor
7  produced in any amount. Am I right about that?
8      A.  Correct.
9      Q.  So Dancor did not pay ELECHS $1,392.30, as
10 it swore to PetSmart that it had in payment
11 application number five, true?
12     A.  True.
13     Q.  Gerflor. Once again, this final payment
14 application, Dancor is representing, swears to
15 PetSmart that it's already paid Gerflor $4,500, and
16 we previously established that Dancor had only paid
17 $3,779.37. Is that still the case in payment
18 application number five?
19     A.  Correct.
20     Q.  Tulsa Tile Guys, in payment application
21 number four, Dancor swore to PetSmart that it had
22 already paid Tulsa Tile Guys $4,224. In payment
23 application number five, Dancor has sworn to
24 PetSmart that it has now paid Tulsa Tile Guys
25 $7,603.20; do you see that?

35 (Pages 134 to 137)

Page 138

1     A.  Yes.
2     Q.  Am I right about that?
3     A.  You are correct in your statement.
4     Q.  And I was able to find no record of any
5  payment to Tulsa Tile Guys.  Am I right about that?
6     A.  Correct.
7     Q.  Is it true then that -- that Dancor had
8  not paid Tulsa Tile Guys $7,603.20, as it swore to
9  PetSmart that it had in payment application number
10  five?
11     A.  Correct.
12     Q.  I think we talked about Graybar.  And your
13  testimony was that Graybar was paid by credit card;
14  am I right?
15     A.  Correct.
16     Q.  Novar.  Is -- we covered that in the
17  previous payment application.  Was that also a
18  credit card?  I don't remember.
19     A.  The credit card, I think it's a deductive
20  change order to my electrician, if I'm not mistaken.
21     Q.  Okay.  And then the last entry on the
22  sworn statement is a payment to Dancor Construction
23  of $172,817, and am I correct that Dancor collected
24  that money for itself?
25     A.  Correct.

Page 139

1     Q.  All right.  If you take a look at the
2  bottom of payment application number five, is it
3  true that the -- that the notary provision, the
4  signature and notary provision for the sworn
5  statement in payment application number five is
6  missing?
7     A.  It is missing.
8     Q.  And you understand that at the -- at the
9  top of the sworn statement, on both pages, it
10  identifies an affiant, right?
11     A.  It does.
12     Q.  And then when you get to the bottom, there
13  is no -- there's no notary for the affiant to sign,
14  true?
15     A.  True.
16     Q.  Would Dancor agree that the form of the
17  sworn statement should include a notary provision
18  for the signature of the affiant?
19     A.  True.
20     Q.  And the -- the notary provision for the
21  signature of the affiant in previous -- in the first
22  two payment applications, maybe first three, was Dan
23  Policicchio, right?
24     A.  True.
25     Q.  And it was included in those sworn

Page 140

1  statements, true?
2     A.  True.
3     Q.  And then in the -- in the sworn statements
4  for payment application number four and number five,
5  the notary provision for the sworn statement is
6  missing, true?
7     A.  True.
8     Q.  And so Dan Policicchio has not signed the
9  notary provision for payment application number four
10  and five, true?
11     A.  True.
12     Q.  The -- the date of payment application
13  number five is January 31st, 2017, right?
14     A.  Correct.
15     Q.  I think one of the areas that you were
16  familiar about was when the date of substantial
17  completion was.  What was the date of the
18  substantial completion of construction?
19     A.  I will have to refer that one, it's in
20  January, I can guess if you would like me to, but I
21  believe I can -- I can pull that information out if
22  I need to real quick.  I know the Certificate of
23  Occupancy was obtained on the 17th.
24     Q.  Let's put it this way, because we don't
25  need to have specific dates.

Page 141

1     A.  Okay.
2     Q.  The issue is that the Certificate of
3  Occupancy, substantial completion, was before
4  January 31st, 2017, true?
5     A.  True.
6     Q.  So in terms of all of the work that the
7  subcontractors and suppliers had provided for
8  Dancor, that had all been -- with the exception of
9  punch list items, that had all been provided and
10  completed before the January 31st 2017 payment
11  application number five, true?
12     A.  True.
13     Q.  And Dancor accepted all of the work and
14  materials from the subcontractors and suppliers that
15  it had retained for the PetSmart project in Tulsa,
16  true?
17     A.  True, minus any change orders that
18  happened post 1-31-17.
19     Q.  Okay.  And Dancor did not dispute that
20  the -- that any of the subcontractors or suppliers
21  had provided the services or the products that they
22  provided, true?
23     A.  True.
24     Q.  All right.  Let's take a look again at
25  Exhibit Number 14, and let's -- actually it's

36 (Pages 138 to 141)

Page 142

1   Exhibit Number 15, that's the PetSmart payments,
2   right?
3       A.  Correct.
4       Q.  All right.  So, as of January 27th, 2017,
5   PetSmart paid Dancor $1,186,696.26.  True?
6       MR. LYTLE:  Object to the form.
7       THE WITNESS:  596.26.
8       Q.  Oh, did I read that wrong?  I tend to do
9   that.
10      MR. LYTLE:  Just for the date, the record,
11  that's when the last payment application was, but
12  the last payment looks like it was March when the
13  money actually came in, just so we're clear.
14      MR. IVY:  I see.  Okay.
15      THE WITNESS:  Paid, 3-6-17.
16      Q.  I got it.  Now, who prepared Exhibit
17  Number -- what is this exhibit number?  16?
18      MR. LYTLE:  15.
19      MR. IVY:  15.
20      THE WITNESS:  Dan J. Policicchio.
21  BY MR. IVY:
22      Q.  Who prepared this document?
23      A.  Daniel Policicchio, Sr.
24      Q.  Dan Policicchio, Sr. prepared Exhibit
25  Number 15, the PetSmart payment summary.  When did

Page 143

1   Dan Policicchio prepare that?
2       A.  I don't have the exact date, I just know
3   it was scanned over to me.
4       Q.  Do you know if this -- if Dan Policicchio
5   prepared Exhibit Number 15 in preparation for this
6   deposition?
7       A.  It appears so, because Exhibit 14 that was
8   scanned in with it says through July 13th, 2018.
9       Q.  Okay.  So, if we look at Exhibit Number
10  15, the payment summary, and compare it to the
11  payment applications, we can see that Dancor, in its
12  first payment application, requested $129,243.45
13  from PetSmart, and received $129,243.45 from
14  PetSmart, true?
15      A.  True.
16      Q.  So PetSmart paid everything that Dancor
17  requested in payment application number one, true?
18      A.  True.
19      Q.  And then payment application two, Dancor
20  requested $248,007.40, true?
21      A.  True.
22      Q.  And Exhibit 15 tells us that PetSmart paid
23  Dancor $248,007.40, true?
24      A.  True.
25      Q.  So PetSmart paid to Dancor everything that

Page 144

1   Dancor requested in payment application number two;
2   is that right?
3       A.  Correct.
4       Q.  Payment application number three shows
5   that Dancor requested $423,004.11 from PetSmart.  Do
6   you see that?
7       A.  Yes.
8       Q.  Is that true?
9       A.  That is true.
10      Q.  And the Exhibit Number 15, Dan
11  Policicchio's PetSmart payment summary shows that
12  PetSmart paid Dancor $423,004.11; is that true?
13      A.  Correct.
14      Q.  So PetSmart paid Dancor everything that
15  Dancor requested in payment application number
16  three, true?
17      A.  True.
18      Q.  Payment application number four, Dancor
19  requested $251,941.65, true?
20      A.  True.
21      Q.  And the PetSmart payment summary that Dan
22  Policicchio prepared, Exhibit Number 15 shows that
23  PetSmart paid Dancor $251,941.65, true?
24      A.  True.
25      Q.  So, PetSmart paid Dancor everything Dancor

Page 145

1   requested in payment application number four, true?
2       A.  True.
3       Q.  And then payment application number five,
4   Dancor requested $134,339.65, true?
5       A.  399.65.
6       Q.  Did I mess up my numbers again?  Let me --
7       A.  Unless I'm not reading it right.
8       Q.  No, it's probably me.  I have a little bit
9   of dyslexia, so I'll flip my numbers around a lot.
10      A.  399.65 in payment application five.
11      Q.  Let me reask the question so I get a clean
12  record.
13      A.  Okay.
14      Q.  Dancor -- in payment application number
15  five, Dancor requested a payment from PetSmart of
16  $134,399.65; is that true?
17      A.  Correct.
18      Q.  And Dan Policicchio's PetSmart payment
19  summary, Exhibit Number 15, shows that PetSmart paid
20  Dancor $134.399.65; is that true?
21      A.  True.
22      Q.  So PetSmart paid Dancor everything that
23  Dancor requested from PetSmart in payment
24  application number five, right?
25      A.  Correct.

37 (Pages 142 to 145)

Page 146

1     Q.  Do you know where Dancor got the
2  information that is contained in Exhibit Number 15,
3  the PetSmart payment summary?
4     A.  In the payment applications.
5     Q.  Well, what's shown in Exhibit Number 15 is
6  what PetSmart actually paid, what's shown in payment
7  applications is what Dancor asked PetSmart to pay,
8  so, my question is, do you know where Dancor got the
9  information about how much money PetSmart actually
10 paid to Dancor as shown in Exhibit Number 15?
11    MR. LYTLE:  Object to the form.
12    THE WITNESS:  No.
13    Q.  There would be a record somewhere at
14 Dancor of what PetSmart actually paid to Dancor;
15 isn't that true?
16    A.  True.
17    MR. IVY:  If anybody wants to take a
18 five-minute break, this would be a good time because
19 I have to figure out where I am, so I can put my
20 file back together so I can do it quickly in the
21 next --
22    VIDEO TECHNICIAN:  We're off --
23    MR. IVY:  And do my darnedest to get you
24 out of here.
25    VIDEO TECHNICIAN:  We're off the record,

Page 147

1  the time is 1:20 p.m.
2     (Recess taken.)
3     VIDEO TECHNICIAN:  We're back on the
4  record, the time is 1:30 p.m.
5     (Plaintiff's Exhibit No. 19 marked.)
6  BY MR. IVY:
7     Q.  Before you is Exhibit Number 19.  Do you
8  see that?
9     A.  I do.
10    Q.  Is that a sworn statement form that Dancor
11 gave to Allegiance Electric -- well, what is this?
12 This is -- Dancor produced this as 3440 in its
13 records.  What is this?
14    A.  This appears to be a Sworn Statement from
15 a subcontractor.  A subcontractor Sworn Statement.
16    Q.  This is a subcontractor making a Sworn
17 Statement to Dancor, correct?
18    A.  Correct.
19    Q.  So Dancor is doing on its end the same
20 thing that PetSmart is doing with Dancor with the
21 sworn statements?
22    A.  Correct.
23    Q.  And does Dancor provide this form to the
24 subcontractor that's filling it out?
25    A.  Would be, this -- don't know if this is an

Page 148

1  actual PetSmart form, a lot of clients do have their
2  own particular forms, too, but this might be a
3  Dancor form.
4     Q.  Okay.  In any event, Dancor used this form
5  with one of its own subcontractors, right?
6     A.  Correct.
7     Q.  And in using this form, there is a
8  signature and notary provision at the bottom of the
9  sworn statement that's Exhibit Number 19, true?
10    A.  True.
11    Q.  All right.  So -- do I need this document
12 back again?  Would you pull up the payment summary
13 exhibit?  Oh, here it is.
14    A.  15 or 14?
15    Q.  15 is the -- is the PetSmart payment
16 summary, right?
17    A.  Correct.
18    Q.  We've established, from Exhibit Number 15
19 that Dan Policicchio prepared, that PetSmart paid
20 Dancor a total of $1,186,596.26, true?
21    A.  Correct.
22    Q.  Okay.  And did all of that money go to
23 Dancor's general -- what's it called, the general
24 what fund?
25    A.  The operating account.

Page 149

1     Q.  The general operating account?  Did all of
2  that money go into the general operating account?
3     A.  That would be where it would be going,
4  correct.
5     Q.  All right.  Is there any way that someone
6  could look at Dancor's finances and figure out where
7  PetSmart's money went?
8     A.  I do not believe so at this time.
9     Q.  Okay.  During the period of time that the
10 PetSmart construction was going on, did Dancor pay
11 Dan Policicchio a salary?
12    A.  Dan Policicchio is an employee of Dancor,
13 so he would receive a paycheck and salary, yes.
14    Q.  What is Dan -- what was Dan Policicchio's
15 salary during the period of time of the PetSmart
16 construction?
17    A.  I do not have that document in front of
18 me.
19    Q.  Does Dancor know what its total payroll
20 was during the period of time of the PetSmart
21 construction?
22    A.  I do not have that information in front of
23 me.
24    Q.  Okay.  Does Dancor know whether Dan
25 Policicchio received any other compensation during

38 (Pages 146 to 149)

Page 150

1  the period of time of the PetSmart construction,
2  other than salary?
3      A.  I do not have that information.
4      Q.  If Dan Policicchio had made payments to
5  himself from the -- I don't know, the general
6  operating from Dancor's general -- from Dancor's
7  general operating account, there would be a record
8  showing that payment, true?
9      A.  In that scenario, yes.
10     Q.  Okay.  So if I understand correctly, this
11 is repeating a little bit of what we've talked
12 about, but I'm trying to get an overall picture.
13 Dancor would take in money from all of its
14 construction projects and put it into the general
15 operating account and then make payments to one job
16 or another as Dancor saw fit, true?
17     A.  True.
18     Q.  So there would be no way of isolating
19 money for one job, like the PetSmart job, and money
20 for another job like some job in another state; is
21 that true?
22     A.  That is true.
23     Q.  You testified that Dancor was aware of the
24 and bound by the laws of the state of Oklahoma.
25 There is a law in the state of Oklahoma that

Page 151

1  requires that money paid to a contractor be held as
2  a trust fund for payment of subcontractors; is that
3  true?
4      A.  I do not know that law personally right
5  offhand.
6      Q.  Is Dancor aware of that law?
7      A.  If it's an Oklahoma law, I'm sure it's
8  public record, so we're bound by the laws, then,
9  yes, we would be subject to that law.
10     Q.  I understand Dancor's subject to that law,
11 my question is, does Dancor know about that law,
12 does Dancor know that when it receives money on a
13 construction project in Oklahoma, it's to hold the
14 funds as trust accounts for subcontractors?
15         MR. LYTLE:  Object to the form.
16         THE WITNESS:  According to my statement
17 earlier, we know about the laws, so, yes.
18     Q.  Okay.  And just so that we're clear for
19 the -- for the record, the law speaks for itself,
20 and so my summary of it is probably not exact, but
21 the idea is that -- is that there's a -- that a
22 contractor is to hold funds paid in a construction
23 contract for -- in trust for subcontractors, and
24 then as to the specifics of the law, I'll -- I'll
25 incorporate that into this question by reference.

Page 152

1  But so, in terms of establishing a -- a trust
2  account or in order to meet its -- strike that.
3      What, if anything, did Dancor do to meet its
4  obligations to treat the money paid to it as kept in
5  trust for payment of Dancor subcontractors?
6          MR. LYTLE:  Object to the form.
7          THE WITNESS:  Dancor did not put it into a
8  trust.
9      Q.  Did Dancor treat the money that it
10 received from PetSmart in some other way as if it
11 was holding it in trust for the subcontractors,
12 other than putting it in a trust account?
13     A.  No.
14     Q.  It would be impossible for us to know
15 whether payments that Dancor made out of the
16 general -- out of its general operating fund to
17 other projects came from the money from PetSmart or
18 some other general contractor; is that true?
19     A.  True.
20     Q.  And all of those payments were made -- any
21 payment made to any subcontractor or any job that
22 Dancor had, that would have all been at the
23 discretion of Dan Policicchio, correct?
24     A.  Correct.
25     Q.  Dan Policicchio was the only person who

Page 153

1  decided who was going to be paid what at Dancor,
2  true?
3      A.  True.
4      Q.  And that included whether Dancor was
5  paying subcontractors on a PetSmart job,
6  subcontractors on some other job or employees of
7  Dancor, true?
8      A.  True.
9          MR. LYTLE:  Should be on 20, if that's --
10         MR. IVY:  No, I'm going back to an old
11 one.  I may have another one soon, but thank you, I
12 appreciate that.  I'm trying to decide what order to
13 go in, because I can probably -- I'm trying to
14 squeeze things together so that I don't take longer
15 than I need to.
16     Q.  Okay.  Let's do this.  This can shorten
17 things.  Let's take a look at payment application
18 number five, okay?  And remind me what exhibit
19 number that is.
20     A.  18.
21     Q.  Okay.  So we're looking at payment
22 application number five, Exhibit Number 18, and
23 since this -- since the payment application number
24 five is the last one, the last payment application
25 that Dancor made, this would now include all of the

Page 154

1  subcontractors and suppliers that Dancor used on the
2  PetSmart job in Tulsa; is that true?
3      A.  Up to the date of the application, yes.
4      Q.  Okay.  As Dancor sits here today, does
5  Dancor know how much it has paid to each one of the
6  subcontractors and suppliers identified in payment
7  application number five?
8      A.  The payment summary would be on Exhibit
9  14.
10     Q.  Exhibit 14 is the --
11     A.  Vendor summary.
12     Q.  Okay.  So, it's Dancor's testimony that as
13  of today, Dancor has paid Allegiance Electric
14  $37,186.77 of a total contract of $120,262.21; is
15  that true?
16     A.  According to Exhibit 14, yes.
17     Q.  Well, just to be precise, that's according
18  to Exhibit 14 and Exhibit 18?
19     A.  18.  Correct.
20     Q.  And these --
21     A.  It's a supplier, there's a Bryant in
22  there, too, that's why it says Consolidated Electric
23  Supply and Allegiance.  I'd have to pull their sworn
24  statement to look at that one.  If we have that.  I
25  don't see it on there.  It doesn't look like they

Page 155

1  listed their supplier on that sworn statement for
2  November.
3      Q.  Okay.
4      A.  Unless it's a completely different
5  electric supplier and I'm mistaken, and if so, I
6  apologize.  Consolidated Electric Supply and
7  Allegiance use Electrical Supplier as an electrical
8  supply house.
9      Q.  Is there -- would there be some record
10  that Dancor has that would identify the difference
11  that you are looking at, but can't --
12     A.  I would have to look at all the sworn
13  statements that were submitted on that, the payment
14  applications, and verify.
15     Q.  Okay.  Well, let's skip over that one,
16  let's go to DaVco.  So it's -- it's Dancor's
17  testimony today that it has paid DaVco Mechanical
18  Contractors, Inc. through today, $21,330 of a total
19  contract of $183,900, true?
20     A.  True.
21     Q.  So, as of today, Dancor has still not paid
22  the $151,335 that it swore to PetSmart it had paid
23  to DaVco in payment application number five; is that
24  true?
25     A.  True.

Page 156

1      Q.  And it's Dancor's testimony that as of
2  today, it's paid Demolition Wrecking $145,831.50 of
3  a $162,035 contract; is that true?
4      A.  True.
5      Q.  And the difference then is still owing,
6  right?
7      A.  True.
8      Q.  And that's true of DaVco and -- and the
9  other ones that we've talked about so far, right?
10     A.  True.
11     Q.  Legal ongoing, well, there's two, there's
12  a -- an entry here for accounting, accounting
13  doesn't have anything to do with payment of
14  subcontractors, that's a -- is that -- that's
15  Dancor's expense for its own accounting, is that
16  what that is?
17     A.  That's what it appears to be, yes.
18     Q.  Okay.  Well, you're Dancor, so I'm
19  asking --
20     A.  Yes, it is the accounting would be there,
21  same as legal, which is legal fees there.
22     Q.  So we have legal, that also has nothing --
23  that's in the amount of $34,680, that doesn't have
24  to do with subcontractors, that has to do with
25  Dancor's legal expenses having to due with, in part,

Page 157

1  I imagine, to this lawsuit; is that true?
2      A.  Correct.
3      Q.  Then there's an entry for payroll, that's
4  Dancor's payroll, that doesn't have anything to do
5  with subcontractors in this case; is that true?
6      A.  Correct.
7      Q.  Okay.  And then there's R.L.S.
8  Construction, $136,632.  Is that the amount that
9  Dancor is testifying that it has paid to R.L.S.
10  Construction as of today's date?
11     A.  And in the settlement.
12     Q.  Okay.  So, in addition -- so that -- just
13  so we're clear, the $136,632, Dancor is testifying
14  it actually already paid that to R.L.S.; is that
15  true?
16     A.  Yes, those figures show to be paid to
17  R.L.S.
18     Q.  Okay.  And then an additional $150,000 is
19  shown as -- a promised pay to R.L.S. in the future?
20     A.  No, that was their settlement.
21     Q.  So, did -- does that mean that Dancor paid
22  a total of 286,000 and change to R.L.S.?
23     A.  Correct.
24         MR. LYTLE:  Well, and -- if I may, just
25  correct that on the record, that settlement is -- is

40  (Pages 154 to 157)

Page 158

1   being paid out over a period of time, so that 150
2   has not been paid as of today.
3        MR. IVY: Okay.
4        MR. LYTLE: Just -- I don't want there to
5   be confusion about that.
6        Q. Well, that's what I thought, I just
7   want -- that's why I said, and it would make sense
8   to break it out that way if that's the case. So 136
9   and change was actually paid, 150 remains to be
10  paid; is that right?
11       A. Yes.
12       Q. There's an amount at the bottom for Victor
13  Williams for $29,654.97. It was my understanding
14  from your previous testimony that Victor Williams
15  was an employee of Dancor. Am I wrong about that?
16       A. No, you're right.
17       Q. Is there a reason why he's not included in
18  payroll?
19       A. Do not have that answer.
20       Q. Okay. There's some -- there are a number
21  of suppliers or possibly subcontractors that are --
22  that appear to not be on this vendor summary, that
23  are in payment application number five, Advanced
24  Fixtures is one of them. Do you see Advanced
25  Fixtures in the vendor summary there?

Page 159

1        A. No.
2        Q. By the way, R.L.S. had to sue Dancor to --
3   R.L.S. sued Dancor seeking its -- seeking payment in
4   the amount owed to it, true?
5        A. True.
6        Q. And DaVco sued Dancor to try to recover
7   the amount due to DaVco, true?
8        A. I believe so, true.
9        Q. And Brazeal also filed a lawsuit against
10  Dancor trying to get the money that Dancor owed to
11  Brazeal; is that true?
12       A. I believe so, true.
13       Q. I don't see Brazeal listed on this vendor
14  summary. Do you see Brazeal on here?
15       A. They are not listed in the vendor summary.
16       Q. Excuse me?
17       A. They are not listed on the vendor summary.
18       Q. Does Dancor know why Brazeal and
19  Allegiance Electric and any other -- I don't want to
20  have to cross copy, because I want to be able to get
21  you to your plane if we can, but why those two and
22  any other subcontractors or suppliers that are
23  listed on the payment applications are not contained
24  on this vendor summary?
25       A. No.

Page 160

1        Q. If we had the records that -- that this
2   vendor summary was based on, would we be able to
3   answer that question, why those subcontractors and
4   suppliers are not on the vendor summary?
5        MR. LYTLE: Object to the form.
6        THE WITNESS: I do not have that answer.
7        Q. Okay. What's the total amount that Dancor
8   owes to its subcontractors and suppliers that it
9   still has not paid?
10       A. I do not have that total figure in front
11  of me.
12       Q. How would you go about determining that
13  number?
14       A. Determine that number would have to be all
15  change orders submitted to PetSmart, what was paid
16  against us, and then what was owed to the
17  subcontractors, you had a total amount of all
18  payments -- or sorry, our total contract amount plus
19  change orders less paid amount to subcontractors.
20       Q. Well, now, we can do that with the -- if
21  we assume that the amounts that are on Exhibit --
22  this is 15, right, or 14, the job cost vendor
23  summary?
24       A. Vendor summary would be 14.
25       Q. All right. Now, vendor summary number 14

Page 161

1   is not a sworn document, right?
2        A. No.
3        Q. The sworn statement in payment application
4   number five is a sworn statement, right?
5        A. Yes.
6        Q. The numbers that are contained in the
7   sworn statement in payment application number five
8   are -- are not accurate, though, right?
9        A. No.
10       Q. No, they're not accurate; am I right?
11       A. No, they are not accurate.
12       Q. So, I guess part of my question is, how is
13  it that we can trust the vendor summary that's
14  Number 14, and we can't trust the sworn statement?
15       MR. LYTLE: Object to the form.
16       Q. The sworn statement is that Dancor
17  prepared and submitted to PetSmart for payment?
18       A. I do not have an answer for that.
19       Q. And since there are -- we've established
20  at least two, and there may be more, vendors and
21  subcontractors that are missing from the vendor
22  summary, how would -- even if you gave us a formula,
23  how would PetSmart go about figuring out what's the
24  total amount that Dancor still owes to its
25  subcontractors and vendors?

41 (Pages 158 to 161)

Page 162

1     MR. LYTLE:  Object to the form.
2     THE WITNESS:  I do not have that answer.
3     Q.  It wouldn't be possible, would it?
4     MR. LYTLE:  Object to the form.
5     THE WITNESS:  I can't answer that, if it's
6  possible or not, to find out the exact amount for
7  all the subcontractors.
8     Q.  Well, based on the information that Dancor
9  has produced to PetSmart, and given the fact that we
10  don't know what the correct numbers are in the sworn
11  statements, Dancor misrepresented the amounts they
12  paid in the sworn statements that are presented in
13  PetSmart, and given that there are -- there's an
14  unsworn list of and incomplete list of vendors and
15  subcontractors in Exhibit Number 14, and we have
16  a -- and Dancor produced a bunch of checks that
17  don't account for all the payments that it said that
18  it made, how would PetSmart, using what's supposed
19  to be a complete production of Dancor's financial
20  records, figure out what Dancor still owes to its
21  subcontractors, is that possible?
22     MR. LYTLE:  Object to the form.
23     THE WITNESS:  I can't answer if it's
24  possible or not.  You would have to go through the
25  documents that I presented here, and as you stated,

Page 163

1  with a formula, and find out what's owed, what's
2  presented.
3     Q.  Okay.  We know -- so, from the documents
4  presented, we -- PetSmart may be able to conclude
5  what the amounts of the contracts are with the
6  vendors and the subcontractors, we know what Dancor
7  says the amount of the contracts are, and I suppose
8  the contracts were produced, so we can probably
9  check that.  I'm going to guess that the amounts of
10  the contracts are probably correct?
11     A.  Correct.
12     Q.  So we know who the -- who all the vendors
13  and subcontractors are, that should be reflected in
14  payment application number five, unless somebody
15  came along after that and did some minor thing.  But
16  the majority of them, the main ones are going to be
17  shown in payment application number five, true?
18     A.  Correct.
19     Q.  We know that a large number of the
20  representations by Dancor of what it paid to its
21  subcontractors in payment application number five
22  are -- are not correct, so we can't use those
23  figures to figure out what's actually owed to the
24  subcontractors, right, because the numbers are
25  wrong?

Page 164

1     MR. LYTLE:  Object to the form.
2     THE WITNESS:  True.
3     Q.  And so then the other way that we might be
4  able to figure it out is to look at the financial
5  records that Dancor produced that Dancor claimed
6  were complete financial records, which consists of
7  checks that match up with some, but not a lot of
8  what Dancor claims to have paid in the payment
9  applications, true?
10     MR. LYTLE:  Object to the form.
11     THE WITNESS:  True.
12     Q.  And the other place we could go to
13  figure out what Dancor may still owe its contractors
14  is the job vendor summary number 14, but we
15  established that the job summary includes amounts
16  that don't have anything to do with subcontractors
17  and don't include many other subcontractors, and
18  then a bunch of subcontractors are all put together
19  in one category that's not supported by any
20  individual documentation; is that true?
21     MR. LYTLE:  Object to the form.  It
22  misstates the testimony and the documents.  You can
23  answer.
24     THE WITNESS:  True.
25     Q.  So, given that, is there any other

Page 165

1  document, other than the financials that Dancor
2  produced, that were supposed to be complete, that --
3  that PetSmart can look to, other than the ones we've
4  talked about, to try to figure out what Dancor still
5  owes to its contractors?
6     MR. LYTLE:  Object to the form.
7     THE WITNESS:  No.
8     Q.  Is it your testimony today that -- it's
9  your testimony, as I understand it, that Dancor
10  doesn't know what it still owes to its contractors;
11  is that true, the subcontractors?
12     MR. LYTLE:  Object to the form.
13     THE WITNESS:  The vendor summary shows
14  what was paid, and what would be left would be the
15  contractual amounts that are in our contracts and
16  remaining change orders that are open.
17     Q.  That's not my question.  My question is,
18  is it your testimony that as you sit here today,
19  Dancor does not know what it still owes to its
20  subcontractors?
21     MR. LYTLE:  Object to the form.  It's been
22  asked and answered.  You can answer.
23     THE WITNESS:  No, we know what's there,
24  based upon the vendor summary that was provided to
25  you, what's been paid, and what the subcontractor

42  (Pages 162 to 165)

Page 166

1  amounts would be owed.
2      Q.  So you're -- you're basing your conclusion
3  that Dancor could tell us what it still owes its
4  subcontractors, based on this document number 14
5  that we've already talked about; is that true?
6      A.  True.
7      Q.  Okay.  And the way we would do it is we
8  would take document number -- Exhibit Number 14 and
9  compare it to what?  What would we compare -- what
10  would we use along with Exhibit Number 14 to figure
11  out what Dancor still owes its subcontractors?
12      A.  Contract amounts less change orders or
13  plus change orders.  Any change orders that are
14  there, unless previously paid.
15      Q.  So, I don't know what that means.  There
16  are change orders, which is during the construction
17  period something else has to be done and something's
18  approved and a subcontractor then does more than
19  they initially intended, right?
20      A.  Change order means change of scope, if you
21  have scope of work, any changes above or beyond,
22  positive or negative, to that contract amount,
23  whether it takes more to do something or it takes
24  less, that's a change to your contract.
25      Q.  Okay.

Page 167

1      A.  If it's a change plus or minus, the change
2  order has to be authorized, written and signed and
3  approved before the contractor can move forward.
4      Q.  Okay.  And does the -- would the payment
5  applications reflect change orders?
6      A.  Up to January 31st, payment application
7  five, Exhibit 18, to payment -- where's it at?
8  Sorry.  It's here somewhere.  There are change
9  orders.  I'd have to look back, but I think it was
10  like 13 or something that they had approved up to.
11  But, yes, we do have the change orders with
12  PetSmart that would show that PetSmart has approved
13  these change orders, if that's PetSmart's payment.
14  If it was not something that PetSmart requested, it
15  was an internal change order, then that's something
16  that, hey, you're not going to do the scope of work,
17  we're going to have somebody else do it, be
18  deductive.  As I stated earlier, I believe the Novar
19  was purchased by Dancor, which you provided the
20  Allegiance Electric showing the Novar sworn
21  statement.
22      Q.  Okay.  Let me see if I have this right.
23  The change orders, what that does is that basically
24  tells us what the final number is for the contract
25  for any subcontract, so --

Page 168

1      A.  And those were provided to you in our
2  5,000 plus pages.
3      Q.  I got it.  So there's -- so a contract
4  might start out at $50,000, but then they have to
5  put in an additional sink or something and now it's
6  50,000 and -- 55 -- $55,000 or something like that.
7  Or it could be that Dancor decides, you know, we
8  don't want you to put -- we only want you to put in
9  four out of five sinks, we're going to have somebody
10  else do the fifth sink, so it's 44 -- 45,000 instead
11  of 50,000, it could go either way?
12      A.  Correct.
13      Q.  In the end, we'll be able to figure out
14  what the total amount that was due to that
15  contractor was by taking the original contract and
16  then adding or subtracting based on the change
17  orders; is that true?
18      A.  Correct.
19      Q.  Okay.  So we -- so we start with that.
20  We'll just call the result of that product the
21  amount the contractor is due, okay?  So if we're
22  going to figure out the amount that the contractor
23  is due, we're going to figure out how much less than
24  the contractor is due Dancor has actually paid, then
25  we would then -- you're saying then we go to Exhibit

Page 169

1  Number 14, which is the job and vendor summary,
2  right?
3      A.  Correct.
4      Q.  And then we would take that total amount
5  that they're due and subtract the amount that Dancor
6  has identified in Exhibit Number 14 in the job and
7  vendor summary, right?
8      A.  Correct.
9      Q.  And that's your testimony that that would
10  tell us how much Dancor still owes its
11  subcontractors?
12      A.  Correct.
13      Q.  Okay.  However, we've established that
14  some subcontractors aren't listed on the job and
15  vendor summary, true?
16      MR. LYTLE:  Object to the form.
17      THE WITNESS:  True.
18      Q.  Okay.  For example, we established that
19  Brazeal is not listed on the job and vendor summary,
20  right?
21      A.  They are not on a job and vendor summary,
22  which shows the payments that were made to
23  subcontractors.
24      Q.  Okay.  So, and I believe there's others.
25  There was a supplier named Elliott Electric, there's

43 (Pages 166 to 169)

Page 170

1  a -- if -- if all of the subcontractors are not
2  listed on the job and vendor summary, what are we
3  subtracting?  How -- what do we -- how do we know
4  what to subtract?
5          MR. LYTLE:  Object to the form.
6          THE WITNESS:  The payments that were made
7  are summarized on this sheet.
8      Q.  Yeah.
9      A.  Okay.  So if the contractor is not on that
10  sheet --
11     Q.  I see, they didn't receive a payment?
12     A.  Correct.
13     Q.  Okay.  I got it.  So, what -- what Exhibit
14  Number 14 means, if it doesn't list a subcontractor,
15  that non-listed subcontractor was paid nothing; is
16  that true?
17     A.  According to that, correct.
18     Q.  Okay.  And then we have this element of --
19  I don't know, we'll call it the -- there's a --
20  there's a -- there's one number here, the 129,000
21  and change number that several different suppliers
22  are all contained in one.  So, do you -- does Dancor
23  know whether the $129,140 that was paid by credit
24  card paid the entirety of the subcontractors that
25  are listed there under that category?

Page 171

1      A.  If it was a credit card payment on those,
2  then, yes, they were paid.
3      Q.  Okay.
4      A.  We had -- the suppliers on this job had to
5  be paid 100 percent on those credit card payments
6  that was made via credit card, it wasn't a down
7  payment, it wasn't a progress payment.
8      Q.  Okay.
9      A.  It was a payment for material supplies to
10  be shipped ahead of receiving the materials and
11  ahead of receiving any funds for materials as they
12  had to be purchased for the job, if they were
13  purchased, they were there and then obviously we
14  would bill for them.
15     Q.  Okay.  And I think we established that
16  there's -- there may be one or two subcontractors
17  not named in that entry for credit card payments
18  that actually were paid by credit card; is that
19  true?
20     A.  Correct.
21     Q.  But we can't -- how would PetSmart be able
22  to figure out which subcontractors those are?
23     A.  I do not have that answer for you.
24     Q.  Okay.  Has Dancor reviewed the
25  Supplemental Responses to Interrogatories and

Page 172

1  Request for Production that Dancor produced to
2  PetSmart?
3      A.  Yes.
4      Q.  And you've heard me talk about a group of
5  documents that Dancor identified as its financial
6  records, which was a combination of the pay
7  applications, plus a number of payments that was --
8  that were checks.  And those checks were listed
9  individually by -- by Bates number, correct?
10     A.  Correct.
11     Q.  And am I right that the -- that -- that
12  the documents that were identified by Bates number,
13  if I -- if I look at all of those documents, if I
14  put all of those documents there, that, plus the
15  payment applications is what Dancor says is the
16  entirety of their financial records for the project;
17  am I right?
18          MR. LYTLE:  Object to the form.
19          THE WITNESS:  I believe so, yes, without
20  having to look at all the records that were there
21  right in front of me, as I'm not looking through
22  them, but, yes, what we submitted was the financial
23  records.
24     Q.  Okay.  And let me -- let me give you a
25  little bit easier question to -- you -- you reviewed

Page 173

1  the pages that were identified, and those are
2  accurately represented in -- in the responses; is
3  that true?
4      A.  True.
5      Q.  Okay.  I just don't want to have to go
6  through all of them or make you go through all of
7  them.
8      A.  There's -- there's 5,000 pages here, if we
9  need to start looking at pages, we need to start
10  making some arrangements.
11     Q.  Okay.  Pull up, if you will, the contract
12  between PetSmart and Dancor, the number of which I
13  cannot remember.
14     A.  Exhibit 5.  No, Exhibit 6 was the full
15  contract.  Well, no.  That was the qualification
16  review.  Sorry.  Contract, Exhibit 8.
17     Q.  Okay.  And you have the Exhibit 8, the
18  construction contract between PetSmart and Dancor in
19  front of you; is that true?
20     A.  True.
21     Q.  All right.  Does -- now, just one more
22  question about the unpaid subcontractors.  It would
23  be possible for Dancor, using the records that it
24  produced to PetSmart and any other records that may
25  exist that we've talked about, to determine what it

44  (Pages 170 to 173)

Page 174

1  owes its subcontractors, right?
2           MR. LYTLE:  Object to the form.
3           THE WITNESS:  Correct.
4       Q.  It's Dancor's obligation to know what it
5  owes its subcontractors, right?
6       A.  True.
7       Q.  So that, I guess, is not a number that you
8  have readily at hand in front of you; am I right
9  about that?
10      A.  True.
11      Q.  Okay.  But it's a number that -- that's
12  known by somebody, I mean, it should be known by
13  Dancor, right?
14      A.  Correct.
15      Q.  All right.  That number, as you sit here
16  as Dancor, do you have any approximation of what
17  that number is?
18      A.  No.
19      Q.  Did -- did Dancor do anything to research
20  its corporate memory to determine what the amount it
21  still owes its subcontractors is?
22          MR. LYTLE:  Object to the form.
23          THE WITNESS:  They looked at the -- we
24  provided the paid vendor summary.
25      Q.  Okay.  Now, as we talked about at the

Page 175

1  beginning, this is a 30(b)(6) deposition of the
2  Dancor corporation, and there are certain things
3  that ought to be in the corporate memory of Dancor,
4  one of those things I will argue for the record is,
5  in this case, what Dancor still owes its
6  subcontractors.  And I think that is highly relevant
7  and a clear element that should have been known.
8  However, let's work with this.
9           MR. LYTLE:  Just for the record, I'm going
10  to object to that representation.  If you want to do
11  the math on what is paid and what's in final pay
12  application, it's a calculation that can be made.
13          MR. IVY:  All right.  You may miss your
14  plane, but let's make the calculation, unless you
15  want to do it while I'm asking other questions, so
16  he can make his plane.  Your call.
17          MR. LYTLE:  My call was we were going to
18  start at 9:00, that didn't happen.  You've deposed
19  him for multiple hours on a separate occasion, we're
20  here, we're cooperating, if you want me to
21  subcontract 1.1 million minus 577,000, I can do
22  that.  I think that responds to your question, but
23  you haven't asked me, so we'll let you ask the
24  question.
25          MR. IVY:  1 million minus 577,000.

Page 176

1  BY MR. IVY:
2       Q.  Can we agree that the amount that Dancor
3  still owes its subcontractors is something over
4  $400,000?
5       A.  I would have to do some math, I didn't
6  exactly look at that one, but I believe it would
7  possibly be in that ballpark.  Let's see.  What do
8  we owe?  Where we have been paid minus what we owe.
9  So we've been paid 1,186,000, and we've paid out a
10  total of 577,381.28.  Based upon those calculations,
11  less the items that were legal and operating
12  expenses from Dancor.  And accounting.
13      Q.  You can give me a ballpark.  What's a
14  ballpark number then that you -- that you think is
15  reasonable, give yourself plus or minus, I don't
16  know, let's try it with plus or minus 100,000.
17  That's a pretty broad range.
18      A.  So we paid 1186 and we paid out directly
19  to trades and vendors via credit card or by check,
20  that leaves a difference of right at 600,000.
21      Q.  Okay.  So, is that a ballpark figure that
22  Dancor still owes its subcontractors?
23      A.  It's a ballpark figure, yes.
24      Q.  Okay.  And I'm willing to go plus or minus
25  100,000, you know, because I understand there can be

Page 177

1  some issues of -- but for purposes of the questions
2  I'm going to ask next, it's a calculation that
3  Dancor should make, not me, so we'll work with your
4  number and we'll put in some -- a fudge factor
5  there, okay?
6       A.  Okay.
7       Q.  All right.  I'd like you to take a look at
8  the contract between Dancor and PetSmart, and in
9  particular, I would like you to look at page 3 of 20
10  at the top, the paragraph that starts at the very
11  top.  And then I'd like you to look at the last
12  sentence of that paragraph that starts at the top of
13  page three.  Are you where I am?
14      A.  I am.
15      Q.  It says, "Further, client," and that's
16  PetSmart, right?
17      A.  Correct.
18      Q.  "Shall have the right to pay any portion
19  of such final payment directly to unpaid
20  subcontractors or others claiming any lien rights
21  with respect to the project or jointly to any such
22  persons and contractor."  Do you see that?
23      A.  I do.
24      Q.  And that refers to the -- that refers to
25  the retainage, right, PetSmart holds back 10 percent

45 (Pages 174 to 177)

Page 178

1  plus, I think, some amount, and then Dancor, after
2  Dancor meets all of its obligation, PetSmart is
3  supposed to pay that retainage to Dancor, right?
4      A.  What's the plus amount?  It should just be
5  retainage?
6      Q.  Well, maybe it is just retainage.  I
7  thought maybe it would have something to do with the
8  change orders, I don't know.
9      A.  Well, they do still owe us additional
10  change orders past the final application number
11  five, so that could be the plus amount.
12      Q.  Okay.  All right.
13      A.  There we go.
14      Q.  Do you have any idea how much those change
15  orders are?
16      A.  Not in front of me right now, I believe
17  there's a summary of it that was sent in all of our
18  documents.
19      Q.  Okay.
20      A.  There's -- let's see.  Not in front of me
21  at the moment.
22      Q.  Okay.  Is it true that the contract
23  between PetSmart and Dancor permits PetSmart to use
24  the retainage to pay any unpaid contractors or
25  lienholders of Dancor?

Page 179

1      A.  That shows by the contract, yes.
2      Q.  Okay.  And we've established that there
3  were many unpaid subcontractors and lienholders of
4  Dancor, true?
5          MR. LYTLE:  Object to the form.
6          THE WITNESS:  True.
7      Q.  I only have one of these for -- oh, no, I
8  have two.
9      (Plaintiff's Exhibit No. 20 marked.)
10      Q.  Okay.  On -- is -- you're looking at
11  Exhibit Number 20, which is Dancor's Answer to
12  PetSmart's Amended Complaint.  Do you see that?
13      A.  I do.
14      Q.  Go to page ten, if you would.  You might
15  want to look at page nine, also.  Page nine is the
16  start of Dancor's counterclaim against PetSmart; do
17  you see that?
18      A.  I do see it.
19      Q.  All right.  Go to page ten, please, and
20  paragraph eight on page ten.  Do you see that?
21      A.  Yes.
22      Q.  It says the defendant, that's Dancor,
23  right?
24      A.  Correct.
25      Q.  Is entitled to the holdback.  The holdback

Page 180

1  is the retention, right?
2      A.  Correct.
3      Q.  Of $126,939.70 plus any holdbacks from the
4  change orders.  Do you see that?
5      A.  Correct.
6      Q.  Okay.  Now, we've already established that
7  PetSmart, under the contract, can use the holdback
8  to pay unpaid subcontractors of Dancor, true?
9      A.  True.
10      Q.  And, in fact, PetSmart has paid unpaid
11  subcontractors, frankly, lienholders, of -- caused
12  by Dancor's failure to pay the subcontractors in an
13  amount in excess of 126,939.  Therefore, Dancor is
14  not entitled to the holdback of 126,939.70, is it?
15          MR. LYTLE:  Object to the form.
16          THE WITNESS:  According to your statement,
17  no.
18      Q.  And the information that -- well, Dancor
19  would know by looking at its own documents, just as
20  PetSmart could, that Dancor's subcontractors were --
21  were unpaid to a substantial degree --
22          MR. LYTLE:  Object --
23      Q.  -- somewhere around 600,000, true?
24          MR. LYTLE:  Object to the form.
25          THE WITNESS:  True.

Page 181

1      Q.  While we have the contract in front of us,
2  if you would, again, on page 3 of 20 of the contract
3  between PetSmart and Dancor, did we say that was
4  number -- what number is that?
5      A.  Exhibit 8.
6      Q.  Eight.  If you'd look at the second
7  paragraph, second full paragraph on page three.  Do
8  you see that?
9      A.  Starting "For each day"?
10      Q.  Right.  "For each day following the 20th
11  day after the substantial completion date that
12  contractor fails to complete all items in the punch
13  list in their entirety, contractor shall be
14  obligated to pay client the sum of $500 per day as
15  reasonable liquidated damages, and not as a penalty,
16  liquidated damages, to reimburse client for the
17  additional administration required of its personnel
18  impaired or lost business opportunities caused by
19  contractor's delay."  Do you see that?
20      A.  I see that.
21      Q.  I think you were -- I think you testified
22  to a rough date that the punch list was completed.
23  I want to know now, because you're here testifying
24  on behalf of Dancor, does Dancor know the date that
25  the punch list was completed?

46 (Pages 178 to 181)

Page 182

1      A.  I have a -- two dates right in my head
2   from the e-mails that we were taken care of, I would
3   say the last date is no later than 4-18 when -- and
4   that's per one of the e-mails.  4-11 was the other
5   date, but it was confirmed everything was last
6   correspondence I have with Jeff Stephens was 4-18
7   from items were satisfied.
8      Q.  Okay.  So there is an e-mail from Jeff
9   Stephens identifying that date in the documents that
10   were produced?
11      A.  We had the questions that were -- I can't
12   remember what numbers they are in there, but I can
13   pull the e-mails that were provided to you and pull
14   the information that these were the items between
15   Jeff Stephens and Brad, the store manager of
16   PetSmart, that these are the items left, these are
17   items completed, and there's even pictures that show
18   it in -- within those e-mails, too, that are
19   embedded into it and printed out.
20      Q.  Okay.  So Dancor would agree that under
21   the contract, PetSmart is entitled to liquidated
22   damages for the period identified in the contract,
23   the 20 days after substantial completion date until
24   April 18th; is that true?
25      A.  That is true.

Page 183

1      MR. LYTLE:  I'm going to object to the
2   form as a legal conclusion.  You can answer.
3      THE WITNESS:  That is true.
4      Q.  Okay.  Would Dancor consider liens that
5   were filed by its subcontractors that were served on
6   Dancor to be part of the financial records regarding
7   the PetSmart project in Tulsa?
8      MR. LYTLE:  Object to the form.
9      THE WITNESS:  They directly relate to
10   finances, so, technically, they are a legal
11   financial record of what's owed to the contractor.
12      Q.  Okay.
13      A.  And their -- then obviously it's what it
14   is.
15      Q.  I saw no record in any of the documents
16   that Dancor produced of any liens of any -- of any
17   of its subcontractors; am I correct about that?
18      MR. LYTLE:  Object to the form.
19      THE WITNESS:  I do not believe that liens
20   were included in any of the documents.
21      Q.  Okay.  There was a -- one of the
22   categories of documents R.L.S. produced was
23   correspondence with subcontractors, correct?
24      MR. LYTLE:  Object to the form.
25      THE WITNESS:  I believe so, correct.

Page 184

1      Q.  I tell you what.  We'll take a minute.  I
2   don't remember the exhibit number.  Dan -- defendant
3   Dancor Construction's Responses to Plaintiff's First
4   Interrogatories and Requests for Production.  What
5   exhibit was that?
6      MR. LYTLE:  It should be one of the first
7   couple.  Number 2.
8      MR. IVY:  Exhibit 2?
9      MR. LYTLE:  Yep.
10      Q.  If you would take a look at -- could you
11   hold that up so I can make sure I'm looking at the
12   same document you are?
13      A.  Do I need to pass it down?
14      Q.  Oh, thank you.  Yeah, that's the same.
15   Thank you.
16      A.  Thank you.
17      Q.  If you look at Request Number 12 on the
18   Requests for Production.
19      A.  Okay.
20      Q.  PetSmart requested Dancor to produce all
21   correspondence or records of other communication
22   between you and each and every of your
23   subcontractors concerning any issue involving the
24   PetSmart store.  Do you see that?
25      A.  I do.

Page 185

1      Q.  And did Dancor understand that to mean
2   that PetSmart was requesting that Dancor produce all
3   correspondence that it had with its subcontractors
4   related to the PetSmart store?
5      A.  That's what it looks like.
6      Q.  Okay.  And was Dancor aware of the fact
7   that there was a federal court order requiring
8   Dancor to produce those documents?
9      MR. LYTLE:  Object to the form.
10      THE WITNESS:  If it was regarding this
11   document I hold in my hand, Exhibit 2, then, yes, we
12   were aware of this document, Number 12.
13      Q.  Okay.  Did Dancor receive any
14   correspondence from any of its subcontractors that
15   were not paid, saying, where is my money?
16      A.  That would be found in your e-mails, so,
17   yes, I do remember reviewing e-mails and a few of
18   those e-mails questioned where the funds were.
19      Q.  Okay.  I'm going to show you some e-mails
20   that I did not find anywhere in Dancor's production
21   of documents.  If I'm wrong, you can correct me.
22   But let's start with -- if you would mark this as --
23   are we on 21?
24      (Plaintiff's Exhibit No. 21 marked.)
25      Q.  What I'm going to show you is a series of

Page 186

1  correspondence from one of the unpaid
2  subcontractors. So, are you taking a look at
3  Exhibit Number 21?
4      A.  I am.
5          MR. IVY:  Do you need a copy of this,
6  Gregg?
7          MR. LYTLE:  No, I think I've got them
8  here.
9      Q.  Okay.  Exhibit Number 21 is a e-mail, if
10 you look on the second page of it, there's an e-mail
11 from Rick Smith of R.L.S. Construction.  Do you know
12 who Rick Smith is?
13     A.  Shown here on page two of the document to
14 be Rick Smith, owner of R.L.S. Construction.
15     Q.  Does Dancor know who Rick Smith is?
16     A.  It shows to be here in Dancor
17 correspondence, so it looks like they do know who
18 Rick Smith is, yes.
19     Q.  Okay.  And this is a e-mail from R.L.S.
20 to Dancor, it says, "Robert," it's written to Robert
21 Albertson.  Robert Albertson, who is Robert
22 Albertson?
23     A.  Robert Albertson was the previous project
24 manager, or his title was Director of Operations,
25 who left.

Page 187

1      Q.  And now, Dancor provided a last known
2  address for Mr. Albertson, but didn't for
3  Mr. Williams, do you know who I'm talking about?
4          MR. LYTLE:  I'm going to correct the
5  record, that's a misstatement, of course, that's
6  fine, if you want to misstate on the record, that's
7  your --
8          MR. IVY:  No, I don't want to misstate on
9  the record.  Did Dancor provide a last known for
10 Victor Williams?
11         MR. LYTLE:  It's right under the one for
12 Mr. Albertson, yes.
13         MR. IVY:  It is?
14         MR. LYTLE:  It is.
15         MR. IVY:  Well, then I totally missed it.
16         MR. LYTLE:  You did.  I would refer you to
17 supplemental answer, the last known address for
18 Victor Williams is 998 Fall Drive, Lewisville,
19 Texas, 75067.  Immediately above that is the last
20 known address for Mr. Albertson.
21         MR. IVY:  Let's -- here.  Now, you know I
22 received -- this is in the supplemental?
23         MR. LYTLE:  Yep.
24         MR. IVY:  Is this in the Word version that
25 you sent me?

Page 188

1          MR. LYTLE:  No, it's -- it's in Exhibit
2  Number 3 that's already an exhibit to this
3  deposition.
4          MR. IVY:  Okay.  Thank you.  My mistake.
5          MR. LYTLE:  You're welcome.  And, Counsel,
6  just for the record, if you're going to identify the
7  exhibits that were made in the R.L.S. state court
8  matter relating to those e-mails, to the extent
9  those have not been produced, there may be a
10 clarification that needed to be made on our end,
11 we're trying to produce 5,000 and some-odd pages of
12 documents, and so if those weren't included by a
13 mistake on our part, then that's my fault for that.
14         MR. IVY:  While we're making statements
15 about -- about correspondence, if -- if that's the
16 claim, it's -- it's fairly questionable, because
17 these are not only -- this is -- this is the only
18 example that I have a window into.  There are -- we
19 have identified a lot of subcontractors.  And I did
20 not see a lot of e-mails regarding "where's my
21 money".
22         Now, that being the case, these e-mails that
23 I'm going through were identified as trial exhibits
24 by R.L.S., so they were known not only to Dancor,
25 but their attorneys.  So we're going to go through

Page 189

1  them now.  So, I'm going to ask you a question now,
2  are you with me?
3          THE WITNESS:  I'm with you.
4  BY MR. IVY:
5      Q.  This is a e-mail from Rick Smith dated
6  January 4th, 2017, to Robert Albertson, who was
7  working for Dancor at the time, true?
8      A.  True.
9      Q.  The project manager, I think you said?
10     A.  He was running the job, yes.  His official
11 title was Director of Operations.
12     Q.  And it says, "Robert:  We've been looking
13 forward to a payment for the PetSmart in Tulsa, OK.
14 As of January 4th, 2017, we have not received any
15 payments and the account is past delinquent.  Please
16 notify us as soon as you can to let us know when we
17 can expect payment for this project."  Do you see
18 that?
19     A.  I do see that.
20     Q.  Okay.  Now, there's a response from Robert
21 Albertson saying that -- that Dancor has not
22 received billing from R.L.S. for the month of
23 December.  Do you see that?
24     A.  I do see that.
25     Q.  Okay.  So, Dancor's response here is that

48  (Pages 186 to 189)

Page 190

1  you haven't sent us your bill.  Do I understand that
2  correctly?
3      A.  That is what it states on the e-mail.
4      Q.  Okay.  Let's mark this as Exhibit 22,
5  please.
6          (Plaintiff's Exhibit No. 22 marked.)
7      Q.  Are you looking at Exhibit 22?
8      A.  I am.
9      Q.  All right.  This is an e-mail from Rick
10 Smith of R.L.S. Construction to Dan Policicchio,
11 correct?
12     A.  It is.
13     Q.  And this says, "We are looking for
14 October, 24,200, November, 92,700, December, 67,154.
15 We are just getting in a pickle with our suppliers
16 over this."  Do you see that?
17     A.  I do see that.
18     Q.  And Dan Policicchio responded, "Rick, are
19 you looking for the November billing, which we
20 submitted to the owner on November 30th, 2016 and
21 have yet to receive funding from them?"  Do you see
22 that?
23     A.  I do see that.
24     Q.  When Dan Policicchio told Rick Smith that
25 Dancor had not yet received funding from PetSmart as

Page 191

1  of January 4th, 2017, was that accurate?
2      A.  What he was looking for, in his statement,
3  "Rick, are you looking for November billing on
4  there," that that is Dan's.  So, on 11-30, he
5  submitted it and paid 19.  So on 1-4, Dan's
6  statement is accurate.
7      Q.  Rick Smith here is saying, from R.L.S., is
8  saying that they weren't paid for October, November
9  or December.  Am I right about that?
10     A.  He said he's looking for the payments on
11 those three, correct.
12     Q.  Okay.  And we've established that PetSmart
13 paid Dancor $129,243 in September, 248,007 in
14 October, 423,004 in November, and -- and Dan
15 Policicchio is telling R.L.S. that Dancor hasn't
16 received funding from PetSmart?
17     A.  For November billing.  On this statement,
18 Exhibit 22 that you handed me, there is a response
19 to an e-mail string and this is an excerpt from the
20 entire e-mail string I do not have, stating that
21 1-4-2017 at 5:35:31 p.m., "Rick, are you looking for
22 the November billing," and I -- do I need to -- I
23 can read the whole thing for you if you want me to,
24 "which we submitted to the owner 11-13-2016 and have
25 yet to receive funding from them."

Page 192

1      And then Rick responded back, January 4th, 2017
2  at 5:43 p.m., with his response.  Looking for
3  October, November and December.  We had not, on
4  1-4-2017 at 5:35:31 seconds in the afternoon,
5  received the November 30th, 2016 application that
6  Dan is mentioning in the e-mail.
7      Q.  Well, R.L.S. is also asking for October,
8  aren't they?
9      A.  They are looking at that.  There's no
10 other e-mails that are referring to Dan's statement
11 for November's payment.
12     Q.  Okay.  So you're -- you're -- so based on
13 the -- based on the description that you're giving
14 to us here, that's your explanation for Dan's
15 response, right?
16         MR. LYTLE:  Object to the form.
17         THE WITNESS:  I don't have anything before
18 it.
19     Q.  Okay.
20     A.  This is kind of in between a string of
21 e-mails as well.  The way you worded it to me was
22 R.L.S. asking Dan's question, so I was a little
23 confused there and wanted to correct the statement
24 on the order of the way those e-mails were on these
25 time stamps, because it confused me when I was

Page 193

1  looking at the way you worded the question.
2      Q.  Can we mark this as Exhibit 2 -- are we on
3  22?
4          (Plaintiff's Exhibit No. 23 marked.)
5          THE WITNESS:  Unless I'm missing
6  something.  The e-mails are printed out, but the
7  e-mail string is a little bit different, I apologize
8  if I'm reading this incorrectly.
9      Q.  Well, you understand, this is what I have,
10 so I'm working with what I have.  It may be that
11 this is all in there, I don't think it is, and so
12 I -- I'm not trying to misrepresent anything.  This
13 is all I have, because, see, Dancor, as far as I
14 know, and I had to look at 5700 documents in a very
15 short period of time, but as far as I know Dancor
16 didn't produce any of this, so I'm going with what I
17 have, okay?
18     A.  Yes.
19     Q.  I'm not trying to misrepresent anything, I
20 just need to ask about what I have and why I didn't
21 get it, okay?
22     A.  Absolutely.
23     Q.  All right.  So we're looking now at
24 Exhibit Number 23?
25     A.  Correct.

49 (Pages 190 to 193)

Page 194

1    Q.  And what -- what's the -- what's the
2  little -- what's the exhibit number in the corner?
3    A.  12.
4    Q.  12, okay.  There is an e-mail from Rick
5  Smith of R.L.S. to Dan Policicchio saying -- this is
6  on January 9th, 2017, saying, "Dan, we still have
7  not received any payment of the PetSmart in Tulsa,
8  can you please check on this for us?"  So as of
9  2017, R.L.S. is saying they haven't
10  received any payment from Dancor; is that true?
11    A.  I need to check the applications and what
12  payments were made to R.L.S.
13    Q.  That's what they're saying, right, that's
14  what R.L.S. is saying?
15    A.  It says they didn't receive anything.
16  That's what it states, now, whether that's true or
17  not, we'd have to look back at checks that were made
18  to R.L.S. and to substantiate their claim that
19  anything was paid.
20    Q.  And on Exhibit 23, Dan Policicchio
21  responds, "The October was issued prior to end of
22  the year and mailed.  The November, we are waiting
23  on owner payment, and the December was just
24  invoiced, generally this is a 30 to 45 day payer."
25  Did I read that correctly?

Page 195

1    A.  You did.
2    Q.  Okay.  Let's mark this as Exhibit 24.
3    A.  This was the second part of that you gave
4  me as 23, so here's the rest of the string as it's
5  going up.
6    (Plaintiff's Exhibit No. 24 marked.)
7    Q.  So as I understand it from Number 23, Dan
8  Policicchio said that October's mailed, right?
9    A.  According to Exhibit 23.
10    Q.  All right.  And now we're looking at 24,
11  and here's -- this shows Dan Policicchio sending an
12  e-mail to Rick Smith at R.L.S. Construction saying,
13  "this will be issued in Friday's check run and sent
14  FedEx on the account number given.  Have a great day
15  and remainder of the week."  So now, Mr. Policicchio
16  is saying that he's going to send the check via
17  FedEx, right?
18    A.  Correct.
19    Q.  So before he said he put it in the mail
20  and now he said he's going to FedEx it, right?
21    MR. LYTLE:  Object to the form.
22    THE WITNESS:  So he put it in the mail and
23  he reissued the check in lieu of one at FedEx on
24  Exhibit 24, second page.
25    Q.  So -- so what we can conclude from that is

Page 196

1  that Dancor told Rick that somehow the first check
2  was lost in the mail and that they would fax -- that
3  they would reissue and send it by FedEx, right?
4    A.  That's what the exhibit says, correct.
5    Q.  Okay.
6    (Plaintiff's Exhibit No. 25 marked.)
7    Q.  Okay.  You see Exhibit Number 25?
8    A.  I do.
9    Q.  This is from Rick Smith to Shawn, who I
10  guess is Shawn Stevens.  Who's Shawn Stevens?
11    A.  According to Exhibit 25, office manager at
12  R.L.S. Construction, LLC.
13    Q.  So Dan Policicchio is sending an -- is
14  sending an e-mail to Shawn at R.L.S. saying, "Thank
15  you as this helps and if you didn't already know,
16  Sheila," this is what I meant to say.  Who's Sheila?
17  That's what I was looking for.
18    A.  Sheila Caliguire was a person who worked
19  in our office that would collect the paperwork for
20  the subcontractors.
21    Q.  How do you spell Caliguire?
22    A.  C-A-L-I-G-U-I-R-E.
23    Q.  And which office did Sheila Caliguire work
24  at?
25    A.  She was working in the Irvine office,

Page 197

1  California.
2    Q.  Is that the same office where Dan
3  Policicchio works?
4    A.  That is correct.
5    Q.  And Sheila Caliguire's sole responsibility
6  was to do what?
7    A.  She was actually the construction
8  coordinator who would assist with obtaining the
9  paperwork from the subcontractors.
10    Q.  She would assist with what?
11    A.  Obtaining the billing work,
12  subcontractors, insurance certificates, W-9s,
13  anything that's related to the business file for
14  each subcontractor.
15    Q.  She's collecting documents and creating a
16  file?
17    A.  Correct.
18    Q.  And so this says from Dan Policicchio to
19  Rick Smith, "Thank you as this helps and if you did
20  not know already, Sheila was let go in November and
21  Debby is the new person collecting documents issued
22  to myself for processing."  And below that, I
23  suppose, this is the e-mail that prompted that.
24  "Attached is the November 1st I sent to Sheila,"
25  this is from Rick Smith to Dan -- to Shawn and it

Page 198

1    cross copies, I think, Dan Policicchio. Right?
2        A.    It does copy, the initial one that they
3    sent in November does not copy anybody but Sheila,
4    and for whatever reasons, possibly to poor e-mail
5    management, as it looks like here it did not get to
6    anybody else, that Sheila did not do something with
7    it, and then obviously she was no longer with
8    Dancor.
9        Q.    Okay.  So this is -- this is basically at
10   the beginning of February, R.L.S. is saying still
11   don't have my money, and Dan Policicchio is saying
12   she -- looks like it was Sheila's fault?
13       A.    Yeah, can you forward to me what you sent
14   to her, oh, I didn't get that, and she's no longer
15   here as of this date, so --
16       Q.    Okay.  And so -- and R.L.S. sends -- sends
17   new stuff that it had sent before to Sheila?
18       A.    And it looks like they did forward the
19   e-mail at that time.
20       Q.    Okay.
21       A.    I'm assuming it would have the attachments
22   to it as well.
23       Q.    So first, the check's in the mail, then
24   it's going by FedEx then Sheila never got it to
25   Dan Policicchio; is that right?

Page 199

1        MR. LYTLE:  Object to the form.
2        Q.    What we've established so far?
3        A.    That's what it looks like from the
4    timeline of 23 to 25 exhibits.
5        (Plaintiff's Exhibit No. 26 marked.)
6        THE WITNESS:  Thank you.
7        Q.    Okay.  Looking at Number 26, this looks
8    like more of the same that we've been talking about,
9    about Sheila and resubmitting the documents; am I
10   right?
11       A.    This looks like the exact same e-mail.
12       Q.    Yeah.  So let's --
13       A.    Just a different copy.
14       Q.    Okay.  Huh?
15       A.    This looks like this --
16       Q.    Do they both have the same thing in the
17   corner?
18       A.    It's just confusing, because it's the same
19   e-mail.
20       Q.    Maybe I sent -- maybe I marked the wrong
21   one.
22       A.    If you look at the top, the only
23   difference between these two is your title line
24   right there and not being here.
25       Q.    Oh, okay.

Page 200

1        A.    And when you get -- if you look at the
2    times and then the second page.
3        Q.    So I think that's just the way it was
4    submitted by R.L.S.
5        A.    The long line of things that they had.  So
6    these are basically the same exhibits.
7        Q.    Same exhibits, but they're -- but they --
8    they were submitted separately by R.L.S., and that's
9    why I'm doing it.
10       A.    Okay.  No, you're fine.  I don't see any
11   difference between those two.
12       Q.    Yeah, me, either.  So now let's mark this
13   wherever we are.  What are we on now?
14       (Plaintiff's Exhibit No. 27 marked.)
15       Q.    I'm showing you Exhibit 27, which by the
16   way, again, just so the record's clear, there's
17   little plaintiff's exhibit stickers in the
18   right-hand corner, those plaintiff's exhibit
19   stickers are related to R.L.S.'s lawsuit in the
20   state court case.  These were submitted as exhibits
21   in that case.
22       So I've marked them as deposition exhibits in
23   the middle and so this is Deposition Exhibit Number
24   24 and this is an e-mail from Shawn at R.L.S.
25   Construction to Dan Policicchio on February 2nd.

Page 201

1    "What's the e-mail we should be sending pay apps to?
2    I have sent January and December pay applications
3    over to accounting@Dancor.com; is this correct?
4    Also, can you check to see if these have been
5    filed?"
6        So this is -- I guess this is Shawn making sure
7    that she's sending them to the right place because
8    she's not getting a response; is that right?
9        A.    Yes.
10       (Plaintiff's Exhibit No. 28 marked.)
11       Q.    So Exhibit 28 is an e-mail, first there's
12   a -- at the bottom there's an e-mail from Dan
13   Policicchio to Shawn at R.L.S. saying that is the
14   correct e-mail, referring to the previous exhibit,
15   and you may want to send to Debby directly, as well
16   as her e-mail.  Debby, looks like debbyp@Dancor.
17   Who's Debby?
18       A.    Debby works in our California office.
19   Debby Policicchio.
20       Q.    Is she -- she's obviously related to Dan?
21       A.    That is correct.
22       Q.    What's -- what's her relationship?
23       A.    She's married to him, his wife.
24       Q.    And what is her function with Dancor
25   corporation?

51 (Pages 198 to 201)

Page 202

1      A.   She stepped in to assist with pay
2  applications as we needed someone to help with the
3  subcontractors who were needing responses from
4  Sheila.
5      Q.   Okay.  And in Exhibit Number 28, Shawn is
6  responding, "So it's safe to assume that our
7  November pay application was not processed and will
8  take an extra month to get here."  Do you see that?
9      A.   I see that.
10      Q.   Okay.  Is that the same pay application
11  that Dan Policicchio had previously said was in the
12  mail and then by FedEx?
13      A.   According to this e-mail, yes.
14          (Plaintiff's Exhibit No. 29 marked.)
15      Q.   Okay.  So, Exhibit Number 29, this is an
16  e-mail back and forth from Dan Policicchio and Shawn
17  at R.L.S. there's an email from Dan Policicchio
18  saying, "No, Shawn; I'm processing based upon my
19  review and should have it out in the next week!  I
20  will hand the November draw issues and then my
21  regular team will take it from there until final
22  payment.  Thanks."  Have I read that correctly?
23      A.   You read it correctly.
24      Q.   And then Shawn, it looks like about nine
25  days, or, no, a little more, 11 days later, the

Page 203

1  response, "Thank you for the update.  Can you
2  confirm if we should be expecting this week?"
3      So, on February 3rd, Dan Policicchio is saying
4  that he'd have it out in the next week, and then
5  more than a week later, Shawn at R.L.S. is sending
6  an e-mail saying, "Thanks for the update.  Can I
7  confirm that we should be expecting this week?"
8  because they don't have it yet, right?
9      A.   According to the e-mail, correct.
10      Q.   Okay.
11          (Plaintiff's Exhibit No. 30 marked.)
12      Q.   Okay.  Looking at Exhibit Number 30, this
13  is an e-mail from Shawn at R.L.S. Construction on
14  February 20th, so now this is another six days after
15  that last e-mail on the -- on 2014, it says -- it's
16  from Shawn to Dan Policicchio.  "Good afternoon, I
17  am looking for status payments on PetSmart Tulsa for
18  November, December, January, I know we had spoke
19  last week about a FedEx delivery for the November
20  payment, but we still haven't seen or heard any --
21  any information regarding it in a few days.  The
22  December and January are now 60 and 30 days,
23  respectively, so we are expecting to see them both
24  soon as well."  Do you see that?
25      A.   I see that.

Page 204

1      Q.   Okay.  So, the Fed -- the letter, the
2  FedEx and then the promise to get payment to R.L.S.
3  by Dan Policicchio in a week all haven't happened,
4  and so this is Shawn following up saying, we still
5  don't have it, right?
6      A.   Correct.
7          (Plaintiff's Exhibit No. 31 marked.)
8      Q.   Showing you Exhibit Number 31.  This is
9  now on March 20th.  So, we're a full month past the
10  last e-mail that we talked about.  And now, Shawn is
11  writing to Dan Policicchio, copying his wife, Debby
12  Policicchio, accounting at Dancor and some other --
13  and folks at R.L.S.
14      R.L.S. is saying, "Dancor, we haven't heard
15  from you in a while and your lawyer wasn't able to
16  get ahold of us last week, as you mentioned he
17  would.  Can you give us an update as to PetSmart
18  project payments?  We are now four months past and
19  120 days since November 20th, 2016.  Attached is the
20  cost of accumulated interest."
21      So now, as of March 20th, the letter didn't get
22  there, the FedEx didn't get there, and the promise
23  to pay within a week didn't get there, and now we're
24  a month later and they're still not being paid,
25  true?

Page 205

1          MR. LYTLE:  Object to the form.
2          THE WITNESS:  Correct, according to this
3  e-mail.
4      Q.   Okay.
5          (Plaintiff's Exhibit No. 32 marked.)
6      Q.   I'm showing you what's been marked as
7  Exhibit Number 32.  This is an e-mail from Glenna
8  Whitefield at R.L.S. Construction, and it's to Ethan
9  Prescott, Don Policicchio and Jeff Stephens, and
10  some other people, it looks like, at R.L.S., and
11  it's dated March 15th, 2017.  Do you know who Ethan
12  Prescott is?
13      A.   Associate Vice President of Development
14  for Leon Capital Group, who here is represented as a
15  landlord.
16      Q.   Okay.  So Dancor is aware of the fact that
17  Ethan Prescott is a -- is an officer of the company
18  that is PetSmart's landlord, true?
19      A.   Correct.
20      Q.   Okay.  And this e-mail from R.L.S. goes to
21  PetSmart's landlord and says, "The mechanic's lien
22  was filed in Tulsa County on Monday, March 13th,
23  2017," right?
24      A.   Correct.
25      Q.   And so now R.L.S., still not having been

Page 206

1  paid, has filed a lien, right?
2      A.  Correct.
3      Q.  Now, does Dancor -- is Dancor aware that
4  a -- a letter like this about a lien to a client's
5  landlord is pretty serious?
6      MR. LYTLE:  Object to the form.
7      THE WITNESS:  It's a lien, so it's -- it's
8  a mechanic's lien that they're looking for money.
9      Q.  A lien that's being sent to a landlord of
10  a client, is Dancor aware that that could affect
11  their client's relationship with their landlord?
12      MR. LYTLE:  Object to the form.
13      THE WITNESS:  Every client's different,
14  and mechanic liens get sent to all parties that are
15  listed, but that's one of the things they have to
16  do, the client, the landlord, the GC, so, yes, it's
17  a serious lien, obviously, a mechanic's lien is a
18  notice of nonpayment.
19      Q.  And if Dancor is doing what it's supposed
20  to do under the contract and under the promises that
21  it's already made, it should have -- this lien
22  should have never been filed, right?
23      A.  Correct.
24      Q.  Does -- does Dancor know whether the
25  filing of a lien by R.L.S. or any other

Page 207

1  subcontractors had any effect on PetSmart?
2      MR. LYTLE:  Object to the form.
3      THE WITNESS:  I don't know if it affected
4  PetSmart, I have not been told that it affected
5  PetSmart in any way.
6      Q.  Did Dancor ever ask PetSmart if it was
7  having problems as a result of liens caused by
8  Dancor's nonpayment?
9      MR. LYTLE:  Object to the form.
10      THE WITNESS:  Not to my knowledge.
11      (Plaintiff's Exhibit No. 33 marked.)
12      Q.  Okay.  This is Exhibit Number 33 is
13  e-mails from Shawn at R.L.S. to Dan Policicchio, his
14  wife, Debby Policicchio, and others at R.L.S.  It
15  says, Dancor, on March 20th, "Dancor, we haven't
16  heard from you in a while and your lawyer wasn't
17  able to get ahold of us last week."  I think this is
18  a repeat of something we saw before.
19      A.  This is the follow-up to Exhibit 31.
20      Q.  Okay.  So they're -- so now Dancor is
21  following up in Exhibit 33 saying, Dancor, it's been
22  48 hours since my last e-mail, the one we've already
23  talked about, and still no word of a resolution of
24  past due amount from your party, we need an update
25  ASAP.  Do you see that?

Page 208

1      A.  I do see that.
2      Q.  So at this point now, apparently, Dancor
3  has gotten their lawyer involved; is that right?
4      A.  Yes.  As the mechanic's lien was filed on
5  3-15, this one is coming -- what was the date on
6  this?  Actually doesn't show a date.  Do you have
7  the next e-mail?
8      Q.  Possibly.  I'll -- I'll give you what's
9  next.
10      A.  I'm just trying to correlate the dates
11  with it.
12      Q.  Yeah.  I -- you may be ahead of me
13  because, you may know more than I do.  I'm giving
14  them to you in the order that R.L.S. presented them.
15      A.  Okay.
16      Q.  And Dancor's lawyer that they're referring
17  to, is that Mr. Robinson?
18      A.  Correct.
19      Q.  What's his first name?
20      A.  Matt.
21      Q.  Matt.
22      A.  Yeah, so it is after.
23      (Plaintiff's Exhibit No. 34 marked.)
24      Q.  Number 34 is part of this -- it's really
25  just additional e-mails regarding the same thing

Page 209

1  that we're talking about in the last e-mail with the
2  follow-up, where Shawn from R.L.S. says, "It's been
3  48 hours since my last e-mail," right?
4      A.  Correct.
5      Q.  Okay.  So we'll go through that one
6  quickly.
7      A.  That one includes the time stamp I asked
8  about.
9      Q.  I'm sorry?
10      A.  That included the time stamp I asked about
11  in 33.
12      Q.  Right.
13      A.  To verify about the liens we know about at
14  that time, attorney is involved, why is an attorney
15  involved, obviously, there's a lien filed on the
16  15th, here it is the 20th.  Or the 22nd, I'm sorry.
17      Q.  Exhibit Number 35.
18      (Plaintiff's Exhibit No. 35 marked.)
19      Q.  Okay.  Exhibit Number 35 appears to be an
20  e-mail from Dan Policicchio to Shawn and others at
21  R.L.S.  Apparently in response to the request for
22  follow-up that R.L.S. had made, and Dan Policicchio,
23  says, "Matt Robinson, who is copied, is handling all
24  financial closeouts on this project.  I will be
25  available to discuss later next week after his

53 (Pages 206 to 209)

Page 210

1  discussions with owner to formally finalize and
2  close out this project as a whole. I appreciate
3  your patience and please reach out to Matt middle of
4  next week for updates, which I hope will be in
5  agreement with yourself. Thanks.
6      Again - Robert James and any other person with
7  Dancor cannot get you an update, other than Matt or
8  myself."
9      So, the last part down there is basically
10  saying you can only talk to me, Dan Policicchio, or
11  my lawyer if you want to know about finances, right?
12      MR. LYTLE: Object to the form.
13      THE WITNESS: As the people that were not
14  dealing directly with financial information at that
15  time do not have that record, correct.
16      Q. Okay. This is consistent with what you
17  testified to on previously that Don Policicchio was
18  the -- was the person responsible for finances for
19  Dancor, true?
20      A. True.
21      Q. And then it says, at the beginning of the
22  e-mail says "Matt Robinson, who was copied," oh,
23  this is the same thing. He's copied and he's
24  handling all financial closeouts. Do you -- can you
25  tell me what this -- what does -- what's Dan --

Page 211

1  what's Dancor's testimony about what this e-mail
2  means?
3      MR. LYTLE: Object to the form. Document
4  speaks for itself. You can answer, if you can.
5      THE WITNESS: I mean, this document means
6  that there's a lien filed on this job, according to
7  all the exhibits that you presented in this case,
8  and Matt, the attorney, is going to be closing out
9  the case. He will be the person to discuss any
10  actions, obviously it's gone legal, and to follow-up
11  with Matt Robinson.
12      Q. I see. So at this point, Dancor is
13  saying, deal with Matt Robinson about payment?
14      MR. LYTLE: Object to the form.
15      THE WITNESS: Correct.
16      Q. Okay.
17      A. As it states, Matt Robinson, who's copied,
18  is handling all financial closeouts.
19      Q. What does Dancor mean by "all financial
20  closeouts"?
21      A. Closing out the project, financial
22  information that would be there, regarding any
23  mechanic's liens.
24      MR. IVY: We have a tape change.
25      VIDEO TECHNICIAN: Off the record, the

Page 212

1  time is now 3:02.
2      (Recess taken. Plaintiff's Exhibit 36 marked.)
3      VIDEO TECHNICIAN: We're back on the
4  record, the time is now 3:03 p.m.
5  BY MR. IVY:
6      Q. We're now looking at Exhibit 36.
7      A. Correct.
8      Q. Exhibit 36, I think, gives some additional
9  background on the e-mail that we just read about,
10  Matt Robinson handling all financial closeouts
11  because there's a -- at the top of Exhibit 36
12  there's an e-mail just before it looks -- well, is
13  this before or after? I can't --
14      A. After.
15      Q. Okay. So Dan Policicchio is using
16  military time there. So it's -- his -- Dan
17  Policicchio's e-mail about Matt Robinson is handling
18  financial closeouts is written at 4:47, and then at
19  6:18 -- now, we're in different time zones.
20      A. We're in different time zones and these
21  are completely different formats, too, which we
22  don't use military time in ours, so this must be a
23  conversion in our analysis side. I don't know how
24  that happened. I can't tell you if -- it looks like
25  somebody's used a different e-mail program, if you

Page 213

1  look at the signatures, they don't have any
2  pictures, they don't have any HTML or --
3      Q. Okay.
4      A. Or rich text.
5      Q. Anyway, on the -- in Exhibit 36 on March
6  22nd at 6:18, Shawn from R.L.S. is sending an e-mail
7  to Dan Policicchio with a copy to, looks like his
8  wife, Debby, and his e-mail. "Dan, why are you
9  holding out payments from November when you've been
10  paid up to retainage." Do you see that?
11      A. I see that.
12      Q. And when saying -- when they say you've
13  been paid up to retainage, that means that Dancor
14  has received all 1.1 something million dollars from
15  PetSmart, right?
16      A. Correct.
17      Q. Is that a reasonable question, in Dancor's
18  opinion?
19      MR. LYTLE: Object to the form.
20      THE WITNESS: It's a reasonable question
21  for R.L.S. to ask, they're asking why they haven't
22  received their money.
23      Q. And what's the answer?
24      A. I don't have an answer for why they didn't
25  get their money.

54 (Pages 210 to 213)

Page 214

1    Q.  Okay.
2        (Plaintiff's Exhibit No. 37 marked.)
3    Q.  I'm showing you what's marked as Exhibit
4    Number 37.  Do you see that?
5    A.  Yeah.
6    Q.  This is an e-mail, looks like eight days
7    after Mr. Policicchio referred R.L.S. to Matt
8    Robinson, Shawn at R.L.S. is writing to Mr. Robinson
9    and cross copying Mr. Policicchio and others at
10   Dancor saying, "Matt, it is now Thursday, the 30th
11   of March, and we still have no response from you.
12   Daniel Policicchio, Sr. advised that you would be
13   reaching out to us first on 3-17, then on 3-29,
14   which neither happened.  We are looking for an
15   update today.  Reach me any time."  And leaves a
16   phone number.  Do you see that?
17   A.  I see that.
18   Q.  Is Dancor aware of whether Matt Robinson
19   ever reached out to R.L.S. Construction?
20   A.  I do not have that knowledge.
21       (Plaintiff's Exhibit No. 38 marked.)
22   Q.  It's 38, right?  I'm showing what we've
23   marked as Exhibit Number 38, which is an e-mail from
24   R.L.S., Shawn, again, at R.L.S. and Dan Policicchio
25   and others at Dancor.  This is written, it appears,

Page 215

1    about four days after the last e-mail that we talked
2    about in 37, Exhibit 37, and it says, "Dan, are we
3    getting an update today?  Matt didn't have any
4    information last week."  Do you see that?
5    A.  Yes.
6    Q.  Okay.  So, apparently after referring the
7    matter to Dancor's attorney, Dancor's attorney isn't
8    giving any information to R.L.S., is that a fair
9    interpretation from Dancor's point of view?
10   A.  Per the e-mail, he did not have the
11   information from last week to give.
12       (Plaintiff's Exhibit No. 39 marked.)
13   Q.  All right.  Looking at Number 39, you can
14   see that there's an e-mail from Ethan Prescott,
15   you've identified him as PetSmart's landlord, and
16   it's copied to Dan Policicchio, and it's also copied
17   to some people I don't recognize, to Shawn at
18   R.L.S., to Matt Robinson, Dancor's attorney, and
19   another person apparently with the landlord, maybe
20   that's who the other people are.  And it says,
21   "Landlord expects the tenant to pay the
22   subcontractors and this could potentially violate
23   the lease obligations.  Please let the landlord know
24   once the final lien release and waiver has been
25   filed.  Negative press to our shopping center and

Page 216

1    our company will not be tolerated due to a breach of
2    contract that has nothing to do with the landlord."
3    Do you see that?
4    A.  Yes.
5    Q.  Now, the tenant is not Dancor, is it?
6    A.  No.
7    Q.  The tenant is PetSmart, right?
8    A.  Correct.
9    Q.  So here Dancor is receiving, I think we
10   could fairly describe this as a threatening letter
11   from PetSmart's landlord, right?
12       MR. LYTLE:  Object to the form.
13       THE WITNESS:  Yes.
14   Q.  If Dancor received such an e-mail from its
15   own landlord, Dancor would consider that to be
16   threatening, true?
17   A.  In that context, the threaten to go to
18   local news stations, yes, that's a threat.
19   Q.  Also, threatened to potentially -- a
20   threat about violations of lease obligations, right?
21   A.  Correct.
22   Q.  So potentially the tenant could be thrown
23   out, potentially they get negative press, these are
24   all implicated by this e-mail, correct?
25   A.  Correct.

Page 217

1    Q.  Does Dancor know whether it followed up
2    with PetSmart about this e-mail after it received it
3    from PetSmart's landlord?
4    A.  Not at this time.
5        (Plaintiff's Exhibit No. 40 marked.)
6    Q.  I'm showing you two pages as one exhibit.
7    A.  No, it didn't get stapled.  Do we have a
8    stapler?
9    Q.  I do.
10   A.  Here it is.
11   Q.  Okay.  Looking at Exhibit Number 40 now,
12   this is an e-mail from Dan Policicchio to Rick at
13   R.L.S. Construction, that's Rick Smith, the owner of
14   R.L.S., right?
15   A.  Yes.
16   Q.  Now, there's a fairly large section of
17   this that's blocked off, which I suspect was blocked
18   off because it had to do with settlement
19   negotiations, but we'll talk about the part that's
20   not blocked off.  This is the only thing that I have
21   seen, so that's all we can talk about.
22   This is from Dan Policicchio to Rick Smith
23   dated April 17th, it says, "Dear Rick, I am writing
24   this to you and you only, an e-mail long overdue as
25   I am ashamed, no attorneys, et cetera.  I'm not a

55 (Pages 214 to 217)

Page 218

1  perfect person, but there are situations that come
2  up in business and personal affairs that are
3  uncontrollable and unfortunately this is one of them
4  and your firm was caught in the middle.  And you won
5  this battle" -- "I concede and you won this battle,
6  which was not really a battle that should have been
7  fought.  Thank you in advance for this
8  consideration, as I truly appreciate it, and I,
9  again, apologize for the issue it has caused you and
10 your firm."  Do you see that?
11     A.  Yes.
12     Q.  Does Dancor know what uncontrollable and
13 unfortunate business affairs Dan Policicchio is
14 referring to in Exhibit Number 40?
15     A.  Not exactly what he was looking at.
16     Q.  What -- what generally does Dancor know?
17     A.  It looks like to be financial information
18 that --
19        MR. LYTLE:  He's not asking you what's
20 blocked out.  He's asking what he's referring to.
21     Q.  I'm asking if Dancor knows what the
22 unfortunate business situations, the unfortunate,
23 uncontrollable business situations that Dan
24 Policicchio is referring to in this e-mail are?
25     A.  It looks to be about the business of

Page 219

1  general state of the company.
2      Q.  Well, I'm not asking what it looks to be,
3  I'm asking if Dancor knows what Dan Policicchio was
4  referring to when talking about uncontrollable and
5  unfortunate business affairs?
6      A.  Yes.
7      Q.  Okay.  What are those uncontrollable and
8  unfortunate business affairs?
9      A.  I would have to say it would be towards
10 the financial stability of the company and where
11 it's at.
12     Q.  Does that mean that Dancor was struggling,
13 financially?
14     A.  Based upon this, it looks like it was
15 struggling, yes.
16     Q.  Well, I'm not asking based upon this, I'm
17 asking, this is -- this is a question to Dancor
18 Corporation, Dancor Corporation would know whether
19 it was struggling financially.  If you're not
20 prepared to answer that on behalf of Dancor
21 Corporation, you can tell me that.  But if Dan -- I
22 just want to know, does Dancor know what he's
23 talking about there?  I'm not asking you to
24 speculate what he's --
25     A.  Yes.

Page 220

1      Q.  I'm not asking you, as a person, to
2  speculate.
3      A.  Yes.
4      Q.  Okay.  Dancor does know what -- what
5  unfortunate and uncontrollable Dan Policicchio is
6  referring to in this e-mail?
7      A.  Yes.
8      Q.  What are they?
9      A.  That would be the financial situation that
10 Dancor is in, if you look at our balance sheet and
11 where our financials are, I believe that will
12 explain for itself.
13     Q.  Okay.  What caused that financial
14 difficulty that you're referring to?
15     A.  Don't have an exact answer on that.  That
16 could be a multitude of things, it could be from
17 legality in the construction industry, it's a very
18 volatile industry and there's a lot of clients that
19 have gone bankrupt as well.  It's -- it's a tough
20 industry to work in, and we rely on, you know,
21 clients to continue moving forward and to pay their
22 projects, too.
23        Obviously, from what you have provided to me
24 and as Dancor concedes, PetSmart has paid on the
25 applications that we did, not all clients that

Page 221

1  way, and Dancor has been working to keep moving
2  forward and keep pressing on.  Obviously we're in a
3  financial situation, per the e-mail, and what's
4  blocked out and what was dated in front of me.
5      Q.  Now, if Dancor paid subcontractors on a
6  project for a client that was paying Dancor and
7  didn't pay subcontractors for clients that were not
8  paying Dancor, Dancor wouldn't have that problem,
9  would they?
10     A.  In that statement, no.
11     Q.  Does Dancor know what personal and
12 uncontrollable personal affairs Daniel Policicchio
13 is talking about in Exhibit Number 40?
14     A.  No.
15     Q.  Does Dancor know why Dan Policicchio is
16 referring to R.L.S.'s attempt to get paid for the
17 work that it did on behalf of Dancor as a battle?
18        MR. LYTLE:  Object to the form.
19        THE WITNESS:  Well, on this one it was a
20 battle because it went to court.  This is April
21 17th, looks like it's post settlement or post -- I
22 guess it would -- would you call it a settlement?
23     Q.  Okay.  Now, we've gone through a long
24 series, I think they start with Exhibit 21, roughly,
25 through Exhibit 40.

56 (Pages 218 to 221)

Page 222

1    A.   Correct.
2    Q.   Am I correct that none of these e-mails
3  are in the documents that Dancor produced to
4  PetSmart in response to PetSmart's request for all
5  communication with all subcontractors?
6         MR. LYTLE:  Object to the form.
7         THE WITNESS:  I do not believe so.
8    Q.   You do not believe they were produced?
9    A.   I do not believe they were produced, no.
10    Q.   Does Dancor know whether there are similar
11  correspondence with other subcontractors asking
12  where's my money and other complaints that were not
13  produced to PetSmart?
14    A.   Not to my knowledge, no.
15    Q.   To your knowledge -- I'm asking today.
16    A.   To Dancor's knowledge, no.
17    Q.   So it's Dancor's position that no other
18  subcontractor followed up in any correspondence
19  after they didn't get paid?
20         MR. LYTLE:  Object to the form.
21         THE WITNESS:  They should be in the
22  e-mails that were submitted.
23         MR. LYTLE:  Can you let me know when a
24  good time for a break would be, I would appreciate
25  that.

Page 223

1         MR. IVY:  Oh, if you want to do it now,
2  this would be great.
3         VIDEO TECHNICIAN:  We're off the record,
4  the time is 3:18.
5         (Recess taken.)
6         VIDEO TECHNICIAN:  We're back on the
7  record, the time is now 3:25 p.m.
8  BY MR. IVY:
9    Q.   Is Dancor currently involved in any other
10  litigation that involves failure to pay its
11  subcontractors?
12    A.   I would have to reference the sheet that
13  you provided to me earlier that we have, about the
14  litigation, anything that's open, so there's a
15  possibility, yes.
16    Q.   If you looked at that sheet, would you be
17  able to testify on behalf of Dancor which ones are
18  claims that Dancor didn't pay its contractors,
19  subcontractors?
20    A.   Yes, as Exhibit 7 does state the summary.
21    Q.   Is the information that you get in
22  responding to that just what's written on Exhibit 7,
23  or does Dancor have its own separate knowledge of
24  what lawsuits are pending against it?
25    A.   I'm looking at Exhibit 7, which would be

Page 224

1  the list of lawsuits that are out there, or
2  mechanic's liens.
3    Q.   Dancor Corporation would have been served
4  with any lawsuit that was filed against it, right?
5    A.   Correct.
6    Q.   And Dancor would, by reason of the
7  service, have knowledge of each lawsuit that was
8  filed against it, right?
9    A.   Yes.
10    Q.   So I'm asking, aside from what's written
11  in this Courthouse News Service printout, does
12  Dancor have knowledge of the lawsuits that are
13  currently pending against it for failure to pay
14  subcontractors?
15         MR. LYTLE:  Object to the form.
16         THE WITNESS:  Yes.
17    Q.   What is that knowledge?
18    A.   Knowledge is there's a lien that's filed
19  and it comes in to Dancor.
20    Q.   How many lawsuits are currently pending
21  against Dancor for failure to pay its
22  subcontractors, other than the PetSmart case that
23  we're talking about?
24    A.   I do not have an exact number for you at
25  this time.

Page 225

1    Q.   Okay.  Just glancing at this, this report
2  that Dancor produced, I'm looking at one, two,
3  three, four, five, six, seven, eight, nine, ten,
4  eleven, twelve, thirteen, fourteen -- no, that's us.
5  Yeah, something in the ballpark of 14 lawsuits since
6  the PetSmart construction project started.  Is that
7  ballpark?
8    A.   It's a ballpark.
9    Q.   And who at Dancor is responsible for
10  handling lawsuits, other than Dancor's lawyers?
11    A.   Dancor's attorney is the main people that
12  handled the lawsuits and our president, Daniel
13  Policicchio, Sr. would be the other person.
14    Q.   So Dan Policicchio is the corporate
15  contact for Dancor's lawyers with regard to any
16  litigation?
17    A.   Correct.
18    Q.   Okay.  We've established that Dancor has
19  not paid a number of its subcontractors, right, we
20  can agree on that?
21    A.   Correct.
22    Q.   And the actions that Dancor undertook with
23  regard to the subcontractors are pretty much the
24  same, promised to pay them and didn't pay them,
25  right?

Page 226

1    A.   Correct.
2    Q.   Dancor accepted the work from all of the
3  subcontractors that it employed without objection,
4  right?
5    A.   I -- if the punch list was completed,
6  then, yes, the punch list, that's our objection, we
7  have our time to object, obviously, it would be
8  punch, but, yes, sure.
9    Q.   And now the punch list isn't complete, so
10 if Dancor ultimately accepted all of the work of all
11 of its subcontractors and suppliers, right?
12   A.   Yes, the punch was completed as of April
13 2017 for PetSmart.
14   Q.   Okay.  Is it true that Dan Policicchio and
15 Dancor willfully, intentionally and wrongfully
16 misappropriated the monies due to its subcontractors
17 in specific violation of Oklahoma's Trust Fund
18 statute?
19        MR. LYTLE:  Object to the form and the
20 legal conclusion.  You can answer.
21        THE WITNESS:  I do not know at the moment
22 that we willfully, intentionally did anything.
23        MR. IVY:  By the way, this is what I was
24 looking at.  I don't know how, you know, we
25 obviously got something crossed, but that's what I

Page 227

1  printed from what you sent me and I don't -- I don't
2  know how -- anyway, I just wanted to let you know,
3  that's where I thought that Victor Williams hadn't
4  been identified.
5        MR. LYTLE:  Well, he's -- he's on there,
6  that's the same thing, it says Victor Williams.
7        MR. IVY:  Oh, I just -- I just misread it.
8        MR. LYTLE:  Yeah.  I think there's not a
9  space in between, so maybe that just --
10       MR. IVY:  That's totally me.
11       MR. LYTLE:  You may have skimmed down.
12       MR. IVY:  That's just me.  All right.  We
13 are very nearly done.
14       MR. LYTLE:  Famous last words, so knock on
15 wood.
16       MR. IVY:  I'm usually truthful about that.
17 BY MR. IVY:
18   Q.   Would you pull out the -- Dancor's Answer
19 to PetSmart's Amended Complaint, please?
20   A.   Answer of Defendant to Amended Complaint?
21   Q.   Correct.
22   A.   Exhibit 20.
23   Q.   Exhibit 20.  All right.  I'd like to again
24 turn to page nine and ten, which is Dancor's
25 counterclaim against PetSmart.  The counterclaim

Page 228

1  cites a section of the contract that states that
2  within 20 days after the completion of all work on
3  the punch list and a Certificate of Occupancy and
4  substantial completion date, the contractor shall
5  submit to the client final application for payment.
6  Basically that provision is saying that once the
7  punch list is done and the Certificate of Occupancy
8  and the substantial completion date are reached,
9  that's when Dancor should be able to submit its
10 request for final payment, right?
11   A.   Correct.
12   Q.   And then paragraph four states that the
13 Certificate of Substantial Compliance was issued on
14 January 11th, right?
15   A.   Yes.
16   Q.   And it's paragraph five says the
17 Certificate of Occupancy was issued by the City of
18 Tulsa on January 17th, right?
19   A.   Correct.
20   Q.   Something about Dancor and Liberty Mutual
21 posting a bond, correct?
22   A.   Dancor didn't post it, Dancor caused --
23   Q.   Caused, yeah, Dancor caused Liberty Mutual
24 to post a bond.  And then it says, "Payment has been
25 demanded by Dancor and plaintiff has refused to make

Page 229

1  said payment."  Plaintiffs being -- is PetSmart
2  there, right?
3    A.   Yes.
4    Q.   Okay.  So I think we've already
5  established, but I want to make sure this is clear.
6  We can agree, based on the contract, correct, that
7  the -- there's one additional requirement here
8  before the holdback gets paid, that the Certificate
9  of Substantial Compliance has to be completed, the
10 Certificate of Occupancy has to be completed, the
11 punch list has to be completed, and there have to be
12 no unpaid subcontractors that PetSmart would
13 otherwise pay using the holdback funds, right?
14       MR. LYTLE:  Object to the form.
15       THE WITNESS:  Yes.
16   Q.   Okay.  So the fact that these other things
17 have occurred does not entitle Dancor to recover its
18 holdback funds if PetSmart used those holdback funds
19 to pay unpaid subcontractors, correct?
20       MR. LYTLE:  Object to the form.
21       THE WITNESS:  Correct.
22   Q.   As a matter of client relations, would
23 Dancor consider it poor client relations to demand a
24 final payment from a client for which Dancor has not
25 paid its subcontractors and their client had to pay

58 (Pages 226 to 229)

Page 230

1  a bunch of liens to those subcontractors?
2        MR. LYTLE:  Object to the form.
3        THE WITNESS:  Not good client relations.
4     Q.  Okay.  I'm just going to look at my notes
5  one last time and I think we're done.
6     A.  Thank you.
7        MR. LYTLE:  If you want to start handing
8  me these, I'll make sure we've got them all here.
9        (Off the record.)
10 BY MR. IVY:
11    Q.  I don't want to end this deposition -- and
12 I do not recall from looking at the -- at the tax
13 records, I don't want to end the deposition without
14 getting the name of the accountant who does the
15 bookkeeping.  Is it your testimony that the name of
16 that -- name and address of that accountant are on
17 those tax records?
18    A.  Yes, they are.  I believe Peter Dressler
19 is listed on there, and I believe it has the firm as
20 well.  I can find out where those records are.
21       MR. LYTLE:  No.
22       THE WITNESS:  Volume 7.
23       MR. LYTLE:  No, I'll tell you.  This one.
24 There we are.
25       THE WITNESS:  I think it's the last page.

Page 231

1        MR. LYTLE:  Should be right there.
2        THE WITNESS:  Yes.  It is listed in here,
3  this is Dan Porter 1124, Peter Dressler, D, as in
4  Delta, R-E-S-S-L-E-R, firm name, Exact Services,
5  Incorporated.  Would you like their address?
6  BY MR. IVY:
7     Q.  Yes, please.
8     A.  424 East Illinois Street, Wheaton,
9  Illinois, 60187.
10    Q.  60187.  Okay.  Thank you very much.
11    A.  Uh-huh.
12    Q.  Does Dancor know whether that's still
13 Peter Dressler's location?
14    A.  To the best of my knowledge, our
15 knowledge, yes, as Dancor.
16    Q.  Okay.
17       MR. IVY:  We're done, thank you.  Make
18 your plane, put your kid to bed.
19       MR. LYTLE:  Just -- just real quick, I
20 just want to make sure we've got everything, just
21 let me do this while we're here.
22       MR. IVY:  Exhibits?
23       MR. LYTLE:  Yeah.
24       MR. IVY:  Good idea.  There's a lot of
25 stuff.  I never touched them after they left my

Page 232

1  hands, which is a very good thing.
2        THE WITNESS:  I've got all 40.  They're
3  all here.
4        MR. LYTLE:  I'm not seeing --
5        THE WITNESS:  Well, see, spoke too soon.
6  They're mixed.  And you -- it was to the back of --
7  okay.
8        MR. IVY:  James has a very solid memory, I
9  perceived.
10       MR. LYTLE:  He does.  I'm missing 23,
11 which is one of the e-mails.  Did that end up back
12 over there?  Because one of them is like the same.
13       THE WITNESS:  There it is.
14       MR. LYTLE:  I should probably look at
15 things before I talk, how's that guys?
16       MR. IVY:  I try very hard not to touch any
17 exhibit after I give it up, because I will lose it.
18       MR. LYTLE:  We got to Number 40?  We're
19 good.  Sorry about that.  Just for the record, he
20 will read and sign the deposition.
21       VIDEO TECHNICIAN:  We're off the record,
22 the time is now 3:41 p.m.
23       (Deposition concluded.)
24
25

Page 233

1            ERRATA SHEET
2       WITNESS: JAMES ALLEY
3       DATE: JULY 16, 2018
4       REPORTER:  Brenda Schmitz, CSR, RPR
5  NO CORRECTIONS ARE NECESSARY _____
6  PAGE LINE  CORRECTION          REASON
7  ____ ____ _____
8  ____ ____ _____
9  ____ ____ _____
10 ____ ____ _____
11 ____ ____ _____
12 ____ ____ _____
13 ____ ____ _____
14 ____ ____ _____
15 ____ ____ _____
16 ____ ____ _____
17 ____ ____ _____
18 ____ ____ _____
19 ____ ____ _____
20 ____ ____ _____
21 ____ ____ _____
22 ____ ____ _____
23 ____ ____ _____
24 ____ ____ _____
25 ____ ____ _____

59 (Pages 230 to 233)

Page 234

```
1              JURAT
2        I, JAMES ALLEY, do hereby state under oath
3   that I have read the above and foregoing transcript
4   in its entirety, and that the same is a full, true,
5   and correct transcription of my testimony so given
6   at said time and place, except for the corrections
7   noted.
8
9        _____
         JAMES ALLEY
10
11       SUBSCRIBED AND SWORN TO BEFORE ME, the
12  undersigned Notary Public in and for the State of
13  _____ on this, the _____ day of
14  _____, 2018.
15
16       _____
              Notary Public
17
    My Commission Expires: _____
18
19
20
21
22
23
24       REPORTED BY:  BRENDA SCHMITZ, CSR, RPR
25
```

Page 235

```
1              CERTIFICATE
2   STATE OF OKLAHOMA   )
                        )  SS:
3   OKLAHOMA COUNTY     )
4        I, Brenda Schmitz, Certified Shorthand Reporter
5   within and for the State of Oklahoma, do hereby
6   certify that the above-named JAMES ALLEY was by me
7   first duly sworn to testify to the truth, the whole
8   truth, and nothing but the truth in the case
9   aforesaid; that the above and foregoing deposition
10  was by me taken in shorthand and thereafter
11  transcribed; that the same is true and correct; and
12  that it was taken on JULY 16, 2018 at the time of
13  9:56 a.m. in the City of Oklahoma City, County of
14  Oklahoma, State of Oklahoma under the stipulations
15  hereinbefore set out, and that I am not attorney for
16  or relative of any of said parties or otherwise
17  interested in the event of said action.
18       IN WITNESS WHEREOF, I have hereunto set my hand
19  and official seal this 27th day of July, 2018.
20
         _____
21       BRENDA SCHMITZ, CSR, RPR
         Oklahoma Certified Shorthand Reporter
22       Certificate No. 00823
         Expires: December 31, 2018
23
24
25
```

60 (Pages 234 to 235)