# EXHIBIT 1

Policicchio, Daniel
August 9, 2018

---

**Page 3**

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

PETSMART, INC.,                 )
                                )
            Plaintiff,          )
                                )
vs.                             ) No. 17-CV-0361-
                                )    CVE-JFJ
DANCOR CONSTRUCTION, INC.,      )
and DANIEL J. POLICICCHIO,      )
Sr.,                            )
                                )
            Defendants.         )

The videotaped discovery deposition of
DANIEL J. POLICICCHIO, Sr., taken before
LAURA L. BABYAR, C.S.R., Notary Public, at
28 North 1st Street, Geneva, Illinois, on
Thursday, August 9, 2018, at the hour of
10:20 a.m.

Q & A Reporting, Inc.
7115 Virginia Road, Suite 105
Crystal Lake, Il 60014
(815) 477-2230
www.qareportinginc.com

---

**Page 4** (Exhibits)

```
 1                 E X H I B I T S
 2  Number                         Marked for ID
    45 ........................... Pg. 24, Ln. 20
 3  46 ........................... Pg. 27, Ln. 17
    47 ........................... Pg. 118, Ln. 7
 4      (UPON conclusion of the deposition, the
    Reporter received Pg. 1 of 6 for Exhibit No. 45;
 5  did not receive Exhibit No. 46; and received
    Exhibit No. 47 to be attached to the transcript.)
 6
    Number                         First Referenced
 7
     2 ........................... Pg. 13, Ln. 7
 8   3 ........................... Pg. 14, Ln. 1
     4 ........................... Pg. 15, Ln. 9
 9   6 ........................... Pg. 35, Ln. 12
     7 ........................... Pg. 41, Ln. 11
10   8 ........................... Pg. 113, Ln. 6
     9 ........................... Pg. 45, Ln. 7
11  10 ........................... Pg. 53, Ln. 6
    11 ........................... Pg. 60, Ln. 18
12  14 ........................... Pg. 83, Ln. 2
    15 ........................... Pg. 141, Ln. 6
13  17 ........................... Pg. 67, Ln. 7
    18 ........................... Pg. 90, Ln. 1
14  20 ........................... Pg. 114, Ln. 23
    21 ........................... Pg. 142, Ln. 7
15  22 ........................... Pg. 143, Ln. 18
    23 ........................... Pg. 145, Ln. 7
16  24 ........................... Pg. 146, Ln. 3
    25 ........................... Pg. 146, Ln. 11
17  26 ........................... Pg. 147, Ln. 19
    27 ........................... Pg. 147, Ln. 22
18  28 ........................... Pg. 148, Ln. 5
    29 ........................... Pg. 148, Ln. 20
19  30 ........................... Pg. 150, Ln. 3
    31 ........................... Pg. 150, Ln. 20
20  32 ........................... Pg. 151, Ln. 17
    33 ........................... Pg. 152, Ln. 16
21  34 ........................... Pg. 153, Ln. 6
    35 ........................... Pg. 154, Ln. 11
22  36 ........................... Pg. 155, Ln. 16
    37 ........................... Pg. 157, Ln. 23
23  38 ........................... Pg. 158, Ln. 23
    39 ........................... Pg. 159, Ln. 11
24  40 ........................... Pg. 160, Ln. 23
```

---

**Page 2**

```
 1  APPEARANCES:
 2      LAW OFFICE OF ROBERT H. ALEXANDER, Jr.,
        P.C., by
 3      MR. ROBERT W. IVY,
        100 N. Broadway, 18th Floor
 4      PO Box 868
        Oklahoma City, OK 73101-0868
 5      (405)232-0803
        appeared on behalf of the plaintiff;
 6
 7      McDANIEL ACORD, PLLC, by
        MR. GREGG J. LYTLE,
 8      9343 E. 95th Court
        Tulsa, OK 74133
 9      (918)382-9200
        appeared telephonically on behalf of the
10      defendants;
11
12  ALSO PRESENT:
13      LAW OFFICE OF MATTHEW ROBINSON, by
        MR. MATTHEW ROBINSON,
14      28 N. 1st Street, Suite 108
        Geneva, IL 60134
15      appeared on behalf of the defendants.
16      ADVANCED VIDEO SOLUTIONS, by
        MR. NICK PAGE, Videographer
17
18
19
20              I N D E X
21  Witness:                         Page
22  DANIEL J. POLICICCHIO, Sr.
23  Examination by:
24      Mr. Ivy ...................... 7-168
```

---

**Page 4**

```
 1              (Witness sworn.)
 2      MR. IVY:  Before we start, um, we need to, uh,
 3  cover a couple things procedurally.  Um, under the,
 4  uh, Federal Rules of Civil Procedure, a deposition
 5  can be conducted, um, by -- remotely by telephone
 6  upon, uh, stipulation of the parties.  I have not,
 7  uh, had any -- nobody's made a request for that
 8  stipulation of me.
 9      Gregg, are you asking me to stipulate
10  that you can attend this deposition by telephone?  10:25:43
11      MR. LYTLE:  I would, Robert.  And I thought we
12  had discussed that, since I was not going to be
13  able to travel.
14      MR. IVY:  Well, you never told me that you
15  weren't able to travel.  The last conversation we
16  had was that you were talking about possibly
17  bringing some kind of a motion, but, uh -- so I
18  understand that now you're requesting a stipulation
19  to attend by telephone; is that right?
20      MR. LYTLE:  That's correct.                   10:26:07
21      MR. IVY:  Okay, I agree.  Um, now, however, I
22  do not agree to having, uh, two counsel represent
23  Mr. Policicchio at this deposition.  Nor do I agree
24  to having someone who's not admitted in the case or
```

Policicchio, Daniel
August 9, 2018

## Page 5

1   admitted in the Northern District representing
2   Mr. Policicchio at this deposition.
3          Uh, so I would ask that, uh, that
4   Mr. Robinson -- though, I thank him for his
5   hospitality in hosting this deposition, that he
6   remove his microphone and not be heard during the
7   deposition.  And if we can't agree to that, then I
8   won't agree to your attending by telephone.
9          MR. LYTLE:  So are you just asking that
10  Mr. Robinson would not make objections during the    10:26:49
11  deposition?
12         MR. ROBINSON:  That's what I understood.
13  Right?
14         MR. IVY:  Well, I'm asking that Mr. Robinson
15  not, uh, defend in any way during the deposition.
16  If he wants to work with his client, you know, when
17  we're on breaks or something, I don't have a
18  problem with that.  And I don't have a problem with
19  him being here.  I just -- if you're going to
20  attend by telephone, the basis for my stipulation    10:27:10
21  agreeing to that is that there's just one person
22  defending the deposition, and that would be you,
23  Gregg.
24         MR. LYTLE:  Okay.  And so my understanding

## Page 6

1   would be, then, that would just be Mr. Robinson
2   does not make objections during the deposition,
3   correct?
4          MR. ROBINSON:  Or other commentary.
5          MR. IVY:  Yeah, or any other commentary.
6          MR. LYTLE:  Sure.
7          MR. ROBINSON:  That's fair.
8          MR. IVY:  Just so that he's not on the record.
9   He can be on the record as being here but, you
10  know, but that's all.                                10:27:38
11         MR. ROBINSON:  I'm good with that.  So, you
12  know, just, Gregg, you're going to -- I guess
13  maybe -- are we on the record yet?  We are, right?
14  I guess I would only just say, then, make sure we
15  give time -- because Gregg is on the phone -- so he
16  can make his objections.  Other than that, yeah, I
17  can be quiet.  That may surprise you, but I can
18  actually be quiet.  So I'm cool with that, Gregg,
19  if you are.
20         MR. LYTLE:  That's fine.                      10:28:02
21         MR. ROBINSON:  Okay.
22         MR. IVY:  Okay.
23
24

## Page 7

1          DANIEL J. POLICICCHIO, Sr.,
2   having been first duly sworn, was examined and
3   testified as follows:
4                EXAMINATION
5   BY MR. IVY:
6    Q   Mr. Policicchio, um --
7    A   Yes, sir.
8    Q   (Continuing) -- you understand that you're
9   here to give a deposition under court order of the
10  Northern District of Oklahoma, true?                 10:28:17
11   A   That's true.
12   Q   Um, there have been two prior depositions
13  of, uh, Dancor Construction, Inc.  And can we call
14  that Dancor today?
15   A   Fine.
16   Q   Um, is Dancor -- is that named after you
17  because your first name's Dan?
18   A   Yes.
19   Q   Um, Dancor testified that you directed
20  that the witness who appeared for Dancor be the      10:28:45
21  witness who appear for Dancor; is that accurate?
22   A   Yes.
23   Q   Um, have you given a deposition before?
24   A   Yes, I have.

## Page 8

1    Q   Okay.  Um, how many times have you given
2   depositions before?
3    A   Once.
4    Q   When was that?
5    A   Ten plus years ago.
6    Q   What kind of case was that?
7    A   It was involving somebody else and I was a
8   witness for it.
9    Q   Okay.  Well, that was a little bit of time
10  ago.  So let me just give you a couple ground rules  10:29:18
11  so we're on the same page.  Um, as you can tell,
12  there's a court reporter.  There's a videographer.
13  And I'm going to ask you a series of questions, um,
14  and you're going to give a series of answers.  It's
15  a little bit unlike -- well, it's a lot unlike an
16  ordinary conversation because we're making a
17  record.  Ultimately, the result of this is going to
18  be a transcript that's going to have question/
19  answer, question/answer, question/answer.  Uh, as a
20  result of that, uh, we need to make sure -- and      10:29:45
21  during the course of the deposition, I may, from
22  time to time, remind you.  If I do that, I'm not
23  trying to scold or anything.  I'm just trying to
24  protect the record.

2 (Pages 5 to 8)

Policicchio, Daniel
August 9, 2018

Page 9

1      A   Okay.
2      Q   And I may need to remind myself from time
3    to time, because we're all humans, that we don't
4    want to talk over each other.  Okay?
5      A   Yes.
6      Q   So please try to wait until you've heard a
7    full question before you give an answer.  Okay?
8      A   Agreed.
9      Q   And I will try to wait for you to finish
10   your answer before I ask you another question.    10:30:14
11   Okay?
12     A   Agreed.
13     Q   Um, if you don't understand a question,
14   please let me know.  I'll be happy to rephrase it.
15   Okay?
16     A   Yes.
17     Q   Uh, I don't always rephrase it.  If I
18   think the question's very clear, I might just let
19   that question stand.
20     A   Okay.                                          10:30:27
21     Q   If you answer a question, I'm going to
22   assume that you understood it.  Fair enough?
23     A   Fair.
24     Q   Um, if you need to take a break, um, let

Page 10

1    us know.  It's not an endurance contest.  Um, there
2    may be certain times during the deposition where
3    we're in the middle of a subject.  In which case,
4    uh, if you request a break, I may ask that you wait
5    just a few minutes.  But, you know --
6      A   That's fair.
7      Q   (Continuing) -- reasonably speaking, we'll
8    break if you need it, okay?
9      A   That's fair.
10     Q   Um, and we've stipulated that your            10:30:58
11   counsel, Mr. Lytle, can attend, uh, by telephone,
12   um, and, uh -- and that Mr. Robinson who's sitting
13   here will not participate in the deposition.  You
14   understand that?
15     A   Yes, I do.
16     Q   Okay.  Also, you'll need to make your
17   answers always be out loud.  So yes --
18     A   Yes.
19     Q   (Continuing) -- no, rather than a nod or
20   that sort of thing.  Okay?                          10:31:26
21     A   Yes.
22     Q   Also, uhm-uhm and uhn-uhn, that is out
23   loud, but it's still not a yes or no.  So you got
24   to try and make them yes or nos, unless something

Page 11

1    more is required.  Okay?
2      A   Yes.
3      Q   Um, your -- uh, Mr. Robinson handed me a
4    document, um, an Offer of Judgment.  And the Offer
5    of Judgment, uh, says that he allows a judgment to
6    be entered against him in this case in the amount
7    of 156,667.98, plus reasonable attorneys' fees and
8    costs incurred through August 9th, 2018.
9           Uh, did you help, um, come up with
10   the number that is reflected in this Offer of       10:32:18
11   Judgment?
12     A   Yes.
13     Q   How did you calculate that number of
14   $156,667.98?
15     A   It came from the dollar amount --
16   obviously, I don't recall right at this point.
17   What PetSmart paid out to various subcontractors
18   was a little over $200,000, if I'm not mistaken.
19   Exact number I don't know.  Two oh two, two twenty.
20   Can't remember exactly.  Uh, minus the remaining    10:32:43
21   funds that PetSmart owned -- owes Dancor of
22   $145,000 and change.  That difference was like,
23   roughly $56,000.  And that's where the 56 and so
24   much came.  And then, in turn, we put an additional

Page 12

1    $100,000 on there for miscellaneous.
2      Q   Okay, thank you.  Oh, I forgot one thing
3    in our preliminaries.  You're here testifying in
4    your capacity as President and CEO of Dancor.
5      A   Yes.
6      Q   You understand that?  Okay.  There are
7    things obviously that you did as President and CEO
8    of Dancor that you did also as Dan Policicchio.  So
9    is it okay if I call you Dan Policicchio?
10     A   You can call me Dan.                           10:33:35
11     Q   Okay.  Um, that -- so there's going to be
12   some overlap, but the overlap is always going to be
13   because you're testifying on behalf of Dancor as
14   its President and CEO.  Understand that?
15     A   Yes.
16     Q   Okay.  I have a couple more housekeeping
17   things, then we'll get going.
18     A   No problem.
19     Q   Do you recall answering interrogatories on
20   behalf of Dancor in this case?                      10:34:14
21     A   I don't recall.
22     Q   Okay.  I'm going to show you -- and we
23   have, um -- I'm going to -- for purposes so that we
24   don't get awash in Exhibit stickers, I'm going to

3  (Pages 9 to 12)

Policicchio, Daniel
August 9, 2018

Page 13

1  refer to Exhibits that we used at Dancor's 30(b)(6)
2  deposition as the Exhibit numbers for the
3  deposition of Mr. Policicchio as well.
4       You okay with that, Gregg?
5  MR. LYTLE:  Yeah, that's fine.
6  BY MR. IVY:
7     Q   I'm going to show you what we've marked as
8  Plaintiff's Exhibit No. 2.  Just take a quick look
9  at that.  I'm not even going to hardly ask you any
10 questions about that because you've already signed    10:35:00
11 and verified that.
12    A   Um-um.
13    Q   If you want to glance at it and then take
14 a look at the last page, that's your verification
15 page.
16        (Witness examines document.)
17    A   Yes, that's my verification.
18    Q   Okay.  Um, do you recall, uh, reviewing
19 these interrogatories --
20    A   Yes, that's correct.                           10:37:00
21    Q   (Continuing) -- and verifying that they're
22 accurate?  And the reason I'm asking you this
23 question is that I got two more supplements to it
24 that weren't signed by anybody and didn't have a

Page 14

1  verification.  So I want you to take a look at
2  Plaintiff's Exhibit 3 which is Defendant Dancor
3  Construction, Inc.'s Supplemental Responses to
4  Plaintiff's First Interrogatories and Requests for
5  Production.  And take a look at that.
6       And, uh, and what I want to know is
7  do you verify those supplemental responses in the
8  same way that you verified the first ones?  And I'm
9  not asking you if you signed the verification.  I
10 know you didn't.  I just want to know as you're      10:37:34
11 sitting here today under oath, do you provide the
12 same assurance that you did for your signed and
13 verified interrogatories that those are accurate?
14        (Witness examines document.)
15    A   These are the supplemental responses.  I'm
16 assuming those are different documents coming,
17 forthcoming.  When you say like, the responses and
18 the supplemental response, see Dancor 2192-4326.
19 Those are other forms or --
20    Q   When it's referring to Bates numbers,        10:39:53
21 those are the Bates numbers of the documents that
22 Dancor produced.
23    A   Okay, thank you.  Verified.  It's fine.
24    Q   Okay.  So you have verified the accuracy

Page 15

1  of the responses in Plaintiff's Exhibit No. 3,
2  correct?
3     A   To the best of my knowledge, yes.
4     Q   Okay.  And then, I was also given by
5  Mr. Lytle a document which was a second set of
6  supplemental responses.  It's not labeled that, but
7  that's what it is.
8     A   Okay.
9     Q   And this was Exhibit 4 from Dancor's
10 deposition.  And ask if you would also verify those   10:40:57
11 responses.
12        (Witness examines document.)
13    A   Verified to the best of my knowledge, yes.
14    Q   Okay.  So you have reviewed Dancor's
15 second supplemental responses which are Plaintiff's
16 Exhibit 4, even though that's not what they're
17 labeled, and you verify those as well, true?
18    A   Yes.
19    Q   Are you aware, sir, that there was a court
20 order requiring Dancor to produce additional         10:44:04
21 documents just recently?
22    A   Just the other day, yes.
23    Q   Okay.  Um --
24    A   On the 8th, or something like that.

Page 16

1     Q   And you were made aware of that, true?
2     A   Yes.
3     Q   And did you identify the documents, the
4  additional documents that were produced?
5     A   The best that we could, yes.
6     Q   Okay.  And when you say "we", I'm asking
7  did you personally?  Did Dan Policicchio, on behalf
8  of Dancor, identify those documents?
9     A   I identified them and gave them to Gregg,
10 yes.                                                  10:44:34
11    Q   There were approximately 5600 plus
12 documents that were produced before that.  As I
13 understand it from the deposition of Dancor, those
14 were identified in combination between you and
15 Mr. Alley; is that true?
16    A   Correct.
17    Q   Okay.  Um, now, I received those, the
18 documents that you produced while I was traveling
19 here yesterday and there were 200 of them.  I have
20 not had a chance to print them.  I have had a        10:45:06
21 chance to look at them, um, and they appear to all
22 be bank records.  Am I right about that?
23    A   If I'm not mistaken, yes.
24    Q   Okay.  How did you, um -- what, um --

4  (Pages 13 to 16)

Policicchio, Daniel
August 9, 2018

Page 17

1    which -- strike that.  Let me start over.
2         What are these -- why did you
3    identify those bank records?  What was the purpose
4    of producing those?  And I'm not saying because
5    there was a court order.  We know that.  But there
6    were certain requests that were made of Dancor to
7    produce documents.  Which of those requests was --
8    were those bank records produced to respond to?
9       A   Those were the bank records that probably
10   show like, the checks that were issued or relevant    10:45:50
11   check numbers that -- I believe you have checks
12   that were given to subcontractors previously.  You
13   could cross reference that onto the bank statements,
14   and deposits as well.
15      Q   Okay.  As I recall -- and I can pull these
16   up on my computer as necessary.  But just
17   generally, as I recall, those bank records were ran
18   from January, 2017 to December, 2017.  Am I right
19   about that?
20      A   I can't remember the dates, but -- without    10:46:22
21   obviously seeing what was sent yesterday again.
22      Q   Tell you what.  I'm going to get into
23   specifics on that a little bit later.  But let's,
24   for now -- Dancor testified that there was a --

Page 18

1    that Dancor had a general operating fund.  Did you
2    read the depositions of Dancor?
3       A   Yes.
4       Q   And did you agree with the answers that
5    Dancor gave?
6       A   Yes.  To the best of my knowledge, yes, I
7    agree with them.
8       Q   Were any of the bank records that were
9    produced just recently bank records of the general
10   operating fund?    10:47:33
11      A   Yes.
12      Q   Which of those records reflects Dancor's
13   general operating fund?  Which bank?
14      A   It's the Hancock Bank checking account and
15   there was a Bank of America checking account, too.
16      Q   Is the Bank of America also the general
17   operating account?
18      A   Yes.
19      Q   Did Dancor have any other general
20   operating accounts other than the Hancock Bank    10:48:06
21   account and the Bank of America account?
22      A   No.
23      Q   One of the issues with prior production of
24   documents was that there were -- it purported to

Page 19

1    produce records of e-mails between Dancor and
2    subcontractors.  As it turned out, there were --
3    there was at least one substantial omission from
4    e-mails with subcontractors.  And the one
5    substantial omission that we identified at the time
6    was e-mails between RLS Construction and Dancor
7    regarding requests for payment that were made by
8    RLS.  Do you remember seeing that in the deposition
9    of Dancor?
10      A   I remember seeing that.    10:49:22
11      Q   Okay.  Now, as it was represented to me,
12   the documents that were produced were produced in
13   groups.  So, for example, Dancor testified that it
14   compiled all of the e-mails from a folder,
15   basically, that contained all of subcontractor
16   communication; is that right?
17      A   I believe so, yes.
18      Q   How is it that a subset of subcontractor
19   e-mails would have been not included in that group
20   of subcontractor e-mails?    10:50:04
21      MR. LYTLE:  Object to the form.
22      THE WITNESS:  My response to that is our
23   project manager at the time, Robert Albertson, who
24   probably has a good chunk of the e-mails, once --

Page 20

1    you know, obviously you can prove otherwise if you,
2    know, need.  Please tell me.  Once an employee is
3    terminated or let go -- he left on his own
4    recourse.  Um, once we terminate an account and
5    everything else like that, Microsoft only keeps the
6    e-mails for 30 days and then they purge them.  I
7    know we switched servers.  Exact time on that, I
8    don't know.  Those documents, those e-mails we're
9    still trying to get back.  But at this point, you
10   know, we're still trying to retrieve those e-mails    10:50:49
11   so we can forward them to you as an Exhibit that
12   you're requesting.
13         That's where the bulk of the e-mails,
14   you know, above and beyond what James has and
15   everything else, and myself, will be coming from,
16   since he had the day-to-day operations on the
17   project and communication with all the subs,
18   contractors.
19   BY MR. IVY:
20      Q   Okay.  Well --    10:51:08
21      A   If that makes sense.  Hopefully it does.
22      Q   Let me see if I can break that down a
23   little bit.
24      A   Um-um.

5 (Pages 17 to 20)

Policicchio, Daniel
August 9, 2018

Page 21

1    Q   So was the communication that
2  Robert Albertson had with subcontractors, did that
3  communication take place on -- through a Dancor
4  e-mail exchange?
5    A   Yes, through Microsoft, if I'm not
6  mistaken.
7    Q   Okay.  And what you're telling me is that
8  any e-mail that was contain -- that was done
9  through Mr. Albertson would have been automatically
10  purged 30 days after he was terminated?      10:51:43
11    A   I believe --
12    Q   After he --
13    A   I don't purge it.  That's something that
14  Microsoft does.  Because when you obviously cancel
15  an account through Microsoft -- I'm not an IT
16  person or anything else like that.  So I can't
17  give, you know, hundred percent accuracy on that.
18  So I apologize on that.  But that's what I'm being
19  told.  And that's what we're trying to retrieve
20  through our own, you know, server that we have.    10:52:05
21  See if there's anything there and kind of break
22  down everything that's pertaining to this project
23  only because, obviously, he was involved in other
24  projects as well.

Page 22

1    Q   Okay.  Are you -- by "you", I mean
2  Dan Policicchio.  Are you on that same Microsoft
3  server?
4    A   Everybody is, yes.
5    Q   Okay.  So if you had received an e-mail,
6  it would not have been purged because you're still
7  there, right?
8    A   Correct.
9    Q   I'm going to represent to you,
10  Mr. Policicchio, that you are copied on a large    10:52:38
11  number of those RLS e-mails that we're talking
12  about.
13    A   Um-um, yes.
14    Q   But they still weren't produced.  So my
15  question is how is it that documents that would
16  still exist that were subcontractor communications
17  not be produced?  How would they be separated out?
18    A   Good question.  And I'll have to look into
19  that for you and I'll get it for you.  I didn't
20  break out my e-mails for PetSmart related only to    10:53:12
21  individual subcontractors.  I believe they can do a
22  search by names.  Just have to verify each name of
23  our contact person at sub and do a search on that.
24  I'm sure I could break it out, if that makes sense.

Page 23

1    Q   It makes sense, but the issue is that
2  there were, I don't know, hundreds, maybe
3  thousands, I don't know, a lot of subcontractor
4  e-mails that were produced.  That it appears would
5  have been produced by going through just that
6  process.  And yet, a very specific sub group of
7  subcontractor e-mails wasn't in there.
8        You would agree that all of those RLS
9  Construction e-mails that were attached as an
10  Exhibit to the Dancor deposition were not produced,    10:54:10
11  right?
12    MR. LYTLE:  Object to the form.
13    THE WITNESS:  I can't -- without looking at
14  them again, I can't say yes or no to that one.
15  Because if I was copied on a ton of them, it would
16  be just repetitive.
17  BY MR. IVY:
18    Q   All right.  Well, we can rely on Dancor's
19  testimony on that.  So that's okay.  So other than
20  the explanation that Mr. Albertson's e-mails might    10:54:35
21  have been purged by Microsoft 30 days after he was
22  terminated, is there any other explanation that you
23  can identify here today why subcontractor e-mails
24  regarding requests for payment as exampled by those

Page 24

1  RLS e-mails from the Dancor deposition, why those
2  would not have been produced?
3    A   I don't have an answer for that.
4    Q   Okay.  After that deposition, I contacted
5  two other subcontractors and asked them if they had
6  e-mail contact with Dancor regarding requests for
7  payment.  And I got responses.  Um, those are now
8  of record.  They were filed along with -- they're
9  identified as Document 88-2 filed in this case.
10  Um, I'd like to go over those with you.    10:55:56
11        And let's -- here's what let's do.
12  In terms of Exhibits, there may be a couple that
13  are missing at the end, but I know that the
14  Exhibits from Dancor's deposition, I'm pretty sure
15  they ended at 40.  So let's -- why don't we go
16  ahead and mark this one, for safety sake, let's go
17  ahead and mark this one as Exhibit 45.  There may
18  be some missing, but that way we know we're not
19  double marking something.
20        (WHEREUPON, a document was marked    10:56:42
21         Deposition Exhibit No. 45 for
           identification as of 8/9/2018.)
22  BY MR. IVY:
23    Q   I'm going to hand you what we've marked as
24  Deposition Exhibit No. 45.  Um, and I think I just

6 (Pages 21 to 24)

Policicchio, Daniel
August 9, 2018

Page 25

1    counted it's a six-page Exhibit. These are
2    e-mails, um, between Brazeal Masonry and Dancor.
3    Um, in the -- on the first page of it, this is an
4    e-mail that's directed to Dan Policicchio and
5    Debby Policicchio. Debby Policicchio is your wife;
6    is that true?
7        A   Yes.
8        Q   She's employed by Dancor construction?
9        MR. LYTLE:  Robert?
10       MR. IVY:  Yes, Gregg.                    10:57:41
11       MR. LYTLE:  Robert, I'm sorry to interrupt. I
12   just want to make sure I'm looking at the same
13   thing. So this is 88-2 that you attached to the
14   motion?
15       MR. IVY:  Correct.
16       MR. LYTLE:  Thank you. Sorry about that.
17       MR. IVY:  No problem.
18   BY MR. IVY:
19       Q   What is Debby Policicchio's position with
20   Dancor?                                     10:58:03
21       A   Just a general, you know, office staff.
22   She was administrative.
23       Q   Ask you to take a look at Exhibit 45,
24   please.

Page 26

1            (Witness examines document.)
2        A   These appear to be correspondence between
3    Brazeal Masonry and Dancor; but, obviously, I need
4    to verify these with my own e-mails, double-check
5    them. But, yes.
6        Q   Okay. You can see on here that these were
7    directed to your e-mail. Your e-mail address was
8    danp@dancor.com.
9        A   That's correct.
10       Q   And your wife Debby Policicchio's e-mail   10:59:43
11   address was debbyp@dancor.com?
12       A   That is correct.
13       Q   There were an awful lot of documents that
14   were produced and in a very short period of time.
15   To the best of my ability, I do not believe that
16   these were produced --
17       A   Okay.
18       Q   (Continuing) -- with Dancor's original
19   production.
20       A   Okay.                                11:00:09
21       Q   Do you have an explanation for why
22   these -- why Exhibit No. 45, why these e-mails were
23   not produced as part of the subcontractor
24   communication?

Page 27

1        A   No, I do not have an answer on that one,
2    no.
3        Q   Okay. Brazeal, by the way, is one of the
4    subcontractors that Dancor did not pay, correct?
5        A   As far as I know. As far as who got paid
6    what, I need to see that breakdown. But could be
7    accurate.
8        Q   As you sit here right now, you don't know
9    which subcontractors were paid and which ones were
10   not paid?                                   11:00:46
11       A   Off the top of my head, exact dollar
12   amounts, no. It's been a year and a half, two
13   years.
14       MR. IVY:  I'm going to take the stickies off
15   of this for the Exhibit, but if you'd mark that as
16   46, please.
17           (WHEREUPON, a document was marked
             Deposition Exhibit No. 46 for
18           identification as of 8/9/2018.)
19   BY MR. IVY:
20       Q   The other subcontractor that I contacted  11:01:18
21   that provided me with, um, e-mails was Advanced
22   Fixtures, Inc. Um, do you recall Advanced Fixtures,
23   Inc. being a subcontractor or supplier of Dancor?
24       A   They were, if I'm not mistaken, a required

Page 28

1    PetSmart vendor that we had to use.
2        Q   Um, and this is a 34-page Exhibit. Um,
3    these are e-mails that came from Advanced Fixtures;
4    though, within the e-mail chains, there are, uh --
5    you'll see e-mails from other subcontractors as
6    well. Um, I'm going to ask you some questions
7    about some specifics within these and, you know,
8    but you can take a look at that generally speaking.
9            (Witness examines documents.)
10       Q   You know, so we're not here forever, I    11:04:01
11   would just suggest that you identify those are
12   e-mail strings that were at some point directed to
13   you.
14       A   Obviously the fir -- I agree. As far as
15   the first set, these were not directed to me, the
16   first three pages. Because we're not -- nobody
17   from Dancor's on these --
18       Q   Um-um.
19       A   (Continuing) -- first three pages. So I
20   can't verify those. And the second two pages, like  11:04:22
21   I said, you know, they look to be, you know, to
22   myself and accounting.
23       Q   These are --
24       A   From Advanced Fixtures.

7 (Pages 25 to 28)

Policicchio, Daniel
August 9, 2018

Page 29

1    Q    (Continuing) -- Pages 5 and 6 of the
2    document that was filed in federal court.
3    A    They appear to be legitimate.  Until I go
4    back and I want to pull up Robert's and myself's
5    e-mails.  Anything that's missed or individually,
6    which I will get to.  And then Page 7 and 8, 9, 10,
7    11, 12, 13, 14, 15, 16, 17 were -- looks like
8    corresponding e-mails between the subcontractors,
9    which I'm not privy to.  And Pages 18, 19, 20, 21,
10   22, 23, 24, 25, 26, 27, 28, 29, 30 looks like          11:06:31
11   corresponding e-mails, you know, with Dancor and
12   the subcontractor.
13   Q    So Pages 18 through 30, um, according to
14   the page numbers from the document filed in court,
15   um, those are correspondence that Dancor was
16   included in, correct?
17   A    Yes.  Then Pages 31 to 35, those just --
18   e-mails from subcontractors Dancor's not on.
19   Q    Got it.  Thank you.  Now, for the ones
20   that you identified that Dancor was on there, and      11:07:48
21   if I'm right that those were not previously
22   produced, um, do you have an explanation for why
23   those would not have been produced as part of the
24   subcontractor e-mails that were produced?

Page 30

1    A    No, I don't have an answer on that.  But
2    like I said, I will produce some based upon my -- I
3    have to drill down in my e-mails directly.  Can I
4    ask -- can I get a list of the names?  Because it's
5    easy to search for names for the e-mails.  Is that
6    possible?  Because I can do a search on Outlook.
7    Then it will come up any e-mails written to.  We
8    might be able -- one subcontractor might have four
9    people that work for the firm.
10   Q    For purposes of what you're talking about,    11:08:35
11   what I would suggest is that after the deposition,
12   you get together with your counsel and you work out
13   whatever you need to do to make a full response to
14   production.  But that's, you know, that's different
15   than what we're doing here today.  Okay?
16   A    That's fine.
17   Q    There was an e-mail in Exhibit 45 that --
18   no, 46, right?  This one's 46.  Yeah.  There was an
19   e-mail in Exhibit 46 that, um, where someone from a
20   subcontractor called Rain Tech, um, wrote that they    11:09:50
21   talked to a former employee of Dancor who informed
22   me that this is a common practice of theirs.  He
23   quit because Dancor stopped paying him.  Is there
24   someone who worked for Dancor that quit because

Page 31

1    Dancor stopped paying them?
2    A    Not that I'm aware of.
3    Q    Were there employees of Dancor who quit,
4    um, while the PetSmart project was going on?
5    A    I don't recall, to be honest with you.  I
6    don't -- maybe our superintendent.
7    Q    There's an e-mail in Exhibit 46, this one
8    was from Demolition Wrecking Company.  This is one
9    that -- on which Dancor was not copied.  So you may
10   not have seen this before.  But, um, in this one,      11:11:09
11   uh, Derold -- who I think is Derold Wofford.  Yeah.
12   (Continuing) -- wrote to say, "I called the
13   PetSmart corporate headquarters and was told we
14   need to talk to Richard Courtney.  I left him a
15   message.  Haven't heard back yet.  Maybe if enough
16   of us call him, we will get a response from the
17   PetSmart side to see if Dan is telling the truth
18   and Dancor has not been paid by PetSmart yet."  And
19   then there's a phone number.  Uh, did you tell, uh,
20   Derold -- do you know who Derold Wofford is?          11:11:50
21   A    Yes.
22   Q    Did you tell Derold Wofford that the
23   reason that you had not paid him was because
24   PetSmart hadn't paid you yet?

Page 32

1    A    I don't recall the situation, but I do
2    recall that he was paid a considerable amount of
3    money, over a hundred and thirty, forty thousand
4    dollars.  And he was owed retention and probably a
5    change order.  Don't quote me on it, but --
6    obviously, you can quote me on it.  But he was paid
7    a considerable amount of money already.  And then
8    obviously Dancor was still owed funds from
9    PetSmart.
10   Q    So let me see if I understand that.  This    11:12:23
11   was dated April 13th, 2017, this e-mail that I'm
12   talking about.  Um, now, in April, I believe that
13   PetSmart had paid Dancor everything that Dancor had
14   requested of PetSmart, other than retainage, right?
15   A    I believe so.  Retainage, and if there was
16   any open change orders, so --
17   Q    Okay.  So what you're telling me is that
18   what you may have told Mr. Wofford is that, uh, the
19   amount that he was not paid yet was the amount for
20   retainage and -- the amount that he was due for       11:12:57
21   retainage and change orders?
22   A    Possibly, yes.  Retainage and change
23   orders.  Because I know he was paid a considerable
24   amount already.

8 (Pages 29 to 32)

Policicchio, Daniel
August 9, 2018

Page 33

1    Q   Does considerable amount -- is that the
2    same he was paid everything he was supposed to be
3    paid, other than retainage and change orders?
4    A   I believe so.
5    Q   I believe we've established already,
6    through Dancor's deposition, that you were the
7    person that handled all the finances for Dancor,
8    true?
9    A   Yes.
10   Q   Um, was it -- if a subcontractor was        11:13:51
11   contacting you, um, and making claims for payment
12   from you, sometimes repeated and getting hotter
13   over time, is that something that you would make
14   note of?  Would you remember that?
15   A   Yes and no, depending on what the
16   situation was.
17   Q   We've identified, um, three subcontractors
18   now of Dancor that had correspondence with Dancor
19   asking about when they were going to get paid.  We
20   know that there were more than three.  We know from   11:14:31
21   Dancor's deposition, there were more than three
22   subcontractors who hadn't been paid.  Um, were
23   there -- to your memory, were there other
24   subcontractors besides those three -- RLS

Page 34

1    Construction, Brazeal Masonry and Advanced
2    Fixtures -- that had been in contact with you
3    asking where their money was?
4    A   I don't recall that, but I know there were
5    more.
6    Q   So we know that when you do an additional
7    search looking for more of those e-mails, there is
8    some to be found?
9    A   Possibly.
10   Q   Um, let me rephrase that.  We know that     11:15:12
11   there were other correspondence like that.  You're
12   just not sure if technologically you're able to
13   recover them.  Is that what you're saying?
14   MR. LYTLE:  Object to the form.
15   THE WITNESS:  I believe I understand your
16   question.  But, yes, if I could do a search on my
17   e-mails and if we can find Robert's, I'm sure, you
18   know, anything that comes up, any correspondence,
19   we can find it.
20   BY MR. IVY:                                     11:15:41
21   Q   Is there a reason why you couldn't find
22   that before?
23   A   No answer to that.  I don't have an answer
24   for that.  Robert's, I would say, explained that

Page 35

1    earlier with his.
2    Q   But with your -- with correspondence to
3    you, those e-mails would have been available to you
4    at the time you made your first document
5    production, true?
6    A   True.  And probably 99 percent of my
7    e-mails, I always copy somebody else from Dancor.
8    Hence, would have been all on the package that was
9    sent to you.  I very rarely do not copy anybody on
10   any e-mails from internally within Dancor,         11:16:14
11   obviously.  That's what I meant.
12   Q   All right.  I'm going to show you, uh,
13   Plaintiff's Exhibit No. 6 which is a
14   prequalification review.  Are you familiar with
15   that document?
16   A   Yes, I am.
17   Q   The Exhibit 6 is a document that -- it
18   appears to be a form, right?
19   A   Yes.
20   Q   That's a form that's regularly used in    11:16:55
21   construction to get qualified to do work for
22   somebody; is that true?
23   A   Yes.
24   Q   And you filled out that form for PetSmart

Page 36

1    because you wanted Dancor to get some work from
2    PetSmart, right?
3    A   Yes.
4    Q   If you would look at the -- here, I'll
5    find it for you.  Towards the middle of that
6    document, um, you sent in with the prequalification
7    review certain financial information; is that true?
8    A   Yes.
9    Q   Um, you sent in, uh, income and expenses,  11:18:16
10   uh, balance sheets, and statement of cash flows,
11   uh, for three years, from 2010 to 2012; is that
12   right?
13   A   Yes, '10, '11 and '12.  Correct.
14   Q   Okay.  Um, these documents, these income
15   and expenses, balance sheets, and statement of cash
16   flows, these are records that Dancor ordinarily
17   kept?
18   A   We did everything on QuickBooks.  So yes
19   and no.
20   Q   These are documents that QuickBooks        11:18:52
21   creates?
22   A   I believe so, yes.
23   Q   And are these -- these are documents that
24   Dancor created, obviously, for three years before

9 (Pages 33 to 36)

Policicchio, Daniel
August 9, 2018

Page 37

1  PetSmart -- before they made this request for
2  business from PetSmart?
3      A  It appears to, yes.
4      Q  And I believe that Dancor's already
5  testified that it would have continued to create
6  these documents after 2012 and until 2017.
7      A  I don't recall that.  No, I --
8      Q  You don't recall or you don't know?
9      A  I don't know.  I don't know that we agreed
10  to continue that.                              11:19:26
11      Q  Did Dancor not continue to make income and
12  expense sheets, balance sheets, and statements of
13  cash flows after 2012?
14      A  Not that I'm aware of.  If there were, I
15  don't recall at this time.
16      Q  Is there a reason that Dancor would have
17  stopped that accounting practice after 2012?
18      A  A lot of our clients didn't ask for these.
19      Q  So is the only reason that Dancor was
20  creating these income and expense, balance sheets,  11:19:51
21  and statement of cash flow because some clients
22  asked for them?
23      A  PetSmart, exactly.
24      Q  So is it your testimony that the income

Page 38

1  and expenses, balance sheets, and statements of
2  cash flow that are attached to the qualification
3  review that's marked Plaintiff's Exhibit No. 6 were
4  created specifically for that qualification review?
5      A  I believe so, yes.
6      Q  And otherwise, Dancor doesn't keep track
7  of that accounting information; is that true?
8      A  No.  We do our yearly taxes obviously
9  every year and my accountant does that once a year.
10      Q  PetSmart requested, um, information,       11:20:37
11  documents regarding Dancor's net worth.  Also
12  requested balance sheets for a period of time, from
13  2012 through 2017.  Do you remember seeing that
14  request?
15      A  I don't recall that, no.
16      Q  Okay.  We received a balance sheet in a
17  tax return for one year.  Um, I take it that Dancor
18  has filed taxes for more than -- has filed taxes
19  2012 through 2017, true?
20      A  That's correct.                           11:21:24
21      Q  So at a minimum, if the only balance sheet
22  that Dancor ever created was for taxes, um, there
23  would be a balance sheet in the tax return for each
24  of those years, 2012 through 2017, true?

Page 39

1      A  I would assume so, yes.
2      MR. LYTLE:  Object to the form.  Just to
3  clarify, the 2017 return has not been filed.  I
4  think we have produced the extension showing that
5  that had not been filed yet.
6      THE WITNESS:  Correct.
7  BY MR. IVY:
8      Q  Okay.  Other than 2017, though, there
9  would be -- for the taxes that Dancor actually
10  filed, for the returns they actually filed, there  11:21:58
11  would be a balance sheet for each one of those
12  years, true?
13      A  I assume so, yes.
14      Q  Are you aware that Dancor produced only
15  one year of a balance sheet in its taxes?
16      A  The taxes that we submitted to you, yes.
17      Q  Is there a reason that Dancor withheld the
18  other balance sheets from their document production?
19      A  No, not that I'm aware of.
20      Q  If you would take a look at Page 4.  I'm  11:22:37
21  referring to the form -- the page number on the
22  form of the general contractor review that's marked
23  as Exhibit 6 I believe, right?  Yes.  Do you see at
24  the bottom there that -- is that your signature?

Page 40

1      A  Yes.
2      Q  And when you signed that, you stated that
3  you were duly sworn and you depose and say that the
4  information provided in this document is true and
5  sufficiently complete so as not to be misleading,
6  is that true?
7      A  Yes.
8      Q  And that was signed and notarized on
9  December 11th of 2013, true?
10      A  Yes.                                       11:23:26
11      Q  If you would take a look at Page 2 of the
12  form.  And this is -- by the way, this is an AIA
13  document, right?
14      A  AIA 305, if I'm not mistaken.  Yes.
15      Q  Do you see on Page 2 of the form, under
16  Section 3.2, claims and suits?
17      A  Yes.
18      Q  It says, "Are there any judgments, claims,
19  arbitration proceedings or suits pending or
20  outstanding against your organization or its        11:24:06
21  officers?"  Do you see that question?
22      A  Yes.
23      Q  And you answered no; is that right?
24      A  Yes.

Q & A Reporting, Inc.
815-477-2230

Policicchio, Daniel
August 9, 2018

Page 41

1    Q    Your attorneys produced a document that --
2    in response to our request from PetSmart for
3    litigation that PetSmart was involved in, um, that
4    identified a number of lawsuits that preceded that
5    statement.  Are you aware of lawsuits that were
6    pending at the time that you signed the general
7    contractor review saying that there were no
8    lawsuits?
9        A    Not aware unless I know exactly which one
10   you're talking about.  If you could point them out.    11:24:53
11       Q    I'm going to show you what's marked as
12   Plaintiff's Exhibit No. 7.  And if you go to the
13   last page of that document.
14           Now, you signed this -- you said you
15   signed this document on December -- signed and
16   notarized it on December 11th of 2013, true?
17       A    December 11, 2013.  Yes.
18       Q    Okay.  So if you go to the last page of
19   Exhibit 7 is it?
20       A    Yes.    11:25:45
21       Q    There are -- if you go from the bottom of
22   the page up.  That way we'll get the oldest ones.
23   There are 1, 2, 3, 4, 5, 6, 7, 8, 9, or even 10
24   cases -- oh, no.  This one's after.  Nine cases

Page 42

1    that were -- that are identified as having been
2    filed before you signed, um, the qualification
3    review.  Do you see that?
4        A    Yes.
5        Q    Do you have any reason to -- are you
6    familiar with the lawsuits that are identified
7    in --
8        A    I'm somewhat familiar with the cases.
9    Obviously I would have to refer to, you know, my
10   attorney who handled those.  A lot of these didn't    11:26:40
11   come to fruition or a lot of them were in our
12   favor, too.
13       Q    Okay.  Whether or not they were in your
14   favor, the question was whether any judgments,
15   claims, arbitration proceedings or suits pending or
16   outstanding against your organization or its
17   officers.  Whether they were successful or not, the
18   question was were they outstanding.
19           Um, is it your testimony that none of
20   these cases that we've identified on the last page    11:27:10
21   of Exhibit 7 were, uh, pending or outstanding at
22   the time you signed the general qualification
23   review?
24       MR. LYTLE:  Object to the form.

Page 43

1        THE WITNESS:  I don't recall what the status
2    or outcome of these were.
3    BY MR. IVY:
4        Q    At the time that you signed the general
5    contractor qualification review, did you know then?
6        A    I don't recall.
7        Q    Is it possible that you signed the general
8    qualification review answering that there were no
9    such lawsuits when you didn't really know?
10       MR. LYTLE:  Object to the form.    11:27:53
11       THE WITNESS:  Yes, possibly.
12   BY MR. IVY:
13       Q    Did you -- would it be your practice to
14   sign a general qualification review certifying that
15   there were no lawsuits pending against Dancor in a
16   general qualification review, would you say no,
17   there were no such lawsuits because you wanted to
18   get the business?
19       MR. LYTLE:  Object to the form.
20       THE WITNESS:  Yes, possibly.    11:28:28
21   BY MR. IVY:
22       Q    Is it possible that you would indicate
23   that there were no lawsuits pending when there
24   actually were and actually knew that they were

Page 44

1    pending in order to get business?
2        A    No, that I don't recall on that.  No.
3        Q    Are there any -- any of the lawsuits that
4    are listed on the last page of Exhibit 7 that you
5    do recognize?
6        A    They're so old.  So it's, you know, some
7    of the names pop out to me.  But what the
8    resolution was or the outcome, I don't recall that.
9        Q    Okay.  Or whether they were pending at the
10   time that you signed the qualification review?    11:29:24
11       A    Whether they were pending, yes.
12       Q    That's something that right now you can't
13   recall?
14       A    No.
15       Q    Okay.  I'm going to put these in a pile.
16   If you ever -- during the course of the deposition,
17   if you want to refer to something we've dealt with
18   before, we can put it -- we're putting everything
19   right here.  So we can always go back to it.  So
20   when I take something from you, it's not because    11:29:52
21   I'm trying to hide it from you.  It's all sitting
22   right here.
23       A    Not a problem.
24       MR. ROBINSON:  Off the record for a moment.

11 (Pages 41 to 44)

Policicchio, Daniel
August 9, 2018

Page 45

1          (Discussion had off the record.)
2   BY MR. IVY:
3       Q    All right.  Mr. Policicchio, I want to
4   take you through briefly the Payment Applications
5   that Dancor made to PetSmart.  Um, and I'm going to
6   skip over -- other than we're going to talk just
7   generally.  And I've marked Payment Application
8   No. 1 as Exhibit 9.  I'm not even going to refer to
9   that other than -- we're not going to get into
10  detail on this one other than to establish that they're          11:33:19
11  Payment Applications are a way that -- they're an
12  ordinary practice in the construction industry as a
13  way to receive, manage the money during a
14  construction project; is that true?
15      A    That's correct.  Yes.
16      Q    And they are done through AIA which is
17  American Institute of Architecture?
18      A    Yes.
19      Q    There's AIA forms that govern that, right?
20      A    There's multiple forms, yes.  PetSmart          11:33:54
21  obviously utilized the AIA.
22      Q    And that's not unusual.  You've had
23  clients before use AIA?
24      A    Yes, 99 percent.  Yes.

Page 46

1       Q    So Dancor is familiar with the use of the
2   AIA forms?
3       A    To a point, yes.
4       Q    Um, at least with respect to the AIA forms
5   that were used in the PetSmart case, in the
6   PetSmart project, Dancor was familiar with those
7   forms?
8       A    Yes.
9       Q    Um, there's a document at the front, an
10  AIA Form G702 which is identified as Application          11:34:36
11  and Certificate for Payment.  Do you see that?
12      A    Yes.
13      Q    And it sort of sums up whatever's happening
14  in that particular Pay Application, right?
15      A    It gives a breakdown, original contract
16  sum, if there's any change orders, and then,
17  obviously, the amount that's billing that
18  particular period, yes.
19      Q    Right.  And then behind the Form 702,
20  there's a bunch of other documents that are          11:35:01
21  relevant to making up what this sort of summary in
22  seven -- in the Form 702 is, right?
23      A    Yes.  It's a G703.
24      Q    I'm looking at a document that says G702.

Page 47

1       A    Okay.
2       Q    G702?
3       A    Yes.
4       Q    Okay.  Um, and each of these Applications
5   and Certificate for Payment are contained a
6   provision where the contractor certifies under oath
7   that certain things have happened, right?
8       A    Yes.
9       Q    In particular, what it says is "The
10  undersigned contractor certifies that to the best          11:35:48
11  of the contractor's knowledge, information and
12  belief, the work covered by this Application for
13  Payment has been completed in accordance with the
14  contract documents, that all amounts have been paid
15  by the contractor for work for which previous
16  certificates for payment were issued and payments
17  received from the owner, and that current payment
18  shown herein is now due."  Do you see that?
19      A    Yes.
20      Q    And on that first Payment Application, is          11:36:13
21  that your signature there?
22      A    Yes.
23      Q    You signed that on September 30th of 2016,
24  right?

Page 48

1       A    Correct.
2       Q    And that's signed and notarized, meaning
3   that was signed under oath, true?
4       A    Yes.
5       Q    Um, now, there were a total of five
6   Payment Applications that Dancor made to PetSmart,
7   true?
8       A    I believe so, yes.
9       Q    So we're talking right now about the first
10  of five.          11:36:46
11      A    Correct.
12      Q    And this Payment Application, you signed
13  it on September 30th.  Does that give us an idea
14  of -- that some work had been started before the
15  30th and now you're saying please pay me for that
16  work?
17      A    Correct.
18      Q    This document also contains, if you go in
19  a few pages, a sworn statement.  Do you see that?
20      A    Yes.          11:37:27
21      Q    And the sworn statement identifies you as
22  the affiant.  Do you see that?
23      A    Yes.
24      Q    And again, in that sworn statement, you

Q & A Reporting, Inc.
815-477-2230

Policicchio, Daniel
August 9, 2018

Page 49

1    are sworn on oath and declare, um, various things
2    that are contained in the document, right?
3        A    Correct.
4        Q    Um, and in particular, what it says is
5    that, um, Daniel J. Policicchio, Sr. -- that's you?
6        A    Yes.
7        Q    (Continuing) -- being duly sworn on oath
8    declares and says that he is the President of
9    Dancor Construction, Inc., that is -- I think
10   that's supposed to be you -- is the contractor, or    11:38:09
11   Dancor, under the contract with PetSmart, owner,
12   for certain improvements on the following described
13   premises, and then it describes the place where the
14   PetSmart store was going to be built.  True?
15       A    True.
16       Q    And that was 10122 South Memorial Drive,
17   Tulsa, right?
18       A    Correct.
19       Q    And then underneath that it says, "That
20   for the purpose of said contract, the following    11:38:31
21   persons have been contracted with and have
22   furnished or are furnishing materials for, and have
23   done or are doing labor on said improvements.  That
24   there is due and to become due them respectively

Page 50

1    the amount set opposite their names for materials
2    and labor as stated.  That this statement is a
3    full, true and complete statement of all such
4    persons, the amounts paid and the amounts due or to
5    become due to each."  True?
6        A    True.
7        Q    Okay.  And then there's a list of
8    subcontractors underneath that, right?
9        A    Correct.
10       Q    And those -- the subcontractors that are    11:39:07
11   listed, are those the subcontractors that Dancor
12   knows of as of the first Payment Application?
13       A    Correct.
14       Q    So as we go along, we may get more
15   subcontractors added in?
16       A    Possibly, yes, or less.
17       Q    And so if some part of a job is
18   eliminated -- we don't need that shelf on the fifth
19   level -- then we'd eliminate that subcontractor?
20       A    Correct.    11:39:32
21       Q    And then this document identifies the type
22   of work the subcontractor's doing, the amount of
23   the contract -- and when it says the amount of
24   contract, that's the amount of the contract for

Page 51

1    that particular subcontractor, right?
2        A    Correct.
3        Q    So that reflects the amount of the
4    subcontractor's contract with Dancor?
5        A    Correct.
6        Q    And then, um, retention, that's that -- is
7    that ten percent that's held back?
8        A    Generally 10 percent held back, yes.
9        Q    And retention is held back because nobody
10   wants to get to the end of a job and then have    11:40:03
11   somebody leave the job and have it not finished,
12   right?
13       A    Correct.
14       Q    So retention makes sure that someone
15   finishes the job in order to get that last bit,
16   true?
17       A    Generally, yes.
18       Q    And when I say finish the job, I mean you
19   for your subcontractors, you want to know that your
20   subcontractors have fully complied with their    11:40:22
21   contracts before you pay them that last retainage
22   amount, that ten percent.
23       A    Yes.
24       Q    And that would be the same of PetSmart.

Page 52

1    PetSmart wants to make sure that Dancor has
2    completed all of its contractual requirements
3    before it pays Dancor that retainage amount, true?
4        A    Correct.
5        Q    Um, and then it indicates the amount of
6    previous payments.  Do you see that?
7        A    Yes.
8        Q    And the amount of this payment.  So when
9    it says the amount of this payment, it's referring
10   to what is due now but not necessarily paid yet?    11:40:54
11       A    Correct.
12       Q    And previous payments means Dancor's
13   already paid that to that subcontractor?
14       A    Paid or to be paid, yes.
15       Q    Well, isn't the -- oh.  So net of previous
16   payments includes paid or to be paid?
17       A    The way I look at it, yes.  Paid, to be
18   paid or previously invoiced.
19       Q    Okay.  From my review of Payment
20   Application 1 and Dancor's -- the bank records that    11:41:36
21   Dancor produced, it looks like everybody that
22   Dancor said they paid, they paid in Payment
23   Application No. 1.  In fact, in Payment Application
24   No. 1, it's only to be paid because it's the first

13  (Pages 49 to 52)

Policicchio, Daniel
August 9, 2018

Page 53

1  application.
2      A   It looks that way.  Correct.
3      Q   So we're not -- we don't have an issue of
4  previous payments.  So we're done with Payment
5  Application No. 1.
6          I'm going to show you Exhibit 10.
7  And this is the second Payment Application that
8  Dancor made to PetSmart, correct?
9      A   Not what I have.  It says the second page
10  is Application 1.                              11:42:31
11      Q   Hang on a second.  So it looks like there
12  is a -- within Exhibit 10, there is an invoice
13  that's related to Payment Application No. 1, right?
14  Is that what you're pointing out?
15      A   That's what I'm pointing out, the second
16  page of that Exhibit.  I haven't looked at anything
17  further, so --
18      Q   So I think that for whatever reason, that
19  document was contained within the paperwork we had
20  for Payment Application No. 2.  But I think if you   11:43:14
21  look at the rest of it, I think the rest of it
22  appears to be the same types of documents.  So we
23  have the -- there's the G702 for Payment Application
24  No. 2.

Page 54

1      A   Correct.
2      Q   And we've already talked about that
3  document, right?
4      A   Yes.
5      Q   And then behind there's a -- if you go to
6  the sworn statement, there's a sworn statement for
7  Payment Application No. 2, also?
8      A   Correct.
9      Q   And that one you are the affiant for the
10  sworn statement of Payment Application No. 2 again,  11:43:52
11  true?
12      A   True.
13      Q   And if you look at the bottom of the sworn
14  statement, you have signed and notarized that sworn
15  statement, true?
16      A   True.
17      Q   And the sworn statement, that's also part
18  of a form; isn't it?
19      A   What do you mean?
20      Q   You don't create this document yourself.   11:44:15
21  This is -- a sworn statement, is this an AIA form?
22      A   No.  It's an outside AIA form.
23      Q   I noticed that Dancor had a very similar
24  sworn statement form for one of Dancor's

Page 55

1  subcontractors.  It was basically the same in
2  format.  It had a notary line at the end for
3  Dancor's subcontractor to sign.
4      A   Correct.
5      Q   Is this a form that Dancor uses?
6      A   We use this as well, like you stated
7  before, with our subcontractors so they can list
8  their suppliers that they have on a job so we can
9  track that as well making sure, you know,
10  everything checks and balances.                11:44:52
11      Q   So my question is you're the person who
12  creates this form, right?  The sworn statement
13  form?
14      A   Yes.
15      Q   How do you do it?  How do you create this
16  form?
17      A   I don't understand the question.  We list
18  all our subcontractors and type it on there based
19  on their contract.
20      Q   I'm going a little bit broader than that.   11:45:13
21      A   Yeah, I don't --
22      Q   Let me set the stage.  So it's getting to
23  be November and you've finished the work for
24  payment period number two.  And you are sitting

Page 56

1  down at your computer and you're thinking to
2  yourself it's time to bill PetSmart.  It's time to
3  send in that Payment Application.  So you sit down
4  in front of your computer and you're going to fill
5  out a sworn statement.  You do this on a computer,
6  right?
7      A   Yes.
8      Q   What do you pull up?
9      A   Well, sworn statement -- I think I
10  understand what you're getting at on that one.  We   11:45:51
11  submit our bills at the end of the month.  For
12  PetSmart specifically, for the preceding month.
13  They're always -- this one in conjunction -- this
14  Application No. 2 is for the month of October.
15          So we submitted our submission on
16  10/31/2016.  We collect invoices from each
17  subcontractor, generally give them a deadline seven
18  days prior to the end of the month where they have
19  to project the work completed for that said month.
20  Meaning this one -- this is October.  So that's     11:46:23
21  where we get the numbers for the -- the net amount
22  of this payment, what they're looking for.
23  Obviously, that net amount is, you know, less any
24  retention that's in the second column.  Does that

Policicchio, Daniel
August 9, 2018

Page 57

1    make sense?
2       Q   Yes. You're actually getting more
3    specific than I'm looking for.
4       A   So I'm trying to help out. So we
5    collect -- we just don't pull it out of the air.
6    Sometimes we do. Depends. There's some
7    subcontractors that don't, you know, submit an
8    invoice on time. But we know they performed when
9    we talked to our project manager, superintendent,
10   yes, XYZ did some saw cutting. But they're a        11:46:59
11   small firm. They didn't do it. So we would
12   probably bill for them so they don't have to wait
13   an entire month, another month.
14      Q   And you generally know what saw cutting
15   would cost and so you're able to --
16      A   We base it upon their contract. If
17   they're 50 percent done, 100 percent done. We can
18   determine that at that time, depending on the
19   trade.
20      Q   I got it. My question is even a little    11:47:19
21   more broad than that. I mean, I'm going real broad
22   here, okay? I want to know, you're sitting in
23   front of your computer and you have to -- you're
24   creating this document. You open a file, I take

Page 58

1    it? You open some file. A Word document?
2       A   Like Word or Excel document. That's the
3    sworn statement, yes.
4       Q   Okay. So there is a document in Dancor's
5    server that's called Sworn Statement?
6       A   Correct.
7       Q   And then you pull up that document and
8    then you input the information depending upon what
9    job and what pay period it is, right?
10      A   Um-um. Yes.                              11:47:56
11      Q   So you would use the same form whether it
12   was a PetSmart job or whether it was some other
13   job.
14      A   Yes, to a point. Yes.
15      Q   Assuming that they were following the same
16   AIA format.
17      A   Correct.
18      Q   And, um, so this comes from a certain form
19   that's saved in Dancor's records, true?
20      A   True.                                    11:48:23
21      Q   Okay. And then you just fill in the
22   blanks.
23      A   Yes.
24      Q   So under all these, as you've described,

Page 59

1    you find out the information of the subcontractors
2    and you fill in the blanks.
3       A   Correct.
4       Q   And then you get to the end and you sign.
5    Now, who's -- who is -- who's K. Noble?
6       A   She's a notary.
7       Q   Is she somebody who works for you?
8       A   No. She's an outside notary, traveling
9    notary.
10      Q   So is this someone that you would call and    11:48:53
11   say, hey, swing by and --
12      A   At this time, yes.
13      Q   So when you were done with your Payment
14   Application, you would actually -- you'd say, okay,
15   I'm done, but now I got to have this thing
16   notarized because it's part of the form.
17      A   Correct.
18      Q   So you got to call K. Noble who stops by
19   and -- his? Her?
20      A   It's a her.                              11:49:23
21      Q   In her car and --
22      A   Yes.
23      Q   And then she pulls out the stamp thing and
24   watches you sign and --

Page 60

1       A   Yes.
2       Q   And then you sign?
3       A   Generally that's how it works, yes.
4       Q   And you did understand that when you did
5    that, you called her and you had her come and
6    everything, the reason was you were signing under
7    oath, right?
8       A   Correct.
9       Q   We are done with Payment Application
10   No. 2.                                          11:50:06
11      MR. LYTLE: Bob, before we get to No. 3, which
12   I assume is coming, do you mind if we take a
13   bathroom break real quick?
14      MR. IVY: I don't mind.
15      MR. LYTLE: Thank you.
16      (WHEREUPON, there was a break had
17      from 11:46 to 11:56 a.m.)
17   BY MR. IVY:
18      Q   I'm going to show you what we've marked as
19   Plaintiff's Exhibit 11, which is Payment Application
20   3. Do you see that?                            12:02:17
21      A   Yes, that's correct.
22      Q   And Payment Application No. 3 starts with
23   that G702 form where you have sworn under oath that
24   to the best of your knowledge and belief, the work

15 (Pages 57 to 60)

Policicchio, Daniel
August 9, 2018

Page 61

1  covered by this application for payment has been
2  completed in accordance with contract documents,
3  that all amounts have been paid by the contractor
4  for work for which previous certificates for
5  payment were issued and payments received from the
6  owner, and that current payment shown herein is now
7  due. And you signed and notarized that, true?
8    A  To the best of my knowledge, yes, true.
9    Q  That is your signature there?
10   A  Yes, it is.                          12:02:57
11   Q  And that is a notary there, right?
12   A  Yes, it is.
13   Q  And that was signed and notarized on
14  December 1st, 2016, true?
15   A  Correct.
16   Q  All right. If you would turn to the sworn
17  statement, please. I'm going to summarize this for
18  the sake of speed because Dancor's already
19  testified to this, and I don't think we need to go
20  through it in the same type of detail as a result.  12:03:24
21     But, um, under the -- in the sworn
22  statement, under the category of net of previous
23  payments, um, there was a, uh -- what I did was I
24  matched up the records that Dancor produced, the

Page 62

1  payments with the -- what was identified in the
2  sworn statement as having been paid. And I
3  identified that, um, there was an amount to
4  Girtman & Associates for $10,075.70 for which there
5  was no record of that being paid. There was an
6  amount of $2,528 to Roll-A-Shade with no record of
7  that being paid. There was an amount of $2,912.58
8  to Eliason Corporation with no record of that being
9  paid. Um, there was an indication of a prior
10  payment to DaVco Mechanical Contractors of          12:04:26
11  $47,542.50. There was a payment indicated in
12  Dancor's records, but was only for 21,330 and maybe
13  some pennies. There was a payment of $17,910 to
14  Brazeal Masonry for which there was no record of
15  being paid. And then there was a -- there's an
16  indication of a payment to Dancor, but that's
17  different.
18     Is it true that Dancor indicated that
19  the amounts that I have just identified had been
20  paid to subcontractors previously but was not paid?  12:05:11
21     MR. LYTLE: Object to the form.
22     MR. IVY: You want me to go through them one
23  by one, Gregg?
24     MR. LYTLE: No. I just think that you didn't

Page 63

1  include -- on that vendor summary that was
2  provided, some of those people are listed on that
3  vendor summary. So I just think it's an incomplete
4  question.
5     MR. IVY: Some of the people were listed.
6     MR. LYTLE: There are payments, credit card
7  payments listed to Girtman, Roll-A-Shade, amongst
8  others. And those were some of the people you said
9  were not paid, so --
10    MR. IVY: Oh, I see. There were certain ones  12:05:44
11  that Dancor testified had been paid by credit card.
12  So let's put that in there.
13  BY MR. IVY:
14    Q  With the exception of those that Dancor
15  had been paid by credit card, are we agreed that
16  the ones that show no record of payment were not,
17  in fact, paid?
18    A  To the best of my knowledge, yes.
19    Q  Okay.
20    A  But the credit card payments, yes.        12:06:03
21    Q  Are you able to identify which ones of
22  these are credit card payments? I think your
23  counsel indicated Girtman was a credit card
24  payment?

Page 64

1    A  Girtman, I believe, was one. National
2  Cart might have been one. I'm not sure about
3  Alvarado Manufacturing. Not a hundred percent sure
4  on that one. Roll-A-Shade, I believe. Not a
5  hundred percent. Eliason, credit card. Possibly
6  Impact Specialties. Then there were other various.
7  I think that you had a list of the other ones like
8  Graybar. But those were lower tier. Those are
9  required PetSmart vendors that we paid via credit
10  card.                                            12:07:00
11    Q  Okay. The subcontractors that were not
12  paid by credit card, then, that there is no record
13  of payment would be -- for this one would be
14  Brazeal Masonry, which would be $17,910?
15    A  Yes, I believe so.
16    Q  And DaVco, which had only been paid
17  $21,330 and not $47,542.
18    A  I believe so.
19    Q  Is that true?
20    A  I believe so.                             12:07:45
21    Q  Is it true that when you swore that Dancor
22  had paid Brazeal and had paid DaVco $47,542, that
23  that was -- that was a lie?
24    MR. LYTLE: Object to the form.

16 (Pages 61 to 64)

Policicchio, Daniel
August 9, 2018

Page 65

1    THE WITNESS:  I don't recall.  I can't answer
2  that.
3  BY MR. IVY:
4    Q   You don't dispute, though, that you did
5  swear under oath that Dancor had paid Brazeal
6  $17,910 already, true?
7    A   True.
8    Q   And you don't dispute that Dancor had
9  swore under oath that it had paid DaVco Mechanical
10  Contractors $47,542.50, true?                    12:08:55
11    A   True.
12    Q   The part you can't recall is whether
13  Dancor actually paid them?
14    A   Correct.
15    Q   All right.  If Dancor's already testified
16  that they didn't pay them those amounts, would it
17  be true that what's indicated on the sworn
18  statement for those two subcontractors is a lie?
19    MR. LYTLE:  Object to the form.
20    THE WITNESS:  I can't answer that now.        12:09:24
21  It's -- we have our various payments.  Like,
22  there's a good example, too, which I'd like to add,
23  if you don't mind.  Like Allegiance Electric was
24  electrical sub, going back to the credit card

Page 66

1  payments.  Because I know we made a large payment
2  to Graybar for almost 73, $74,000, and that was
3  part of their contract.  As well as Novar probably
4  for 17 to 20 grand.  That's prior -- Allegiance
5  Electric, there's a lot of money that work that was
6  spent out.  That was probably part of this Pay
7  Application that we paid via credit card, too.  And
8  again, those are PetSmart required vendors.  So I'm
9  sure they can attest to receiving payment from us.
10  BY MR. IVY:                                      12:10:06
11    Q   And I'm not asking about those
12  particular --
13    A   No, I know.  I just want to --
14    Q   There's a number of subcontractors here
15  that I didn't bring up because I found records for
16  payment for them.  And I understand that some were
17  paid by credit card.  And we'll get to that in a
18  minute.  The ones I was referring to were DaVco and
19  Brazeal.
20        I think Brazeal filed a lawsuit            12:10:26
21  against Dancor because it didn't get paid, right?
22    A   That I don't recall whether they did or
23  not.
24    Q   You don't know that Brazeal filed a

Page 67

1  lawsuit against Dancor?
2    A   I don't believe so.  I think there is one
3  other firm.
4    Q   And DaVco filed a lawsuit against Dancor
5  for not being paid, didn't it?
6    A   Correct.
7    Q   I'm going to show you what we have marked
8  as Plaintiff's Exhibit No. 16, which is Payment
9  Application 4; is that true?
10    A   That's accurate.                           12:11:20
11    Q   And if we look at the AIA Form 702, that's
12  your signature under the portion that says that the
13  undersigned contractor certifies that to the best
14  of the contractor's knowledge, information and
15  belief the work covered by this application for
16  payment has been completed in accordance with
17  contract documents and that all amounts have been
18  paid by the contractor for work for which previous
19  certificates for payment were issued and payments
20  received from the owner, and that current payment   12:11:52
21  shown herein is now due.  Is that your signature
22  there?
23    A   Correct.  Yes.
24    Q   And you signed and notarized that under

Page 68

1  oath on December 27th, 2016, true?
2    A   That is correct.
3    Q   Let's go to the sworn statement.  First of
4  all, I'd like to take you to the end of the sworn
5  statement and have you look at the bottom of that.
6  Is there something different about the bottom of
7  the sworn statement for Payment Application No. 4?
8    A   Yes.
9    Q   What's different?
10    A   The signature.                             12:12:28
11    Q   The notary is missing, right?
12    A   Notary and signature.
13    Q   Okay.  Um, and you prepared this sworn
14  statement for Payment Application No. 4, correct?
15    A   Yes.  Correct.
16    Q   You deleted the signature portion.
17    A   I don't recall that.
18    MR. LYTLE:  Object to the form.
19  BY MR. IVY:
20    Q   Why is the signature -- the notary and     12:12:53
21  signature under oath missing from the sworn
22  statement in Payment Application No. 4?
23    A   I don't recall.
24    Q   Do you know what happened to it?

17  (Pages 65 to 68)

Policicchio, Daniel
August 9, 2018

Page 69

1    A   No, I don't recall.
2    Q   What would -- we're talking about a Word
3  document -- well, strike that.
4        So you did prepare this sworn
5  statement, true, for Payment Application No. 4?
6    A   It appears so, yes.
7    Q   You're the only one who prepares those,
8  true?
9    A   Correct.
10   Q   And you had done three Payment          12:13:30
11 Applications before this one, right?
12   A   Correct.  Could this have been pushed off
13 to a third page since we added a lot more line
14 items in there?  A lot of times it will push it a
15 whole section to a third page, which I don't see a
16 third page here.  Just a possibility.  I don't
17 know.
18   Q   I've not seen any document that contains
19 a -- whether it's from PetSmart or from Dancor,
20 that contains a signature page for this.  It        12:13:58
21 appears that -- do you see the bottom of the page
22 where ordinarily the sworn state -- the notary and
23 signature would be?
24   A   Yes.

Page 70

1    Q   It appears, you know, from looking at
2  other examples, that there's -- if we look at the
3  previous Payment Application, there appears to be
4  enough room for it to be down there.
5    A   There appears to be, yes.
6    Q   It's just not there.  Now, on the -- yeah.
7  This is the fourth Payment Application, right?
8    A   Correct.
9    Q   So you do the first Payment Application.
10 You fill everything in.  And you're ready to go     12:14:43
11 through it.  And you've got a certain process that
12 you go through because you do these on a regular
13 basis, right?
14   A   I sign a lot of paper.  Yes.
15   Q   And so when you get to the end of Payment
16 Application No. 1, you call K. Noble, the traveling
17 notary, right?
18   A   Um-um.
19   Q   And she comes by and you do the notary.
20 Um, you do Payment Application No. 2.  You finish.   12:15:05
21 You call K. Noble.  She comes and you do the
22 notary, right?
23   A   Yes.
24   Q   You do Payment Application No. 3.  You

Page 71

1  finish.  You call K. Noble.  She comes.  You sign
2  the notary, right?
3    A   Correct.
4    Q   Then you do Payment Application No. 4 and
5  there's -- there isn't a notary on it.  And I take
6  it then that this time you didn't call K. Noble?
7    A   She had to sign the -- for the G702.  So
8  an application is there.  I don't recall what
9  happened with that on the bottom.  Like I said, we
10 did add a lot of subcontractors on the first page,  12:15:40
11 which, you know, this is a spreadsheet.  It could
12 have pushed everything down, all the cells.  I
13 don't know.  I don't recall.  I can't answer that.
14   Q   Okay.
15   A   And then obviously when I come in and sign
16 things, I sign where it has my signature on there.
17   Q   The sworn statement in Payment Application
18 No. 4, is there any indication on that what date
19 you prepared that sworn statement?
20   A   It states on December 31st, which is      12:16:19
21 period to.
22   Q   Yeah.  That's the period that the sworn
23 statement covers, right?  That's the Payment
24 Application period?

Page 72

1    A   That's correct.  That's correct.
2    Q   Now, there isn't anything on the sworn
3  statement in Payment Application No. 4 that
4  identifies the date that you prepared that
5  document, right?
6    A   Not that -- no, not that I can see, except
7  for the top right-hand corner.
8    Q   Okay.  In Payment Application No. 4 for
9  demolition -- in the sworn statement for Demolition
10 Wrecking, do you see that it says that net of       12:17:21
11 previous payments $145,831.50?  Do you see that?
12   A   Yes.
13   Q   The records that were supplied by Dancor
14 support that Dancor actually had paid Demolition
15 Wrecking $111,165.75.  And that was supported by
16 the testimony of Dancor.  Are you aware of that?
17   A   If that's what's shown on the spreadsheet
18 that we gave you from QuickBooks, yes.
19   Q   Well, that's -- the spreadsheet that we
20 got from QuickBooks is something that we'll get to  12:17:59
21 later.  This is a different question.  The question
22 is the records that Dancor supplied as its
23 financial records supports payment of only
24 $111,165.75 to Demolition Wrecking.  And -- but

18  (Pages 69 to 72)

Policicchio, Daniel
August 9, 2018

Page 73

1    Dancor is claiming here that it paid $145,831.50 to
2    Demolition Wrecking.  And my question is -- and
3    Dancor has already admitted at its deposition that
4    it only paid $111,165.75.
5         The statement that Dancor had paid
6    $145,831.50 is not accurate, is it?
7    A   I don't recall.
8        MR. LYTLE:  Object to form.
9    BY MR. IVY:
10   Q   If Dancor had in fact only paid          12:18:51
11   $111,165.75, then the statement -- this sworn
12   statement as to what Dancor had paid Demolition
13   Wrecking was a false statement under oath, wasn't
14   it?
15       MR. LYTLE:  Object to the form.
16       THE WITNESS:  Again, I can't -- I don't
17   recall.
18   BY MR. IVY:
19   Q   Um, if you look down three, there's --
20   three entries, there's RLS Construction.  Do you   12:19:16
21   see that?
22   A   Yes.
23   Q   And in Payment Application No. 4, it says
24   that Dancor had previously paid RLS Construction

Page 74

1    $105,219 and zero cents.  Do you see that?
2    A   Yes.
3    Q   Dancor has already admitted that it only
4    paid RLS Construction $21,780 at that point in
5    time.  Are you aware of that?
6        MR. LYTLE:  Object to the form.
7        THE WITNESS:  I don't recall either at this
8    point in time.
9    BY MR. IVY:
10   Q   Is it true that at the time of Payment     12:19:53
11   Application No. 4, Dancor had not paid RLS
12   Construction $105,219?
13       MR. LYTLE:  Object to the form.
14       THE WITNESS:  I don't recall the exact amount.
15   BY MR. IVY:
16   Q   So it's your testimony today that you're
17   not able to -- you don't recall whether Dancor had
18   paid RLS a hundred and five thousand dollars two
19   hundred nineteen dollars as it swore that -- as you
20   swore that it had on Payment Application No. 4?    12:20:27
21   A   Like I said, I don't recall the exact
22   amounts at this time.
23   Q   Okay.  Aside from exact amounts, can we
24   agree at least if we're dealing with generalities,

Page 75

1    is it within your knowledge that Dancor had not
2    paid RLS Construction anything close to $105,000 by
3    that point in time?
4        MR. LYTLE:  Object to the form.
5        THE WITNESS:  Yes.
6    BY MR. IVY:
7    Q   You know that because RLS sued Dancor,
8    right?
9    A   Correct.
10   Q   And very recently RLS entered into a        12:21:04
11   settlement agreement with Dancor.
12   A   That's correct.
13   Q   And so those issues are front and center,
14   right?
15   A   That's correct.
16   Q   Um, and we know that until that that --
17   until that settlement was entered, Dancor had
18   substantially less than $105,219 to RLS, true?
19   A   The exact amount is -- I don't know.  I
20   don't recall at this time, but, yes.              12:21:27
21   Q   It was less than 105,000, true?
22   A   Yes.
23   Q   So the statement that Dancor had paid
24   $105,219 in Payment Application 4 is false.

Page 76

1        CHAIRMAN:  Object to the form.
2        MR. IVY:  Correct?
3        THE WITNESS:  It's possibly inaccurate,
4    correct.  Yes.
5    BY MR. IVY:
6    Q   And the statement that Dancor had already
7    paid RLS $105,219 in Payment Application No. 4 was
8    a lie, wasn't it?
9        MR. LYTLE:  Object to the form.
10       THE WITNESS:  That I don't recall the exact    12:21:59
11   amount again.
12   BY MR. IVY:
13   Q   If you go down to -- there's an entry for
14   APS Fire.  Do you see that?
15   A   Yes.
16   Q   APS Fire was not paid by credit card, was
17   it?
18   A   Not that -- to my knowledge.  I don't
19   recall, no.
20   Q   And the sworn statement in Payment         12:22:40
21   Application No. 4 states that Dancor had already
22   paid APS Fire $14,035.05.  Do you see that?
23   A   Yes.
24   Q   Dancor did not actually pay APS Fire

19 (Pages 73 to 76)

Policicchio, Daniel
August 9, 2018

Page 77

1  anything, did it?
2      A   I don't recall.
3      Q   If Dancor had not paid APS Fire anything
4  at all, then the statement in Payment Application
5  No. 4 that Dancor had paid APS Fire $14,035.05
6  would not be true; am I right?
7      MR. LYTLE:  Object to the form.
8      THE WITNESS:  I don't recall exactly amount
9  paid.
10  BY MR. IVY:                                   12:23:24
11     Q   Okay.  Um, the question was if Dancor had
12  not paid APS anything, then a statement under oath
13  that Dancor had paid $14,035.05 to APS Fire would
14  be a lie.  True?
15     MR. LYTLE:  Object to the form.
16     THE WITNESS:  I don't recall.
17  BY MR. IVY:
18     Q   What don't you recall?
19     A   The exact amount paid.  I would like to
20  see, you know, the breakdown that could refresh my  12:23:49
21  memory a little better.
22     Q   I'd like to see that, too.  Because I
23  asked if there was a -- there were discovery
24  requests that asked Dancor to match the amounts

Page 78

1  paid to the records supporting those amounts paid.
2  Those to this date have never been completed in
3  full.  So I'd like to see that, too.
4          I can tell you that -- I can
5  represent to you that I found no record in what
6  Dancor produced as its financial records of any
7  payment being made to APS Fire.  Um, so -- and I
8  can tell you that Dancor has already testified
9  under oath that it did not make that payment to APS
10  Fire of $14,035.05.                           12:24:32
11         And so what I'm asking you is based
12  on that fact, based on what's already been
13  established as an admission that Dancor did not pay
14  APS Fire $14,035.05, that statement in Payment
15  Application No. 4 that that payment had been made
16  is a lie; isn't it?
17     A   If that was submitted previously, then you
18  are correct.
19     MR. ROBINSON:  Hang on, hang on.  I think he
20  was saying something.  Go ahead, Gregg.          12:25:04
21     MR. LYTLE:  Object to the form.
22     MR. ROBINSON:  Okay.  Go ahead.
23     THE WITNESS:  If that was previously submitted
24  by us and it's obviously in the documents there and

Page 79

1  it's true and accurate, then, I will have to agree.
2  BY MR. IVY:
3      Q   If you go down to Allegiance Electric on
4  the sworn statement?
5      A   Okay.
6      Q   It says that Dancor had paid Allegiance
7  Electric, had already paid -- had previously paid
8  Allegiance Electric $87,645.60.  Do you see that?
9      A   Yes, I do.
10     Q   Dancor's records supported only a payment  12:25:45
11  of $19,350 to Allegiance Electric.  And that was --
12  and Dancor testified to that fact at its
13  deposition.  The statement in the sworn statement
14  for Payment Application No. 4 that Dancor paid
15  Allegiance Electric $87,645.60 is not true, is it?
16     MR. LYTLE:  Object to the form.
17     THE WITNESS:  I don't recall exact amount, but
18  also, too, that's reflective of payments made to
19  Allegiance Electric or joint checks to Allegiance
20  Electric and our supplier, which I believe is    12:26:27
21  listed on one of the forms previously submitted.
22  BY MR. IVY:
23     Q   Allegiance Electric and what supplier?
24     A   Which supplier exactly, that I don't know.

Page 80

1  I know there's a supplier.
2      Q   So is it your testimony that if we take
3  the amount that's shown in Dancor's records of
4  $19,350 being paid to Allegiance Electric and add
5  that to an unidentified -- an amount paid to an
6  unidentified supplier, that that amount will total
7  $87,645.60?
8      A   I don't recall that, I guess, the other
9  dollar amount.  Then we can determine that total
10  paid.                                          12:27:11
11     Q   Well, again, I'd like to see that, too,
12  because we requested that.  And to this date, we
13  still have not gotten that response.
14     A   I believe that was on the QuickBooks
15  report.  I'm sure it's in your -- we're going to
16  get to later you indicated, so --
17     Q   We will.  And for the record, because
18  we've gone back for court several times seeking
19  court order after court order to get compliance
20  with discovery.  We would have the answers to these  12:27:45
21  questions if Dancor only responded to their
22  discovery, written discovery the way they were
23  supposed to and matched the amount of payments to
24  the amounts identified in the sworn statements.

20  (Pages 77 to 80)

Policicchio, Daniel
August 9, 2018

Page 81

1  There's a reason that that question was asked.  It
2  was to get through this as simply as possible.
3  Here we are all this time later.  We finally have
4  Mr. Policicchio here who's the only person who can
5  answer these questions, apparently, other than
6  through documents, which Dancor's already admitted
7  through documents, and I can't get a straight
8  answer because that work apparently hasn't been
9  done.
10      MR. LYTLE:  Counsel, which interrogatory are    12:28:26
11  you referring to?
12      MR. IVY:  I'm not going to spend my time doing
13  that right now.  We can take care of that in a
14  motion practice.
15      MR. LYTLE:  But for the record, you're saying
16  there is an interrogatory that requests that?
17      MR. IVY:  I'm saying there's a discovery
18  request that requests that.  Whether it's an
19  interrogatory or whether it's a request for
20  production, it's one or the other.  And I    12:28:47
21  specifically asked and you were specifically
22  ordered to identify which documents pertain to
23  which request, and that did not happen fully.  So,
24  you know, I'm just going to keep going and we'll

Page 82

1  deal with it all at the end.
2  BY MR. IVY:
3      Q   If you look at the entry for DaVco
4  Mechanical Contractors in the Payment Application
5  No. 4?  You see that?
6      A   Yes.
7      Q   It says that Dancor had already paid DaVco
8  Mechanical Contractors $135,810.  Do you see that?
9      A   Yes.
10      Q   DaVco is one of the subcontractors that    12:29:29
11  sued Dancor, right?
12      A   That's correct.
13      Q   You are aware as you sit here today, are
14  you not, that Dancor did not pay DaVco $135,810?
15      A   The exact amount, I don't -- I don't
16  recall.  I got to see the suit again to see exactly
17  what was paid out and what was on that sheet again.
18  So you possibly could be correct, yes.
19      Q   All right.  Would it be helpful to you in
20  responding to these questions if you looked at that    12:29:56
21  QuickBooks sheet?
22      A   It helps.  It would help.  That refreshed
23  my memory because obviously this is a year and a
24  half, two years ago almost.  So every little bit

Page 83

1  helps.
2      Q   I'm going to show you what's been marked
3  as Plaintiff's Exhibit No. 14.  Is that the
4  QuickBooks form you're talking about?
5      A   Yes, sir, it is.
6      Q   And does looking at Exhibit No. 14 refresh
7  your recollection about how much Dancor has paid in
8  total to DaVco?
9      A   Yes.
10      Q   That amount is $21,330, correct?    12:30:49
11      A   Yes.
12      Q   And so Dancor had not, at the time of
13  Payment Application No. 4, previously paid DaVco
14  Mechanical Contractors $135,810 as indicated in the
15  sworn statement; is that true?
16      A   Yes.
17      MR. LYTLE:  Object to the form.
18  BY MR. IVY:
19      Q   So the statement in Payment Application
20  No. 4 that Dancor had paid DaVco previously    12:31:14
21  $135,810 is a lie; is it not?
22      A   The intentions were to pay that; but, yes.
23      Q   If I understand that correctly, the
24  intention was to pay it, true?

Page 84

1      A   Yes.
2      Q   But it had not been paid, right?
3      A   Per this other statement, that's correct.
4      Q   But the sworn statement says that it had
5  previously been paid, true?
6      A   True.
7      Q   So the statement in the sworn statement is
8  a lie.  True?
9      MR. LYTLE:  Object to the form.
10      THE WITNESS:  Yes.    12:31:48
11  BY MR. IVY:
12      Q   All right.  Let's take a look at Brazeal
13  Masonry because we talked about them once before.
14  But now that we have the QuickBooks summary in
15  front of us, this may help.  In Payment Application
16  4, you indicated that Dancor had already paid
17  Brazeal Masonry $17,910, true?
18      A   Correct.
19      Q   Um, looking at, uh, Exhibit No. 14, the
20  QuickBooks summary, do you see any payment to    12:32:23
21  Brazeal Masonry?
22      A   No.
23      Q   Does that refresh your memory about what
24  Dancor paid to Brazeal Masonry?

21 (Pages 81 to 84)

Policicchio, Daniel
August 9, 2018

Page 85

1    A   Yes.
2    Q   Is it true that Dancor had paid nothing to
3  Brazeal Masonry?
4    A   Yes.
5    MR. LYTLE:  Object to the form.
6  BY MR. IVY:
7    Q   Is it true, then, that the statement in
8  the sworn statement that Dancor had already paid
9  Brazeal Masonry $17,910 is untrue?
10   A   Appears to be, yes.                    12:32:55
11   Q   Is it true that the statement in the sworn
12 statement that Dancor had already paid Brazeal
13 Masonry $17,910 is a lie?
14   A   Appears to be.
15   MR. LYTLE:  Object to the form.
16 BY MR. IVY:
17   Q   Now, since we've raised this, um, let me
18 ask you a few questions.  This is going out of
19 order, but we can speed things up if I take them as
20 we go.                                       12:34:00
21       Looking at Deposition Exhibit No. 14.
22 Um, this is what you've described as a QuickBooks
23 summary?
24   A   Yes.

Page 86

1    Q   Did you prepare this document?
2    A   Yes.
3    Q   And did you prepare this, uh, for purposes
4  of this lawsuit that we're here today for?
5    A   Yes.
6    Q   When did you prepare this document?
7    A   July -- probably July 13th.
8    Q   July 13th of 2018?
9    A   2018, yes.
10   Q   And what information did you use to        12:34:36
11 prepare this document?
12   A   It's a QuickBooks report and there's an
13 option on there to print out, you know, amounts
14 paid.
15   Q   So somewhere Dancor had already kept the
16 figures of what had been paid to subcontractors?
17   A   It's jotted, it's noted in the QuickBooks
18 system.  And, obviously, you can add to this like I
19 added RLS Construction settlement that we agreed
20 to.                                          12:35:05
21   Q   So I'm trying to -- I don't use QuickBooks
22 myself.
23   A   That's fine.
24   Q   I went to law school because I can't do

Page 87

1  math or accounting or a lot of other things.  Um,
2  but if I understand correctly, when you say it's a
3  QuickBooks summary, this is the type of thing where
4  you push a button and it takes a whole bunch of
5  information and synthesizes it into a report; is
6  that right?
7    A   Correct.  This one particulars from
8  July 1st, 2016, to July, you know, 13th, 2018.  You
9  could specify certain dates, periods and
10 everything.  And it will pop up what it shows, you    12:35:41
11 know, what was paid or issued.  Only exceptions are
12 obviously the credit card payments which we kept a
13 separate tally on and the RLS Construction
14 settlement that was recently agreed to.
15   Q   So somewhere in QuickBooks all these
16 amounts are already entered?
17   A   Correct.
18   Q   How does that happen?  Over the course of
19 the construction, somebody -- is it you that enters
20 that information?                            12:36:14
21   A   It's automatically entered when you issue
22 a check to somebody.  That's automatically saved in
23 the system.  Once you issue a check, write a check,
24 it's already in the QuickBooks system.  It's

Page 88

1  already documented.  And as long as I assign it to
2  the job, it's assigned to this job, it's when you
3  issue the check.
4    Q   Okay.  So the --
5    A   If that makes sense.
6    Q   So the information -- you've said that you
7  added some things.  Let's forget about the adding
8  things.  Let's talk about the report.  Aside from
9  what you added, um, the information that is
10 contained in the QuickBooks summary, uh, in         12:36:49
11 Exhibit 14 is generated entirely from checks that
12 Dancor wrote?
13   A   Checks issued.  Yes, correct.
14   Q   Okay.  And other than checks issued and
15 some credit card payments, um, that's, uh, that's
16 everything that Dancor would have paid, right?
17   A   Correct.  And any settlements or ongoing,
18 as I put, ongoing legal, obviously that number
19 always increases.  But it's assigned to the
20 project.                                     12:37:25
21   Q   Okay.  Um, are there any other records
22 that are involved in creating this QuickBooks
23 summary other than the checks that Dancor wrote?
24   A   No, sir.

22  (Pages 85 to 88)

Policicchio, Daniel
August 9, 2018

Page 89

1    Q   Um, Victor Williams was a superintendent?
2  Is that the right word?
3    A   He was -- yes.  He was a superintendent,
4  correct.
5    Q   And did you hire him specifically for this
6  job?  For the PetSmart job?
7    A   I don't know if he did another project
8  with us in the past.  That I don't recall right
9  now.  But, yes, he was hired to do the job.
10   Q   Now, as I understand it, Victor Williams    12:38:03
11  left, uh, Dancor before the PetSmart project was
12  finished?
13   A   I believe so, yes.
14   Q   What were the circumstances of him leaving
15  Dancor?
16   A   That I don't recall.
17   Q   Did he just up and leave one day?  Or did
18  he talk to you?
19   A   He never chatted with me.  That I don't
20  recall.  He probably chatted with my project    12:38:28
21  management team.
22   Q   So he would have talked with Mr. Albertson
23  until Mr. Albertson left?
24   A   Either Mr. Albertson or Mr. Alley.

Page 90

1    Q   Let's take a look at Payment Application
2  No. 5 which is Exhibit 18.  If you turn to the AIA
3  Form G702.  You see that?
4    A   Yes.
5    Q   This Payment Application is signed and
6  notarized by you, true?
7    A   True.
8    Q   Dated January 31st, 2017?
9    A   True.
10   Q   And by signing and notarizing that under    12:39:57
11  oath, you've stated that the underside contractor
12  certifies that to the best of the contractor's
13  knowledge, information and belief, the work covered
14  by this application for payment has been completed
15  in accordance with the contract documents, that all
16  amounts have been paid by the contractor for work
17  for which previous certificates for payment were
18  issued and payments received from the owner, and
19  that current payment shown herein is now due.  Do
20  you see that?                                    12:40:21
21   A   Yes.
22   Q   Turn to the sworn statement, please.
23       Oh, I'm sorry.  On Payment
24  Application No. 4, I don't think we covered -- went

Page 91

1  back after you looked at the QuickBooks summary.
2  Allegiance Electric.
3    A   Yes.
4    Q   Um, the sworn statement in Payment
5  Application No. 4 states that Dancor had previously
6  paid Allegiance Electric $87,645.60.  Do you see
7  that?
8    A   Yes.
9    Q   The QuickBooks summary says that overall
10  for the whole thing -- this indicates for the    12:42:21
11  entire project what was paid, right?
12   A   That's correct.
13   Q   That for the entire project,
14  Allegiance Elec -- Dancor paid Allegiance Electric
15  $37,186.77, true?
16   A   Thirty-seven one -- if that's 86, yes.
17  Looks like an 88.
18   Q   Let's call it 88.
19   A   That's fine.  And also, if you scroll
20  down, Consolidated Electric Supply and Allegiance,  12:42:41
21  that's the joint check that I was -- indicated
22  earlier.
23   Q   So Consolidated and Allegiance are taken
24  together.

Page 92

1    A   Yes, sir.
2    Q   So if we add those two things together --
3  so what is that?  Like, 64,000.  Sixty-three five?
4  Something like that?
5    A   Yes.
6    Q   Ballpark?  Okay.  So if we take
7  Consolidated Electric and Allegiance together, we
8  know that for the entire project Dancor paid them
9  approximately $63,500, true?
10   A   True.                                        12:43:19
11   Q   But in the sworn statement for the Payment
12  Application No. 4, Dancor swore to PetSmart under
13  oath that it had already paid Allegiance Electric
14  and this other one $87,645.60, true?
15   A   True.
16       MR. LYTLE:  Object to the form.
17  BY MR. IVY:
18   Q   So the statement under oath that Dancor
19  had paid Allegiance Electric $87,645.60 is not
20  true, am I right?                                 12:43:53
21   A   According to this, correct.
22       MR. LYTLE:  Form.
23  BY MR. IVY:
24   Q   The statement in the sworn statement for

23  (Pages 89 to 92)

Policicchio, Daniel
August 9, 2018

Page 93

1  Payment Application No. 4 that Dancor had paid
2  Allegiance Electric $87,645.60 is a lie, true?
3    MR. LYTLE:  Object to the form.
4    THE WITNESS:  True.
5  BY MR. IVY:
6    Q   And we're done with four.
7    A   Here you go.
8    Q   Okay, back to five.  I'm sorry about that
9  interruption.  Um, if you take a look at the sworn
10  statement for Payment Application No. 5.        12:44:49
11    A   I'm there.
12    Q   Go to the end of that, if you would.  Is
13  it true that the notary and signature is missing
14  from payment -- for the sworn statement of Payment
15  Application No. 5, also?
16    A   Yes.
17    Q   Is there -- do you recall deleting the
18  signature and sworn statement provision of the
19  sworn statement for Payment Application No. 5?
20    A   No, I don't recall.               12:45:21
21    Q   Do you recall what happened to the
22  signature and notary provision in the sworn
23  statement for Payment Application No. 5?
24    A   No, I don't recall.

Page 94

1    Q   There's no change in your reporting
2  regarding Demolition Wrecking in Payment
3  Application No. 5.  It's the same as what was
4  reported in Payment Application No. 4, true?
5    A   That's correct.
6    Q   So your statement that -- you're actually
7  showing on the -- on your QuickBooks summary that
8  Dancor eventually did pay Demolition Wrecking
9  $145,831.50.
10    A   That's correct.                 12:46:20
11    Q   I only found a record of payments of
12  $111,165.75 in what Dancor -- in the financial
13  records that Dancor produced to me.  Um, so there
14  must be an additional check that's missing or that
15  I missed.  Um, it would be unusual for me to miss
16  it, though, because that was one of the areas in
17  the responses to production requests that -- or
18  interrogatories, I'm not sure which one, where I
19  was given actual document numbers for checks.  Um,
20  so maybe we can look for that.             12:47:01
21    A   I will look for that myself, too.  I made
22  note of it.
23    Q   If you go down to RLS Construction.  In
24  Payment Application No. 5, you've indicated that

Page 95

1  Dancor had already paid RLS Construction
2  $165,657.60.  Do you see that?
3    A   Yes.
4    Q   That's another, oh, 60,000 added onto what
5  you had indicated in Payment Application No. 4,
6  true?
7    A   That is correct.
8    MR. LYTLE:  Object to the form.
9    THE WITNESS:  I haven't seen -- I saw four,
10  but I don't have it in front of me.          12:47:48
11  BY MR. IVY:
12    Q   Okay.  In any event, as of the time of
13  Payment Application No. 5, Dancor had not paid RLS
14  Construction $165,657.60, had it?
15    A   That is correct, according to Exhibit 14.
16    Q   And Exhibit 14, which you're looking at --
17  well, I can tell you that from the documents that
18  Dancor produced and based on the admission of
19  Dancor at its deposition, at the time of this
20  Payment Application, Dancor had only paid RLS   12:48:23
21  Construction $21,780.  Are you aware of that?
22    A   At the time of this deposition?
23    MR. LYTLE:  Objection, form.
24  BY MR. IVY:

Page 96

1    Q   At the time of the Payment Application.
2  At the time of Payment Application No. 5.
3    A   Back in January, yes.  I don't recall
4  exact dollar amount, but that could be accurate.
5    Q   Okay.  In any event, we know that your
6  statement here that Dancor had paid RLS
7  Construction, at the time of Payment Application
8  No. 5, $165,657.60 is not correct, right?
9    MR. LYTLE:  Object to the form.
10    THE WITNESS:  It appears to be, yes, correct.  12:49:03
11  BY MR. IVY:
12    Q   And we know that the -- would it be true
13  that your statement here that Dancor had paid RLS
14  Construction $165,657.60 in Payment Application
15  No. 5 is a lie?
16    MR. LYTLE:  Object to the form.
17    THE WITNESS:  It appears to be, you know, more
18  than what was actually at that time, yes.
19  BY MR. IVY:
20    Q   If you go down to APS Fire on Payment   12:49:53
21  Application No. 5.  Do you see that?
22    A   Yes.
23    Q   You've now stated that Dancor has
24  previously paid APS Fire $16,649.99.  Do you see

24  (Pages 93 to 96)

Policicchio, Daniel
August 9, 2018

Page 97

1  that?
2      A   Yes.
3      Q   Dancor had not paid APS Fire $16,649.99,
4  had it?
5      A   Not according to Exhibit 14.
6      Q   And according to Exhibit 14, Dancor has
7  never paid APS Fire any amount of money, true?
8      A   That's correct.
9      MR. ROBINSON:  Just for the record, Mr. Lytle
10 did object to the -- not that question, but the        12:50:29
11 question before it and it was missed on the -- by
12 the court reporter because it was pretty quiet.
13     MR. LYTLE:  Sorry about that guys.  I'll be
14 loud.
15     MR. ROBINSON:  I just checked with her and she
16 didn't catch that.  It was just objection to the
17 form?  Is that correct, Mr. Lytle?
18     MR. LYTLE:  Yep.
19     MR. ROBINSON:  Thank you.  And thank you,
20 Mr. Ivy.                                               12:50:49
21     MR. IVY:  No problem.  I will -- if it's that
22 type of thing, I don't have a problem.  You know,
23 you're managing the phone, but -- um --
24 BY MR. IVY:

Page 98

1      Q   Your statement in Payment Application
2  No. 5 that Dancor had paid APS Fire $16,649.99 is a
3  lie, true?
4      MR. LYTLE:  Object to the form.
5      THE WITNESS:  I think I answered that.
6  According to Exhibit 14, that's correct.
7  BY MR. IVY:
8      Q   If you go down to DaVco -- actually,
9  Allegiance Electric.  On Payment Application No. 5,
10 you've stated that Allegiance Electric -- that        12:51:48
11 Dancor has paid Allegiance Electric a hundred and
12 eight dollars two hundred thirty-five dollar -- let
13 me start that one over.  Holy mackerel.
14     On Payment Application No. 5, you've
15 stated that Dancor had already paid Allegiance
16 Electric $108,235.99.  Do you see that?
17     A   Yes.  Yes, I do.
18     Q   And I believe that we have already
19 established from Exhibit 14 that Dancor had only
20 paid Allegiance Electric somewhere in the ballpark   12:52:21
21 of $63,500 total, true?
22     A   Correct.
23     Q   So the statement in your sworn statement
24 to PetSmart that Dancor had paid Allegiance

Page 99

1  Electric $108,235.99 is not true, correct?
2      A   That's correct.
3      MR. LYTLE:  Object to the form.
4  BY MR. IVY:
5      Q   And your statement under oath to PetSmart
6  that Dancor had paid Allegiance Electric
7  $108,235.99 was a lie, true?
8      MR. LYTLE:  Object to the form.
9      THE WITNESS:  According to Exhibit 14,
10 correct.                                               12:52:54
11 BY MR. IVY:
12     Q   Take a look at the next one which is DaVco
13 Mechanical Contractors.  Um, in Payment Application
14 No. 5, you've sworn to PetSmart that Dancor had
15 already paid DaVco $151,335.  Do you see that?
16     A   Yes.
17     Q   We know from Exhibit 14 that Dancor had
18 only ever paid DaVco a total of $21,330, correct?
19     A   Correct.
20     Q   So the statement that you made to PetSmart   12:53:31
21 that Dancor had already paid DaVco $151,335 was not
22 true?
23     MR. LYTLE:  Object to the form.
24     THE WITNESS:  Correct, according to Exhibit 14.

Page 100

1  BY MR. IVY:
2      Q   And the statement that you made that
3  Dancor had already paid DaVco Mechanical
4  Contractors $151,335 was a lie, true?
5      MR. LYTLE:  Object to the form.
6      THE WITNESS:  According to Exhibit 14,
7  correct.
8  BY MR. IVY:
9      Q   Even though I'm not good with math, um,
10 going through these Payment Applications and the     12:54:24
11 sworn statements, it appears to me that somewhere
12 in the ballpark of Payment Application No. 5,
13 things started going wrong in some way; is that
14 true?
15     A   That's probably a good analogy, yes.
16     Q   Okay.  So tell me what happened at about
17 the time -- first of all, in Payment Application
18 No. 3 where we are -- what month are we in now?
19 We're in --
20     A   January?  Three?                              12:55:02
21     Q   Three is -- yeah, it's --
22     A   December probably.
23     Q   The invoice date is December 9th for
24 Payment Application No. 3.

25  (Pages 97 to 100)

Policicchio, Daniel
August 9, 2018

Page 101

1    A   December 9th?
2    Q   Is the invoice date.  Want me to pull that
3    one out?
4    A   Okay, yeah, for the month of November.
5    You're correct.
6    Q   Okay.  So things are starting to go wrong
7    in Payment Application No. 3.  And then we saw that
8    they were going pretty far wrong in Payment
9    Application No. 4, right?
10   A   Yes.                                    12:55:52
11   Q   It started accelerating, true?
12   A   Yes.
13   MR. LYTLE:  Object to the form.
14   BY MR. IVY:
15   Q   What was happening?  What happened?  What
16   was the problem?
17   A   Well, obviously, it's been a while.
18   There's a lot of things that were transpiring
19   within the company, whether it be other -- within
20   the organization with other owners, developers not   12:56:09
21   paying Dancor, judgments that we were actually
22   awarded, could not collect on.  Various
23   subcontractors throughout the company we're paying
24   twice, you know, for -- that we already paid.

Page 102

1         Which, ultimately, Mr. Ivy, it's
2    probably at that point it was in the high, you
3    know, six-figure, probably close to the
4    seven-figure mark where Dancor was owed a lot of
5    money or paid out twice in various instances, you
6    know.  Without getting into detail, I would have to
7    drawn down on that a little more later if you need
8    me.  And then taken out high-interest loans just
9    to, you know -- you know, to pay various
10   subcontractors, to pay employees.  It just -- and   12:57:02
11   then, ultimately, the lack of no new work or being
12   awarded projects just kind of -- just kind of, you
13   know, put multiple holes in the boat and it was
14   filling up.  That's in a quick little synopsis of
15   things.
16   Q   Okay.  Um, so it sounds like it was -- if
17   I can break that down.  It sounds like, um, uh,
18   there were problems with -- I didn't understand one
19   of things you said.  That's why I want to break it
20   down.  You said there were problems with paying     12:57:47
21   subcontractors twice?
22   A   Uh, there were instances where, you know,
23   I would pay a subcontractor a hundred thousand
24   dollars.  I'm throwing out a number.  I don't know

Page 103

1    exactly.  And they would take the money and,
2    honestly, it wasn't -- they, you know, they had
3    lower-tier subs that they didn't, you know, divulge
4    to us.  And then those lower-tier subs were calling
5    and we would have to pay, you know, pay again.  And
6    then, in turn, we sued the subcontractor.
7         Which I don't know if we won that
8    exact case or various -- we won various cases.  We
9    got judgments in our favor which -- and then trying
10   to collect on them was a very, very, very difficult.   12:58:24
11   Hence, that's kind of what -- with everything else,
12   like I said, that's hence why Dancor went to ABC,
13   the assignment to benefit the creditors.  For all
14   purposes, I'll use ABC going forward, if that's
15   fine with you.  That's hence we went that route and
16   see if they're going to collect it.
17        Like I said, it's in the high six
18   figures, possibly low seven-figure range that
19   Dancor's owed a lot of money that we couldn't
20   collect on, maybe that ABC can.  And then           12:58:55
21   personally, you know, I personally guaranteed a lot
22   of these high-interest loans and everything else
23   like that, too, that I'm dealing with personally.
24   Q   Um, all right.  So at the time of the

Page 104

1    PetSmart project, um, how many employees did Dancor
2    have?  We're talking about a five-month period,
3    roughly.
4    A   Four to eight.  You know, the exact
5    number, I don't know.  And there were some 1099
6    contractors which were superintendents or I
7    believe Victor Williams was a 1099 contractor, too.
8    Q   What was your monthly payroll during those
9    five months?
10   A   Between office staff and the              12:59:53
11   superintendents, without it in front of me, it
12   could be 20 to 25 per pay period and there's two
13   pay periods per month.  So could be close to
14   $50,000 a month.  Again, I would have to verify the
15   numbers for you.
16   Q   Did employee salaries come out of the
17   general operating fund?
18   A   Employee salaries came out of -- yes,
19   employee salaries came out of that and obviously
20   assigned to projects, whatever the case may be,     01:00:28
21   depending on what project they were working on.
22   Q   Did you take a salary during the PetSmart
23   project?
24   A   During the PetSmart project, during that

26  (Pages 101 to 104)

Policicchio, Daniel
August 9, 2018

Page 105

1  time frame I did take a, you know, a smaller salary
2  and there were few pay periods where I didn't even
3  take a salary at all or have a payment issued to
4  me. But I paid my employees.
5      Q   What salary did you pay yourself?
6      A   Roughly probably 58 -- 55, $58,000.
7      Q   Is that total during the PetSmart project?
8      A   During the PetSmart project time frame,
9  yes.
10     Q   And was that out of the general fund?    01:01:11
11     A   That's with everybody else's, yes, sir.
12 Like I said, a few times I didn't take a salary. A
13 few, you know, there's probably a few pay periods
14 where I didn't.
15     Q   Did you pay yourself any other
16 compensation during the PetSmart project?
17     A   No, sir.
18     Q   As a general contractor, um, when you do
19 work in a state, you need to follow the state's
20 laws, right?    01:02:12
21     A   To the best of our ability, yes.
22     Q   You're aware that -- well, strike that.
23        There is an Oklahoma law that
24 requires contractors to hold payments that are made

Page 106

1  by -- for the benefit of a construction contract in
2  trust for the payment of subcontractors. Are you
3  familiar with that?
4      A   I don't recall that. Not at the time of
5  the project, no.
6      Q   So during the period of time of the
7  PetSmart project, did Dancor conduct itself without
8  knowledge of that law, that Oklahoma law?
9      MR. LYTLE:  Object to the form.
10     THE WITNESS:  I was not aware of it    01:02:53
11 personally.
12 BY MR. IVY:
13     Q   Okay. Do you know whether anybody at
14 Dancor was aware of that law?
15     A   No, I do not.
16     Q   Are you aware of that law now?
17     A   I'm aware of that law now.
18     Q   Okay. When did you become aware of that
19 law?
20     A   Just recently.    01:03:08
21     Q   Did you become aware of that law because
22 of the RLS lawsuit?
23     A   I don't know if it was RLS lawsuit or this
24 one here. That I don't recall, Mr. Ivy.

Page 107

1      Q   Dancor did not hold the money that
2  PetSmart paid to Dancor in trust, did it?
3      MR. LYTLE:  Object to the form.
4      THE WITNESS:  No, sir.
5  BY MR. IVY:
6      Q   Let me ask a more specific question.
7  Dancor did not hold the money that PetSmart paid to
8  Dancor as a result of the PetSmart project in trust
9  for the benefit of the subcontractors, did it?
10     A   No, it didn't.    01:03:42
11     MR. LYTLE:  Object to the form.
12 BY MR. IVY:
13     Q   Dancor didn't have a specific trust fund
14 for purposes of this project, did it?
15     A   No, sir.
16     Q   And Dancor didn't otherwise keep the
17 PetSmart money separate so that it could take care
18 of the PetSmart job, right?
19     A   Correct.
20     Q   Um, if Dancor had kept the PetSmart money    01:04:11
21 separate from other Dancor operations, um, then
22 we'd be at a place today where the only thing that
23 would be due and owing to subcontractors would be
24 retainage plus change orders, right?

Page 108

1      MR. LYTLE:  Object to the form.
2      THE WITNESS:  Possibly on that one, was it one
3  million one eighty-six we were paid?  And we're
4  paying out 904,000. So, yeah, that deficit
5  probably would have been different.
6  BY MR. IVY:
7      Q   Um, Dancor previously testified that the
8  ballpark amount that Dancor still owes to
9  subcontractors on the PetSmart job is in the area
10 of $600,000. Are you able to be more specific than    01:05:05
11 that?
12     A   Not at this time. I don't recall that
13 dollar amount, but no.
14     Q   Do you -- as you're sitting here today, do
15 you know how much Dancor still owes to the
16 subcontractors and suppliers on the PetSmart job?
17     A   No, sir.
18     Q   Is the reason that you made the statements
19 that were not accurate in the Payment Applications
20 about what Dancor had paid to its subcontractors,    01:05:41
21 is the reason you made those statements so that you
22 could continue getting money from PetSmart?
23     MR. LYTLE:  Object to the form.
24     THE WITNESS:  It was just our typical monthly

27  (Pages 105 to 108)

Policicchio, Daniel
August 9, 2018

Page 109

1    draws to, you know, obviously on all projects, just
2    to continue to get money in.
3    BY MR. IVY:
4        Q    And you needed to continue getting money
5    in to continue your operations, right?
6        A    Operations, you know, pay some of the
7    subcontractors, you know, where we're at right now
8    with them versus what we have been paid.  So, yes.
9        Q    If you had been honest in your reporting
10   in the Payment Applications about what Dancor had    01:06:13
11   actually paid its subcontractors, were you
12   concerned that PetSmart might not make those
13   payments to you?
14       MR. LYTLE:  Object to the form.
15       THE WITNESS:  No, that didn't cross my mind.
16   No, I don't recall it.
17       MR. LYTLE:  Bob, I don't want to interrupt
18   your flow.  If we get to a point where we can take
19   another quick break, I'd appreciate that.
20       MR. IVY:  This would be a fine time.    01:06:50
21       MR. LYTLE:  Okay.  Thank you.
22           (WHEREUPON, there was a break had
23           from 1:01 to 1:18 p.m.)
23   BY MR. IVY:
24       Q    Would it be fair to say that you know that

Page 110

1    Dancor, uh, owes a number of its subcontractors a
2    fair amount of money?
3        A    Yes.
4        Q    In the hundreds of thousands of dollars?
5    We don't know the exact amount, but --
6        A    Don't know the exact amount, but that's
7    something that I'm working with the ABC firm and
8    we're going to get a tally on.
9        Q    Um, would it be possible for you to
10   calculate the amount that's still owed to    01:24:29
11   subcontractors based on Dancor records?
12       A    Yes.
13       Q    Um, I think we figured out a formula at
14   the last -- at Dancor's deposition.  Uh, so I won't
15   get into the detail of that with you.  Um, would
16   you agree that, uh, that Dancor, um, did not meet
17   its contractual obligations with PetSmart?
18       MR. LYTLE:  Object to the form.
19       THE WITNESS:  In what aspect?  On the
20   financial side or on the construction side?    01:25:09
21   BY MR. IVY:
22       Q    By not paying Dancor's subcontractors,
23   Dancor did not meet its contractual obligations
24   with PetSmart; is that true?

Page 111

1        A    I agree and disagree on that question.
2        Q    Okay.  What do you disagree with?
3        A    Because depending on -- I have to really
4    get into it and talk to the management team as far
5    as any underlying issues with subcontractors on
6    performance or timeliness or whatever the case may
7    be, you know, outside, you know, outside the whole
8    realm, which is our duty as a general contractor.
9        Q    During the period of time that
10   subcontractors were -- after they had done their    01:25:46
11   work and were asking Dancor about payment, you do
12   remember getting -- or did you get phone calls from
13   subcontractors asking about payment?
14       A    I don't recall any phone calls.
15       Q    Do you remember getting e-mails from
16   subcontractors asking about payment?
17       A    I do recall some e-mails, yes.  Which ones
18   I don't know, so --
19       Q    During the time that you were getting
20   communication from subcontractors about payment,    01:26:11
21   did you ever tell any of them that the reason that
22   you weren't paying them was because PetSmart hadn't
23   paid you?
24       A    I don't recall, but I believe there was

Page 112

1    something previously that we discussed could have
2    retained the retainage and it could be pertaining
3    to performance on the sub, which goes back down to
4    my project management team.  Because we do issue
5    several e-mails to the subcontractors for non-
6    performance or put them into whatever the
7    case may be.  So it could be out there.
8        Q    So -- but to be specific, if you told a
9    subcontractor that you weren't paying them because
10   PetSmart hadn't paid you, your memory is that that    01:26:51
11   only had to deal with the issue of retainage?
12       A    Could be retainage.  Could be -- if
13   there's e-mails out there, which obviously I'm
14   going to look for myself, whatever e-mails, it
15   could be retainage.  It could be for a monthly
16   application, too, depending when they e-mailed me
17   pertaining to when actually PetSmart issued a check
18   to Dancor, too.  So there could be a little lack in
19   time.  Does that make sense?
20       Q    In the circumstances -- we've gone through    01:27:19
21   several circumstances where Dancor -- where you
22   indicated to PetSmart that Dancor had paid
23   subcontractors that you hadn't paid at all.  In
24   those circumstances, would you have told those

Q & A Reporting, Inc.
815-477-2230

Policicchio, Daniel
August 9, 2018

Page 113

1  subcontractors that you weren't paying them because
2  PetSmart hadn't paid you yet?
3      MR. LYTLE:  Object to the form.
4      THE WITNESS:  I don't recall that, no.
5  BY MR. IVY:
6      Q  I'm going to show you Plaintiff's
7  Exhibit 8.  This is the contract between Dancor and
8  PetSmart.  And if you would please take a look at
9  the third page.  And this is under Section 6, Final
10  Application for Payment.                        01:28:26
11      A  That's the second page for me.
12      Q  But I want you -- it's under that.  But on
13  the third page there's a -- is language that I want
14  to go over with you.
15      A  Okay, I see that.
16      Q  Okay.  On the third page, about, oh,
17  halfway into the first -- the paragraph that's at
18  the top of the page, it says, "Client shall have
19  the right to pay any portion of such final payment
20  directly to said -- directly to unpaid            01:29:04
21  subcontractors or others claiming any lien rights
22  with respect to the project or jointly to any such
23  persons and contractor."  Do you see that?
24      A  Yes.

Page 114

1      Q  So the contract allows PetSmart to use the
2  retainage to pay any unpaid subcontractors, true?
3      A  True.
4      Q  And I think you've previously testified
5  that you're aware that -- well, maybe it's not
6  testimony.  Maybe -- are you aware that PetSmart
7  has paid several subcontractors on their liens?
8      A  Yes, that was probably one of the first
9  things we talked about.  Correct.
10      Q  Okay.  Um, and under the contract,        01:29:44
11  PetSmart's entitled to do that with the retainage
12  money to Dancor, right?
13      A  What I read here, yes.
14      Q  Okay.  Um, are you aware that Dancor filed
15  a counterclaim against PetSmart?
16      A  I'm somewhat aware, yes; but exactly the
17  details, I don't know.
18      Q  Did you ever review the counterclaim that
19  Dancor filed against PetSmart?
20      A  If I signed it, I probably did review it.   01:30:15
21  But what date, I don't know.
22      Q  I don't think you did sign it.  Um, I'm
23  going to show you Plaintiff's Exhibit number 20 and
24  I'm going to tell you where to turn to.  Page 9 and

Page 115

1  10.  Do you see where it says counterclaim?
2      A  Yes.
3      Q  And then if you go to the end of the
4  counterclaim, which is on the next page, and
5  Paragraph 8, do you see that?  It says, "The
6  Defendant is entitled to the hold back of
7  126,939.70 plus any hold backs from the change
8  orders."  Do you see that?
9      A  Yes, I see that.
10      Q  That's the retainage, right?  That's what   01:31:27
11  we're talking about there?
12      A  I believe that's the retainage.  I know
13  it's more than that; but, yes.  But it might be
14  part of the change orders.
15      Q  Okay.  Um, now, PetSmart is entitled to
16  use the retainage to pay any unpaid subcontractors,
17  right?
18      A  According to the contract, yes.
19      Q  And you're aware now that PetSmart has in
20  fact paid subcontractors, correct?                01:31:47
21      A  Correct.  Yes.
22      Q  And so would you agree with me that
23  Dancor's claim in its counterclaim against PetSmart
24  is not well-based in fact?

Page 116

1      MR. LYTLE:  Object to the form.
2      THE WITNESS:  No, I can't.  I don't recall
3  that.  I would have to look into this more.  This
4  is from John Dunn, okay.
5  BY MR. IVY:
6      Q  The contract -- since the contract allows
7  PetSmart to pay unpaid subcontractors, right?  We
8  know that?
9      A  Correct.
10      Q  And we know there are unpaid              01:32:20
11  subcontractors, right?
12      A  Correct.
13      Q  And we know that PetSmart has, in fact,
14  paid those subcontractors, right?
15      A  Now I know, yes, correct.  At the time of
16  this, I don't know.
17      Q  Under those circumstances -- well, as of
18  today, is it fair to say that Dancor isn't entitled
19  to get its retainage back?
20      A  Correct.                                  01:32:40
21      Q  Okay, thank you.  If you would take a look
22  at Page 4 of the contract, there's an
23  indemnification provision.  Do you see that?
24      A  Yes.

29  (Pages 113 to 116)

Policicchio, Daniel
August 9, 2018

Page 117

```
 1      Q   And I believe your Offer of Judgment
 2   offered attorneys -- reasonable attorneys' fees.
 3   Um, you're familiar with indemnification
 4   provisions, right?
 5      A   To a point, yes.
 6      Q   And you're the one who entered into this
 7   contract with PetSmart, right?
 8      A   Correct.
 9      Q   And you're aware that the contract
10   contains a provision that the contractor shall    01:33:40
11   indemnify and hold PetSmart harmless?
12      A   I see that here, yes.
13      Q   Okay.  Um, and so you understand that
14   Dancor is responsible for indemnifying and holding
15   PetSmart harmless with respect to actions arising
16   out of this project, true?
17      MR. LYTLE:  Object to the form.
18      THE WITNESS:  To a certain point, yes.
19   BY MR. IVY:
20      Q   When you say to a certain point, what do   01:34:10
21   you mean?
22      A   Well, depends what, you know -- that's a
23   broad statement at 9.1.  Just, you know, you have
24   to really dig down exactly -- just like you're
```

Page 118

```
 1   asking me for different breakdowns -- exactly what
 2   your losses are, so on and so forth, you know,
 3   stuff like that.  That has to be reviewed.
 4      MR. IVY:  Okay.  We're done with that.
 5      Let's go ahead and mark that with
 6   whatever -- 47.
 7      (WHEREUPON, a document was marked
 8      Deposition Exhibit No. 47 for
 9      identification as of 8/9/2018.)
10   BY MR. IVY:
11      Q   I'm going to show you what I've had marked   01:35:24
12   as Deposition Exhibit No. 47 and have you take a
13   look at this.  I believe that that is a sworn
14   statement form that Dancor provided to one of its
15   subcontractors or suppliers.  Am I right about
16   that?
17      A   That is correct.
18      Q   So that's a form that you would have
19   created?
20      A   It's a form we have as a part of our
21   contracts with our subcontractors, yes.           01:35:42
22      Q   And that form that came from Dancor, that
23   has a notary provision at the bottom, doesn't it?
24      A   That is correct.
```

Page 119

```
 1   and RLS Construction, and you've already entered
 2   into a settlement agreement with RLS Construction.
 3   Um, RLS Construction, I think we agree, Dancor paid
 4   some amount to RLS, but a small amount of the total
 5   that they were due, correct?
 6      A   I believe so, yes.
 7      Q   And we talked about several other
 8   contractors that Dancor has not -- also has not
 9   fully paid, true?
10      A   Correct.                                    01:37:28
11      Q   Are the other subcontractors in
12   substantially the same position as RLS?
13      MR. LYTLE:  Object to the form.
14      THE WITNESS:  As far as what way?  As far
15   as --
16   BY MR. IVY:
17      Q   Well, if a subcontractor hasn't been paid,
18   um, they're subject to the same laws and contracts,
19   uh, governing the relationship with Dancor that RLS
20   was, true?                                         01:37:53
21      A   Correct.
22      Q   Um, would you agree that you and Dancor
23   willfully, intentionally and wrongfully
24   misappropriated the moneys that were due to RLS in
```

Page 120

```
 1   violation of Oklahoma's trust fund statute?
 2      MR. LYTLE:  Object to the form.
 3      THE WITNESS:  I was not aware of the trust
 4   fund statute as I've indicated before.  So I can't
 5   really answer that question.
 6   BY MR. IVY:
 7      Q   Okay.  Um, and I'm going to ask this two
 8   ways in case the objection was due to the compound.
 9   Would you agree that you willfully, intentionally
10   and wrongfully misappropriated moneys due to RLS?  01:38:41
11      MR. LYTLE:  Object to the form.
12      THE WITNESS:  Again, I can't really answer
13   that question.
14   BY MR. IVY:
15      Q   Why can't you answer that question?
16      A   Because I didn't -- the way I see it, I
17   didn't do anything, you know, intentionally.
18      Q   When you swore to PetSmart that you had
19   paid subcontractors money that you hadn't actually
20   paid, was that -- wasn't that intentional?         01:39:11
21      A   I swore that we received the funds for
22   each application.  Moneys were received -- if they
23   were received in a timely fashion, I got to look
24   back at the Pay Applications again, making sure
```

Policicchio, Daniel
August 9, 2018

Page 121

1 that sometimes if we were actually paid while
2 submitting the trailing, you know, Pay
3 Applications, so -- but like I said, I didn't do
4 anything intentionally. I didn't.
5 Q   Well, there were some subcontractors who
6 weren't paid at all, right?
7 A   That we talked about, yes.
8 Q   Okay. And you -- but you swore under oath
9 to PetSmart that you had paid some subcontractors
10 that hadn't been paid at all, true?                    01:39:52
11 MR. LYTLE: Object to the form.
12 THE WITNESS: We intended to pay them, yes, on
13 those forms and whatever column that was.
14 BY MR. IVY:
15 Q   Well, stating that you had already paid
16 them -- stating under oath to PetSmart that you had
17 already paid subcontractors that hadn't been paid
18 anything, isn't that an intentional act?
19 MR. LYTLE: Object to the form.
20 THE WITNESS: I don't look at it that way. Me    01:40:14
21 personally, myself personally, I don't look at it
22 that way.
23 BY MR. IVY:
24 Q   Do you acknowledge any misconduct in

Page 122

1 failing to pay trust funds held in a fiduciary
2 capacity to subcontractors of Dancor?
3 MR. LYTLE: Object to the form.
4 THE WITNESS: No, I don't. Like I said, I
5 wasn't aware of the trust fund.
6 BY MR. IVY:
7 Q   Okay. Do you admit to conduct sufficient
8 to impose Category 2 exemplary damages under
9 Oklahoma law?
10 MR. LYTLE: Object to the form.                    01:41:14
11 THE WITNESS: I don't know what that is to be
12 specifically. So I can't answer that.
13 BY MR. IVY:
14 Q   For purposes of this question, um -- well,
15 we've established that there's some amount that --
16 some amount of money that Dancor owes to its
17 subcontractors and it's a fair amount of money.
18 It's in the hundreds of thousands and we don't know
19 exact -- you don't know exactly how much.
20 A   And that's what I'm working on, yes.         01:43:06
21 Q   You also testified that PetSmart paid
22 Dancor everything that PetSmart was supposed to pay
23 under the contract other than retainage, true?
24 A   Retainage and possibly some change orders,

Page 123

1 correct.
2 Q   Okay. So if, um -- and you know now that
3 there's an Oklahoma law that requires Dancor to
4 hold that -- the money paid by PetSmart in trust.
5 A   I'm aware of that now.
6 Q   And we know that that didn't happen,
7 right?
8 A   Correct.
9 Q   So how would we go about determining where
10 PetSmart's money went if it didn't go to the        01:43:51
11 subcontractors?
12 A   Well, determining out of, I believe, like
13 I said, what we were paid, the one million one
14 eight six or something like that. $904,000 is
15 accounted for on that Exhibit 14? If I'm not
16 mistaken, whatever it was.
17 Q   Okay. But when you talk about -- just so
18 we're clear on this. When you talk about $904,000
19 being accounted for, there's a column for
20 Victor Williams.                                      01:44:20
21 A   Correct.
22 Q   And he's not a subcontractor. He's just --
23 A   He was a 1099 contractor, so --
24 Q   Right. So he's not somebody that PetSmart

Page 124

1 was paying for.
2 A   No.
3 Q   Um, and there's a column for $109,654.97.
4 That's payroll, right?
5 A   Payroll, correct.
6 Q   And that's not something that was part of
7 the PetSmart contract, right?
8 A   Well, it is part of the contract because
9 there is payroll associated with the contract for
10 superintendents, project managers and staff.         01:44:44
11 Q   But that's addressed by the amounts that
12 are going to be paid out to subcontractors and to
13 Dancor.
14 A   Well, it's part of the whole contract with
15 PetSmart, so --
16 Q   There's a column for legal ongoing and
17 legal is not part of -- shouldn't be part of that.
18 A   It shouldn't be. Probably a small portion
19 at the beginning with contract issues, but correct.
20 Q   And there's a column for accounting. And    01:45:08
21 accounting, that shouldn't be part of that
22 assessment either, should it?
23 A   Correct.
24 Q   Um, there's also -- if I look under RLS

Q & A Reporting, Inc.
815-477-2230

Policicchio, Daniel
August 9, 2018

Page 125

1    Construction, um, there's two numbers listed.
2    One's 136,000 and another is 150,000. One's for
3    RLS Construction. Another one's for RLS
4    Construction settlement.
5       A   Correct.
6       Q   Those amounts add up to something more
7    than what the total RLS contract was, true?
8       A   Correct.
9       Q   And some of that has to do with payment of
10   attorneys' fees for RLS, right?          01:45:49
11      A   Whatever the breakdown is. I don't have
12   the settlement in front of me, so -- correct.
13      Q   And some of it has to do with punitive
14   damages for RLS Construction, right?
15      MR. LYTLE: Object to the form.
16      THE WITNESS: Like I said, I don't have the
17   exact breakdown of the judgment. I don't know if
18   you do either. But obviously, I can't give you the
19   exact breakdown now.
20   BY MR. IVY:                             01:46:09
21      Q   But some of that amount that you have on
22   this vendor summary is not amounts that we should
23   subtract from the accounting that we're doing right
24   now where we're trying to figure out where

Page 126

1    PetSmart's money went, right?
2       A   Well, a portion of it, yes. But exactly
3    what dollar amount that is, I would have to give
4    you the breakdown based upon the settlement
5    agreement. Because the prior number, going from my
6    memory, 136,000, give or take, that they were paid
7    RLS already, correct?
8       Q   That's what this --
9       A   Yeah, prior to the settlement, sorry.
10   That's what I meant.                     01:46:41
11      Q   That's what this vendor summary says.
12      A   Yeah.
13      Q   Um, so my question's a little bit
14   different, though. I'm not trying to find out what
15   got paid to subcontractors. That's a -- I do want
16   to know that. But what I want to know is the
17   amount that didn't get paid to subcontractors, how
18   do we know where that went?
19      A   And that will be the breakdown. Like I
20   said, I have to work with the ABC company now. And 01:47:05
21   I'll get that breakdown. I'll submit it to Gregg
22   and then he'll have the breakdown for you exactly.
23   What went, what's open, what we show on our books
24   and how we got to those numbers, too. Because

Page 127

1    obviously it's probably base contract, change
2    orders, deducts, whatever the case may be, less any
3    payments, if any payments were made. Hopefully
4    that answers your question. I'll get that for you.
5       Like I said, I have to work with ABC
6    on it. As long as they give me the green light to
7    release that, I will. Please keep in mind that I
8    have no control over the company as of July 12th.
9    I have to get permission to go through the books.
10   I'll have to work with them.             01:47:46
11      Q   Does Dancor -- did Dancor have any assets
12   when it turned over -- when it did whatever it did
13   with the ABC agreement?
14      A   No. All we had -- I asked this whether
15   receivables -- what we talked about before in the
16   high six figures, low seven figures. So to me,
17   that's an asset.
18      Q   So we can conclude that -- but no liquid
19   assets.
20      A   No, sir.                          01:48:09
21      Q   So we can conclude that the money that
22   PetSmart paid to Dancor was spent.
23      A   Yes.
24      Q   And my question is if we wanted to

Page 128

1    determine what PetSmart's money was spent on, that
2    wasn't spent on pursuing the PetSmart project
3    contract, how we'd be able to figure out what it
4    was spent on?
5       A   Good question. And that's something -- if
6    you can allow me to get some time, I can
7    probably -- I can probably determine that per
8    month. The five Pay Applications were, you know,
9    what came in, what went out those specific months.
10      Q   So to give a -- to put a fine point on it 01:48:46
11   for purposes of this deposition, you're not able
12   to -- as you sit here today, you're not able to
13   identify where PetSmart's money went that didn't go
14   to paying subcontractors on the contract, right?
15      A   That's correct.
16      Q   But you may be able to figure that amount
17   out --
18      A   Correct.
19      Q   (Continuing) -- um, given time.
20      A   Correct.                          01:49:07
21      Q   Okay.
22      A   Like I said, that's all going to help in
23   the analysis of finding the final tallies. For not
24   only PetSmart, for various other projects as well,

32  (Pages 125 to 128)

Policicchio, Daniel
August 9, 2018

Page 129

1    too, that the ABC company wants to know for the
2    debt and the asset side of it.
3        Q    Now, I'm going to look at what I said I
4    was going to look at later.  While I do that, I'm
5    going to ask you a couple more questions.  The
6    documents that Dancor produced day before yesterday
7    was it?  Or was it yesterday?  It was yesterday.
8    Right, Gregg?
9        MR. LYTLE:  That's correct.
10       THE WITNESS:  What's today?  The 9th?  Yeah,    01:50:12
11   the 8th.  Yes.
12   BY MR. IVY:
13       Q    The documents that Dancor produced
14   yesterday, um, did those documents contain records
15   of credit card payments to various subcontractors
16   and suppliers that are identified on the job and
17   vendor summary?
18       A    No.  Because we don't have access to that
19   account anymore.  That's the reason I think I
20   mentioned earlier.  Those are all PetSmart required    01:50:44
21   subs.  So I'm sure they'll be more than happy to
22   give you that information directly, or I can try to
23   ask for it myself.
24       Q    And Dancor's previously testified that

Page 130

1    those credit card payments would have been made on
2    a credit card on a business account?
3        A    Correct.
4        Q    Um, was that with Hancock Bank?
5        A    Yeah, I believe the majority, if not all
6    of it was the Hancock Visa, if I'm not mistaken.
7        Q    And you're saying that as of the date that
8    Dancor entered into the agreement with the ABC
9    company, Dancor no longer has access to those
10   records?    01:51:27
11       A    Dancor no longer has access to those
12   records or the bank accounts, no.  Those banks --
13   they were closed.  The Visa was closed way before
14   that.
15       Q    At some time Dancor had records of its
16   Visa account, didn't it?  Didn't Dancor get
17   statements?
18       A    No, we didn't get statements.  It was all
19   online.  No paper statements were given.
20       Q    Okay.  Did Dancor ever download the --    01:51:50
21   Dancor didn't keep its own records?  Didn't keep
22   records of that for itself?
23       A    No, sir.  But let me rephrase.  Sorry.
24   But we keep records of payments, yes.  We had the

Page 131

1    paid receipts or whatever the case may be or could
2    have been an e-mail from Graybar, you know,
3    everything was paid in full.  Or it could have, you
4    know --
5        Q    So if we -- if anyone tried to determine,
6    um, tried to confirm that these various contractors
7    were paid by credit card, uh -- well, strike that.
8    Let me ask this question:
9            You said that the Visa card became
10   what?  Inactive?    01:52:48
11       A    Obviously probably, like I said, around
12   maybe the second or third payout, we eliminated
13   that.  I had to pay off -- that was another deal I
14   made with Hancock Bank as far as a separate loan
15   agreement to pay that off.  The card was done.
16   Like I said, it was a Hancock Visa and it probably
17   could have been on the American Express corporate
18   card, too.  But each of those vendors were PetSmart
19   required vendors and they were paid.  And I believe
20   they're listed on Pay Application 4 and 5, the    01:53:16
21   dollar amounts, if I'm not mistaken.
22       Q    Okay.  But I'm interested in trying to
23   find out about the credit card records.  So the
24   Hancock Bank Visa got closed somewhere about the

Page 132

1    time of the second or third Payment Application?
2        A    I believe so.  Exact date I don't have.
3        Q    And that was in negotiations with -- that
4    Dancor had with Hancock Bank?
5        A    Correct.
6        Q    And did they give you a loan to pay off
7    the card?
8        A    That was probably part of it as far as --
9    because we were behind on the payments on a certain
10   portion of it.  And we determined, you know, to get    01:53:56
11   a loan on it.  Then they gave me a short-term note.
12       Q    Okay.  So Hancock Bank gave you a
13   short-term note and part of that was paying off the
14   Visa card?
15       A    It was just specifically for the Visa card
16   and they had to close the Visa account.  They're
17   two separate departments with Hancock.  One's got
18   the banking side and the credit card side.  The
19   credit card side would be paid off and then my
20   banking relation did a loan for me.  Probably like    01:54:16
21   a bridge loan if you could call it.
22       Q    And is it your testimony that the -- that
23   Hancock Bank no longer has access to the records of
24   the Visa card?

33  (Pages 129 to 132)

Policicchio, Daniel
August 9, 2018

Page 133

1      A   I can't speak for Hancock Bank, but I'm
2   assuming they should.
3      Q   Okay.  But Dancor doesn't have access to
4   those?
5      A   No, we don't have access to those.
6      Q   And did Dancor lose access to records of
7   its Visa card when it entered into that deal with
8   Hancock Bank with the note when it got closed?
9      A   Probably, yes.  We didn't have no more
10  access to the accounts.                          01:55:08
11     Q   So you said that it could be the Hancock
12  Bank Visa.  You said it could also have been paid
13  with an AmEx corporate card.  Any other cards that
14  might have paid these subcontractors or suppliers?
15     A   No.  Those would be the only two.
16     Q   Do you still have the AmEx corporate card?
17     A   Yes.
18     Q   Do you get statements from them?
19     A   We get statement -- I can get -- well,
20  it's all online and I could, you know, print out.  01:55:55
21  I don't know how far back they'll let me go.  But I
22  still have access to the accounts.  If I need to
23  get in there, I'm sure I could request it from
24  them.

Page 134

1      Q   Okay.  So the documents that Dancor
2   produced yesterday, um, they don't contain any
3   communications between Dancor and Dancor's
4   subcontractors, right?
5      A   No.
6      Q   And they don't contain any records
7   regarding payment of subcontractors or suppliers by
8   credit card, right?
9      A   Correct.
10     Q   They are -- do they reflect all of          01:56:54
11  Dancor's banks that Dancor worked with?
12     A   I didn't -- obviously I know it was
13  submitted and Gregg sent it to me.  So I haven't
14  reviewed it yet.  So I need to review what was
15  submitted.  Whatever I gave, you know, Gregg, if
16  there's anything missing, I'm sure we can get
17  whatever's missing.  As long as I can get access to
18  it and ABC company allows me to do it.
19     Q   Okay.  So you're going a place that I was
20  going to ask you about.  Because I'm just trying to  01:57:30
21  understand how these -- we got about 200 pages.  Am
22  I right, Gregg?  About 200 pages?
23     MR. LYTLE:  I believe that's true, yes.
24     MR. IVY:  About 200 pages of bank records.

Page 135

1   BY MR. IVY:
2      Q   Did these come from the ABC company?
3      A   Those came from my records.
4      Q   Why did you have them in your records?
5      A   We do reconciliation.  So I did have them
6   available.
7      Q   So these are records that you had not
8   given to the ABC company?
9      A   ABC company has them.
10     Q   You gave copies of them and then you kept   01:58:04
11  a copy?
12     A   I have copies, yes.  Because obviously, we
13  need them for tax purposes for '17.  Like I said, I
14  need to see exactly what Gregg sent out.
15     Q   Do you know how many pages of documents
16  you gave to Gregg?
17     A   No, I don't.
18     Q   Now, to the best of my understanding from
19  being able to look at these very quickly, it looks
20  like there is a -- there are records, Bank of        01:58:45
21  America records, Advantage Checking, account number
22  ending in 5281?
23     A   That's the business account, yeah.
24     Q   Is that -- when you say that's the

Page 136

1   business account, is that what you refer to as the
2   general operating fund?
3      A   Yes, sir.
4      Q   All right.  And from a page at the
5   beginning, it appears there's an account summary
6   from January 1st, 2017, to January 31st, 2017, and
7   then a whole bunch of documents behind that.
8      A   Probably individual months.
9      Q   That appear to be months in 2017.
10     A   The statements can run anywhere from four   01:59:59
11  pages to ten pages, depending on which bank and
12  what they have.
13     Q   Yeah, ending in December.  So we have Bank
14  of America from January to December of 2017.
15  That's in one file.  There's another file which is
16  Bank of America, an account ending in 5320.  Do you
17  recognize that one?
18     A   I don't know if that's the business.  It's
19  a money market savings account, whatever you want
20  to call it.                                          02:00:57
21     Q   It says your business interest maximizer.
22     A   There you go.  That's the .2 percent.
23     Q   So this is a money market?
24     A   Probably, yes.

34  (Pages 133 to 136)

Policicchio, Daniel
August 9, 2018

Page 137

1    Q    And this also shows from January -- well,
2    this -- January 1st to January 31st, 2017.  So this
3    is one month.  I'm trying to see if there's more.
4    Oh, here's February.  So it looks like these are
5    month by month.  Hold on.  So I'm showing
6    statements from this account from January through
7    December of 2017, also.  Does that sound right?  Or
8    do you not know?
9    A    No, it sounds right.
10   Q    Okay.  And then there's a fourth file        02:02:23
11   which is Hancock Bank, which appears to be a
12   checking account ending in 2875.  Does that
13   sound --
14   A    That's the checking account, yes.
15   Q    What's the difference between the Hancock
16   checking account and the Bank of America checking
17   account?
18   A    Two separate banks.
19   Q    Are they both general operating fund?
20   A    Yes, sir.                                     02:02:47
21   Q    And am I right, did you say this already,
22   that if we take Bank of America and Hancock, those
23   two checking accounts together, that's the total of
24   Dancor's general operating fund?

Page 138

1    A    Yes.
2    Q    There isn't anything else that's used?
3    A    Besides a minor money market, but --
4    Q    So Dancor might use its Bank of America
5    Money Market as a general operating fund, too?
6    A    Correct.
7    Q    Are all of Dancor's banking accounts
8    general operating fund?
9    A    Yes, they are.
10   Q    Everything goes into one pot and --          02:03:20
11   A    Correct.
12   Q    And goes out to various places?
13   A    Correct.
14   Q    And then the fourth file is also Hancock
15   Bank, an account ending in 2883.
16   A    That's just like the B of A money market
17   account.
18   Q    So this one's a money market account?
19   A    Same, yeah.
20   Q    And this also appears to be January          02:04:07
21   through November of 2017.  Did the Hancock money
22   market fund end in November of 2017?
23   A    I don't know the exact dates.  But like I
24   said, both B of A and Hancock, those accounts are

Page 139

1    all closed.  I think the Hancock closed in '17.  I
2    need to check on it, though, the exact date.
3    Q    I don't see any banking records in 2016.
4    Do you know whether you provided any banking
5    records in 2016?
6    A    I don't recall providing anything.  May I
7    ask Gregg?
8         Gregg, did I give you '16?  Gregg?
9    MR. LYTLE:  I think you just have to answer
10   his question at this point.                        02:05:17
11   THE WITNESS:  Okay, sorry.  I don't recall
12   giving them.
13   BY MR. IVY:
14   Q    When Dancor received a payment from
15   PetSmart, where did that payment go?
16   A    To which account?
17   Q    Um-um.
18   A    I don't remember if PetSmart paid actual
19   live check or they did direct deposit.  I don't
20   remember that.  So obviously, if it was a direct    02:06:04
21   deposit, probably went into the Hancock account.
22   And if it was a live check, you know, again, it
23   could have been between, you know, both accounts.
24   Q    But somewhere in these records --

Page 140

1    A    You would match the exact dollar amounts
2    with the deposits.
3    Q    Well, I can't match -- oh, wait.  Here we
4    go.  I can't match two of them because two of them
5    were made in 2016.
6    A    Okay.  The last quarter of 2016, correct.
7    Q    Yeah.  But I might be able to match -- but
8    I ought to be able to match the payment -- I'm
9    looking at your --
10   A    Do you have the dates of the payments?       02:06:49
11   Let me look at this one here.  Sorry.  Do you mind?
12   So it was paid on 11/31.  This is 12/6.  So yeah,
13   we need November and December.
14   Q    Did we already put that one in the
15   Exhibits?
16   A    I will ask ABC to get you November and
17   December.  Because that looks like the payment that
18   was paid on 11/3, the first one; and the second was
19   paid on 12/6.
20   Q    Well again, I think Gregg would tell you     02:07:34
21   that for purposes of today, we're just answering
22   questions.  And then what Dancor needs to do to
23   respond to discovery is something --
24   A    That's fair.  I will make my own notes,

35  (Pages 137 to 140)

Policicchio, Daniel
August 9, 2018

Page 141

1    too.  I want to be on top of it for you.
2        Q   Just so we can make a record, the summary
3    of payments that PetSmart made -- you prepared
4    this, right?
5        A   Yes.
6        Q   This is Plaintiff's Exhibit No. 15; is
7    that correct?
8        A   That's correct.
9        Q   Okay.  And when did you prepare
10   Plaintiff's Exhibit 15?                          02:09:15
11       A   Exact date, I don't know.  Couple months
12   ago maybe?  Yeah.  Exact date, I don't know.
13       Q   I can show you this, if you'd like.  But
14   in Payment Application No. 3, that was the period
15   to November 30th, 2016.
16       A   Okay.
17       Q   Indicated a payment to RLS Construction of
18   $21,780.  And I did find a check supporting that
19   payment.  So by November 30th, Dancor had paid RLS
20   $21,780.                                         02:12:57
21           Um, I want to go over with you some
22   of the e-mails that RLS Construction had identified
23   in their lawsuit.  Have you seen these before,
24   other than me running them by you this morning?

Page 142

1        A   I could take a look at them and tell you
2    yes or no if I did, so --
3        Q   Okay.  These are a series of e-mails, um,
4    mostly regarding payment.  Um, I'm going to show
5    you -- actually, I'm going to pull out another so I
6    can follow along.  One second here.
7            I will show you what's been marked as
8    Exhibit No. 21.  And you'll see another sticker on
9    there.  The reason for the other sticker is that,
10   uh, RLS identified these as trial exhibits in its   02:14:17
11   lawsuit against Dancor where we identified it as an
12   Exhibit in Dancor's deposition.  And that's what
13   the Exhibit 21 is.
14           Um, so as I -- and as I indicated to
15   Mr. Alley during Dancor's deposition, these
16   exhibits are as I have seen them as RLS identified
17   them as trial exhibits.  There may be more to some
18   of these strings.  I'm not trying to hide anything
19   or anything.  This is all I have because Dancor
20   didn't produce these to me.  So I don't have        02:14:52
21   whatever may be the totality of it.  But this is
22   what I have.  So this is what we're going to talk
23   about.
24           So I've shown you Exhibit No. 21.  Do

Page 143

1    you see that?
2        A   Yes, I do.
3        Q   That is an e-mail, on the front page, from
4    Robert Albertson to Rick Smith.  And it cross
5    copies you and Debby Policicchio, your wife.
6        A   Correct.
7        Q   And this is a -- if you look at the whole
8    string, this is asking about when they're going to
9    get paid, right?
10       A   Yes.                                       02:15:33
11       Q   And this indicates that Mr. Albertson has
12   forwarded this request to you, right?
13       A   He copied me on it, yes.  And it also
14   looks like there's seven pages total, but we're
15   missing 1 through 4.
16       Q   Right.  As I said, this is all I got.
17       A   That's all you have.
18       Q   Show you Exhibit 22.
19       A   And this is probably them.  This four,
20   maybe.                                            02:16:06
21       Q   Um, this is an e-mail from Rick Smith
22   who's the -- is he the President of RLS
23   Construction?
24       A   I'm assuming so.  I don't know.

Page 144

1        Q   You don't know Rick Smith?
2        A   I believe he's -- I don't know if he's a
3    principal, but I know I communicated with him, too.
4    But his title there, I don't know.
5        Q   Okay.  He's somebody at RLS?
6        A   Correct.
7        Q   And he's saying that he's looking for
8    payments from October, November, and December.
9        A   Correct.
10       Q   And he said we're getting in a pickle with   02:16:34
11   our suppliers, right?
12       A   Correct.
13       Q   And then you respond here, "Rick, are you
14   looking for the November billing which we submitted
15   on 11/30 and have yet to receive
16   funding from them?".
17       A   Question mark, yes.
18       Q   So he's asking about October, November,
19   and December, right?
20       A   That's what he replied to, correct.         02:16:57
21       Q   Okay.  Did you answer him in your e-mail
22   to him about October?
23       A   That I don't know.  I have to see Page 3,
24   to be honest with you.  Apparently it shows that I

36  (Pages 141 to 144)

Policicchio, Daniel
August 9, 2018

Page 145

1  have because it's my stamp on top.
2    Q   Okay.  Yeah.  And, you know, as you look
3  at these, like we said, this is the only one RLS
4  put out there.  So we're just trying to figure out
5  what's going on.
6    A   Correct.
7    Q   Hand you what's been marked as 23.  This
8  is an e-mail from Rick Smith of RLS Construction on
9  January 9th to you, right?
10   A   That is correct.                          02:18:08
11   Q   And he said "We still have not received
12  any payment on the PetSmart store.  Can you check
13  this for us?"  And you said, "The October was
14  issued prior to end of the year and mailed.  The
15  November we're waiting on and December was just
16  invoiced.  Generally this owner is a 30- to 45-day
17  payer."
18       So here you've indicated that the
19  October payment is in the mail, right?
20   A   According to my January 4th one, correct.  02:18:33
21  And the reply to Rick on January 9th is obviously
22  on Page 2, which I'm sure we'll get to.
23   Q   We'll see because -- um, but I'm right.
24  You're saying the October one is in the mail.  The

Page 146

1  other ones are yet to come because --
2    A   That's pretty much what it states, yes.
3    Q   Okay.  Show you 24.  Okay.  So it's a
4  couple days later now.  It's January 11th.  Um, and
5  it looks like Rick Smith is telling you that he
6  didn't get a check, right?
7    A   Correct.
8    Q   And you're saying you'll stop payment and
9  reissue a check and send via Fed Ex.
10   A   Correct.                                  02:20:03
11   Q   Okay.  No. 25.  Looking at Exhibit 25.
12  We're now up to looks like February.
13   A   November on the second page.
14   Q   Oh, I think -- yeah, it says -- if you
15  look on the first page of Exhibit 25, it's from
16  Shawn at RLS and that's to you, right?
17   A   That is to me, correct.
18   Q   And it says, "Attached is a November 1
19  sent over to Sheila several months ago.  We need an
20  update regarding payments for our vendors who have  02:21:02
21  bills on this project for 60 to 90 days now."  So
22  here in February, that's the November one it
23  attached.
24   A   That's attached.

Page 147

1    Q   And then at the top of 25 is an e-mail
2  from you to Shawn.  I don't see the date on it.
3    A   Probably on Page 3.
4    Q   But it says it's about missing Payment
5  Application No. 2, which is her e-mail.  It says,
6  "Shawn, thank you as this helps.  And if you did
7  not know already, Sheila was let go in November and
8  Debby is the new person collecting documents to
9  issue to myself for processing."
10   A   Correct.                                  02:21:41
11   Q   So Shawn is asking where's the money and
12  it looks like you're saying thanks for the
13  information and Sheila's no longer with us, right?
14   A   Correct.
15   Q   Did you ever -- did you provide -- this
16  e-mail doesn't tell her anything about when they're
17  going to get paid, does it?
18   A   No.
19   Q   This is Exhibit 26.  This looks like it's
20  the same thing.  We can skip right over that.      02:22:27
21   A   That's the same.
22   Q   This is Exhibit 27.  And this is Shawn
23  again, on February 2nd, saying "What's the e-mail
24  we should be sending it to?  I've sent January and

Page 148

1  December to accounting.  Can you check if these
2  have been filed."  And I don't even see a response,
3  so --
4    A   No.
5    Q   This one isn't all that helpful.  Show you
6  28.  Oh, this is the reply to the one in 27.  And
7  this is an e-mail from you to Shawn at RLS on
8  February 2nd saying "That's the correct e-mail,
9  that accounting e-mail, and you may want to send to
10  Debby directly as well," with Debby's e-mail,       02:23:42
11  right?
12   A   Correct.
13   Q   And Shawn responds on the next day,
14  February 3rd, "So it's safe to assume that our
15  November Pay Application was not processed and will
16  take an extra month to get here?"  Is that right?
17   A   Correct.
18   Q   And we don't have an answer yet to that.
19   A   I'm sure it's coming up.
20   Q   This is Exhibit 29.  And this appears to   02:24:04
21  be the response.  It's from you on February 3rd,
22  right?
23   A   That is correct.
24   Q   And it says, "No, Shawn.  I am processing

Q & A Reporting, Inc.
815-477-2230

Policicchio, Daniel
August 9, 2018

Page 149

1  based upon my review and should have it out in the
2  next week. I will handle the November draw issues
3  and then my regular team will take it from there
4  until final payment. Thanks." Did I read that
5  correctly?
6      A   That's correct.
7      Q   So you're telling Shawn that the November
8  Pay Application has in fact not gone through yet;
9  is that what you're saying?
10     A   Well, all depends how you read into that          02:24:48
11  I need to look into that because I know we had a
12  transition from when Sheila was there, too. A lot
13  of paperwork was lost or misfiled, put it that way.
14     Q   Okay. So I'm just trying to find out. Is
15  it -- did Sheila misplace the November Payment
16  Application and it went into PetSmart late?
17     A   She probably did a lot of things as far as
18  didn't file them or put them into the system or
19  whatever, you know, the case may be. And that's
20  when we released her any ways because there was a   02:25:22
21  multitude of things with that employee, so -- not
22  even pertaining to this.
23     Q   Okay. So Shawn is asking if you can
24  confirm that they should be expecting payment this

Page 150

1  week.
2      A   Correct.
3      Q   Now we're on Exhibit 30, which is an
4  e-mail from Shawn to you on February 20th.
5  Subject: Past due invoices. It says, "Good
6  afternoon. I am looking for status payments on
7  PetSmart Tulsa for November, December and January."
8          So it looks like October got paid.
9  That was probably that payment that we've
10  previously identified.                                02:26:06
11     A   The 21,000 or whatever the change was.
12     Q   "I know we had spoke last week about a
13  FedEx delivery for the November payment, but we
14  still haven't seen or heard any information
15  regarding it in a few days. The December and
16  January are now 60 and 30 days respectively, so we
17  are expecting to see them both soon as well."
18          Did I read that correctly?
19     A   That is correct.
20     Q   Okay. Let's go to 31. This is an e-mail   02:26:31
21  from Shawn at RLS Construction on March 20th. So
22  that's a month past the last e-mail we just talked
23  about.
24     A   Roughly, correct.

Page 151

1      Q   And it says, "Dancor, we haven't heard
2  from you in a while and your lawyer wasn't able to
3  get ahold of us last week as you mentioned he
4  would. Can you give us an update on the PetSmart
5  project payments. We are now four months past and
6  120 days since November 20th. Attached is the cost
7  of accumulated interest we will also be expecting.
8  Page 3 has a breakout for your records. Thank you,
9  Shawn."
10          Does this sound -- did I read that          02:27:24
11  accurately?
12     A   Yes, you did.
13     Q   Does this sound like she's being accurate
14  at this point? Were they four months -- was Dancor
15  four months past on the November 20th?
16     A   I can't -- I don't recall.
17     Q   Okay. Show you Exhibit 32. This is an
18  e-mail from Glenna Whitefield at RLS and it's to
19  Ethan Prescott, Dan Policicchio, and some other
20  people. So you did receive this, correct?           02:28:08
21     A   My name's on it, yes.
22     Q   Do you know who Ethan Prescott is?
23     A   No.
24     Q   If you look down, you see that

Page 152

1  Ethan Prescott is the Associate Vice President of
2  Development for the Leon Capital Group? Does that
3  tell you anything? Does that spark a memory?
4      A   No, it doesn't.
5      Q   Um, so this says, "Good morning, Ethan.
6  The mechanic's lien was filed in Tulsa County." So
7  this is RLS informing this Ethan Prescott gentleman
8  and you that they have now filed a mechanic's lien,
9  right?
10     A   That's what it states, yes.                     02:28:47
11     Q   And at that point Dancor had still not
12  paid RLS for November, December, January, true?
13     A   I don't recall.
14     Q   But we'd know that from --
15     A   We'd know that, correct.
16     Q   This is Exhibit 33. I'm not exactly sure
17  how this lines up. Like I said, this comes from
18  somebody else. So I can't make it line up. But it
19  appears to be an e-mail to you from Shawn Stevens,
20  and we can't -- we don't know what date that is.     02:29:35
21  We know the one underneath, what that is; but this
22  says, "It's been 48 hours since my last e-mail and
23  still no word of resolution of past due amount from
24  your party. We need an update ASAP."

Q & A Reporting, Inc.
815-477-2230

Policicchio, Daniel
August 9, 2018

Page 153

1    Um, we've gone through quite a few of
2  these. Do you remember RLS sending you lots of
3  e-mails about getting paid?
4    A  I don't recall, you know, Mr. Ivy, exactly
5  how many.
6    Q  Thirty-four. So we're looking at
7  Exhibit 34. Oh, this looks like the previous
8  Exhibit with a date on it. So this is an e-mail
9  from March 22nd. So this is actually before they
10  filed -- not quite sure why they filed this order,    02:30:27
11  but this looks like it was before they filed the
12  mechanic's lien and it says, "Dancor, it's been 48
13  hours since my last e-mail. Still no word of a
14  resolution of past due account from your party. We
15  need an answer ASAP."
16    A  Correct.
17    Q  And then the one that's attached
18  to --
19    A  I don't have an attachment to this one.
20    Q  Is it a two-page?    02:30:52
21    A  No. It's just one page.
22    Q  Oh. Okay. I think it got separated, but
23  that doesn't matter.
24    I'm going to show it to you as I have

Page 154

1  the entirety of it. Because I think -- I show this
2  as -- and I think they just got separated. So
3  that's that Exhibit 34 and the one right behind
4  when it says we haven't heard from you in 48 hours.
5  And the one behind it is the e-mail from a couple
6  days ago.
7    A  Correct.
8    Q  Talking about we haven't heard from you or
9  your lawyer.
10    A  Correct.    02:31:55
11    Q  Okay. This one is Exhibit 35. And this
12  is dated March 22nd. This is from you to Shawn at
13  RLS and it says, "Matt Robinson who's copied is
14  handling all financial closeouts on this project
15  and will be available to discuss later next week
16  after he has discussions with the owner to formally
17  finalize and close out the project as a whole. I
18  appreciate your patience. And please reach out to
19  Matt middle of next week for updates which I hope
20  will be in agreement with yourself. Thanks.    02:32:36
21  Again, Robert, James, and any other person within
22  Dancor cannot get you an update other than Matt or
23  myself."
24    A  That's correct.

Page 155

1    Q  And that's -- you're informing RLS that
2  financial matters are just for you and Matt?
3    A  Correct.
4    Q  Um, okay. So in March, you're telling
5  Shawn at RLS that at this point now your lawyer's
6  handling it and you're waiting to close out the
7  project to pay them; is that true?
8    A  Based upon that statement, yes, that's
9  somewhat.
10    Q  In March -- on March 22nd, 2017, um, did    02:33:24
11  you believe that when the project closed out, you'd
12  be able to pay RLS?
13    MR. LYTLE:  Object to the form.
14    THE WITNESS:  I don't recall.
15  BY MR. IVY:
16    Q  Okay. This is Exhibit 36. This is an
17  e-mail from March 22nd from Shawn to you, correct?
18    A  That is correct.
19    Q  And it's cross copied to Debby Policicchio,
20  your wife, true?    02:34:12
21    A  That is correct.
22    Q  And it says, "Dan, why are you holding out
23  payments from November when you've been paid up to
24  retainage?"  Did I read that correctly?

Page 156

1    A  That is correct.
2    Q  And on March 22nd, based on your payment
3  summary, this statement is accurate. That Dancor
4  had actually been paid by PetSmart up to retainage,
5  right?
6    A  Up to -- yeah, probably the retainage and
7  any hold backs and change orders.
8    Q  So this -- Shawn's statement in Exhibit 36
9  is accurate that you have been paid up to
10  retainage, Dancor had been paid up to retainage,    02:34:57
11  right?
12    A  Yes.
13    Q  And then attached to this is some other
14  e-mails that we have previously gone through.
15    A  Correct. Looks like continuation of the
16  last one.
17    Q  Do you know, did you ever respond to this
18  March -- is this -- is this your response to this
19  March 26th e-mail the one where you said Matt's
20  going to try to close it out?    02:35:27
21    A  That was the March 22nd e-mail. That was
22  the last one. That e-mail was written on
23  March 22nd.
24    Q  Okay. Exhibit 36 that we're looking at

Q & A Reporting, Inc.
815-477-2230

Policicchio, Daniel
August 9, 2018

Page 157

1  right now from Shawn was sent at 6:18 p.m. to you.
2  And Exhibit 35 was sent by you to Shawn at
3  4:18 p.m. Is that the difference between
4  California and --
5      A   You have to watch, yeah, the time stamps
6  depending where you write it. There's two hours
7  difference. Oklahoma's on Central Time, correct?
8      Q   Yes. So this is actually a response --
9  Exhibit 35 is your response to Shawn's e-mail in
10  Exhibit 36.                                    02:36:15
11      A   No. I think he responded to my e-mail
12  where I indicated Matt Robinson's copied and the
13  last one, again, Robert, James and other persons
14  within Dancor cannot -- he responded to that,
15  according to this. Because everything should be on
16  top, the way I see it.
17      Q   Shawn is a he by the way?
18      A   I believe so. I could be wrong. Looked
19  like Shawn replied to the -- my original e-mail.
20      Q   Okay. Do you remember ever responding to    02:36:49
21  Shawn's reply to your e-mail?
22      A   I don't recall, Mr. Ivy.
23      Q   Okay. Show you Exhibit 37. This is
24  March 30th. Shawn from RLS Construction is writing

Page 158

1  to M. Robinson. Is that Matt Robinson?
2      A   Yes.
3      Q   And you and your wife are both copied,
4  right?
5      A   That is correct.
6      Q   As is James A. at Dancor?
7      A   That's the wrong e-mail address for James
8  Alley, just FYI, and Robert Albertson.
9      Q   And in this one Shawn says, "Matt, it is
10  now Thursday the 30th of March and still we have no    02:37:59
11  response from you. Daniel Policicchio, Sr. advised
12  that you'd be reaching out to us first on
13  March 17th and then again on March 29th, which
14  neither happened. We are looking for an update
15  today. Reach me any time."
16          And then below it looks like Shawn
17  wrote that in response to your e-mail saying that
18  Matt Robinson's handling the closeout, right?
19      A   That's correct.
20      Q   Do you remember if you responded to    02:38:31
21  Shawn's e-mail on March 30th?
22      A   No, sir, I don't recall.
23      Q   Show you Exhibit 38. And this is on
24  April 3rd, 2017, from Shawn, and it's addressed to

Page 159

1  you and your wife Debby and other people at Dancor,
2  right?
3      A   Correct.
4      Q   It says, "Dan, are we getting update
5  today? Matt didn't have any information last
6  week." Did I read that correctly?
7      A   Yes, you did.
8      Q   Do you know if you responded to this
9  e-mail, Exhibit No. 38?
10      A   No, I don't recall.                      02:39:15
11      Q   Showing you Exhibit No. 39.
12      MR. LYTLE: And, Bob, when we're done with
13  this line, do you mind if we take a break after
14  that?
15      MR. IVY: I don't mind because that's a good
16  time for me to take a break anyway.
17      MR. LYTLE: Okay, thanks.
18  BY MR. IVY:
19      Q   Looking at Exhibit No. 39. This is an
20  e-mail. Looks like it's from Ethan Prescott and    02:39:54
21  it's to you and a bunch of other people. Looks
22  like subcontractors.
23      A   Yeah. It looks like people from RLS.
24      Q   Okay. And it includes -- so it's got you

Page 160

1  on there. It's got M. Robinson at Dancor. Did
2  Matt Robinson have a Dancor e-mail?
3      A   He had a Dancor e-mail, yes.
4      Q   Was Matt Robinson an employee of Dancor?
5      A   No.
6      Q   Okay. And this e-mail says, "Landlord
7  expects the tenant to pay the subcontractors and
8  this could potentially violate the lease
9  obligations. Please let landlord know once the
10  final lien release and waiver has been filed.    02:40:42
11  Negative press to our shopping center and our
12  company will not be tolerated due to a breach of
13  contract that has nothing to do with the landlord."
14  Do you see that?
15      A   Yes.
16      Q   Did this give you notice that the failure
17  to pay RLS was going to be a problem for PetSmart?
18      MR. LYTLE: Object to the form.
19      THE WITNESS: I don't recall.
20  BY MR. IVY:                                      02:41:04
21      Q   As you sit here now, can you see how --
22      A   All depends how you read into it.
23      Q   And last Exhibit, No. 40. Do you
24  recognize this e-mail?

40  (Pages 157 to 160)

Policicchio, Daniel
August 9, 2018

Page 161

1     A   With all the blankouts?  No.
2     Q   Okay.  This is an e-mail that appears to
3  be from you, true?
4     A   Correct.
5     Q   On April 17th to Rick at RLS Construction.
6  Am I right?
7     A   That's correct.
8     Q   I can tell you that counsel for RLS told
9  me that the reason that the blankouts are there was
10  because there are settlement discussions and he          02:41:49
11  felt it appropriate to blank out anything dealing
12  with settlement discussions.
13        And this says, "Dear Rick, I am
14  writing this to you and you only, an e-mail long
15  overdue as I am ashamed.  No attorneys, et cetera."
16  And a long blank.  "I'm not a perfect person, but
17  there are situations that come up in business and
18  personal affairs that are uncontrollable; and,
19  unfortunately, this is one of them and your firm
20  was caught in the middle."  Some blank.  "I concede  02:42:17
21  and you won this battle, which is not really a
22  battle that should have been fought."  Some more
23  blank.  "Thank you in advance for this
24  consideration as I truly appreciate it and

Page 162

1  apologize for the issue it has caused you and your
2  firm."
3        Do you remember sending this, you
4  know, with the -- aside from the parts that are
5  blanked out?
6     A   Yes, I recall if this is -- obviously, I
7  can't read what's underneath that are blanked out.
8  This is a settlement agreement that I reached out
9  directly to Rick on.  It started the talks.
10     Q   All right.  And when you talk about        02:42:52
11  situations that come up in business and personal
12  affairs, are you talking about the business
13  problems that you talked about earlier today?
14     A   Yes, sir.
15     Q   You said business and personal affairs.
16  Were there personal affairs also that were a
17  problem for you?
18     A   I mean personal affairs, it's like I
19  personally guaranteed those high-interest loans and
20  everything, too.                                    02:43:12
21     Q   I see.  Um, and you say, "I concede and
22  you won this battle."  Did you view this as a
23  battle?
24     A   No.  It's just a figure, you know, of

Page 163

1  speech.  That just --
2     Q   Okay.  All right.  Um, so would it be fair
3  to say that in this e-mail, you're admitting that
4  you, uh, owed RLS and that they were in the right?
5     MR. LYTLE:  Object to the form.
6     THE WITNESS:  Without seeing everything that's
7  blanked out, I can't answer that.
8  BY MR. IVY:
9     Q   Okay.  Are you aware that employees of
10  PetSmart tried to contact you on several occasions    02:44:31
11  about payment of subcontractors?
12     A   I don't recall.
13     Q   You don't recall receiving any phone
14  messages?
15     A   I don't recall, no.
16     Q   Um, and you don't recall receiving any
17  e-mails from PetSmart?
18     A   Financially why I did, I don't recall.
19     Q   Was Matt Robinson -- did he always act in
20  the capacity of Dancor's lawyer?                      02:45:05
21     A   Yes.
22     Q   Did he ever act in a capacity other than
23  as Dancor's lawyer?
24     A   No.

Page 164

1     Q   Um, would you agree that -- if we use your
2  figure of speech, that this battle that we're here
3  about right now between Dancor and PetSmart should
4  not have been fought either?
5     MR. LYTLE:  Object to the form.
6     THE WITNESS:  No.  It all depends how you look
7  into that, no, so --
8  BY MR. IVY:
9     Q   Your answer is no?  I didn't understand
10  your answer.                                          02:45:53
11     A   It's a no and a yes.  I just don't
12  understand the question, the point of it, so --
13  I --
14     Q   I guess the point of it is I'm trying
15  to --
16     A   When I mean battle, you know, headaches,
17  you know, whether it's financial.  What's going
18  up -- coming up in business wise.  That's the
19  battle that a business owner goes through.  Not a
20  battle with a client or a person or a figure.        02:46:19
21     MR. IVY:  Okay.  Let's take a break.  I'm
22  going to look through my notes.  We won't have that
23  much more.  Um, but it might be something more once
24  I go through everything.

41  (Pages 161 to 164)

Policicchio, Daniel
August 9, 2018

Page 165

1          (WHEREUPON, there was a break had
          from 2:41 to 2:58 p.m.)
2    BY MR. IVY:
3        Q   Having gone through this series of RLS
4    e-mails, does that refresh your memory at all of
5    any e-mails from RLS in Dancor's files?
6        A   No, I don't.
7        Q   Did you keep a separate e-mail account in
8    which you got your own e-mails?  Or was it all part
9    of the Dancor --
10       A   It was all part of the Dancor dot com        03:04:12
11   e-mails.  And generally, it just -- obviously, you
12   know, we got thousands and thousands and thousands
13   of e-mails.  So a lot of times we don't save them.
14   I just delete them, unless it's an important e-mail
15   as the case may be.  Just to keep everything on
16   there, it's --
17       Q   Having gone through all those RLS e-mails,
18   would you call it a fair characterization that in
19   response to RLS's request for payment and
20   information about payment, you kind of put them off   03:04:44
21   and -- until later?
22       A   I'd say it's fair.  Hence, that's what led
23   up to the last e-mail that was all blocked out with
24   the settlement agreement.

Page 166

1        Q   We've discussed today all of the bank
2    accounts that Dancor used at the time of the
3    PetSmart project?
4        A   Yes.
5        Q   Um, from 2012 through 2017, did Dancor
6    ever do a project for a client that requested, uh,
7    balance sheets, um, from Dancor?
8        MR. LYTLE:  Object to the form.
9        THE WITNESS:  I don't recall that.  But a
10   majority of our clients didn't require them, if not   03:06:05
11   all of them.  Except obviously PetSmart.
12   BY MR. IVY:
13       Q   Now, I know you testified previously that
14   the -- those financial documents that you sent to
15   PetSmart along with the qualification review, you
16   prepared those specifically for that qualification
17   review; is that true?
18       A   Correct.
19       Q   Um, you obviously used some kind of
20   information to create that, create those documents    03:06:43
21   for PetSmart, true?
22       A   True.
23       Q   And that same information would have been
24   available to you between 2012 and 2017, wouldn't

Page 167

1    it?
2        A   True.
3        Q   If you were to go through that process for
4    2017 through 2012, what would you look at in order
5    to prepare balance sheets, statement of income, and
6    I don't remember the third one.
7        A   P and loss statement and a balance sheet.
8    Generally that is a form on QuickBooks that
9    obviously it's reconciled every year by my
10   accountant when he does our federal taxes.           03:07:33
11       Q   So these documents, if we're looking at
12   Exhibit No. 6, which is the general contractor
13   review, that contains, um, income/expenses, balance
14   sheet and statement of cash flows.  Those three
15   reports all come from QuickBooks?
16       A   They're QuickBooks generated, yes.  They
17   have that option on the QuickBooks system.
18       Q   So those same forms could be generated by
19   QuickBooks for 2013, 2014, 2015, 2016, 2017?
20       A   Quite possibly, yes.  You know, formats       03:08:21
21   change every year because obviously you have to
22   change -- QuickBooks updates themselves.  But, yes.
23       Q   So to your memory, Dancor never actually
24   pushed the button on creating those reports after

Page 168

1    2012, but could do so and produce similar reports
2    for later years?
3        A   Quite possibly, yes.
4        MR. LYTLE:  Object to the form.
5        MR. IVY:  That's all I have.
6        THE WITNESS:  Again, thanks for coming down.
7        MR. IVY:  Thanks for taking the time.
8        MR. LYTLE:  Dan, we just have to do one more
9    housekeeping thing.  The court reporter needs to
10   know that -- my advice to you would be to read and    03:09:33
11   sign your deposition.
12       THE WITNESS:  Okay.
13       MR. ROBINSON:  So we'll not waive, then.
14       THE WITNESS:  Yes.
15          FURTHER DEPONENT SAITH NOT.
16          (WHEREUPON, the deposition was
          concluded at 3:04 p.m.)
17
18
19
20
21
22
23
24

42  (Pages 165 to 168)

Q & A Reporting, Inc.
815-477-2230

Page 169

```
1    STATE OF ILLINOIS )
                       ) SS.
2    COUNTY OF McHENRY )

3

4

5        I, LAURA L. BABYAR, Certified Shorthand
     Reporter and notary public in and for the County
6    of McHenry, State of Illinois, do hereby certify
     that DANIEL J. POLICICCHIO, Sr., was by me first
7    duly sworn to testify to the truth, the whole
     truth, and nothing but the truth, and that the
8    above videotaped deposition, Pages 1 through 168,
     inclusive, was recorded stenographically by me
9    and reduced to typewriting by me.
10       I FURTHER CERTIFY that the foregoing
     transcript of the said videotaped deposition is a
11   true and correct transcription of the testimony
     given by the said witness at the time and place
12   specified hereinbefore.
13       I FURTHER CERTIFY that I am not a relative
     or employee or attorney or counsel of any of the
14   parties, nor a relative or employee of such
     attorney or counsel, nor financially interested
15   directly or indirectly in this action.
16       IN WITNESS WHEREOF, I have hereunto set my
     hand at Algonquin, Illinois, this 15th day of
17   August, 2018.
18

19

20
         Laura L. Babyar
21       LAURA L. BABYAR
         Certified Shorthand Reporter
22       CSR License No. 084-002601
         Notary Public
23       McHenry County, IL

24
```

Page 170

```
1        ERRATA SHEET
2    Deposition of:  DANIEL J. POLICICCHIO, SR.

         Taken:  August 9, 2018

3

4    Page      Line      Correction
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Page 171

```
         IN THE UNITED STATES DISTRICT COURT FOR THE
                NORTHERN DISTRICT OF OKLAHOMA


    PETSMART, INC.,            )
                              )
              Plaintiff,      )
                              )
         vs.                  )  No. 17-CV-0361-
                              )     CVE-JFJ
    DANCOR CONSTRUCTION, INC., )
    and DANIEL J. POLICICCHIO, )
    Sr.,                      )
                              )
              Defendants.     )
                              )


         I, DANIEL J. POLICICCHIO, Sr., hereby
    certify that I have read the foregoing transcript
    of my videotaped deposition given at the time and
    place aforesaid, consisting of pages 1 through
    169, inclusive, and I do again subscribe and make
    oath that the same is a true, correct, and
    complete transcript of my deposition so given as
    aforesaid, with the corrections noted.


    _____
         DANIEL J. POLICICCHIO, Sr.,

    Subscribed and sworn to
    before me this _____ day of
    _____, 20___.


    _____
    Notary Public
```

Policicchio, Daniel
August 9, 2018

Page 1

**A**

**a.m** 1:16 60:16
**ABC** 103:12,14,20
    110:7 126:20 127:5
    127:13 129:1 130:8
    134:18 135:2,8,9
    140:16
**ability** 26:15 105:21
**able** 4:13,15 30:8
    34:12 57:15 63:21
    74:17 108:10 128:3
    128:11,12,16 135:19
    140:7,8 151:2
    155:12
**accelerating** 101:11
**access** 129:18 130:9
    130:11 132:23 133:3
    133:5,6,10,22
    134:17
**account** 18:14,15,17
    18:21,21 20:4 21:15
    129:19 130:2,16
    132:16 135:21,23
    136:1,5,16,19 137:6
    137:12,14,16,17
    138:15,17,18 139:16
    139:21 153:14 165:7
**accountant** 38:9
    167:10
**accounted** 123:15,19
**accounting** 28:22
    37:17 38:7 87:1
    124:20,21 125:23
    148:1,9
**accounts** 18:20 130:12
    133:10,22 137:23
    138:7,24 139:23
    166:2
**accumulated** 151:7
**accuracy** 14:24 21:17
**accurate** 7:21 13:22
    14:13 27:7 67:10
    73:6 79:1 96:4
    108:19 151:13 156:3
    156:9
**accurately** 151:11
**acknowledge** 121:24
**ACORD** 2:7
**act** 121:18 163:19,22
**action** 169:15
**actions** 117:15
**actual** 94:19 139:18
**add** 65:22 71:10 80:4
    86:18 92:2 125:6

**added** 50:15 69:13
    86:19 88:7,9 95:4
**adding** 88:7
**additional** 11:24
    15:20 16:4 34:6
    94:14
**address** 26:7,11 158:7
**addressed** 124:11
    158:24
**administrative** 25:22
**admission** 78:13 95:18
**admit** 122:7
**admitted** 4:24 5:1
    73:3 74:3 81:6
**admitting** 163:3
**advance** 161:23
**Advanced** 2:16 27:21
    27:22 28:3,24 34:1
**Advantage** 135:21
**advice** 168:10
**advised** 158:11
**affairs** 161:18 162:12
    162:15,16,18
**affiant** 48:22 54:9
**aforesaid** 171:13,15
**afternoon** 150:6
**ago** 8:5,10 82:24
    141:12 146:19 154:6
**agree** 4:21,22,23 5:7,8
    18:4,7 23:8 28:14
    74:24 79:1 110:16
    111:1 115:22 119:3
    119:22 120:9 164:1
**agreed** 9:8,12 37:9
    63:15 86:19 87:14
**agreeing** 5:21
**agreement** 75:11
    119:2 126:5 127:13
    130:8 131:15 154:20
    162:8 165:24
**ahead** 24:16,17 78:20
    78:22 118:5
**ahold** 151:3
**AIA** 40:12,14 45:16
    45:19,21,23 46:2,4
    46:10 54:21,22
    58:16 67:11 90:2
**air** 57:5
**Albertson** 19:23 21:2
    21:9 89:22,23,24
    143:4,11 158:8
**Albertson's** 23:20
**ALEXANDER** 2:2
**Algonquin** 169:16

**Allegiance** 65:23 66:4
    79:3,6,8,11,15,19,19
    79:23 80:4 91:2,6,14
    91:14,20,23 92:7,13
    92:19 93:2 98:9,10
    98:11,15,20,24 99:6
**Alley** 16:15 89:24
    142:15 158:8
**allow** 128:6
**allows** 11:5 114:1
    116:6 134:18
**Alvarado** 64:3
**America** 18:15,16,21
    135:21 136:14,16
    137:16,22 138:4
**American** 45:17
    131:17
**AmEx** 133:13,16
**amount** 11:6,15 32:2
    32:7,19,19,20,24
    33:1 46:17 50:1,22
    50:23,24 51:3,22
    52:3,5,8,9 56:21,23
    62:3,6,7 74:14 75:19
    76:11 77:8,19 79:17
    80:3,5,6,9,23 82:15
    83:10 96:4 97:7
    108:8,13 110:2,5,6
    110:10 119:4,4
    122:15,16,17 125:21
    126:3,17 128:16
    152:23
**amounts** 27:12 47:14
    50:4,4 61:3 62:19
    65:16 67:17 74:22
    74:23 77:24 78:1
    80:24 86:13 87:16
    90:16 124:11 125:6
    125:22 131:21 140:1
**analogy** 100:15
**analysis** 128:23
**answer** 8:19 9:7,10,21
    24:3 27:1 30:1
    34:23,23 65:1,20
    71:13 81:5,8 120:5
    120:12,15 122:12
    139:9 144:21 148:18
    153:15 163:7 164:9
    164:10
**answered** 40:23 98:5
**answering** 12:19 43:8
    140:21
**ahold** 151:3
**answers** 8:14 10:17
    18:4 80:20 127:4

**anybody** 13:24 35:9
    106:13
**anymore** 129:19
**anyway** 159:16
**apologize** 21:18 162:1
**apparently** 81:5,8
    144:24
**appear** 7:21 16:21
    26:2 29:3 136:9
**APPEARANCES** 2:1
**appeared** 2:5,9,15
    7:20
**appears** 23:4 35:18
    37:3 53:22 69:6,21
    70:1,3,5 85:10,14
    96:10,17 100:11
    136:5 137:11 138:20
    148:20 152:19 161:2
**application** 45:7
    46:10,14 47:12,20
    48:12 50:12 52:20
    52:23,23 53:1,5,7,10
    53:13,20,23 54:7,10
    56:3,14 59:14 60:9
    60:19,22 61:1 66:7
    67:9,15 68:7,14,22
    69:5 70:3,7,9,16,20
    70:24 71:4,8,17,24
    72:3,8 73:23 74:11
    74:20 75:24 76:7,21
    77:4 78:15 79:14
    82:4 83:13,19 84:15
    90:1,5,14,24 91:5
    92:12 93:1,10,15,19
    93:23 94:3,4,24 95:5
    95:13,20 96:1,2,7,14
    96:21 98:1,9,14
    99:13 100:12,17,24
    101:7,9 112:16
    113:10 120:22
    131:20 132:1 141:14
    147:5 148:15 149:8
    149:16
**Applications** 45:4,11
    47:4 48:6 69:11
    100:10 108:19
    109:10 120:24 121:3
    128:8
**appreciate** 109:19
    154:18 161:24
**appropriate** 161:11
**approximately** 16:11
    92:9
**April** 32:11,12 158:24

161:5
**APS** 76:14,16,22,24
    77:3,5,12,13 78:7,9
    78:14 96:20,24 97:3
    97:7 98:2
**arbitration** 40:19
    42:15
**Architecture** 45:17
**area** 108:9
**areas** 94:16
**arising** 117:15
**ASAP** 152:24 153:15
**ashamed** 161:15
**aside** 74:23 88:8 162:4
**asked** 24:5 37:22
    77:23,24 81:1,21
    127:14
**asking** 4:9 5:9,14
    13:22 14:9 16:6
    33:19 34:3 66:11
    78:11 111:11,13,16
    118:1 143:8 144:18
    147:11 149:23
**aspect** 110:19
**assessment** 124:22
**asset** 127:17 129:2
**assets** 127:11,19
**assign** 88:1
**assigned** 88:2,19
    104:20
**assignment** 103:13
**Associate** 152:1
**associated** 124:9
**Associates** 62:4
**assume** 9:22 39:1,13
    60:12 148:14
**assuming** 14:16 58:15
    133:2 143:24
**assurance** 14:12
**attached** 3:5 23:9
    25:13 38:2 146:18
    146:23,24 151:6
    153:17 156:13
**attachment** 153:19
**attend** 4:10,19 5:20
    10:11
**attending** 5:8
**attest** 66:9
**attorney** 42:10 169:13
    169:14
**attorneys** 41:1 117:2
    161:15
**attorneys'** 11:7 117:2
    125:10

Policicchio, Daniel
August 9, 2018

Page 2

**August** 1:15 11:8
169:17 170:2
**automatically** 21:9
87:21,22
**available** 35:3 135:6
154:15 166:24
**awarded** 101:22
102:12
**aware** 15:19 16:1 31:2
37:14 39:14,19 41:5
41:9 72:16 74:5
82:13 95:21 105:22
106:10,14,16,17,18
106:21 114:5,6,14
114:16 115:19 117:9
120:3 122:5 123:5
163:9
**awash** 12:24
**awful** 26:13

_____

**B**

**B** 3:1 138:16,24
**BABYAR** 1:13 169:5
169:20
**back** 20:9 29:4 31:15
44:19 51:7,8,9 65:24
80:18 91:1 93:8
96:3 112:3 115:6
116:19 120:24
133:21
**backs** 115:7 156:7
**balance** 36:10,15
37:12,20 38:1,12,16
38:21,23 39:11,15
39:18 166:7 167:5,7
167:13
**balances** 55:10
**ballpark** 92:6 98:20
100:12 108:8
**bank** 16:22 17:3,8,9
17:13,17 18:8,9,13
18:14,15,16,20,21
52:20 130:4,12
131:14,24 132:4,12
132:23 133:1,8,12
134:24 135:20
136:11,13,16 137:11
137:16,22 138:4,15
166:1
**banking** 132:18,20
138:7 139:3,4
**banks** 130:12 134:11
137:18
**base** 57:16 127:1

**based** 30:2 55:18
78:11,12 95:18
110:11 126:4 149:1
155:8 156:2
**basically** 19:15 55:1
**basis** 5:20 70:13
**Bates** 14:20,21
**bathroom** 60:13
**battle** 161:21,22
162:22,23 164:2,16
164:19,20
**beginning** 124:19
136:5
**behalf** 2:5,9,15 12:13
12:20 16:7
**belief** 47:12 60:24
67:15 90:13
**believe** 17:11 19:17
21:11 22:21 26:15
32:12,15 33:4,5
34:15 36:22 37:4
38:5 39:23 48:8
64:1,4,15,18,20 67:2
79:20 80:14 89:13
98:18 104:7 111:24
115:12 117:1 118:12
119:6 123:12 130:5
131:19 132:2 134:23
144:2 155:11 157:18
**benefit** 103:13 106:1
107:9
**best** 15:3,13 16:5 18:6
26:15 47:10 60:24
61:8 63:18 67:13
90:12 105:21 135:18
**better** 77:21
**beyond** 20:14
**bill** 56:2 57:12
**billing** 46:17 144:14
**bills** 56:11 146:21
**bit** 8:9,15 17:23 20:23
51:15 55:20 82:24
126:13
**blank** 161:11,16,20,23
**blanked** 162:5,7 163:7
**blankouts** 161:1,9
**blanks** 58:22 59:2
**blocked** 165:23
**boat** 102:13
**Bob** 60:11 109:17
159:12
**books** 126:23 127:9
**bottom** 39:24 41:21
54:13 68:5,6 69:21

71:9 118:22
**Box** 2:4
**Brazeal** 25:2 26:3
27:3 34:1 62:14
64:14,22 65:5 66:19
66:20,24 84:12,17
84:21,24 85:3,9,12
**breach** 160:12
**break** 9:24 10:4,8
20:22 21:21 22:20
22:24 60:13,16
102:17,19 109:19,22
159:13,16 164:21
165:1
**breakdown** 27:6
46:15 77:20 125:11
125:17,19 126:4,19
126:21,22
**breakdowns** 118:1
**breakout** 151:8
**breaks** 5:17
**bridge** 132:21
**briefly** 45:4
**bring** 66:15
**bringing** 4:17
**broad** 57:21,21
117:23
**broader** 55:20
**Broadway** 2:3
**built** 49:14
**bulk** 20:13
**bunch** 46:20 87:4
136:7 159:21
**business** 37:2 43:18
44:1 130:2 135:23
136:1,18,21 161:17
162:11,12,15 164:18
164:19
**button** 87:4 167:24

_____

**C**

**C.S.R** 1:13
**calculate** 11:13
110:10
**California** 157:4
**call** 7:13 12:9,10
31:16 59:10,18
70:16,21 71:1,6
91:18 132:21 136:20
165:18
**called** 30:20 31:12
58:5 60:5
**calling** 103:4
**calls** 111:12,14

**cancel** 21:14
**capacity** 12:4 122:2
163:20,22
**Capital** 152:2
**car** 59:21
**card** 63:6,11,15,20,22
63:23 64:5,10,12
65:24 66:7,17 76:16
87:12 88:15 129:15
130:1,2 131:7,9,15
131:18,23 132:7,14
132:15,18,19,24
133:7,13,16 134:8
**cards** 133:13
**care** 81:13 107:17
**Cart** 64:2
**case** 4:24 8:6 10:3
11:6 12:20 24:9
46:5 103:8 104:20
111:6 112:7 120:8
127:2 131:1 149:19
165:15
**cases** 41:24,24 42:8,20
103:8
**cash** 36:10,15 37:13
37:21 38:2 167:14
**catch** 97:16
**category** 61:22 122:8
**caught** 161:20
**caused** 162:1
**cells** 71:12
**center** 75:13 160:11
**Central** 157:7
**cents** 74:1
**CEO** 12:4,7,14
**certain** 10:2 17:6 36:7
47:7 49:12 58:18
63:10 70:11 87:9
117:18,20 132:9
**Certificate** 46:11 47:5
**certificates** 47:16 61:4
67:19 90:17
**Certified** 169:5,21
**certifies** 47:6,10 67:13
90:12
**certify** 169:6,10,13
171:12
**certifying** 43:14
**cetera** 161:15
**chains** 28:4
**CHAIRMAN** 76:1
**chance** 16:20,21
**change** 11:22 32:5,16
32:21,22 33:3 46:16

94:1 107:24 115:7
115:14 122:24 127:1
150:11 156:7 167:21
167:22
**characterization**
165:18
**chatted** 89:19,20
**check** 17:11 87:22,23
87:23 88:3 91:21
94:14 112:17 139:2
139:19,22 141:18
145:12 146:6,9
148:1
**checked** 97:15
**checking** 18:14,15
135:21 137:12,14,16
137:16,23
**checks** 17:10,11 55:10
79:19 88:11,13,14
88:23 94:19
**chunk** 19:24
**circumstances** 89:14
112:20,21,24 116:17
**City** 2:4
**Civil** 4:4
**claim** 115:23
**claiming** 73:1 113:21
**claims** 33:11 40:16,18
42:15
**clarify** 39:3
**clear** 9:18 123:18
**client** 5:16 113:18
164:20 166:6
**clients** 37:18,21 45:23
166:10
**close** 75:2 102:3
104:13 132:16
154:17 155:6 156:20
**closed** 130:13,13
131:24 133:8 139:1
139:1 155:11
**closeout** 158:18
**closeouts** 154:14
**collect** 56:16 57:5
101:22 103:10,16,20
**collecting** 147:8
**column** 56:24 121:13
123:19 124:3,16,20
**com** 165:10
**combination** 16:14
**come** 11:9 30:7 42:11
60:5 71:15 104:16
135:2 146:1 161:17
162:11 167:15

Policicchio, Daniel
August 9, 2018

comes 34:18 58:18 70:19,21 71:1 152:17
coming 14:16 20:15 60:12 148:19 164:18 168:6
commentary 6:4,5
common 30:22
communicated 144:3
communication 19:16 20:17 21:1,3 26:24 111:20
communications 22:16 134:3
company 31:8 101:19 101:23 126:20 127:8 129:1 130:9 134:18 135:2,8,9 160:12
compensation 105:16
compiled 19:14
complete 40:5 50:3 171:14
completed 47:13 52:2 56:19 61:2 67:16 78:2 90:14
compliance 80:19
complied 51:20
compound 120:8
computer 17:16 56:1 56:4,5 57:23
concede 161:20 162:21
concerned 109:12
conclude 127:18,21
concluded 168:16
conclusion 3:4
conduct 106:7 122:7
conducted 4:5
confirm 131:6 149:24
conjunction 56:13
considerable 32:2,7 32:23 33:1
consideration 161:24
consisting 171:13
Consolidated 91:20 91:23 92:7
construction 1:7 7:13 14:3 19:6 23:9 25:8 34:1 35:21 45:12,14 49:9 73:20,24 74:4 74:12 75:2 86:19 87:13,19 94:23 95:1 95:14,21 96:7,14 106:1 110:20 119:1

119:2,3 125:1,3,4,14 141:17,22 143:23 145:8 150:21 157:24 161:5 171:7
contact 22:23 24:6 34:2 163:10
contacted 24:4 27:20
contacting 33:11
contain 21:8 129:14 134:2,6
contained 19:15 47:5 49:2 53:19 88:10
contains 48:18 69:18 69:20 117:10 167:13
contest 10:1
continuation 156:15
continue 37:10,11 108:22 109:2,4,5
continued 37:5
Continuing 7:8 10:7 10:19 13:21 26:18 28:19 29:1 31:12 49:7 128:19
contract 46:15 47:14 49:11,20 50:23,24 50:24 51:4 55:19 57:16 61:2 66:3 67:17 90:15 106:1 113:7 114:1,10 115:18 116:6,6,22 117:7,9 122:23 124:7,8,9,14,19 125:7 127:1 128:3 128:14 160:13
contracted 49:21
contractor 39:22 41:7 43:5 47:6,10,15 49:10 61:3 67:13,18 90:11,16 104:7 105:18 111:8 113:23 117:10 123:23 167:12
contractor's 47:11 67:14 90:12
contractors 20:18 62:10 65:10 82:4,8 83:14 99:13 100:4 104:6 105:24 119:8 131:6
contracts 51:21 118:20 119:18
contractual 52:2 110:17,23
control 127:8

conversation 4:15 8:16
cool 6:18
copied 22:10 23:15 31:9 143:13 154:13 155:19 157:12 158:3
copies 135:10,12 143:5
copy 35:7,9 135:11
corner 72:7
corporate 31:13 131:17 133:13,16
Corporation 62:8
correct 4:20 6:3 13:20 15:2 16:16 22:8 25:15 26:9,12 27:4 29:16 36:13 38:20 39:6 45:15 48:1,11 48:17 49:3,18 50:9 50:13,20 51:2,5,13 52:4,11 53:2,8 54:1 54:8 55:4 58:6,17 59:3,17 60:8,21 61:15 65:14 67:6,23 68:2,14,15 69:9,12 70:8 71:3 72:1,1 75:9,12,15 76:2,4 78:18 82:12,18 83:10 84:3,18 87:7 87:17 88:13,17 89:4 91:12 92:21 94:5,10 95:7,15 96:8,10 97:8 97:17 98:6,22 99:1,2 99:10,18,19,24 100:7 101:5 107:19 114:9 115:20,21 116:9,12,15,20 117:8 118:16,23 119:5,10,21 123:1,8 123:21 124:5,19,23 125:5,8,12 126:7 128:15,18,20 129:9 130:3 132:5 134:9 138:6,11,13 140:6 141:7,8 143:6 144:6 144:9,12,20 145:6 145:10,20 146:7,10 146:17 147:10,14 148:8,12,17,23 149:6 150:2,19,24 151:20 152:15 153:16 154:7,10,24 155:3,17,18,21 156:1,15 157:7

158:5,19 159:3 161:4,7 166:18 169:11 171:14
Correction 170:4
corrections 171:15
correctly 83:23 87:2 149:5 150:18 155:24 159:6
correspondence 26:2 29:15 33:18 34:11 34:18 35:2
corresponding 29:8 29:11
cost 57:15 151:6
costs 11:8
counsel 4:22 10:11 30:12 63:23 81:10 161:8 169:13,14
counted 25:1
counterclaim 114:15 114:18 115:1,4,23
County 152:6 169:2,5 169:22
couple 4:3 8:10 12:16 24:12 129:5 141:11 146:4 154:5
course 8:21 44:16 87:18
court 1:1 2:8 7:9 8:12 15:19 17:5 29:2,14 80:18,19,19 97:12 168:9 171:1
Courtney 31:14
cover 4:3
covered 47:12 61:1 67:15 90:13,24
covers 71:23
create 37:5 54:20 55:15 166:20,20
created 36:24 38:4,22 118:18
creates 36:21 55:12
creating 37:20 57:24 88:22 167:24
credit 63:6,11,15,20 63:22,23 64:5,9,12 65:24 66:7,17 76:16 87:12 88:15 129:15 130:1,2 131:7,23 132:18,19 134:8
creditors 103:13
cross 17:13 109:15 143:4 155:19
Crystal 1:23

CSR 169:21
current 47:17 61:6 67:20 90:19
cutting 57:10,14
CVE-JFJ 1:6 171:6

**D**

D 2:20
damages 122:8 125:14
Dan 7:17 12:8,9,10 16:7 22:2 25:4 31:17 151:19 155:22 159:4 168:8
Dancor 1:7 7:13,14,16 7:19,20,21 11:21 12:4,8,13,20 14:2,18 14:22 15:20 16:8,13 17:6,24 18:1,2,5,19 19:1,6,9,13 21:3 23:10 24:1,6 25:2,8 25:20 26:3 27:4,23 29:11,15,20 30:21 30:23,24 31:1,3,9,18 32:8,13,13 33:7,18 33:18 35:7,10 36:1 36:16,24 37:11,16 37:19 38:6,17,22 39:9,14,17 43:15 45:5 46:1,6 48:6 49:9,11 50:11 51:4 52:1,3,21,22 53:8 54:23 55:5 61:24 62:16,18 63:11,14 64:21 65:5,8,13 66:21 67:1,4 69:19 72:13,14,16,22 73:1 73:3,5,10,12,24 74:3 74:11,17 75:1,7,11 75:17,23 76:6,21,24 77:3,5,11,13,24 78:6 78:8,13 79:6,12,14 80:21 82:7,11,14 83:7,12,20 84:16,24 85:2,8,12 86:15 88:12,16,23 89:11 89:15 91:5,14 92:8 92:12,18 93:1 94:8 94:12,13 95:1,13,18 95:19,20 96:6,13,23 97:3,6 98:2,11,15,19 98:24 99:6,14,17,21 100:3 101:21 102:4 103:12 104:1 106:7 106:14 107:1,2,7,8

Policicchio, Daniel
August 9, 2018

Page 4

107:13,16,20,21
108:7,8,15,20
109:10 110:1,11,16
110:23 111:11
112:18,21,22 113:7
114:12,14,19 116:18
117:14 118:13,21
119:3,8,19,22 122:2
122:16,22 123:3
124:13 127:11,11,22
129:6,13 130:8,9,11
130:15,16,20,21
132:4 133:3,6 134:1
134:3,11 138:4
139:14 140:22
141:19 142:11,19
151:1,14 152:11
153:12 154:22 156:3
156:10 157:14 158:6
159:1 160:1,2,3,4
164:3 165:9,10
166:2,5,7 167:23
171:7
**Dancor's** 13:1 15:9,14
18:12 23:18 24:14
26:18 28:17 29:18
33:6,21 37:4 38:11
52:12,20 54:24 55:3
58:4,19 61:18 62:12
65:15 79:10 80:3
81:6 103:19 110:14
110:22 115:23
129:24 134:3,11
137:24 138:7 142:12
142:15 163:20,23
165:5
**Daniel** 1:7,12 2:22 7:1
49:5 158:11 169:6
170:2 171:7,11,17
danp@dancor.com
26:8
**date** 71:18 72:4 78:2
80:12 100:23 101:2
114:21 130:7 132:2
139:2 141:11,12
147:2 152:20 153:8
**dated** 32:11 90:8
154:12
**dates** 17:20 87:9
138:23 140:10
**DaVco** 62:10 64:16,22
65:9 66:18 67:4
82:3,7,10,14 83:8,13
83:20 98:8 99:12,15

99:18,21 100:3
**day** 15:22 89:17 129:6
148:13 169:16
171:19
**day-to-day** 20:16
**days** 20:6 21:10 23:21
56:18 146:4,21
150:15,16 151:6
154:6
**deadline** 56:17
**deal** 82:1 112:11
131:13 133:7
**dealing** 74:24 103:23
161:11
**dealt** 44:17
**Dear** 161:13
**Debby** 25:5,5,19
26:10 143:5 147:8
148:10 155:19 159:1
**Debby's** 148:10
debbyp@dancor.com
26:11
**debt** 129:2
**December** 17:18 40:9
41:15,16,17 61:14
68:1 71:20 100:22
100:23 101:1 136:13
136:14 137:7 140:13
140:17 144:8,19
145:15 148:1 150:7
150:15 152:12
**declare** 49:1
**declares** 49:8
**deducts** 127:2
**defend** 5:15
**Defendant** 14:2 115:6
**defendants** 1:8 2:10
2:15 171:9
**defending** 5:22
**deficit** 108:4
**delete** 165:14
**deleted** 68:16
**deleting** 93:17
**delivery** 150:13
**demolition** 31:8 72:9
72:9,14,24 73:2,12
94:2,8
**departments** 132:17
**depending** 33:15
57:18 58:8 104:21
111:3 112:16 136:11
157:6
**depends** 57:6 117:22
149:10 160:22 164:6

**DEPONENT** 168:15
**depose** 40:3
**deposit** 139:19,21
**deposition** 1:11 3:4
4:4,10,23 5:2,5,7,11
5:15,22 6:2 7:9,23
8:21 10:2,13 13:2,3
15:10 16:13 19:8
23:10 24:1,4,14,20
24:24 27:17 30:11
33:6,21 44:16 73:3
79:13 85:21 95:19
95:22 110:14 118:7
118:11 128:11
142:12,15 168:11,16
169:8,10 170:2
171:12,14
**depositions** 7:12 8:2
18:2
**deposits** 17:14 140:2
**Derold** 31:11,11,20,20
31:22
**described** 49:12 58:24
85:22
**describes** 49:13
**detail** 45:10 61:20
102:6 110:15
**details** 114:17
**determine** 57:18 80:9
128:1,7 131:5
**determined** 132:10
**determining** 123:9,12
**developers** 101:20
**Development** 152:2
**difference** 11:22
137:15 157:3,7
**different** 14:16 30:14
62:17 68:6,9 72:21
108:5 118:1 126:14
**difficult** 103:10
**dig** 117:24
**direct** 139:19,20
**directed** 7:19 25:4
26:7 28:12,15
**directly** 30:3 113:20
113:20 129:22
148:10 162:9 169:15
**disagree** 111:1,2
**discovery** 1:11 77:23
80:20,22,22 81:17
140:23
**discuss** 154:15
**discussed** 4:12 112:1
166:1

**Discussion** 45:1
**discussions** 154:16
161:10,12
**dispute** 65:4,8
**District** 1:1,1 5:1 7:10
171:1,1
**divulge** 103:3
**document** 11:4 13:16
14:14 15:5,12 24:9
24:20 26:1 27:17
29:2,14 35:4,15,17
36:6 39:18 40:4,13
41:1,13,15 46:9,24
48:18 49:2 50:21
53:19 54:3,20 57:24
58:1,2,4,7 69:3,18
72:5 86:1,6,11 94:19
118:7
**documented** 88:1
**documents** 14:16,21
15:21 16:3,4,8,12,18
17:7 18:24 19:12
20:8 22:15 26:13
28:9 36:14,20,23
37:6 38:11 46:20
47:14 53:22 61:2
67:17 78:24 81:6,7
81:22 90:15 95:17
129:6,13,14 134:1
135:15 136:7 147:8
166:14,20 167:11
**doing** 30:15 49:23
50:22 81:12 125:23
**dollar** 11:15 27:11
80:9 96:4 98:12
108:13 126:3 131:21
140:1
**dollars** 32:4 74:18,19
98:12 102:24 110:4
**dot** 165:10
**double** 24:19
**double-check** 26:4
**download** 130:20
**draw** 149:2
**drawn** 102:7
**draws** 109:1
**drill** 30:3
**Drive** 49:16
**due** 32:20 47:18 49:24
49:24 50:4,5 52:10
61:7 67:21 90:19
107:23 119:5,24
120:8,10 150:5
152:23 153:14

160:12
**duly** 7:2 40:3 49:7
169:7
**Dunn** 116:4
**duty** 111:8

**E**

E 2:8,20 3:1
**e-mail** 21:4,8 22:5
24:6 25:4 26:7,7,10
28:4,12 30:17,19
31:7 32:11 131:2
143:3,21 144:21
145:8 147:1,5,16,23
148:7,8,9,10 150:4
150:20,22 151:18
152:19,22 153:8,13
154:5 155:17 156:19
156:21,22 157:9,11
157:19,21 158:7,17
158:21 159:9,20
160:2,3,6,24 161:2
161:14 163:3 165:7
165:14,23
**e-mailed** 112:16
**e-mails** 19:1,4,6,14,19
19:20,24 20:6,8,10
20:13 22:11,20 23:4
23:7,9,20,23 24:1
25:2 26:4,22 27:21
28:3,5 29:5,8,11,18
29:24 30:3,5,7 34:7
34:17 35:3,7,10
111:15,17 112:5,13
112:14 141:22 142:3
153:3 156:14 163:17
165:4,5,8,11,13,17
**earlier** 35:1 91:22
129:20 162:13
**easy** 30:5
**eight** 98:12 104:4
123:14
**eighty-six** 108:3
**either** 74:7 89:24
124:22 125:18 164:4
**Elec** 91:14
**Electric** 65:23 66:5
79:3,7,8,11,15,19,20
79:23 80:4 91:2,6,14
91:20 92:7,13,19
93:2 98:9,10,11,16
98:20 99:1,6
**electrical** 65:24
**Eliason** 62:8 64:5

Policicchio, Daniel
August 9, 2018

eliminate 50:19
eliminated 50:18
  131:12
else's 105:11
employed 25:8
employee 20:2 30:21
  104:16,18,19 149:21
  160:4 169:13,14
employees 31:3
  102:10 104:1 105:4
  163:9
ended 24:15
endurance 10:1
entered 11:6 75:10,17
  87:16,21 117:6
  119:1 130:8 133:7
enters 87:19
entire 57:13 91:11,13
  92:8
entirely 88:11
entirety 154:1
entitled 114:11 115:6
  115:15 116:18
entries 73:20
entry 76:13 82:3
ERRATA 170:1
establish 45:10
established 33:5 78:13
  98:19 122:15
et 161:15
Ethan 151:19,22
  152:1,5,7 159:20
event 95:12 96:5
eventually 94:8
everybody 22:4 52:21
  105:11
Ex 146:9
exact 11:19 20:7
  27:11 74:14,21,23
  75:19 76:10 77:19
  79:17 82:15 96:4
  103:8 104:4 110:5,6
  122:19 125:17,19
  132:2 138:23 139:2
  140:1 141:11,12
exactly 11:20 37:23
  41:9 77:8 79:24
  82:16 103:1 114:16
  117:24 118:1 122:19
  126:2,22 135:14
  152:16 153:4
Examination 2:23 7:4
examined 7:2
examines 13:16 14:14

15:12 26:1 28:9
example 19:13 65:22
exampled 23:24
examples 70:2
Excel 58:2
exception 63:14
exceptions 87:11
exchange 21:4
exemplary 122:8
Exhibit 3:4,5,5 12:24
  13:2,8 14:2 15:1,9
  15:16 20:11 23:10
  24:17,20,24 25:1,23
  26:22 27:15,17 28:2
  30:17,19 31:7 35:13
  35:17 38:3 39:23
  41:12,19 42:21 44:4
  45:8 53:6,12,16
  60:19 67:8 83:3,6
  84:19 85:21 88:11
  90:2 95:15,16 97:5,6
  98:6,19 99:9,17,24
  100:6 113:7 114:23
  118:7,11 123:15
  141:6,10 142:8,12
  142:13,24 143:18
  146:11,15 147:19,22
  148:20 150:3 151:17
  152:16 153:7,8
  154:3,11 155:16
  156:8,24 157:2,9,10
  157:23 158:23 159:9
  159:11,19 160:23
  167:12
exhibits 13:1 24:12,14
  140:15 142:10,16,17
exist 22:16
expecting 149:24
  150:17 151:7
expects 160:7
expense 37:12,20
expenses 36:9,15 38:1
explained 34:24
explanation 23:20,22
  26:21 29:22
Express 131:17
extension 39:4
extra 148:16

F
fact 52:23 63:17 73:10
  78:12 79:12 115:20
  115:24 116:13 149:8
failing 122:1

failure 160:16
fair 6:7 9:22,23 10:6,9
  109:24 110:2 116:18
  122:17 140:24 163:2
  165:18,22
false 73:13 75:24
familiar 35:14 42:6,8
  46:1,6 106:3 117:3
far 27:5,5 28:14 101:8
  111:4 119:14,14
  131:14 132:8 133:21
  149:17
fashion 120:23
favor 42:12,14 103:9
February 137:4
  146:12,22 147:23
  148:8,14,21 150:4
Fed 146:9
federal 4:4 29:2
  167:10
FedEx 150:13
fees 11:7 117:2 125:10
felt 161:11
fiduciary 122:1
fifth 50:18
figure 125:24 128:3
  128:16 145:4 162:24
  164:2,20
figured 110:13
figures 86:16 103:18
  127:16,16
file 57:24 58:1 136:15
  136:15 137:10
  138:14 149:18
filed 24:8,9 29:2,14
  38:18,18 39:3,5,10
  39:10 42:2 66:20,24
  67:4 114:14,19
  148:2 152:6,8
  153:10,10,11 160:10
files 165:5
fill 56:4 58:21 59:2
  70:10
filled 35:24
filling 102:14
final 113:9,19 128:23
  149:4 160:10
finalize 154:17
finally 81:3
finances 33:7
financial 36:7 72:23
  78:6 94:12 110:20
  154:14 155:2 164:17
  166:14

financially 163:18
  169:14
find 34:17,19,21 36:5
  59:1 126:14 131:23
  141:18 149:14 94
finding 128:23
fine 6:20 7:15 13:5
  14:23 30:16 86:23
  91:19 103:15 109:20
  128:10
finish 9:9 51:18 70:20
  71:1
finished 51:11 55:23
  89:12
finishes 51:15
fir 28:14
Fire 76:14,16,22,24
  77:3,5,13 78:7,10,14
  96:20,24 97:3,7 98:2
firm 30:9 57:11 67:3
  110:7 161:19 162:2
first 3:6 7:2,17 14:4,8
  25:3 28:15,16,19
  35:4 47:20 48:9
  50:12 52:24 68:3
  70:9 71:10 100:17
  113:17 114:8 140:18
  146:15 158:12 169:6
five 48:5,10 74:18
  92:3 93:8 104:9
  128:8
five-month 104:2
Fixtures 27:22,22
  28:3,24 34:2
Floor 2:3
flow 37:21 38:2
  109:18
flows 36:10,16 37:13
  167:14
folder 19:14
follow 105:19 142:6
following 49:12,20
  58:15
follows 7:3
foregoing 169:10
  171:12
forever 28:10
forget 88:7
forgot 12:2
form 19:21 23:12
  34:14 35:18,20,24
  39:2,21,22 40:12,15
  42:24 43:10,19
  46:10,19,22 54:18

54:21,22,24 55:5,12
  55:13,16 58:11,18
  59:16 60:23 62:21
  64:24 65:19 67:11
  68:18 73:8,15 74:6
  74:13 75:4 76:1,9
  77:7,15 78:21 79:16
  83:4,17 84:9 85:5,15
  90:3 92:16,22 93:3
  95:8,23 96:9,16
  97:17 98:4 99:3,8,23
  100:5 101:13 106:9
  107:3,11 108:1,23
  109:14 110:18 113:3
  116:1 117:17 118:13
  118:17,19,21 119:13
  120:2,11 121:11,19
  122:3,10 125:15
  155:13 160:18 163:5
  164:5 166:8 167:8
  168:4
formally 154:16
format 55:2 58:16
formats 167:20
former 30:21
forms 14:19 45:19,20
  46:2,4,7 79:21
  121:13 167:18
formula 110:13
forth 118:2
forthcoming 14:17
forty 30:21
forward 20:11 103:14
forwarded 143:12
fought 161:22 164:4
found 34:8 66:15 78:5
  94:11
four 30:8 93:6 95:9
  104:4 136:10 143:19
  151:5,14,15
fourth 70:7 137:10
  138:14
frame 105:1,8
front 46:9 56:4 57:23
  75:13 84:15 95:10
  104:11 125:12 143:3
fruition 42:11
full 9:7 30:13 50:3
  78:3 131:3
fully 51:20 81:23
  119:9
fund 18:1,10,13
  104:17 105:10
  107:13 120:1,4

Policicchio, Daniel
August 9, 2018

122:5 136:2 137:19
137:24 138:5,8,22
**funding** 144:16
**funds** 11:21 32:8
120:21 122:1
**furnished** 49:22
**furnishing** 49:22
**further** 53:17 168:15
169:10,13
**FYI** 158:8

### G

**G702** 46:10,24 47:2
53:23 60:23 71:7
90:3
**G703** 46:23
**general** 18:1,9,13,16
18:19 25:21 39:22
41:6 42:22 43:4,7,14
43:16 104:17 105:10
105:18 111:8 136:2
137:19,24 138:5,8
167:12
**generalities** 74:24
**generally** 17:17 28:8
45:7 51:8,17 56:17
57:14 60:3 145:16
165:11 167:8
**generated** 88:11
167:16,18
**Geneva** 1:14 2:14
**gentleman** 152:7
**getting** 33:12 55:22
56:10 57:2 102:6
108:22 109:4 111:12
111:15,19 144:10
153:3 159:4
**Girtman** 62:4 63:7,23
64:1
**give** 6:15 7:9 8:10,14
9:7 21:17 48:13
56:17 125:18 126:3
126:6 127:6 128:10
129:22 132:6 139:8
151:4 160:16
**given** 7:23 8:1 15:4
17:12 94:19 128:19
130:19 135:8 169:11
171:12,14
**gives** 46:15
**giving** 139:12
**glance** 13:13
**Glenna** 151:18
**go** 20:3 24:10,15,16

29:3 41:12,18,21
44:19 48:18 50:14
54:5 61:19 62:22
67:11 68:3 70:10,12
76:13 78:20,22 79:3
85:20 93:7,12 94:23
96:20 98:8 101:6
113:14 115:3 118:5
123:9,10 127:9
128:13 133:21
136:22 139:15 140:4
141:21 147:7 150:20
164:24 167:3
**goes** 112:3 138:10,12
164:19
**going** 4:12 5:19 6:12
8:13,14,17,18 9:21
12:11,12,17,22,23
12:24 13:7,9 17:22
22:9 23:5 24:23
27:14 28:6 31:4
33:19 35:12 41:11
44:15 45:5,6,8,9
49:14 53:6 55:20
56:4 57:21 60:18
61:17 65:24 67:7
80:15 81:12,24,24
83:2 85:18 100:10
100:13 101:8 103:14
103:16 110:8 112:14
113:6 114:23,24
118:10 120:7 124:12
126:5 128:22 129:3
129:4,5 134:19,20
142:4,5,22 143:8
145:5 147:17 153:24
156:20 160:17
164:17,22
**good** 6:11 19:24 22:18
65:22 100:9,15
128:5 150:5 152:5
159:15
**gotten** 80:13
**govern** 45:19
**governing** 119:19
**grand** 66:4
**Graybar** 64:8 66:2
131:2
**green** 127:6
**Gregg** 2:7 4:9 5:23
6:12,15,18 13:4 16:9
25:10 62:23 78:20
126:21 129:8 134:13
134:15,22 135:14,16

139:7,8,8 140:20
**ground** 8:10
**group** 19:19 23:6
152:2
**groups** 19:13
**guaranteed** 103:21
162:19
**guess** 6:12,14 80:8
164:14
**guys** 97:13

### H

**H** 2:2 3:1
**half** 27:12 82:24
**halfway** 113:17
**Hancock** 18:14,20
130:4,6 131:14,16
131:24 132:4,12,17
132:23 133:1,8,11
137:11,15,22 138:14
138:21,24 139:1,21
**hand** 24:23 145:7
169:16
**handed** 11:3
**handle** 149:2
**handled** 33:7 42:10
**handling** 154:14
155:6 158:18
**hang** 53:11 78:19,19
**happen** 81:23 87:18
123:6
**happened** 47:7 68:24
71:9 93:21 100:16
101:15 158:14
**happening** 46:13
101:15
**happy** 9:14 129:21
**harmless** 117:11,15
**he'll** 126:22
**head** 27:11
**headaches** 164:16
**headquarters** 31:15
**heard** 5:6 9:6 31:15
150:14 151:1 154:4
154:8
**held** 51:7,8,9 122:1
**help** 11:9 57:4 82:22
84:15 128:22
**helpful** 82:19 148:5
**helps** 82:22 83:1
147:6
**hereinbefore** 169:12
**hereunto** 169:16
**hey** 59:11

**hide** 44:21 142:18
**high** 102:2 103:17
127:16
**high-interest** 102:8
103:22 162:19
**hire** 89:5
**hired** 89:9
**hold** 105:24 107:1,7
115:6,7 117:11
123:4 137:5 156:7
**holding** 117:14 155:22
**holes** 102:13
**Holy** 98:13
**honest** 31:5 109:9
144:24
**honestly** 103:2
**hope** 154:19
**Hopefully** 20:21 127:3
**hospitality** 5:5
**hosting** 5:5
**hotter** 33:12
**hour** 1:15
**hours** 152:22 153:13
154:4 157:6
**housekeeping** 12:16
168:9
**humans** 9:3
**hundred** 21:17 32:3
64:3,5 74:18,19
98:11,12 102:23
**hundreds** 23:2 110:4
122:18

### I

**ID** 3:2
**idea** 48:13
**identification** 24:21
27:18 118:8
**identified** 16:9,14
19:5 24:9 29:20
33:17 41:4 42:1,6,20
46:10 62:1,3,19
80:24 129:16 141:22
142:10,11,16 150:10
**identifies** 48:21 50:21
72:4
**identify** 16:3,8 17:3
23:23 28:11 63:21
81:22 128:13
**II** 1:23 2:14 169:22
**Illinois** 1:14 169:1,6
169:16
**Impact** 64:6
**important** 165:14

**impose** 122:8
**improvements** 49:12
49:23
**inaccurate** 76:3
**Inactive** 131:10
**Inc.'s** 14:3
**include** 63:1
**included** 19:19 29:16
**includes** 52:16 159:24
**inclusive** 169:8 171:13
**income** 36:9,14 37:11
37:20,24 167:5
**income/expenses**
167:13
**incomplete** 63:3
**increases** 88:19
**incurred** 11:8
**indemnification**
116:23 117:3
**indemnify** 117:11
**indemnifying** 117:14
**indicate** 43:22
**indicated** 62:11,18
63:23 65:17 80:16
83:14 84:16 91:21
94:24 95:5 112:22
120:4 141:17 142:14
145:18 157:12
**indicates** 52:5 91:10
143:11
**indication** 62:9,16
71:18
**indirectly** 169:15
**individual** 22:21
136:8
**individually** 29:5
**industry** 45:12
**information** 36:7 38:7
38:10 40:4 47:11
58:8 59:1 67:14
86:10 87:5,20 88:6,9
90:13 129:22 147:13
150:14 159:5 165:20
166:20,23
**informed** 30:21
**informing** 152:7
155:1
**input** 58:8
**instances** 102:5,22
**Institute** 45:17
**intended** 121:12
**intention** 83:24
**intentional** 120:20
121:18

Policicchio, Daniel
August 9, 2018

**intentionally** 119:23
  120:9,17 121:4
**intentions** 83:22
**interest** 136:21 151:7
**interested** 131:22
  169:14
**internally** 35:10
**interrogatories** 12:19
  13:19 14:4,13 94:18
**interrogatory** 81:10
  81:16,19
**interrupt** 25:11
  109:17
**interruption** 93:9
**invoice** 53:12 57:8
  100:23 101:2
**invoiced** 52:18 145:16
**invoices** 56:16 150:5
**involved** 21:23 41:3
  88:22
**involving** 8:7
**issue** 23:1 53:3 87:21
  87:23 88:3 112:4,11
  147:9 162:1
**issued** 17:10 47:16
  61:5 67:19 87:11
  88:13,14 90:18
  105:3 112:17 145:14
**issues** 18:23 75:13
  111:5 124:19 149:2
**items** 69:14
**Ivy** 2:3,24 4:2,14,21
  5:14 6:5,8,22 7:5
  13:6 20:19 23:17
  24:22 25:10,15,17
  25:18 27:14,19
  34:20 39:7 43:3,12
  43:21 45:2 60:14,17
  62:22 63:5,10,13
  65:3 66:10 68:19
  73:9,18 74:9,15 75:6
  76:2,5,12 77:10,17
  79:2,22 81:12,17
  82:2 83:18 84:11
  85:6,16 92:17,23
  93:5 95:11,24 96:11
  96:19 97:20,21,24
  98:7 99:4,11 100:1,8
  101:14 102:1 106:12
  106:24 107:5,12
  108:6 109:3,20,23
  110:21 113:5 116:5
  117:19 118:4,9
  119:16 120:6,14

121:14,23 122:6,13
  125:20 129:12
  134:24 135:1 139:13
  153:4 155:15 157:22
  159:15,18 160:20
  163:8 164:8,21
  165:2 166:12 168:5
  168:7

_____

**J**

**J** 1:7,12 2:7,22 7:1
  49:5 169:6 170:2
  171:7,11,17
**James** 20:14 154:21
  157:13 158:6,7
**January** 17:18 90:8
  96:3 100:20 136:6,6
  136:14 137:1,2,2,6
  138:20 145:9,20,21
  146:4 147:24 150:7
  150:16 152:12
**job** 50:17 51:10,11,15
  51:18 55:8 58:9,12
  58:13 88:2,2 89:6,6
  89:9 107:18 108:9
  108:16 129:16
**John** 116:4
**joint** 79:19 91:21
**jointly** 113:22
**jotted** 86:17
**Jr** 2:2
**judgment** 11:4,5,5,11
  117:1 125:17
**judgments** 40:18
  42:14 101:21 103:9
**July** 86:7,7,8 87:8,8
  127:8

_____

**K**

**K** 59:5,18 70:16,21
  71:1,6
**keep** 38:6 81:24
  107:16 127:7 130:21
  130:21,24 165:7,15
**keeps** 20:5
**kept** 36:17 86:15
  87:12 107:20 135:10
**kind** 4:17 8:6 21:21
  102:12,12 103:11
  165:20 166:19
**knew** 43:24
**know** 5:16 6:10,12
  9:14 10:1,5 11:19
  14:6,10,10 17:5 20:1

20:2,7,8,10,14 21:17
  21:20 23:2,3 24:13
  24:18 25:21 27:5,8
  28:7,10,21,21 29:11
  30:14 31:20 32:23
  33:20,20 34:4,6,10
  34:18 37:8,9,9 41:9
  42:9 43:5,9 44:6
  51:19 55:9 56:23
  57:7,8,14,22 66:1,13
  66:24 68:24 69:17
  70:1 71:11,13 75:7
  75:16,19 77:20
  79:24 80:1 81:24
  86:13 87:8,11 89:7
  92:8 96:5,12,17
  97:22 99:17 101:24
  102:3,6,9,9,13,22,24
  103:2,3,5,7,21 104:4
  104:5 105:1,13
  106:13,23 108:15
  109:1,6,7,24 110:5,6
  111:7,7,18 114:17
  114:21 115:12 116:8
  116:10,13,15,16
  117:22,23 118:2
  120:17 121:2 122:11
  122:18,19 123:2,6
  125:17 126:16,16,18
  128:8 129:1 131:2,4
  132:10 133:20,21
  134:12,15 135:15
  136:18 137:8 138:23
  139:4,22,23 141:11
  141:12 143:24 144:1
  144:2,3,4,23 145:2
  147:7 149:11,19
  150:12 151:22
  152:14,15,20,21
  153:4 156:17 159:8
  160:9 162:4,24
  164:16,17 165:12
  166:13 167:20
  168:10
**knowledge** 15:3,13
  18:6 47:11 60:24
  61:8 63:18 67:14
  75:1 76:18 90:13
  106:8
**knows** 50:12

_____

**L**

**L** 1:13 169:5,20
**labeled** 15:6,17

**labor** 49:23 50:2
**lack** 102:11 112:18
**Lake** 1:23
**landlord** 160:6,9,13
**language** 113:13
**large** 22:10 66:1
**late** 149:16
**LAURA** 1:13 169:5
  169:20
**law** 2:2,13 86:24
  105:23 106:8,8,14
  106:16,17,19,21
  122:9 123:3
**laws** 105:20 119:18
**lawsuit** 66:20 67:1,4
  86:4 106:22,23
  141:23 142:11
**lawsuits** 41:4,5,8 42:6
  43:9,15,17,23 44:3
**lawyer** 151:2 154:9
  163:20,23
**lawyer's** 155:5
**lease** 160:8
**leave** 51:11 89:17
**leaving** 89:14
**led** 165:22
**left** 20:3 31:14 89:11
  89:23
**legal** 88:18 124:16,17
**legitimate** 29:3
**Leon** 152:2
**let's** 17:23 24:11,11,15
  24:16 63:12 68:3
  84:12 88:7,8 90:1
  91:18 118:5 150:20
  164:21
**level** 50:19
**License** 169:21
**lie** 64:23 65:18 76:8
  77:14 78:16 83:21
  84:8 85:13 93:2
  96:15 98:3 99:7
  100:4
**lien** 113:21 152:6,8
  153:12 160:10
**liens** 114:7
**light** 127:6
**line** 55:2 69:13 152:18
  159:13 170:4
**lines** 152:17
**liquid** 127:18
**list** 30:4 50:7 55:7,17
  64:7
**listed** 44:4 50:11 63:2

63:5,7 79:21 125:1
  131:20
**litigation** 41:3
**little** 8:9,15 11:18
  17:23 20:23 55:20
  57:20 77:21 82:24
  102:7,14 112:18
  126:13
**live** 139:19,22
**Ln** 3:2,3,3,7,8,8,9,9,10
  3:10,11,11,12,12,13
  3:13,14,14,15,15,16
  3:16,17,17,18,18,19
  3:19,20,20,21,21,22
  3:22,23,23,24
**loan** 131:14 132:6,11
  132:20,21
**loans** 102:8 103:22
  162:19
**long** 88:1 127:6
  134:17 161:14,16
**longer** 130:9,11
  132:23 147:13
**look** 13:8,14 14:1,5
  16:21 22:18 25:23
  28:8,21 36:4 39:20
  40:11 52:17 53:21
  54:13 68:5 70:2
  73:19 82:3 84:12
  90:1 93:9 94:20,21
  99:12 112:14 113:8
  116:3,21 118:12
  120:23 121:20,21
  124:24 129:3,4
  135:19 140:11 142:1
  143:7 145:2 146:15
  149:11 151:24 164:6
  164:22 167:4
**looked** 53:16 82:20
  91:1 157:18
**looking** 23:13 25:12
  34:7 46:24 56:22
  57:3 70:1 83:6
  84:19 85:21 95:16
  140:9 144:7,14
  146:11 150:6 153:6
  156:24 158:14
  159:19 167:11
**looks** 29:7,10 52:21
  53:2,11 91:17
  135:19 137:4 140:17
  143:14 146:5,12
  147:12,19 150:8
  153:7,11 156:15

158:16 159:20,21,23
**lose** 133:6
**loss** 167:7
**losses** 118:2
**lost** 149:13
**lot** 8:15 23:3 26:13
37:18 42:10,11 66:5
69:13,14 70:14
71:10 87:1 101:18
102:4 103:19,21
149:12,17 165:13
**lots** 153:2
**loud** 10:17,23 97:14
**low** 103:18 127:16
**lower** 64:8
**lower-tier** 103:3,4
**Lytle** 2:7 4:11,20 5:9
5:24 6:6,20 10:11
13:5 15:5 19:21
23:12 25:9,11,16
34:14 39:2 42:24
43:10,19 60:11,15
62:21,24 63:6 64:24
65:19 68:18 73:8,15
74:6,13 75:4 76:9
77:7,15 78:21 79:16
81:10,15 83:17 84:9
85:5,15 92:16,22
93:3 95:8,23 96:9,16
97:9,13,17,18 98:4
99:3,8,23 100:5
101:13 106:9 107:3
107:11 108:1,23
109:14,17,21 110:18
113:3 116:1 117:17
119:13 120:2,11
121:11,19 122:3,10
125:15 129:9 134:23
139:9 155:13 159:12
159:17 160:18 163:5
164:5 166:8 168:4,8

**M**

**M** 158:1 160:1
**mackerel** 98:13
**mail** 145:19,24
**mailed** 145:14
**majority** 130:5 166:10
**making** 8:16 33:11
46:21 55:9 120:24
**manage** 45:13
**management** 89:21
111:4 112:4
**manager** 19:23 57:9

**managers** 124:10
**managing** 97:23
**Manufacturing** 64:3
**March** 150:21 153:9
154:12 155:4,10,10
155:17 156:2,18,19
156:21,23 157:24
158:10,13,13,21
**mark** 24:16,17 27:15
102:4 118:5 144:17
**marked** 3:2 13:7
24:20,23 27:17 38:3
39:22 41:11 45:7
60:18 67:7 83:2
118:7,10 142:7
145:7
**market** 136:19,23
138:3,5,16,18,22
**marking** 24:19
**Masonry** 25:2 26:3
34:1 62:14 64:14
84:13,17,21,24 85:3
85:9,13
**match** 77:24 140:1,3,4
140:7,8
**matched** 61:24 80:23
**materials** 49:22 50:1
**math** 87:1 100:9
**Matt** 154:13,19,22
155:2 157:12 158:1
158:9,18 159:5
160:2,4 163:19
**Matt's** 156:19
**matter** 153:23
**matters** 155:2
**MATTHEW** 2:13,13
**maximizer** 136:21
**McDANIEL** 2:7
**McHENRY** 169:2,6
169:22
**mean** 22:1 51:18
54:19 57:21 117:21
162:18 164:16
**meaning** 48:2 56:20
**means** 52:12
**meant** 35:11 126:10
**mechanic's** 152:6,8
153:12
**Mechanical** 62:10
65:9 82:4,8 83:14
99:13 100:3
**meet** 5:16 110:16,23
**Memorial** 49:16
**memory** 33:23 77:21

82:23 84:23 112:10
126:6 152:3 165:4
167:23
**mentioned** 129:20
151:3
**message** 31:15
**messages** 163:14
**microphone** 5:6
**Microsoft** 20:5 21:5
21:14,15 22:2 23:21
**middle** 10:3 36:5
154:19 161:20
**million** 108:3 123:13
**mind** 60:12,14 65:23
109:15 127:7 140:11
159:13,15
**minimum** 38:21
**minor** 138:3
**minus** 11:20
**minute** 66:18
**minutes** 10:5
**misappropriated**
119:24 120:10
**miscellaneous** 12:1
**misconduct** 121:24
**misfiled** 149:13
**misleading** 40:5
**misplace** 149:15
**missed** 29:5 94:15
97:11
**missing** 24:13,18
68:11,21 93:13
94:14 134:16,17
143:15 147:4
**mistaken** 11:18 16:23
21:6 27:24 40:14
123:16 130:6 131:21
**moment** 44:24
**money** 32:3,7 34:3
45:13 66:5 97:7
102:5 103:1,19
107:1,7,17,20
108:22 109:2,4
110:2 114:12 120:19
122:16,17 123:4,10
126:1 127:21 128:1
128:13 136:19,23
138:3,5,16,18,21
147:11
**moneys** 119:24 120:10
120:22
**month** 56:11,12,14,18
56:19 57:13,13
100:18 101:4 104:13

104:14 128:8 137:3
137:5,5 148:16
150:22
**monthly** 104:8 108:24
112:15
**months** 104:9 128:9
136:8,9 141:11
146:19 151:5,14,15
**morning** 141:24 152:5
**motion** 4:17 25:14
81:14
**multiple** 45:20 102:13
**multitude** 149:21
**myself's** 29:4

**N**

**N** 2:3,14,20
**name** 22:22
**name's** 7:17 151:21
**named** 7:16
**names** 22:22 30:4,5
44:7 50:1
**National** 64:1
**necessarily** 52:10
**necessary** 17:16
**need** 4:2 8:20 9:2,24
10:8,16 20:2 26:3
27:6 30:13 31:14
50:18 61:19 102:7
105:19 133:22
134:14 135:13,14
139:2 140:13 146:19
149:11 152:24
153:15
**needed** 109:4
**needs** 140:22 168:9
**Negative** 160:11
**negotiations** 132:3
**neither** 158:14
**net** 38:11 52:15 56:21
56:23 61:22 72:10
**never** 4:14 78:2 89:19
97:7 167:23
**new** 102:11 147:8
**NICK** 2:16
**Nine** 41:24
**nineteen** 74:19
**Noble** 59:5,18 70:16
70:21 71:1,6
**nobody's** 4:7
**nod** 10:19
**non-** 112:5
**North** 1:14
**Northern** 1:1 5:1 7:10

171:1
**nos** 10:24
**notarized** 40:8 41:16
48:2 54:14 59:16
61:7,13 67:24 90:6
**notarizing** 90:10
**notary** 1:13 55:2 59:6
59:8,9 61:11 68:11
68:12,20 69:22
70:17,19,22 71:2,5
93:13,22 118:22
169:5,22 171:22
**note** 33:14 94:22
132:11,13 133:8
**noted** 86:17 171:15
**notes** 140:24 164:22
**notice** 112:6 160:16
**noticed** 54:23
**Novar** 66:3
**November** 55:23
101:4 138:21,22
140:13,16 141:15,19
144:8,14,18 145:15
146:13,18,22 147:7
148:15 149:2,7,15
150:7,13 151:6,15
152:12 155:23
**number** 3:2,6 11:10
11:13,19 22:11
31:19 39:21 41:4
55:24 66:14 88:18
102:24 104:5 110:1
114:23 126:5 135:21
**numbers** 13:2 14:20
14:21 17:11 29:14
56:21 94:19 104:15
125:1 126:24

**O**

**oath** 14:11 47:6 48:3
49:1,7 60:7,23 65:5
65:9 68:1,21 73:13
77:12 78:9 90:11
92:13,18 99:5 121:8
121:16 171:14
**object** 19:21 23:12
34:14 39:2 42:24
43:10,19 62:21
64:24 65:19 68:18
73:8,15 74:6,13 75:4
76:1,9 77:7,15 78:21
79:16 83:17 84:9
85:5,15 92:16 93:3
95:8 96:9,16 97:10

Policicchio, Daniel
August 9, 2018

98:4 99:3,8,23 100:5
101:13 106:9 107:3
107:11 108:1,23
109:14 110:18 113:3
116:1 117:17 119:13
120:2,11 121:11,19
122:3,10 125:15
155:13 160:18 163:5
164:5 166:8 168:4
**objection** 95:23 97:16
120:8
**objections** 5:10 6:2,16
**obligations** 110:17,23
160:9
**obviously** 11:16 12:7
17:21 20:1 21:14,23
26:3 28:14 32:6,8
35:11 36:24 38:8
42:9 45:21 46:17
56:23 71:15 78:24
82:23 86:18 87:12
88:18 101:17 104:19
109:1 112:13 125:18
127:1 131:11 134:12
135:12 139:20
145:21 162:6 165:11
166:11,19 167:9,21
**occasions** 163:10
**October** 56:14,20
144:8,18,22 145:13
145:19,24 150:8
**Offer** 11:4,4,10 117:1
**offered** 117:2
**office** 2:2,13 25:21
104:10
**officers** 40:21 42:17
**oh** 11:19 12:2 41:24
52:15 63:10 90:23
95:4 113:16 137:4
140:3 146:14 148:6
153:7,22
**OK** 2:4,8
**okay** 4:21 5:24 6:21
6:22 8:1,9 9:1,4,7,11
9:15,20 10:8,16,20
11:1 12:2,6,9,11,16
12:22 13:4,18 14:23
14:24 15:4,8,14,23
16:6,17,24 17:15
19:11 20:20 21:7
22:1,5 23:19 24:4
26:6,17,20 27:3
30:15 32:17 36:14
38:16 39:8 41:18

42:13 44:9,15 47:1,4
50:7 52:19 57:22
58:4,21 59:14 63:19
64:11 68:13 71:14
72:8 74:23 77:11
78:22 79:5 88:4,14
88:21 92:6 93:8
95:12 96:5 100:16
101:4,6 102:16
106:13,18 109:21
111:2 113:15,16
114:10,14 115:15
116:4,21 117:13
118:4,24 120:7
121:8 122:7 123:2
123:17 128:21
130:20 131:22
132:12 133:3 134:1
134:19 137:10
139:11 140:6 141:9
141:16 142:3 144:5
144:21 145:2 146:3
146:3,11 149:14,23
150:20 151:17
153:22 154:11 155:4
155:16 156:24
157:20,23 159:17,24
160:6 161:2 163:2,9
164:21 168:12
**Oklahoma** 1:1 2:4
7:10 105:23 106:8
122:9 123:3 171:1
**Oklahoma's** 120:1
157:7
**old** 44:6
**oldest** 41:22
**omission** 19:3,5
**once** 8:3 19:24 20:2,4
38:9 84:13 87:23
160:9 164:23
**one's** 30:18 41:24
125:2,2,3 132:17
138:18
**ones** 14:8 27:9 29:19
41:22 63:10,16,21
64:7 66:18 111:17
146:1
**ongoing** 88:17,18
124:16
**online** 130:19 133:20
**open** 32:16 57:24 58:1
126:23
**operating** 18:1,10,13
18:17,20 104:17

136:2 137:19,24
138:5,8
**operations** 20:16
107:21 109:5,6
**opposite** 50:1
**option** 86:13 167:17
**order** 7:9 15:20 17:5
32:5 44:1 51:15
80:19,19 85:19
153:10 167:4
**ordered** 81:22
**orders** 32:16,21,23
33:3 46:16 107:24
115:8,14 122:24
127:2 156:7
**ordinarily** 36:16
69:22
**ordinary** 8:16 45:12
**organization** 40:20
42:16 101:20
**original** 26:18 46:15
157:19
**ought** 140:8
**outcome** 43:2 44:8
**Outlook** 30:6
**outside** 54:22 59:8
111:7,7
**outstanding** 40:20
42:16,18,21
**overall** 91:9
**overdue** 161:15
**overlap** 12:12,12
**owed** 32:4,8 102:4
103:19 110:10 163:4
**owes** 11:21 108:8,15
110:1 122:16
**owing** 107:23
**owned** 11:21
**owner** 47:17 49:11
61:6 67:20 90:18
144:15 145:16
154:16 164:19
**owners** 101:20

---

**P**

**P** 167:7
**P.C** 2:2
**p.m** 109:22 157:1,3
165:1 168:16
**package** 35:8
**page** 2:16,21 8:11
13:14,15 25:3 29:6
29:14 39:20,21
40:11,15 41:13,18

41:22 42:20 44:4
53:9,16 69:13,15,16
69:20,21 71:10
113:9,11,13,16,18
114:24 115:4 116:22
136:4 143:3 144:23
145:22 146:13,15
147:3 151:8 153:21
170:4
**pages** 28:16,19,20
29:1,9,13,17 48:19
134:21,22,24 135:15
136:11,11 143:14
169:8 171:13
**paid** 11:17 27:5,9,10
31:18,23,24 32:2,6
32:13,19,23 33:2,3
33:19,22 47:14 50:4
52:10,13,14,14,16
52:16,17,18,22,22
52:24 61:3 62:2,5,7
62:9,15,20,20 63:9
63:11,15,17 64:9,12
64:16,22,22 65:5,9
65:13 66:7,17,21
67:5,18 72:14 73:1,4
73:5,10,12,24 74:4
74:11,18 75:2,17,23
76:7,16,22 77:3,5,9
77:12,13,19 78:1,1
79:6,7,7,14 80:4,5
80:10 82:7,17 83:7
83:13,20 84:2,5,16
84:24 85:2,8,12
86:14,16 87:11
88:16 90:16 91:6,11
91:14 92:8,13,19
93:1 95:1,13,20 96:6
96:13,24 97:3,7 98:2
98:11,15,20,24 99:6
99:15,18,21 100:3
101:24 102:5 105:4
107:2,7 108:3,20
109:8,11 111:23
112:10,22,23 113:2
114:7 115:20 116:14
119:3,9,17 120:19
120:20 121:1,6,9,10
121:15,17,17 122:21
123:4,13 124:12
126:6,15,17 127:22
131:1,3,7,19 132:19
133:12,14 139:18
140:12,18,19 141:19

143:9 147:17 150:8
152:12 153:3 155:23
156:4,9,10
**paper** 70:14 130:19
**paperwork** 53:19
149:13
**paragraph** 113:17
115:5
**part** 26:23 29:23
50:17 54:17 59:16
65:12 66:3,6 115:14
118:19 124:6,8,14
124:17,17,21 132:8
132:13 165:8,10
**participate** 10:13
**particular** 46:14,18
47:9 49:4 51:1
66:12
**particulars** 87:7
**parties** 4:6 169:14
**parts** 162:4
**party** 152:24 153:14
**patience** 154:18
**pay** 27:4 46:14 48:15
51:21 58:9 65:16
66:6 76:24 78:13
82:14 83:22,24 94:8
102:9,10,23 103:5,5
104:12,13 105:2,5
105:13,15 109:6
113:19 114:2 115:16
116:7 120:24 121:2
121:12 122:1,22
128:8 131:13,15,20
132:6 148:15 149:8
155:7,12 160:7,17
**payer** 145:17
**paying** 30:23 31:1
101:21,23 102:20
108:4 110:22 111:22
112:9 113:1 124:1
128:14 132:13
**payment** 19:7 23:24
24:7 33:11 45:4,7,11
46:11 47:5,13,16,17
47:20 48:6,12 50:12
52:8,9,19,22,23 53:4
53:7,13,20,23 54:7
54:10 55:24 56:3,22
59:13 60:9,19,22
61:1,5,6 62:10,11,13
62:16 63:16,24
64:13 66:1,9,16 67:8
67:16,19,20 68:7,14

Policicchio, Daniel
August 9, 2018

68:22 69:5,10 70:3,7
70:9,15,20,24 71:4
71:17,23 72:3,8,23
73:23 74:10,20
75:24 76:7,20 77:4
78:7,9,14,15 79:10
79:14 82:4 83:13,19
84:15,20 90:1,5,14
90:17,19,23 91:4
92:11 93:1,10,14,14
93:19,23 94:2,4,24
95:5,13,20 96:1,2,7
96:14,20 98:1,9,14
99:13 100:10,12,17
100:24 101:7,8
105:3 106:2 108:19
109:10 111:11,13,16
111:20 113:10,19
125:9 132:1 134:7
139:14,15 140:8,17
141:14,17,19 142:4
145:12,19 146:8
147:4 149:4,15,24
150:9,13 156:2
163:11 165:19,20
**payments** 47:16 52:6
52:12,16 53:4 61:5
61:23 62:1 63:6,7,20
63:22 65:21 66:1
67:19 72:11 79:18
80:23 87:12 88:15
90:18 94:11 105:24
109:13 127:3,3
129:15 130:1,24
132:9 140:10 141:3
144:8 146:20 150:6
151:5 155:23
**payout** 131:12
**payroll** 104:8 124:4,5
124:9
**pays** 52:3
**pending** 40:19 41:6
42:15,21 43:15,23
44:1,9,11
**pennies** 62:13
**people** 30:9 63:2,5,8
151:20 159:1,21,23
**percent** 21:17 35:6
45:24 51:7,8,22
57:17,17 64:3,5
136:22
**perfect** 161:16
**performance** 111:6
112:3,6

**performed** 57:8
**period** 26:14 38:12
46:18 55:24 58:9
71:21,22,24 104:2
104:12 106:6 111:9
141:14
**periods** 87:9 104:13
105:2,13
**permission** 127:9
**person** 5:21 21:16
22:23 33:7 55:11
81:4 147:8 154:21
161:16 164:20
**personal** 161:18
162:11,15,16,18
**personally** 16:7
103:21,21,23 106:11
121:21,21 162:19
**persons** 49:21 50:4
113:23 157:13
**pertain** 81:22
**pertaining** 21:22
112:2,17 149:22
**PetSmart** 1:4 11:17
11:21 22:20 28:1
31:4,13,17,18,24
32:9,13,14 35:24
36:2 37:1,2,23 38:10
41:2,3 45:5,20 46:5
46:6 48:6 49:11,14
51:24 52:1 53:8
56:2,12 58:12 64:9
66:8 69:19 89:6,11
92:12 98:24 99:5,14
99:20 104:1,22,24
105:7,8,16 106:7
107:2,7,8,17,18,20
108:9,16,22 109:12
110:17,24 111:22
112:10,17,22 113:2
113:8 114:1,6,15,19
115:15,19,23 116:7
116:13 117:7,11,15
120:18 121:9,16
122:21,22 123:4,24
124:7,15 127:22
128:2,24 129:20
131:18 139:15,18
141:3 145:12 149:16
150:7 151:4 156:4
160:17 163:10,17
164:3 166:3,11,15
166:21 171:4
**PetSmart's** 114:11

123:10 126:1 128:1
128:13
**Pg** 3:2,3,3,4,7,8,8,9,9
3:10,10,11,11,12,12
3:13,13,14,14,15,15
3:16,16,17,17,18,18
3:19,19,20,20,21,21
3:22,22,23,23,24
**phone** 6:15 31:19
97:23 111:12,14
163:13
**pickle** 144:10
**pile** 44:15
**place** 21:3 49:13
107:22 134:19
169:11 171:13
**places** 138:12
**plaintiff** 1:5 2:5 171:5
**Plaintiff's** 13:8 14:2,4
15:1,15 35:13 38:3
41:12 60:19 67:8
83:3 113:6 114:23
141:6,10
**please** 9:6,14 20:2
25:24 27:16 48:15
61:17 90:22 113:8
127:7 154:18 160:9
**PLLC** 2:7
**plus** 8:5 11:7 16:11
107:24 115:7
**PO** 2:4
**point** 11:16 20:9
28:12 41:10 46:3
58:14 74:4,8 75:3
102:2 109:18 117:5
117:18,20 128:10
139:10 151:14
152:11 155:5 164:12
164:14
**pointing** 53:14,15
**Policicchio** 1:7,12
2:22 4:23 5:2 7:1,6
12:8,9 13:3 16:7
22:2,10 25:4,5,5
45:3 49:5 81:4
143:5 151:19 155:19
158:11 169:6 170:2
171:7,11,17
**Policicchio's** 25:19
26:10
**pop** 44:7 87:10
**portion** 67:12 68:16
113:19 124:18 126:2
132:10

**position** 25:19 119:12
**possibility** 69:16
**possible** 30:6 43:7,22
81:2 110:9
**possibly** 4:16 32:22
34:9 43:11,20 50:16
64:5 76:3 82:18
103:18 108:2 122:24
167:20 168:3
**pot** 138:10
**potentially** 160:8
**practice** 30:22 37:17
43:13 45:12 81:14
**preceded** 41:4
**preceding** 56:12
**preliminaries** 12:3
**premises** 49:13
**prepare** 69:4 86:1,3,6
86:11 141:9 167:5
**prepared** 68:13 71:19
72:4 141:3 166:16
**prepares** 69:7
**prequalification**
35:14 36:6
**Prescott** 151:19,22
152:1,7 159:20
**PRESENT** 2:12
**President** 12:4,7,14
49:8 143:22 152:1
**press** 160:11
**pretty** 24:14 97:12
101:8 146:2
**previous** 47:15 52:6
52:12,15 53:4 61:4
61:22 67:18 70:3
72:11 90:17 153:7
**previously** 17:12
29:21 52:18 62:20
73:24 78:17,23 79:7
79:21 83:13,20 84:5
91:5 96:24 108:7
112:1 114:4 129:24
150:10 156:14
166:13
**principal** 144:3
**print** 16:20 86:13
133:20
**prior** 7:12 18:23
56:18 62:9 66:4
126:5,9 145:14
**privy** 29:9
**probably** 17:9 19:24
32:4 35:6 57:12
66:3,6 86:7 89:20

100:15,22 102:2,3
105:6,13 108:5
114:8,20 124:18
127:1 128:7,7
131:11,16 132:8,20
133:9 136:8,24
139:21 143:19 147:3
149:17 150:9 156:6
**problem** 5:18,18
12:18 25:17 44:23
97:21,22 101:16
160:17 162:17
**problems** 102:18,20
162:13
**procedurally** 4:3
**Procedure** 4:4
**proceedings** 40:19
42:15
**process** 23:6 70:11
167:3
**processed** 148:15
**processing** 147:9
148:24
**produce** 15:20 17:7
19:1 30:2 142:20
168:1
**produced** 14:22 16:4
16:12,18 17:8 18:9
19:12,12 22:14,17
23:4,5,10 24:2 26:14
26:16,23 29:22,23
29:24 39:4,14 41:1
52:21 61:24 78:6
94:13 95:18 129:6
129:13 134:2
**producing** 17:4
**production** 14:5 18:23
26:19 30:14 35:5
39:18 81:20 94:17
**project** 19:23 20:17
21:22 31:4 45:14
46:6 56:19 57:9
88:20 89:7,11,20
91:11,13 92:8 104:1
104:21,23,24 105:7
105:8,16 106:5,7
107:8,14 112:4
113:22 117:16
124:10 128:2 146:21
151:5 154:14,17
155:7,11 166:3,6
**projects** 21:24 102:12
104:20 109:1 128:24
**protect** 8:24

**prove** 20:1
**provide** 14:11 147:15
**provided** 27:21 40:4
    63:2 118:13 139:4
**providing** 139:6
**provision** 47:6 93:18
    93:22 116:23 117:10
    118:22
**provisions** 117:4
**public** 1:13 169:5,22
    171:22
**pull** 17:15 29:4 56:8
    57:5 58:7 101:2
    142:5
**pulls** 59:23
**punitive** 125:13
**purge** 20:6 21:13
**purged** 21:10 22:6
    23:21
**purported** 18:24
**purpose** 17:3 49:20
**purposes** 12:23 30:10
    86:3 103:14 107:14
    122:14 128:11
    135:13 140:21
**pursuing** 128:2
**push** 69:14 87:4
**pushed** 69:12 71:12
    167:24
**put** 11:24 44:15,18
    63:12 88:18 102:13
    112:6 128:10 140:14
    145:4 149:13,18
    165:20
**putting** 44:18

**Q**
**qualification** 38:2,4
    42:2,22 43:5,8,14,16
    44:10 166:15,16
**qualified** 35:21
**quarter** 140:6
**question** 9:7,10,13,19
    9:21 13:23 22:15,18
    34:16 40:21 42:14
    42:18 55:11,17
    57:20 63:4 72:21,21
    73:2 77:11 81:1
    97:10,11 107:6
    111:1 120:5,13,15
    122:14 127:4,24
    128:5 131:8 139:10
    144:17 164:12
**question's** 9:18

126:13
**question/** 8:18
**question/answer** 8:19
    8:19
**questions** 8:13 13:10
    28:6 80:21 81:5
    82:20 85:18 129:5
    140:22
**quick** 13:8 60:13
    102:14 109:19
**QuickBooks** 36:18,20
    72:18,20 80:14
    82:21 83:4 84:14,20
    85:22 86:12,17,21
    87:3,15,24 88:10,22
    91:1,9 94:7 167:8,15
    167:16,17,19,22
**quickly** 135:19
**quiet** 6:17,18 97:12
**quit** 30:23,24 31:3
**quite** 153:1,10 167:20
    168:3
**quote** 32:5,6

**R**
**Rain** 30:20
**raised** 85:17
**ran** 17:17
**range** 103:18
**rarely** 35:9
**reach** 154:18 158:15
**reached** 162:8
**reaching** 158:12
**read** 18:2 114:13
    149:4,10 150:18
    151:10 155:24 159:6
    160:22 162:7 168:10
    171:12
**ready** 70:10
**real** 57:21 60:13
**really** 43:9 111:3
    117:24 120:5,12
    161:21
**realm** 111:8
**reason** 13:22 31:23
    34:21 37:16,19
    39:17 42:5 53:18
    60:6 81:1 108:18,21
    111:21 129:19 142:9
    161:9
**reasonable** 11:7 117:2
**reasonably** 10:7
**recall** 11:16 12:19,21
    13:18 17:15,17

27:22 31:5 32:1,2
    34:4 37:7,8,15 38:15
    43:1,6 44:2,8,13
    65:1,12 66:22 68:17
    68:23 69:1 71:8,13
    73:7,17 74:7,14,17
    74:21 75:20 76:10
    76:19 77:2,8,16,18
    79:17 80:8 82:16
    89:8,16,20 93:17,20
    93:21,24 96:3 106:4
    106:24 108:12
    109:16 111:14,17,24
    113:4 116:2 139:6
    139:11 151:16
    152:13 153:4 155:14
    157:22 158:22
    159:10 160:19 162:6
    163:12,13,15,16,18
    166:9
**receipts** 131:1
**receivables** 127:15
**receive** 3:5 45:13
    144:15 151:20
**received** 3:4,5 16:17
    22:5 38:16 47:17
    61:5 67:20 90:18
    120:21,22,23 139:14
    145:11
**receiving** 66:9 163:13
    163:16
**recognize** 44:5 136:17
    160:24
**recollection** 83:7
**reconciled** 167:9
**reconciliation** 135:5
**record** 6:8,9,13 8:17
    8:24 24:8 44:24
    45:1 62:5,6,8,14
    63:16 64:12 78:5
    80:17 81:15 94:11
    97:9 141:2
**recorded** 169:8
**records** 16:22 17:3,8,9
    17:17 18:8,9,12 19:1
    36:16 52:20 58:19
    61:24 62:12 66:15
    72:13,22,23 78:1,6
    79:10 80:3 88:21
    94:13 110:11 129:14
    130:10,12,15,21,22
    130:24 131:23
    132:23 133:6 134:6
    134:24 135:3,4,7,20

135:21 139:3,5,24
    151:8
**recourse** 20:4
**recover** 34:13
**reduced** 169:9
**refer** 13:1 42:9 44:17
    45:8 136:1
**reference** 17:13
**Referenced** 3:6
**referring** 14:20 39:21
    52:9 66:18 81:11
**reflect** 134:10
**reflected** 11:10
**reflective** 79:18
**reflects** 18:12 51:3
**refresh** 77:20 83:6
    84:23 165:4
**refreshed** 82:22
**regarding** 19:7 23:24
    24:6 38:11 94:2
    134:7 142:4 146:20
    150:15
**regular** 70:12 149:3
**regularly** 35:20
**reissue** 146:9
**related** 22:20 53:13
**relation** 132:20
**relationship** 119:19
**relative** 169:13,14
**release** 127:7 160:10
**released** 149:20
**relevant** 17:10 46:21
**rely** 23:18
**remaining** 11:20
**remember** 11:20
    17:20 19:8,10 33:14
    38:13 111:12,15
    139:18,20 153:2
    157:20 158:20 162:3
    167:6
**remind** 8:22 9:2
**remotely** 4:5
**remove** 5:6
**repeated** 33:12
**repetitive** 23:16
**rephrase** 9:14,17
    34:10 130:23
**replied** 144:20 157:19
**reply** 145:21 148:6
    157:21
**report** 80:15 86:12
    87:5 88:8
**reported** 94:4
**reporter** 3:4 8:12

97:12 168:9 169:5
    169:21
**reporting** 1:22 94:1
    109:9
**reports** 167:15,24
    168:1
**represent** 4:22 22:9
    78:5
**represented** 19:11
**representing** 5:1
**request** 4:7 10:4 37:1
    38:14 41:2 81:18,19
    81:23 133:23 143:12
    165:19
**requested** 32:14 38:10
    38:12 80:12 166:6
**requesting** 4:18 20:12
**requests** 14:4 17:6,7
    19:7 23:24 24:6
    77:24 81:16,18
    94:17
**require** 166:10
**required** 11:1 27:24
    64:9 66:8 129:20
    131:19
**requirements** 52:2
**requires** 105:24 123:3
**requiring** 15:20
**resolution** 44:8
    152:23 153:14
**respect** 46:4 113:22
    117:15
**respectively** 49:24
    150:16
**respond** 17:8 140:23
    144:13 156:17
**responded** 80:21
    157:11,14 158:20
    159:8
**responding** 82:20
    157:20
**responds** 148:13
**response** 14:18 19:22
    30:13 31:16 41:2
    80:13 148:2,21
    156:18 157:8,9
    158:11,17 165:19
**responses** 14:3,7,15
    14:17 15:1,6,11,15
    24:7 94:17
**responsible** 117:14
**rest** 53:21,21
**result** 8:17,20 61:20
    107:8

Policicchio, Daniel
August 9, 2018

retainage 32:14,15,20
  32:21,22 33:3 51:21
  52:3 107:24 112:2
  112:11,12,15 114:2
  114:11 115:10,12,16
  116:19 122:23,24
  155:24 156:4,6,10
  156:10
retained 112:2
retention 32:4 51:6,9
  51:14 56:24
retrieve 20:10 21:19
return 38:17,23 39:3
returns 39:10
review 35:14 36:7
  38:3,4 39:22 41:7
  42:3,23 43:5,8,14,16
  44:10 52:19 114:18
  114:20 134:14 149:1
  166:15,17 167:13
reviewed 15:14 118:3
  134:14
reviewing 13:18
Richard 31:14
Rick 143:4,21 144:1
  144:13 145:8,21
  146:5 161:5,13
  162:9
right 4:19 5:13 6:13
  11:16 16:22 17:18
  19:16 22:7 23:11,18
  27:8 29:21 30:18
  32:14 35:12,18 36:2
  36:12 39:23 40:13
  40:23 44:12,19,22
  45:3,19 46:14,19,22
  47:7,24 48:9 49:2,17
  50:8 51:1,12 53:13
  54:3 55:12 56:6
  58:9 60:7 61:11,16
  65:15 66:21 68:11
  69:11 70:7,13,17,22
  71:2,23 72:5 75:8,14
  77:6 81:13 82:11,19
  84:2,12 87:6 88:16
  89:2,8 91:11 92:20
  96:8 101:9 103:24
  105:20 107:18,24
  109:5,7 113:19
  114:12 115:10,17
  116:7,11,14 117:4,7
  118:14 121:6 123:7
  123:24 124:4,7
  125:10,14,23 126:1

128:14 129:8 134:4
  134:8,22 136:4
  137:7,9,21 141:4
  143:9,12,16 144:11
  144:19 145:9,19,23
  146:6,16 147:13,20
  148:11,16,22 152:9
  154:3 156:5,11
  157:1 158:4,18
  159:2 161:6 162:10
  163:2,4 164:3
right-hand 72:7
rights 113:21
RLS 19:6,8 22:11 23:8
  24:1 33:24 73:20,24
  74:4,11,18 75:2,7,10
  75:18 76:7 86:19
  87:13 94:23 95:1,13
  95:20 96:6,13
  106:22,23 118:24
  119:1,2,3,4,12,19,24
  120:10 124:24 125:3
  125:3,7,10,14 126:7
  141:17,19,22 142:10
  142:16 143:22 144:5
  145:3,8 146:16
  148:7 150:21 151:18
  152:7,12 153:2
  154:13 155:1,5,12
  157:24 159:23
  160:17 161:5,8
  163:4 165:3,5,17
RLS's 165:19
Road 1:22
Robert 2:2,3 4:11
  19:23 21:2 25:9,11
  143:4 154:21 157:13
  158:8
Robert's 29:4 34:17
  34:24
Robinson 2:13,13 5:4
  5:10,12,14 6:1,4,7
  6:11,21 10:12 11:3
  44:24 78:19,22 97:9
  97:15,19 154:13
  158:1,1 160:1,2,4
  163:19 168:13
Robinson's 157:12
  158:18
Roll-A-Shade 62:6
  63:7 64:4
room 70:4
roughly 11:23 104:3
  105:6 150:24

route 103:15
rules 4:4 8:10
run 136:10
running 141:24

_____

**S**

S 3:1
safe 148:14
safety 24:16
SAITH 168:15
sake 24:16 61:18
salaries 104:16,18,19
salary 104:22 105:1,3
  105:5,12
save 165:13
saved 58:19 87:22
savings 136:19
saw 57:10,14 95:9
  101:7
saying 17:4 34:13
  41:7 48:15 78:20
  81:15,17 130:7
  144:7 145:24 146:8
  147:12,23 148:8
  149:9 158:17
says 11:5 40:18 46:24
  47:9 49:4,8,19 50:23
  52:9 53:9 67:12
  72:10 73:23 79:6
  82:7 84:4 91:9
  113:18 115:1,5
  126:11 136:21
  146:14,18 147:4,5
  148:24 150:5 151:1
  152:5,22 153:12
  154:4,13 155:22
  158:9 159:4 160:6
  161:13
school 86:24
scold 8:23
scroll 91:19
se 104:6
search 22:22,23 30:5
  30:6 34:7,16
second 15:5,15 28:20
  53:7,9,11,15 56:24
  113:11 131:12 132:1
  140:18 142:6 146:13
section 40:16 69:15
  113:9
see 14:18 20:22 21:21
  26:6 27:6 28:5
  31:17 32:10 39:23
  40:15,21 42:3 46:11

47:18 48:19,22 52:6
  60:20 63:10 69:15
  69:21 72:6,10,11
  73:21 74:1 76:14,22
  77:20,22 78:3 79:8
  80:11 82:5,8,16,16
  84:20 90:3,20 91:6
  95:2 96:21,24 98:16
  99:15 103:16 113:15
  113:23 115:1,5,8,9
  116:23 117:12
  120:16 135:14 137:3
  139:3 142:8 143:1
  144:23 145:23 147:2
  148:2 150:17 151:24
  157:16 160:14,21
  162:21
seeing 17:21 19:8,10
  38:13 163:6
seeking 80:18
seen 31:10 69:18 95:9
  141:23 142:16
  150:14
send 56:3 146:9 148:9
sending 147:24 153:2
  162:3
sense 20:21 22:24
  23:1 57:1 88:5
  112:19
sent 17:21 35:9 36:6,9
  134:13 135:14
  146:19 147:24 157:1
  157:2 166:14
separate 87:13 107:17
  107:21 131:14
  132:17 137:18 165:7
separated 22:17
  153:22 154:2
September 47:23
  48:13
series 8:13,14 142:3
  165:3
server 21:20 22:3 58:5
servers 20:7
set 15:5 28:15 50:1
  55:22 169:16
settlement 75:11,17
  86:19 87:14 119:2
  125:4,12 126:4,9
  161:10,12 162:8
  165:24
settlements 88:17
seven 46:22 56:17
  127:16 143:14

seven-figure 102:4
  103:18
Shawn 146:16 147:2,6
  147:11,22 148:7,13
  148:24 149:7,23
  150:4,21 151:9
  152:19 154:12 155:5
  155:17 157:1,2,17
  157:19,24 158:9,16
  158:24
Shawn's 156:8 157:9
  157:21 158:21
sheet 38:16,21,23
  39:11,15 82:17,21
  167:7,14 170:1
sheets 36:10,15 37:12
  37:12,20 38:1,12
  39:18 166:7 167:5
Sheila 146:19 147:7
  149:12,15
Sheila's 147:13
shelf 50:18
shopping 160:11
short 26:14
short-term 132:11,13
Shorthand 169:5,21
show 12:22 13:7 17:10
  35:12 41:11 53:6
  60:18 63:16 67:7
  83:2 113:6 114:23
  118:10 126:23
  141:13 142:4,7
  143:18 146:3 148:5
  151:17 153:24 154:1
  157:23 158:23
showing 39:4 94:7
  137:5 159:11
shown 47:18 61:6
  67:21 72:17 80:3
  90:19 142:24
shows 87:10 137:1
  144:24
side 31:17 110:20,20
  129:2 132:18,18,19
sign 43:14 55:3 59:4
  59:24 60:2 70:14
  71:1,7,15,16 114:22
  168:11
signature 39:24 47:21
  61:9 67:12,21 68:10
  68:12,16,20,21
  69:20,23 71:16
  93:13,18,22
signed 13:10,24 14:9

14:12 40:2,8 41:6,14
41:15,15 42:2,22
43:4,7 44:10 47:23
48:2,3,12 54:14 61:7
61:13 67:24 90:5
114:20
**signing** 60:6 90:10
**similar** 54:23 168:1
**simply** 81:2
**sir** 7:7 15:19 83:5
88:24 92:1 105:11
105:17 107:4,15
108:17 127:20
130:23 136:3 137:20
158:22 162:14
**sit** 27:8 56:3 82:13
128:12 160:21
**sitting** 10:12 14:11
44:21 55:24 57:22
108:14
**situation** 32:1 33:16
**situations** 161:17
162:11
**six** 103:17 123:14
127:16
**six-figure** 102:3
**six-page** 25:1
**Sixty-three** 92:3
**skip** 45:6 147:20
**small** 57:11 119:4
124:18
**smaller** 105:1
**Smith** 143:4,21 144:1
145:8 146:5
**SOLUTIONS** 2:16
**somebody** 8:7 35:7,22
51:11 59:7 87:19,22
123:24 144:5 152:18
**somewhat** 42:8
114:16 155:9
**soon** 150:17
**sorry** 25:11,16 90:23
93:8 97:13 126:9
130:23 139:11
140:11
**sort** 10:20 46:13,21
**sound** 137:7,13
151:10,13
**sounds** 102:16,17
137:9
**South** 49:16
**spark** 152:3
**speak** 133:1
**speaking** 10:7 28:8

**Specialties** 64:6
**specific** 23:6 57:3
107:6,13 108:10
112:8 128:9
**specifically** 38:4 56:12
81:21,21 89:5
122:12 132:15
166:16
**specifics** 17:23 28:7
**specified** 169:12
**specify** 87:9
**speech** 163:1 164:2
**speed** 61:18 85:19
**spend** 81:12
**spent** 66:6 127:22
128:1,2,4
**spoke** 150:12
**spreadsheet** 71:11
72:17,19
**Sr** 1:8,12 2:22 7:1
49:5 158:11 169:6
170:2 171:8,11,17
**SS** 169:1
**staff** 25:21 104:10
124:10
**stage** 55:22
**stamp** 59:23 145:1
**stamps** 157:5
**stand** 9:19
**start** 4:2 17:1 98:13
**started** 48:14 100:13
101:11 162:9
**starting** 101:6
**starts** 60:22
**state** 69:22 105:19
169:1,6
**state's** 105:19
**stated** 40:2 50:2 55:6
90:11 96:23 98:10
98:15
**statement** 36:10,15
37:21 41:5 48:19,21
48:24 50:2,3 54:6,6
54:10,14,15,17,21
54:24 55:12 56:5,9
58:3,5 61:17,22 62:2
65:18 68:3,5,7,14,22
69:5 71:17,19,23
72:3,9 73:5,11,12,13
75:23 76:6,20 77:4
77:12 78:14 79:4,13
79:13 83:15,19 84:3
84:4,7,7 85:7,8,11
85:12 90:22 91:4

92:11,18,24,24
93:10,14,18,19,23
94:6 96:6,13 98:1,23
98:23 99:5,20 100:2
117:23 118:13
133:19 155:8 156:3
156:8 167:5,7,14
**statements** 17:13
37:12 38:1 80:24
100:11 108:18,21
130:17,18,19 133:18
136:10 137:6
**states** 1:1 71:20 76:21
91:5 146:2 152:10
171:1
**stating** 121:15,16
**status** 43:1 150:6
**statute** 120:1,4
**stenographically**
169:8
**Stevens** 152:19
**sticker** 142:8,9
**stickers** 27:24
**stickies** 27:14
**stipulate** 4:9
**stipulated** 10:10
**stipulation** 4:6,8,18
5:20
**stop** 146:8
**stopped** 30:23 31:1
37:17
**stops** 59:18
**store** 49:14 145:12
**straight** 81:7
**Street** 1:14 2:14
**strike** 17:1 69:3
105:22 131:7
**string** 143:8
**strings** 28:12 142:18
**stuff** 118:3
**sub** 22:23 23:6 65:24
112:3
**subcontractor** 19:15
19:18,20 22:16 23:3
23:7,23 26:23 27:20
27:23 29:12,24 30:8
30:20 33:10 50:19
51:1 52:13 55:3
56:17 102:23 103:6
112:9 119:17 123:22
**subcontractor's** 50:22
51:4
**subcontractors** 11:17
17:12 19:2,4 21:2

22:21 24:5 27:4,9
28:5 29:8,18 33:17
33:22,24 50:8,10,11
50:15 51:19,20 55:1
55:7,18 57:7 59:1
62:20 64:11 65:18
66:14 71:10 82:10
86:16 101:23 102:10
102:21 106:2 107:9
107:23 108:9,16,20
109:7,11 110:1,11
110:22 111:5,10,13
111:16,20 112:5,23
113:1,21 114:2,7
115:16,20 116:7,11
116:14 118:14,20
119:11 120:19 121:5
121:9,17 122:2,17
123:11 124:12
126:15,17 128:14
129:15 133:14 134:4
134:7 159:22 160:7
163:11
**subject** 10:3 119:18
150:5
**submission** 56:15
**submit** 56:11 57:7
126:21
**submitted** 39:16 56:15
78:17,23 79:21
134:13,15 144:14
**submitting** 121:2
**subs** 20:17 103:3,4
129:21
**subscribe** 171:13
**Subscribed** 171:19
**subset** 19:18
**substantial** 19:3,5
**substantially** 75:18
119:12
**subtract** 125:23
**successful** 42:17
**sued** 75:7 82:11 103:6
**sufficient** 122:7
**sufficiently** 40:5
**suggest** 28:11 30:11
**suit** 82:16
**Suite** 1:22 2:14
**suits** 40:16,19 42:15
**sum** 46:16
**summarize** 61:17
**summary** 46:21 63:1
63:3 84:14,20 85:23
87:3 88:10,23 91:1,9

94:7 125:22 126:11
129:17 136:5 141:2
156:3
**sums** 46:13
**superintendent** 31:6
57:9 89:1,3
**superintendents**
104:6,11 124:10
**supplemental** 14:3,7
14:15,18 15:6,15
**supplements** 13:23
**supplied** 72:13,22
**supplier** 27:23 79:20
79:23,24 80:1,6
**suppliers** 55:8 108:16
118:14 129:16
133:14 134:7 144:11
**Supply** 91:20
**support** 72:14
**supported** 72:15
79:10
**supporting** 78:1
141:18
**supports** 72:23
**supposed** 33:2 49:10
80:23 122:22
**sure** 6:6,14 8:20 22:24
24:14 25:12 34:12
34:17 51:14 52:1
55:9 64:2,3 66:9
80:15 94:18 120:24
129:21 133:23
134:16 145:22
148:19 152:16
153:10
**surprise** 6:17
**swear** 65:5
**swing** 59:11
**switched** 20:7
**swore** 64:21 65:9
74:19,20 92:12
120:18,21 121:8
**sworn** 4:1 7:2 40:3
48:19,21,24 49:1,7
54:6,6,10,13,14,17
54:21,24 55:12 56:5
56:9 58:3,5 60:23
61:16,21 62:2 65:17
68:3,4,7,13,21 69:4
69:22 71:17,19,22
72:2,9 73:11 76:20
79:4,13 80:24 83:15
84:4,7 85:8,11 90:22
91:4 92:11,24 93:9

93:14,18,19,22
98:23 99:14 100:11
118:12 169:7 171:19
**synopsis** 102:14
**synthesizes** 87:5
**system** 86:18 87:23,24
149:18 167:17

_____

**T**

**T** 3:1
**take** 9:24 13:8,13 14:1
14:5 21:3 25:23
27:14 28:8 38:17
39:20 40:11 44:20
45:4 57:24 60:12
68:4 71:5 80:2
81:13 84:12 85:19
90:1 92:6 93:9
99:12 103:1 104:22
105:1,3,12 107:17
109:18 113:8 116:21
118:11 126:6 137:22
142:1 148:16 149:3
159:13,16 164:21
**taken** 1:12 91:23
102:8 170:2
**takes** 87:4
**talk** 9:4 31:14 45:6
88:8 89:18 111:4
123:17,18 142:22
162:10
**talked** 30:21 54:2 57:9
84:13 89:22 114:9
118:24 119:7 121:7
127:15 150:22
162:13
**talking** 4:16 22:11
30:10 32:12 41:10
48:9 69:2 83:4
104:2 115:11 154:8
162:12
**talks** 162:9
**tallies** 128:23
**tally** 87:13 110:8
**tax** 38:17,23 135:13
**taxes** 38:8,18,18,22
39:9,15,16 167:10
**team** 89:21 111:4
112:4 149:3
**Tech** 30:20
**technologically** 34:12
**telephone** 4:5,10,19
5:8,20 10:11
**telephonically** 2:9

**tell** 8:11 17:22 20:2
31:19,22 78:4,8
95:17 100:16 111:21
114:24 140:20 142:1
147:16 152:3 161:8
**telling** 21:7 31:17
32:17 146:5 149:7
155:4
**ten** 8:5 51:7,22 136:11
**tenant** 160:7
**terminate** 20:4
**terminated** 20:3 21:10
23:22
**terms** 24:12
**testified** 7:3,19 17:24
19:13 37:5 61:19
63:11 65:15 78:8
79:12 108:7 114:4
122:21 129:24
166:13
**testify** 169:7
**testifying** 12:3,13
**testimony** 23:19 37:24
42:19 72:16 74:16
80:2 114:6 132:22
169:11
**thank** 5:4 12:2 14:23
25:16 29:19 60:15
97:19,19 109:21
116:21 118:24 147:6
151:8 161:23
**thanks** 147:12 149:4
154:20 159:17 168:6
168:7
**theirs** 30:22
**thing** 10:20 12:2
25:13 59:15,23 87:3
91:10 97:22 107:22
147:20 168:9
**things** 4:3 12:7,17
47:7 49:1 71:16
85:19 87:1 88:7,8
92:2 100:13 101:6
101:18 102:15,19
114:9 149:17,21
**think** 9:18 24:24
31:11 39:4 49:9
53:18,20,21 56:9
61:19 62:24 63:3,22
64:7 66:20 67:2
78:19 90:24 98:5
110:13 114:4,22
119:3 129:19 139:1
139:9 140:20 146:14

153:22 154:1,2
157:11
**thinking** 56:1
**third** 69:13,15,16
113:9,13,16 131:12
132:1 167:6
**thirty** 32:3
**thirty-five** 98:12
**Thirty-four** 153:6
**Thirty-seven** 91:16
**thought** 4:11
**thousand** 32:3 74:18
102:23
**thousands** 23:3 110:4
122:18 165:12,12,12
**three** 28:16,19 33:17
33:20,21,24 36:11
36:24 69:10 73:19
73:20 100:20,21
167:14
**throwing** 102:24
**Thursday** 1:15 158:10
**tier** 64:8
**time** 6:15 8:9,22,22
9:2,3 19:5,23 20:7
26:14 33:13 35:4
37:15 38:12 41:6
42:22 43:4 44:10
56:2,2 57:8,18 59:12
71:6 74:5,8,10,22
75:3,20 81:3,12
83:12 95:12,19,22
96:1,2,7,18 100:17
103:24 105:1,8
106:4,6 108:12
109:20 111:9,19
112:19 116:15 128:6
128:19 130:15 132:1
157:5,7 158:15
159:16 166:2 168:7
169:11 171:12
**timeliness** 111:6
**timely** 120:23
**times** 8:1 10:2 69:14
80:18 105:12 165:13
**title** 144:4
**today** 7:14 14:11
23:23 30:15 74:16
82:13 86:4 107:22
108:14 116:18
128:12 129:10
140:21 158:15 159:5
162:13 166:1
**told** 4:14 21:19 31:13

32:18 112:8,24
161:8
**tolerated** 160:12
**ton** 23:15
**top** 27:11 72:7 113:18
141:1 145:1 147:1
157:16
**total** 48:5 80:6,9 83:8
98:21 99:18 105:7
119:4 125:7 137:23
143:14
**totality** 142:21
**track** 38:6 55:9
**trade** 57:19
**trailing** 121:2
**transcript** 3:5 8:18
169:10 171:12,14
**transcription** 169:11
**transition** 149:12
**transpiring** 101:18
**travel** 4:13,15
**traveling** 16:18 59:8
70:16
**trial** 142:10,17
**tried** 131:5,6 163:10
**true** 7:10,11 15:17
16:1,15 25:6 33:8
35:5,6,22 36:7 38:7
38:19,24 39:12 40:4
40:6,9 41:16 45:14
48:3,7 49:14,15 50:3
50:5,6 51:16 52:3
54:11,12,15,16
58:19,20 61:7,8,14
62:18 64:19,21 65:6
65:7,10,11,17 67:9
68:1 69:5,8 74:10
75:18,21 77:6,14
79:1,15 83:15,24
84:5,6,8,17 85:2,7
85:11 90:6,7,9 91:15
92:9,10,14,15,20
93:2,4,13 94:4 95:6
96:12 97:7 98:3,21
99:1,7,22 100:4,14
101:11 110:24 114:2
114:3 117:16 119:9
119:20 121:10
122:23 125:7 134:23
152:12 155:7,20
161:3 166:17,21,22
167:2 169:11 171:14
**truly** 161:24
**trust** 106:2 107:2,8,13

120:1,3 122:1,5
123:4
**truth** 31:17 169:7,7,7
**try** 9:6,9 10:24 129:22
156:20
**trying** 8:23,23 20:9,10
21:19 44:21 57:4
86:21 103:9 125:24
126:14 131:22
134:20 137:3 142:18
145:4 149:14 164:14
**Tulsa** 2:8 49:17 150:7
152:6
**turn** 11:24 61:16 90:2
90:22 103:6 114:24
**turned** 19:2 127:12
**twenty** 11:19
**twice** 101:24 102:5,21
**two** 4:22 7:12 11:19
11:19,19 13:23 24:5
27:12 28:20 55:24
65:18 74:18 82:24
92:2 98:12 104:12
120:7 125:1 132:17
133:15 137:18,23
140:4,4 157:6
**two-page** 153:20
**type** 50:21 55:18
61:20 87:3 97:22
**types** 53:22
**typewriting** 169:9
**typical** 108:24

_____

**U**

**uh** 4:2,4,6,7,17,22 5:3
5:3,15 7:13 8:19,20
9:17 10:4,11,12 11:3
11:5,9,20 13:18 14:6
28:4 31:11,19,19
32:18 35:12 36:9,10
36:11 42:21 61:23
84:19 86:3 88:10,15
89:11 102:17,22
110:1,14,16 119:19
131:7 142:10 163:4
166:6
**uhm-uhm** 10:22
**uhn-uhn** 10:22
**ultimately** 8:17 102:1
102:11
**um** 4:2,3,5,21 7:6,12
7:16,19,23 8:1,11,13
9:13,24,24 10:1,10
10:12 11:3,4,9 12:11

12:23 13:18 15:23
16:17,21,24,24 20:4
24:7,10,24 25:2,3
27:21,22 28:2,2,6
29:13,15,22 30:19
30:20 31:4,10 32:12
33:10,11,17,22
34:10 36:6,9,14
38:10,17,22 41:3
42:2,19 45:5 46:4,9
47:4 48:5 49:1,4,5
51:6 52:5 58:18
61:21,23 62:3,9
68:13 70:20 73:19
75:16 77:11 78:7
84:19 85:17,22 87:1
88:9,15,21 89:1 91:4
93:9 94:13,15,19
97:23 99:13 100:9
102:16,17 103:24
104:1 105:18 107:20
107:21 108:7 110:9
110:13,15,16 114:10
114:14,22 115:15
117:3,13 119:3,18
119:22 120:7 122:14
123:2 124:3,24
125:1 126:13 128:19
129:14 130:4 131:6
134:2 141:21 142:3
142:4,14 143:21
145:23 146:4 152:5
153:1 155:4,10
162:21 163:2,16
164:1,23 166:5,7,19
167:13
**Um-um** 13:12 20:24
22:13 28:18 58:10
70:18 139:17
**uncontrollable** 161:18
**underlying** 111:5
**underneath** 49:19
50:8 152:21 162:7
**underside** 90:11
**undersigned** 47:10
67:13
**understand** 4:18 7:8
9:13 10:14 12:6,14
16:13 32:10 34:15
55:17 56:10 60:4
66:16 83:23 87:2
89:10 102:18 117:13
134:21 164:9,12
**understanding** 5:24

135:18
**understood** 5:12 9:22
**unfortunately** 161:19
**unidentified** 80:5,6
**UNITED** 1:1 171:1
**unpaid** 113:20 114:2
115:16 116:7,10
**untrue** 85:9
**unusual** 45:22 94:15
**update** 146:20 151:4
152:24 154:22
158:14 159:4
**updates** 154:19
167:22
**use** 28:1 45:23 46:1
55:6 58:11 86:10,21
103:14 114:1 115:16
138:4 164:1
**uses** 55:5
**utilized** 45:21

_____

**V**

**various** 11:17 49:1
64:6 65:21 101:22
102:5,9 103:8,8
128:24 129:15 131:6
138:12
**vendor** 28:1 63:1,3
125:22 126:11
129:17
**vendors** 64:9 66:8
131:18,19 146:20
**verification** 13:14,17
14:1,9
**verified** 13:11 14:8,13
14:23,24 15:13
**verify** 14:7 15:10,17
22:22 26:4 28:20
104:14
**verifying** 13:21
**versus** 109:8
**Vice** 152:1
**Victor** 89:1,10 104:7
123:20
**VIDEO** 2:16
**videographer** 2:16
8:12
**videotaped** 1:11 169:8
169:10 171:12
**view** 162:22
**violate** 160:8
**violation** 120:1
**Virginia** 1:22
**Visa** 130:6,13,16

131:9,16,24 132:14
132:15,16,24 133:7
133:12
**vs** 1:6 171:6

_____

**W**

**W** 2:3
**wait** 9:6,9 10:4 57:12
140:3
**waiting** 145:15 155:6
**waive** 168:13
**waiver** 160:10
**want** 9:4 13:13 14:1,6
14:10 25:12 29:4
44:17 45:3 51:19
57:22 62:22 66:13
101:2 102:19 109:17
113:12,13 126:15,16
136:19 141:1,21
148:9
**wanted** 36:1 43:17
127:24
**wants** 5:16 51:10 52:1
129:1
**wasn't** 23:7 73:13
76:8 103:2 120:20
122:5 128:2 151:2
**watch** 157:5
**watches** 59:24
**way** 5:15 14:8 24:18
27:3 40:12 41:22
45:11,13 52:17 53:2
80:22 100:13 119:14
120:16 121:20,22
130:13 149:13
157:16,17
**ways** 120:8 149:20
**we'll** 10:7 12:17 41:22
66:17 72:20 81:24
145:22,23 168:13
**we're** 5:17 8:11,16 9:3
10:3 20:8,10 21:19
22:11 24:18 28:10
28:16 30:15 44:18
45:6,9 48:9 53:3,4
69:2 74:24 80:15
86:4 93:6 100:19
101:23 104:2 108:3
109:7 110:8 115:11
118:4 123:18 125:23
125:24 140:21
142:22 143:14
144:10 145:4,15
146:12 150:3 153:6

156:24 159:12 164:2
167:11
**we've** 10:10 13:7
24:23 33:5,17 42:20
44:17 54:2 60:18
80:18 85:17 112:20
118:24 122:15 150:9
153:1 166:1
**week** 149:2 150:1,12
151:3 154:15,19
159:6
**well-based** 115:24
**went** 86:24 90:24
103:12,15 123:10
126:1,18,23 128:9
128:13 139:21
149:16
**weren't** 4:15 13:24
22:14 111:22 112:9
113:1 121:6
**whatever's** 46:13
134:17
**WHEREOF** 169:16
**Whitefield** 151:18
**wife** 25:5 26:10 143:5
155:20 158:3 159:1
**willfully** 119:23 120:9
**Williams** 89:1,10
104:7 123:20
**wise** 164:18
**withheld** 39:17
**witness** 2:21 4:1 7:20
7:21 8:8 13:16
14:14 15:12 19:22
23:13 26:1 28:9
34:15 39:6 43:1,11
43:20 65:1,20 73:16
74:7,14 75:5 76:3,10
77:8,16 78:23 79:17
84:10 93:4 95:9
96:10,17 98:5 99:9
99:24 100:6 106:10
107:4 108:2,24
109:15 110:19 113:4
116:2 117:18 119:14
120:3,12 121:12,20
122:4,11 125:16
129:10 139:11
155:14 160:19 163:6
164:6 166:9 168:6
168:12,14 169:11,16
**Wofford** 31:11,20,22
32:18
**won** 103:7,8 161:21

162:22
**word** 58:1,2 69:2 89:2
152:23 153:13
**work** 30:9,12 35:21
36:1 47:12,15 48:14
48:16 50:22 55:23
56:19 60:24 61:4
66:5 67:15,18 81:8
90:13,16 102:11
105:19 111:11
126:20 127:5,10
**worked** 30:24 134:11
**working** 104:21 110:7
122:20
**works** 59:7 60:3
**worth** 38:11
**wouldn't** 166:24
**Wrecking** 31:8 72:10
72:15,24 73:2,13
94:2,8
**write** 87:23 157:6
**writing** 157:24 161:14
**written** 30:7 80:22
156:22
**wrong** 100:13 101:6,8
157:18 158:7
**wrongfully** 119:23
120:10
**wrote** 30:20 31:12
88:12,23 158:17
**www.qareportingin...**
1:24

_____

**X**

**X** 2:20 3:1
**XYZ** 57:10

_____

**Y**

**yeah** 6:5,16 13:5
30:18 31:11 55:21
70:6 71:22 100:21
101:4 108:4 126:9
126:12 129:10 130:5
135:23 136:13
138:19 140:7,12
141:12 145:2 146:14
156:6 157:5 159:23
**year** 27:12 38:9,9,17
39:15 82:23 145:14
167:9,21
**yearly** 38:8
**years** 8:5 27:13 36:11
36:24 38:24 39:12
82:24 168:2

Policicchio, Daniel
August 9, 2018

**Yep** 97:18
**yesterday** 16:19 17:21 129:6,7,7,14 134:2

---

**Z**

**zero** 74:1

---

**0**

**084-002601** 169:21

---

**1**

**1** 3:4,8,13 41:23 45:8 52:20,23,24 53:5,10 53:13 70:16 143:15 146:18 169:8 171:13
**1:01** 109:22
**1:18** 109:22
**10** 3:11 29:6 36:13 41:23 51:8 53:6,12 115:1
**10,075.70** 62:4
**10/31/2016** 56:16
**10:20** 1:16
**100** 2:3 57:17
**100,000** 12:1
**10122** 49:16
**105** 1:22
**105,000** 75:2,21
**105,219** 74:1,12 75:18 75:24 76:7
**108** 2:14
**108,235.99** 98:16 99:1 99:7
**109,654.97** 124:3
**1099** 104:5,7 123:23
**11** 3:9,11,16,21,23 29:7 36:13 41:17 60:19
**11/3** 140:18
**11/30** 144:15
**11/31** 140:12
**11:46** 60:16
**11:56** 60:16
**111,165.75** 72:15,24 73:4,11 94:12
**113** 3:10
**114** 3:14
**118** 3:3
**11th** 40:9 41:16 146:4
**12** 3:9 29:7 36:13
**12/6** 140:12,19
**120** 151:6
**126,939.70** 115:7
**12th** 127:8

**13** 3:7 29:7
**135,810** 82:8,14 83:14 83:21
**136,000** 125:2 126:6
**13th** 32:11 86:7,8 87:8
**14** 3:8,12 29:7 83:3,6 84:19 85:21 88:11 95:15,16 97:5,6 98:6 98:19 99:9,17,24 100:6 123:15
**14,035.05** 76:22 77:5 77:13 78:10,14
**141** 3:12
**142** 3:14
**143** 3:15
**145** 3:15
**145,000** 11:22
**145,831.50** 72:11 73:1 73:6 94:9
**146** 3:16,16
**147** 3:17,17
**148** 3:18,18
**15** 3:8,12 29:7 141:6 141:10
**150** 3:19,19
**150,000** 125:2
**151** 3:20
**151,335** 99:15,21 100:4
**152** 3:20
**153** 3:21
**154** 3:21
**155** 3:22
**156,667.98** 11:7,14
**157** 3:22
**158** 3:23
**159** 3:23
**15th** 169:16
**16** 3:13,20,22 29:7 67:8 139:8
**16,649.99** 96:24 97:3 98:2
**160** 3:24
**165,657.60** 95:2,14 96:8,14
**168** 169:8
**169** 171:13
**17** 3:3,20 29:7 66:4 135:13 139:1
**17-CV-0361-** 1:6 171:6
**17,910** 62:13 64:14 65:6 84:17 85:9,13
**17th** 158:13 161:5

**18** 3:11,13,15 29:9,13 90:2
**18th** 2:3
**19** 3:17 29:9
**19,350** 79:11 80:4
**1st** 1:14 2:14 61:14 87:8 136:6 137:2

---

**2**

**2** 3:7,12 13:8 40:11,15 41:23 53:20,24 54:7 54:10 56:14 60:10 70:20 122:8 136:22 145:22 147:5
**2,528** 62:6
**2,912.58** 62:7
**2:41** 165:1
**2:58** 165:1
**20** 3:2,14,18,19 29:9 66:4 104:12 114:23 171:20
**200** 16:19 134:21,22 134:24
**200,000** 11:18
**2010** 36:11
**2012** 36:11 37:6,13,17 38:13,19,24 166:5 166:24 167:4 168:1
**2013** 40:9 41:16,17 167:19
**2014** 167:19
**2015** 167:19
**2016** 47:23 61:14 68:1 87:8 139:3,5 140:5,6 141:15 167:19
**30-** 145:16
**2017** 17:18,18 32:11 37:6 38:13,19,24 39:3,8 90:8 136:6,6 136:9,14 137:2,7 138:21,22 155:10 158:24 166:5,24 167:4,19
**2018** 1:15 11:8 86:8,9 87:8 169:17 170:2
**20th** 150:4,21 151:6 151:15
**21** 3:14 29:9 142:8,13 142:24
**21,000** 150:11
**21,330** 62:12 64:17 83:10 99:18
**21,780** 74:4 95:21 141:18,20
**2192-4326** 14:18

**22** 3:15,17 29:10 143:18
**22nd** 153:9 154:12 155:10,17 156:2,21 156:23
**23** 3:14,15,22,23,24 29:10 145:7
**24** 3:2,16 29:10 146:3
**25** 3:16 29:10 104:12 146:11,11,15 147:1
**26** 3:17 29:10 147:19
**26th** 156:19
**27** 3:3,17 29:10 147:22 148:6
**27th** 68:1
**28** 1:14 2:14 3:18 29:10 148:6
**2875** 137:12
**2883** 138:15
**29** 3:18 29:10 148:20
**29th** 158:13
**2nd** 147:23 148:8

---

**3**

**3** 3:8,16,19 14:2 15:1 41:23 60:11,20,22 70:24 100:12,18,24 101:7 141:14 144:23 147:3 151:8
**3.2** 40:16
**3:04** 168:16
**30** 3:19 20:6 21:10 23:21 29:10,13 150:3,16
**30-** 145:16
**30(b)(6)** 13:1
**305** 40:14
**30th** 47:23 48:13,15 141:15,19 157:24 158:10,21
**31** 3:19 29:17 150:20
**31st** 71:20 90:8 136:6 137:2
**32** 3:20 151:17
**33** 3:20 152:16
**34** 3:21 153:7 154:3
**34-page** 28:2
**35** 3:9,21 29:17 154:11 157:2,9
**36** 3:22 155:16 156:8 156:24 157:10
**37** 3:22 157:23
**37,186.77** 91:15
**38** 3:23 158:23 159:9

**39** 3:23 159:11,19
**3rd** 148:14,21 158:24

---

**4**

**4** 3:8 15:9,16 39:20 41:23 67:9 68:7,14 68:22 69:5 71:4,18 72:3,8 73:23 74:11 74:20 75:24 76:7,21 77:5 78:15 79:14 82:5 83:13,20 84:16 90:24 91:5 92:12 93:1 94:4 95:5 101:9 116:22 131:20 143:15
**4:18** 157:3
**40** 3:24 24:15 160:23
**405)232-0803** 2:5
**41** 3:9
**45** 3:2,4,10 24:17,20 24:24 25:23 26:22 30:17
**45-day** 145:16
**46** 3:3,5 27:16,17 30:18,18,19 31:7
**47** 3:3,5 118:6,7,11
**47,542** 64:17,22
**47,542.50** 62:11 65:10
**48** 152:22 153:12 154:4
**4th** 145:20

---

**5**

**5** 3:18 29:1 41:23 90:2 93:10,15,19,23 94:3 94:24 95:13 96:2,8 96:15,21 98:2,9,14 99:14 131:20
**50** 57:17
**50,000** 104:14
**5281** 135:22
**53** 3:11
**5320** 136:16
**55** 105:6
**56** 11:23
**56,000** 11:23
**5600** 16:11
**58** 105:6
**58,000** 105:6

---

**6**

**6** 3:4,9,10,11,12,21 29:1 35:13,17 38:3 39:23 41:23 113:9

Q & A Reporting, Inc.
815-477-2230

Policicchio, Daniel
August 9, 2018

167:12
**6:18** 157:1
**60** 3:11 146:21 150:16
**60,000** 95:4
**600,000** 108:10
**60014** 1:23
**60134** 2:14
**63,500** 92:9 98:21
**64,000** 92:3
**67** 3:13

---
**7**

**7** 3:3,7,9,10,13,14,15
  29:6 41:12,19,23
  42:21 44:4
**7-168** 2:24
**702** 46:19,22 67:11
**7115** 1:22
**73** 66:2
**73101-0868** 2:4
**74,000** 66:2
**74133** 2:8

---
**8**

**8** 3:10 29:6 41:23
  113:7 115:5
**8/9/2018** 24:21 27:18
  118:8
**815)477-2230** 1:23
**83** 3:12
**86** 91:16
**868** 2:4
**87,645.60** 79:8,15
  80:7 91:6 92:14,19
  93:2
**88** 91:17,18
**88-2** 24:9 25:13
**8th** 15:24 129:11

---
**9**

**9** 1:15 3:8,10 29:6
  41:23 45:8 114:24
  170:2
**9.1** 117:23
**90** 3:13 146:21
**904,000** 108:4 123:14
  123:18
**918)382-9200** 2:9
**9343** 2:8
**95th** 2:8
**99** 35:6 45:24
**9th** 11:8 100:23 101:1
  129:10 145:9,21